Attachment 4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
* * * * * * * * * * * * * * * *
W.R. Individually and on behalf  *
of her minor son, JOSEPH R.;     *   CIV. 302CV429(RNC)
SUSAN K.; M.O., individually     *
and on behalf of her minor son,  *
OMAR S.; and on behalf of all    *
others similarly situated,       *
        PLAINTIFFS,              *
                                 *
                                 *       ORIGINAL
vs.                              *
                                 *
                                 *
CONNECTICUT DEPARTMENT OF        *
CHILDREN AND FAMILIES, and       *
DARLENE DUNBAR, in her official  *
capacity as Commissioner of the  *
Connecticut Department of        *
Children and Families ,          *
        DEFENDANTS.              *
* * * * * * * * * * * * * * * *
```

CONFIDENTIAL

------------------------------------------------

DEPOSITION OF: SANDRA RUDIN

------------------------------------------------

Taken before Sarah B. Najemy, Licensed Shorthand Reporter (#00069) and Notary Public in and for the State of Connecticut, pursuant to the Federal Rules of Civil Procedure, at the offices of Attorney General, 110 Sherman Street, Hartford, Connecticut, on September 18, 2003 at 10:10 a.m.

BRANDON SMITH REPORTING SERVICES
44 Capitol Avenue
Hartford, CT 06106
Tel:  (860) 549-1850
FAX:  (860) 549-1537

1      leave prematurely. She had to be moved because
2      of some behavioral issues. Others in the
3      shelter were feeling threatened by her.
4   Q  So, the shelter couldn't handle her aggressive
5      behaviors?
6   A  Correct. So, at that point, she went to the
7      Salvation Army shelter in Waterbury.
8   Q  How long did she stay there?
9   A  She was there from March 19th of 2001 to June
10     28th, 2001.
11  Q  Was her placement there based on the
12     recommendation of the treatment team?
13  A  That's another emergency shelter program. It's
14     a temporary stop gap for kids while we're
15     looking for a placement.
16  Q  But you didn't answer the question. Was her
17     placement there based on her treatment team
18     recommendation?
19  A  It was recommended that that was the only
20     placement available to her.
21  Q  Did the treatment team believe her needs could
22     be met at the shelter at Salvation Army in
23     Waterbury?
24  A  I don't think we were looking at that. I think
25     we were feeling like her basic needs of housing

CONFIDENTIAL
9/18/2003                W. R. Individually vs Ct. Dept. of Children                Sandra Rudin

Page 116

| | | |
|---|---|---|
| 1 | | Hospital? |
| 2 | A | The staff of Wellspring, in conjunction with us. |
| 3 | | She was exhibiting unsafe behaviors. They felt |
| 4 | | she needed to be brought to the emergency room |
| 5 | | at the hospital. |
| 6 | Q | Okay. So, they took her to the ER? |
| 7 | A | Yes. |
| 8 | Q | And then was she admitted? |
| 9 | A | One day. August 18 to August 19, '02. |
| 10 | Q | Okay. And were any recommendations made by the |
| 11 | | hospital when they discharged her? |
| 12 | A | They felt that she required a structured |
| 13 | | placement. |
| 14 | Q | Was there such a placement available? |
| 15 | A | Not at that time, no. |
| 16 | Q | So what did she do? |
| 17 | A | She went home. |
| 18 | Q | Was it in her best interest to return home? |
| 19 | A | She wanted to go home. |
| 20 | Q | That's not the answer to the question. |
| 21 | A | Was it in her best interest to go home? |
| 22 | Q | Yes. |
| 23 | A | Probably not. |
| 24 | Q | Did any DCF staff take a position on whether she |
| 25 | | should return home? Let me rephrase the |

CONFIDENTIAL
9/18/2003        W. R. Individually vs Ct. Dept. of Children        Sandra Rudin

Page 130

| | | |
|---|---|---|
| 1 | A | I haven't had anyone who's been in what I |
| 2 | | consider an institution. |
| 3 | Q | And you don't consider any of your clients to |
| 4 | | be institutionalized? |
| 5 | A | No. |
| 6 | Q | Are you familiar with the term community-based |
| 7 | | placements? |
| 8 | A | Yes. |
| 9 | Q | And what does that word mean to you? |
| 10 | A | Well, placements out in a community, with |
| 11 | | preference to a child's own community, where all |
| 12 | | of the services can be met through the |
| 13 | | community. And it could be a number of -- it |
| 14 | | could be foster care, therapeutic, IPP, |
| 15 | | professional foster care. It could be a group |
| 16 | | home type setting. Any type of a placement in a |
| 17 | | community where they can get the services. |
| 18 | Q | Do you believe there are any community-based |
| 19 | | placements in Connecticut now for children with |
