Attachment 4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
* * * * * * * * * * * * * * * *
W.R. Individually and on behalf  *
of her minor son, JOSEPH R.;     *   CIV. 302CV429(RNC)
SUSAN K.; M.O., individually     *
and on behalf of her minor son,  *
OMAR S.; and on behalf of all    *
others similarly situated,       *
          PLAINTIFFS,            *
                                 *
vs.                              *      ORIGINAL
                                 *
                                 *
CONNECTICUT DEPARTMENT OF        *
CHILDREN AND FAMILIES, and       *
DARLENE DUNBAR, in her official  *
capacity as Commissioner of the  *
Connecticut Department of        *
Children and Families ,          *
          DEFENDANTS.            *
* * * * * * * * * * * * * * * *
```

CONFIDENTIAL

---

DEPOSITION OF:   SANDRA RUDIN

---

Taken before Sarah B. Najemy, Licensed Shorthand Reporter (#00069) and Notary Public in and for the State of Connecticut, pursuant to the Federal Rules of Civil Procedure, at the offices of Attorney General, 110 Sherman Street, Hartford, Connecticut, on September 18, 2003 at 10:10 a.m.

BRANDON SMITH REPORTING SERVICES
44 Capitol Avenue
Hartford, CT 06106
Tel:  (860) 549-1850
FAX:  (860) 549-1537

| | | |
|---|---|---|
| 1 | | leave prematurely. She had to be moved because |
| 2 | | of some behavioral issues. Others in the |
| 3 | | shelter were feeling threatened by her. |
| 4 | Q | So, the shelter couldn't handle her aggressive |
| 5 | | behaviors? |
| 6 | A | Correct. So, at that point, she went to the |
| 7 | | Salvation Army shelter in Waterbury. |
| 8 | Q | How long did she stay there? |
| 9 | A | She was there from March 19th of 2001 to June |
| 10 | | 28th, 2001. |
| 11 | Q | Was her placement there based on the |
| 12 | | recommendation of the treatment team? |
| 13 | A | That's another emergency shelter program. It's |
| 14 | | a temporary stop gap for kids while we're |
| 15 | | looking for a placement. |
| 16 | Q | But you didn't answer the question. Was her |
| 17 | | placement there based on her treatment team |
| 18 | | recommendation? |
| 19 | A | It was recommended that that was the only |
| 20 | | placement available to her. |
| 21 | Q | Did the treatment team believe her needs could |
| 22 | | be met at the shelter at Salvation Army in |
| 23 | | Waterbury? |
| 24 | A | I don't think we were looking at that. I think |
| 25 | | we were feeling like her basic needs of housing |

Page 116