| 20 | | mental health issues? |
| 21 | A | I believe that there are. I mean, we have |
| 22 | | community-based placements. |
| 23 | Q | So, in your opinion the foster home placements |
| 24 | | that you've talked about today are |
| 25 | | community-based placements? |

1  A   Yes. I wouldn't say for severe mental health
2      issues. But I would say we have a lot of
3      children with mild mental health issues, or
4      behavioral difficulties, who can remain in a
5      foster care setting in the community, attend
6      school in the community, get all the services
7      they need.
8  Q   Do you think it's possible for someone like
9      Shonna to be in a community-based placement?
10 A   That's a difficult question to answer. I think
11     if we had one available to us, maybe. But we
12     don't. We have limited resources, as I said. I
13     don't believe we have any.
14         MS. GAILOR: Just for the record
15         Catherine Williams needs to leave. I'll be
16         done in just a few minutes.
17 BY MS. GAILOR:
18 Q   Have you participated in any trainings with
19     respect to children in residential placements?
20 A   I can't say that I've had trainings. I think
21     I've been to a number of residential facilities
22     when I was a social worker. And I know how they
23     operate. I know the type of population they
24     have. I work with a number of residential
25     facilities. And I think it's more by experience

Page 133

1   CERTIFICATE OF REPORTER

2   I, Sarah Najemy, a Notary Public duly

3   commissioned and qualified in and for the State of

4   Connecticut, do hereby certify that pursuant to

5   Notice, there came before me, on the 18th day of

6   September, 2003, the following named person, to wit:

7   SANDRA RUDIN, who was by me duly sworn to

8   testify to the truth and nothing but the truth;

9   that she was thereupon carefully examined upon her

10  oath and her examination reduced to writing under

11  my supervision; that this deposition is a true

12  record of the testimony given by the witness.

13   I further certify that I am neither attorney

14  nor counsel for, nor related to, nor employed by

15  any of the parties to the action in which this

16  deposition is taken, and further that I am not a

17  relative or employee of any attorney or counsel

18  employed by the parties hereto, or financially

19  interested in the action.

20   IN WITNESS THEREOF, I have hereunto set my

21  hand on this 6th day of October, 2003.

22  Sarah B. Najemy, _____

23  Notary Public, License No. (#00069)

24  My commission expires: 8/31/05

25

Attachment 5

Case 3:02-cv-00429-RNC   Document 60-3   Filed 05/02/2005   Page 9 of 12

W. R., et al vs. State of CT
9/3/2003                                                           Cathleen Connolly

Page 1

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
 2
 3
 4                                          )
      W.R., individually and on behalf      )
 5    of her minor son, JOSEPH R.;          )
      SUSAN K.; M.O., individually and      )
 6    on behalf of her minor son, OMAR      )
      S.; and on behalf of all others       )
 7    similarly situated, and               )
      JEANNE MILSTEIN, CHILD ADVOCATE       )
 8    OF THE STATE OF CONNECTICUT,          )
                       Plaintiffs           )
 9                                          ) Civil Action
      Vs.                                   ) No:302CV429 (RNC)
10                                          )
      CONNECTICUT DEPARTMENT OF CHILDREN    )
11    AND FAMILIES, and DARLENE DUNBAR,     )
      in her official capacity as           )
12    Commissioner of the Connecticut       )
      Department of Children and            )
13    Families,                             )
                       Defendants           )
14                                          )
15
              Deposition of CATHLEEN CONNOLLY, taken
16    before Judith L. Kline, Certified Shorthand
      Reporter/Notary Public in and for the State of
17    Connecticut, pursuant to notice, at the offices of The
      Attorney General, 110 Sherman Street, Hartford,
18    Connecticut, on September 3, 2003 at approximately
      12:34 p.m.
19
      APPEARANCES:
20    FOR THE PLAINTIFFS:
          DOUGLAS CROCKETT, CHIEF COUNSEL
21        ANNE LOUISE BLANCHARD, ESQUIRE
          CONNECTICUT LEGAL SERVICES
22        872 Main Street
          P.O. Box 258
23        Willimantic, CT 06226-0258
24    FOR THE DEFENDANTS:
          SUSAN T. PEARLMAN, ASSISTANT ATTORNEY GENERAL
25        110 Sherman Street
          Hartford, CT 06105
```