```
 1          Hospital?
 2    A     The staff of Wellspring, in conjunction with us.
            She was exhibiting unsafe behaviors. They felt
            she needed to be brought to the emergency room
            at the hospital.
 6    Q     Okay. So, they took her to the ER?
 7    A     Yes.
 8    Q     And then was she admitted?
 9    A     One day. August 18 to August 19, '02.
10    Q     Okay. And were any recommendations made by the
            hospital when they discharged her?
12    A     They felt that she required a structured
            placement.
14    Q     Was there such a placement available?
15    A     Not at that time, no.
16    Q     So what did she do?
17    A     She went home.
18    Q     Was it in her best interest to return home?
19    A     She wanted to go home.
20    Q     That's not the answer to the question.
21    A     Was it in her best interest to go home?
22    Q     Yes.
23    A     Probably not.
24    Q     Did any DCF staff take a position on whether she
            should return home? Let me rephrase the
```

Page 130

| | | |
|---|---|---|
| 1 | A | I haven't had anyone who's been in what I |
| 2 | | consider an institution. |
| 3 | Q | And you don't consider any of your clients to |
| 4 | | be institutionalized? |
| 5 | A | No. |
| 6 | Q | Are you familiar with the term community-based |
| 7 | | placements? |
| 8 | A | Yes. |
| 9 | Q | And what does that word mean to you? |
| 10 | A | Well, placements out in a community, with |
| 11 | | preference to a child's own community, where all |
| 12 | | of the services can be met through the |
| 13 | | community. And it could be a number of -- it |
| 14 | | could be foster care, therapeutic, IPP, |
| 15 | | professional foster care. It could be a group |
| 16 | | home type setting. Any type of a placement in a |
| 17 | | community where they can get the services. |
| 18 | Q | Do you believe there are any community-based |
| 19 | | placements in Connecticut now for children with |
| 20 | | mental health issues? |
| 21 | A | I believe that there are. I mean, we have |
| 22 | | community-based placements. |
| 23 | Q | So, in your opinion the foster home placements |
| 24 | | that you've talked about today are |
| 25 | | community-based placements? |

1   A   Yes. I wouldn't say for severe mental health
2       issues. But I would say we have a lot of
3       children with mild mental health issues, or
4       behavioral difficulties, who can remain in a
5       foster care setting in the community, attend
6       school in the community, get all the services
7       they need.
8   Q   Do you think it's possible for someone like
9       Shonna to be in a community-based placement?
10  A   That's a difficult question to answer. I think
11      if we had one available to us, maybe. But we
12      don't. We have limited resources, as I said. I
13      don't believe we have any.
14          MS. GAILOR: Just for the record
15          Catherine Williams needs to leave. I'll be
16          done in just a few minutes.
17  BY MS. GAILOR:
18  Q   Have you participated in any trainings with
19      respect to children in residential placements?
20  A   I can't say that I've had trainings. I think
21      I've been to a number of residential facilities
22      when I was a social worker. And I know how they
23      operate. I know the type of population they
24      have. I work with a number of residential
25      facilities. And I think it's more by experience

CONFIDENTIAL

9/18/2003     W. R. Individually vs Ct. Dept. of Children     Sandra Rudin

Page 133

1     CERTIFICATE OF REPORTER

2     I, Sarah Najemy, a Notary Public duly

3     commissioned and qualified in and for the State of

4     Connecticut, do hereby certify that pursuant to

5     Notice, there came before me, on the 18th day of

6     September, 2003, the following named person, to wit:

7     SANDRA RUDIN, who was by me duly sworn to

8     testify to the truth and nothing but the truth;

9     that she was thereupon carefully examined upon her

10     oath and her examination reduced to writing under

11     my supervision; that this deposition is a true

12     record of the testimony given by the witness.

13     I further certify that I am neither attorney

14     nor counsel for, nor related to, nor employed by

15     any of the parties to the action in which this

16     deposition is taken, and further that I am not a

17     relative or employee of any attorney or counsel

18     employed by the parties hereto, or financially

19     interested in the action.

20     IN WITNESS THEREOF, I have hereunto set my

21     hand on this 6th day of October, 2003.

22     Sarah B. Najemy, _____

23     Notary Public, License No. (#00069)

24     My commission expires: 8/31/05

25

Attachment 5

Case 3:02-cv-00429-RNC   Document 61-3   Filed 05/02/2005   Page 9 of 12

W. R., et al vs. State of CT
9/3/2003                                                         Cathleen Connolly

Page 1

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
 2
 3
 4                                           )
     W.R., individually and on behalf        )
 5   of her minor son, JOSEPH R.;            )
     SUSAN K.; M.O., individually and        )
 6   on behalf of her minor son, OMAR        )
     S.; and on behalf of all others         )
 7   similarly situated, and                 )
     JEANNE MILSTEIN, CHILD ADVOCATE         )
 8   OF THE STATE OF CONNECTICUT,            )
                       Plaintiffs            )
 9                                           ) Civil Action
     Vs.                                     ) No:302CV429 (RNC)
10                                           )
     CONNECTICUT DEPARTMENT OF CHILDREN      )
11   AND FAMILIES, and DARLENE DUNBAR,       )
     in her official capacity as             )
12   Commissioner of the Connecticut         )
     Department of Children and              )
13   Families,                               )
                       Defendants            )
14                                           )
15
             Deposition of CATHLEEN CONNOLLY, taken
16   before Judith L. Kline, Certified Shorthand
     Reporter/Notary Public in and for the State of
17   Connecticut, pursuant to notice, at the offices of The
     Attorney General, 110 Sherman Street, Hartford,
18   Connecticut, on September 3, 2003 at approximately
     12:34 p.m.
19
     APPEARANCES:
20   FOR THE PLAINTIFFS:
         DOUGLAS CROCKETT, CHIEF COUNSEL
21       ANNE LOUISE BLANCHARD, ESQUIRE
         CONNECTICUT LEGAL SERVICES
22       872 Main Street
         P.O. Box 258
23       Willimantic, CT 06226-0258
24   FOR THE DEFENDANTS:
         SUSAN T. PEARLMAN, ASSISTANT ATTORNEY GENERAL
25       110 Sherman Street
         Hartford, CT 06105
```