Case 3:02-cv-00429-RNC    Document 60-3    Filed 05/02/2005    Page 10 of 12

W. R., et al vs. State of CT

9/3/2003                                                    Cathleen Connolly

Page 37

1  have a narrative by my supervisor, saying child will
2  be returning from IOL to CCP. We are continuing to
3  explore appropriate placement services.
4           MS. PEARLMAN:  Could I clarify, Ann?  Are
5  you talking about the Probate Court hearing on
6  December 20th, with IOL's recommendation, where it was
7  discussed?
8           MS. BLANCHARD:  No.  I think we're talking
9  about -- I'm talking about Superior Court.
10          MS. PEARLMAN:  Oh, Superior Court.
11    Q   (By Ms. Blanchard)  Let me ask you a different
12  question.  There was a time when CCP refused to take
13  Joe back; isn't that right?  They refused to reaccept
14  him?
15    A   They had said he was discharged.  And then
16  there was a period where we had to have discussions
17  about having them take him back.
18    Q   Right.  And there was a Court Order that led to
19  him going back to CCP?
20    A   Right.  Well, I think they were going to before
21  that.  But, yes.
22    Q   Okay.  And you don't recall the recommendations
23  by the Institute of Living staff, other than the fact
24  that they disagreed with the idea of foster care?
25    A   Right, I don't.

Case 3:02-cv-00429-RNC    Document 60-3    Filed 05/02/2005    Page 11 of 12

W. R., et al vs. State of CT
9/3/2003                                                          Cathleen Connolly

Page 38

1   Q   Okay. And were they recommending, if you
2   remember, residential programming, or were they
3   recommending group home, or --
4   A   I sort of feel like I need just their letter,
5   because that's very clear what their letter was.
6   I recall meeting with Joe.
7           MS. PEARLMAN: Hold on. Are you about to
8   give her a letter that would help?
9           THE WITNESS: Thank you.
10  Q   (By Ms. Blanchard) (Hands document to
11  witness.)
12  A   This is what I remember; the calls about the
13  problems there. Okay. The recommendation was a
14  specialized therapeutic community based supervised
15  living situation, where staff are available 24 hours a
16  day to provide clinical services, and to ensure that
17  rules are enforced -- oh, be sought.
18          THE COURT REPORTER: Are enforced or be
19  sought?
20          THE WITNESS: Are enforced -- I cut into
21  the -- they were recommending a specialized
22  therapeutic community based supervised living
23  situation, with 24 hour staff.
24  Q   (By Ms. Blanchard) And is that your
25  recollection of the Institute of Living's

Case 3:02-cv-00429-RNC   Document 60-3   Filed 05/02/2005   Page 12 of 12

W. R., et al vs. State of CT

9/3/2003                                          Cathleen Connolly

Page 39

1    recommendations?

2    A    Yes.

3    Q    Okay. And did DCF find that placement for Joe?

4    A    No.

5    Q    Why not?

6    A    Because that isn't available. That isn't

7    available.

8    Q    Okay. If it was available, do you think you

9    would have placed him there, based on IOL's

10   recommendations?

11   A    I don't know. I don't know. I guess so.

12   Q    Okay. So the placement wasn't available, so

13   instead he went back to CCP?

14   A    Yes.

15   Q    Okay. And during that time after he was at

16   CCP, there was an action in Probate Court; do you

17   remember that?

18   A    In December?

19   Q    Uh-huh.

20   A    (Nods head.) This was supposed to help me.

21   Q    Tell me what you remember about the Probate

22   Court action?

23   A    In December?

24   Q    Yes.

25   A    The judge ordered an appropriate placement by