Case 3:02-cv-00429-RNC    Document 61-3    Filed 05/02/2005    Page 10 of 12

W. R., et al vs. State of CT

9/3/2003                                                    Cathleen Connolly

Page 37

1  have a narrative by my supervisor, saying child will
2  be returning from IOL to CCP. We are continuing to
3  explore appropriate placement services.
4         MS. PEARLMAN: Could I clarify, Ann? Are
5  you talking about the Probate Court hearing on
6  December 20th, with IOL's recommendation, where it was
7  discussed?
8         MS. BLANCHARD: No. I think we're talking
9  about -- I'm talking about Superior Court.
10        MS. PEARLMAN: Oh, Superior Court.
11  Q   (By Ms. Blanchard) Let me ask you a different
12  question. There was a time when CCP refused to take
13  Joe back; isn't that right? They refused to reaccept
14  him?
15  A   They had said he was discharged. And then
16  there was a period where we had to have discussions
17  about having them take him back.
18  Q   Right. And there was a Court Order that led to
19  him going back to CCP?
20  A   Right. Well, I think they were going to before
21  that. But, yes.
22  Q   Okay. And you don't recall the recommendations
23  by the Institute of Living staff, other than the fact
24  that they disagreed with the idea of foster care?
25  A   Right, I don't.

Case 3:02-cv-00429-RNC   Document 61-3   Filed 05/02/2005   Page 11 of 12

W. R., et al vs. State of CT
9/3/2003                                                          Cathleen Connolly

Page 38

1   Q   Okay. And were they recommending, if you
2   remember, residential programming, or were they
3   recommending group home, or --
4   A   I sort of feel like I need just their letter,
5   because that's very clear what their letter was.
6   I recall meeting with Joe.
7           MS. PEARLMAN:  Hold on. Are you about to
8   give her a letter that would help?
9           THE WITNESS:  Thank you.
10  Q   (By Ms. Blanchard)  (Hands document to
11  witness.)
12  A   This is what I remember; the calls about the
13  problems there. Okay. The recommendation was a
14  specialized therapeutic community based supervised
15  living situation, where staff are available 24 hours a
16  day to provide clinical services, and to ensure that
17  rules are enforced -- oh, be sought.
18          THE COURT REPORTER:  Are enforced or be
19  sought?
20          THE WITNESS:  Are enforced -- I cut into
21  the -- they were recommending a specialized
22  therapeutic community based supervised living
23  situation, with 24 hour staff.
24  Q   (By Ms. Blanchard)  And is that your
25  recollection of the Institute of Living's

Case 3:02-cv-00429-RNC   Document 61-3   Filed 05/02/2005   Page 12 of 12

W. R., et al vs. State of CT

9/3/2003                                                          Cathleen Connolly

Page 39

```
 1    recommendations?
 2    A    Yes.
 3    Q    Okay.  And did DCF find that placement for Joe?
 4    A    No.
 5    Q    Why not?
 6    A    Because that isn't available.  That isn't
 7    available.
 8    Q    Okay.  If it was available, do you think you
 9    would have placed him there, based on IOL's
10    recommendations?
11    A    I don't know.  I don't know.  I guess so.
12    Q    Okay.  So the placement wasn't available, so
13    instead he went back to CCP?
14    A    Yes.
15    Q    Okay.  And during that time after he was at
16    CCP, there was an action in Probate Court; do you
17    remember that?
18    A    In December?
19    Q    Uh-huh.
20    A    (Nods head.)  This was supposed to help me.
21    Q    Tell me what you remember about the Probate
22    Court action?
23    A    In December?
24    Q    Yes.
25    A    The judge ordered an appropriate placement by
```