Attachment 1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| W.R, individually and on behalf of her Minor son, Joseph R; Susan K,; M.O, individually and on behalf of all others similarly situated<br>    *Plaintiff* | :<br>:<br>:<br>:<br>:<br>: | CIVIL ACTION NO. 302CV429RNC |
| v. | :<br>: | |
| Connecticut Department of Children and Families, and<br>Darlene Dunbar, in her official capacity as Commissioner of the Connecticut Department of Children and Families<br>    *Defendants* | :<br>: | May 20, 2005 |

### AFFIDAVIT OF GINA MANGANO

I, Gina Mangano, being duly sworn, state:

1. I am a social worker, employed by the Department of Children and Families (DCF).

2. In 2004, I was assigned to provide services to Susan K., who was known to DCF as Shonna K., who was in the care of the department.

3. Susan has received services from DCF since 1991. She continued to receive voluntary services after she turned 18.

4. In 2004, Susan was placed in a self-directed living program at the Supervised LifeStyles (SLS), a mental health program in Brewster, New York. She was living with five other girls in a large house, and receiving mental health services.

5. Since her placement at SLS, she did not request DCF to place her in a less restrictive setting.

6. In the fall of 2004, Susan turned 21and was transitioned out of care with DCF and into care with the Department of Mental Health and Addiction Services (DMHAS). DMHAS is currently responsible for providing care to Susan.

7. Susan is no longer receiving services from DCF and is no longer eligible for services.

_Gina Mangano_ (signature)

Gina Mangano

Subscribed and sworn to before me on this 20th day of May, 2005.

_Eileen M. Lee_ (signature)

Notary Public/Commissioner of the Superior Court

**EILEEN M. LEE**
**COMMISSION EXPIRES 2/28/09**

Attachment 2

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| W.R, individually and on behalf of her<br>Minor son, Joseph R; Susan K,; M.O,<br>individually and on behalf of all others<br>similarly situated<br>　　　　*Plaintiff* | :<br>:<br>:<br>:<br>:<br>: | CIVIL ACTION NO. 302CV429RNC |
| | : | |
| v. | : | |
| | : | |
| Connecticut Department of Children and<br>Families, and<br>Darlene Dunbar, in her official capacity as<br>Commissioner of the Connecticut<br>Department of Children and Families<br>　　　　*Defendant* | :<br>: | May 20, 2005 |

### AFFIDAVIT OF ERIC MOORE

I, Eric Moore, being duly sworn, say:

1.  I am employed as a social worker by the Department of Children and Families.

2.  I have been assigned to the case of Omar S., a youth committed to the care of the Department.

3.  Omar S. has been a client of DCF since August, 2001.

2.  Omar will be turning 18 years old in August of 2005.

3.  On October, 18, 2004, Omar was placed in the Barnard House, in Hartford.

4.  The Barnard House is a licensed group home serving up to 16 residents ages 17 to 25, in four 2-bedroom apartments, with the goal of transitioning psychosocially challenged individuals to independent living.

5. The Barnard House has round the clock supervision by trained residential counselors who provide case management, counseling, independent living skill training. Vocational services are provided by a trained vocational counselor.

6. Barnard House is supervised by a full-time MSW program manager and a psychiatric consultant is available on call at all hours.

7. On April 8, 2005, Omar stated that he was leaving the Barnard House and planned to move in with his mother in New York.

5. On April 9, 2005, Omar left the Barnard House and went to New York. He did this against my advise.

6. Between April 9 and May 9, 2005, I repeatedly tried to speak to Omar as well as his mother to encourage him to return to Connecticut.

7. On April 25, 2005, Omar's mother, advised me that Omar was looking to participate in a Job Corp program in New York.

8. Between April 25, 2005 and May 9, 2005, I left a number of messages for Omar to return my call to discuss returning to Connecticut.

9. On May, 3, 2005, I spoke to Omar who indicated he was not sure whether he wanted to return to Connecticut. I asked him to call on May 4, to discuss participating in Job Corp in Connecticut.

10. Neither Omar nor his mother ever called me and on May 9, 2005, I learned that their phone was disconnected.

11. At no time has Omar asked me if he could return to the Barnard House or another group home.

_Eric Moore_
Eric Moore


Subscribed and sworn to before me on the 20th day of May, 2005.

_Eileen M. Lee_
Notary Public/Commissioner of the Superior Court

**EILEEN M. LEE**
**COMMISSION EXPIRES 2/28/09**

Attachment 3

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| W.R, individually and on behalf of her | : | |
| Minor son, Joseph R; Susan K,; M.O, | : | |
| individually and on behalf of all others | : | |
| similarly situated | : | CIVIL ACTION NO. 302CV429RNC |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| Connecticut Department of Children and | | |
| Families, and | | |
| Darlene Dunbar, in her official capacity as | | |
| Commissioner of the Connecticut | | |
| Department of Children and Families | : | |
| *Defendants* | : | May 20, 2005 |

### AFFIDAVIT OF ANDRE SKORUPA

I, Andre Skorupa being duly sworn, do hereby depose and say that the following is the truth to the best of my knowledge and belief:

1. I am employed as a social worker for the Department of Children and Families.

2. I am assigned to provide services to Joseph R. and his family.

3. When I received this assignment, I reviewed Joseph's file and learned that Joseph has received services through DCF's voluntary service program since 1999.

4. Joseph has had a long history of mental illness and assaultive behaviors.

5. Joseph was adjudicated a delinquent child three times since 2001. He is currently on probation.

6. Even with medication, Joseph's condition is unstable and he demonstrates dangerous conduct, threatening the safety of others.

7. Joseph has had a variety of placements provided by DCF.

8. Joseph will be turning 16 in three weeks.

9. In March, 2005, due to his assaultive and threatening behaviors, he was moved, upon the advice of his treatment providers, from Brightside Treatment Center in Springfield, Massachusetts to Providence Hospital, in Springfield, Massachusetts.

10. Joseph remained at the hospital for treatment until May, 2005, when he was placed at the Children's Place, a state facility for mentally ill children, located in Windsor Locks, Connecticut.

11. Placement at the Children's Place was based on recommendations of the hospital staff and on Joseph's own request. His therapist at Providence Hospital discouraged placement in a group home.

12. Children's Place is not recommending a less restrictive placement at this time, nor has Joseph asked to be moved.

Andre Skorupa

Subscribed and Sworn to before me on this 20th day of May, 2005.

Betty J. Rozario

Notary Public/Commissioner of the Superior Court

My Commission Expires: 8/31/08

Attachment 4

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| W.R, individually and on behalf of her | : | |
| Minor son, Joseph R; Susan K, M.O, | : | |
| individually and on behalf of all others | : | |
| similarly situated | : | CIVIL ACTION NO. |
| 302CV429RNC | | |
| *Plaintiffs* | : | |
| | : | |
| v. | : | |
| | : | |
| Connecticut Department of Children and | | |
| Families, and | | |
| Darlene Dunbar, in her official capacity as | | |
| Commissioner of the Connecticut | | |
| Department of Children and Families | : | |
| *Defendant* | : | May 20, 2005 |

### AFFIDAVIT OF KAREN SNYDER

I, Karen Snyder, being duly sworn, state:

1. I am the Chief of Program Operations for the Department of Children and Families.

2. I have worked in the mental health field for 25 years. I have been Director of Operations at the Department of Mental Health and Addiction Services and executive director of the North Central Connecticut Mental Health Services. I have a masters degree in clinical psychology.

3. In my current position, I am responsible for directing the work of Bureau of Child Welfare, the Bureau of Adolescent Services, the Bureau of Adoption and Interstate Compact Services, and the Bureau of Behavioral Health, Education and Medicine.

4. Among my duties is to oversee placement of children in residential treatment facilities; a central placement team, comprised of mental health specialists within DCF, reviews all cases of children where residential treatment is recommended.

5. Before a child is placed in any residential treatment facility, the central placement team determines whether such a placement is recommended by the child's therapist or other mental health professional. A mental health assessment is required before any child is placed in a residential treatment facility.

1

6. In addition, further steps are taken to consider whether a less restrictive placement would be more appropriate. Specifically, local mental health consultants working for DCF review the child's history to assess the need for such a placement.

7. For children involved with the juvenile justice system, the directors for juvenile justice and for behavioral health, along with myself, also review each case to consider whether other services could be made available to avoid placing the child in a residential treatment facility.

8. The department is currently subject to a federal consent decree, in *Juan F. v. Rell; under* that decree, an Exit Plan has been adopted by the federal district court, containing criteria by which DCF will be evaluated by a court monitor.

9. The Exit Plan requires DCF to obtain the approval of the transition task force established by the federal court before any child who is a member of the *Juan F.* class may be placed out-of-state in a residential treatment facility. The Exit Plan also requires DCF to reduce the number of children placed in residential treatment facilities.

10. To carry out the obligations outlined in the Exit Plan, DCF, in May, 2004 adopted a Positive Outcome for Children Plan (POC plan). The POC Plan resulted in requests for proposals for group homes, family support teams, treatment foster care, treatment group homes alternatives to hospitalization, flexible funding to "enhance the ability of local communities to service children in less restrictive, more local settings."

11. The Department asked for "creative and innovative proposals from providers that are designed to help…meet [DCF's] goal of returning children to Connecticut who are currently out-of-state; to assure that fewer children are placed in residential care and that no child who is removed from his or her home or community remains in an institutional setting for any longer than is absolutely necessary."

12. In September, 2004, DCF also filed a Child and Family Service Plan with the Administration for Children and Families, U.S. Department of Health and Human Services. This five-year plan is required for states that utilize federal funds to help defray the costs of foster care, under the Child Abuse Prevention and Treatment Act.

13. The Service Plan explains in more detail how the department will carry out its obligations under the Exit Plan, establishing target numbers for each office to reduce the number of children placed in residential treatment facilities; using a private non-profit agency to work with each area office to identify children ready for discharge from residential facilities who require community-based services, and assessing needs for expanded community-based programs to prevent children with mental illness from leaving their community.

14. DCF adopted a KidCare mission statement, with the Department of Social Services to strengthen families' capacity to help children with behavioral health needs, with a strong preference to deliver and manage services within the local community.

15. The Department does not have a policy preventing children with serious mental illness from being placed in community-based placements. The department's policy is to provide a broad variety of community-based mental health services to such children and their families to allow them to remain in their communities.

16. DCF offers a multitude of community-based mental health services including: therapeutic foster homes, flexible funds to be used to keep children at home or in foster care, therapeutic group homes, mentoring, etc. The Service Plan also provides a listing of the various types of community-based programs offered to children who are mentally ill and their families. The list includes: care coordination, emergency mobile services, family advocacy, intensive home-based therapy, outpatient adolescent substance abuse treatment, extended day treatment, crisis stabilization beds, and outpatient mental health treatment at child guidance centers.

17. Currently the KidCare budget, which provides many of the community-based mental health services, is approximately $23 million and covers extended day treatment, crisis stabilization, emergency mobile crisis, 59 local care coordinators, home-based therapy, family advocacy, and related services.

18. DCF has utilized both state and federal funds to expand community-based services. Federal community mental health block grant funding, provided by the Substance Abuse and Mental Health Services Administration (SAMHSA) of the Department of Health and Human Services has been used most recently for in-home therapy.

19. DCF was awarded a 6 year, $9 million dollar grant from SAMHSA to be used for the "Partnership for Kids Project" in Bridgeport, to implement a school-based system of care collaborative. Care coordinators were hired for five schools to help develop and implement special treatment plans for mentally ill children to integrate school services and community services for these children. Additional care coordinators are planned, if further federal funds are made available.

20. As part of this expansion of community-based services, DCF is developing 17 new therapeutic group homes. In March, 2005, the department issued an Request for Proposals for the development of "level 1.5" and "level 2" group homes for youth "who may have required psychiatric hospitalizations, are at increased risk for psychiatric hospitalizations or require clinical services of different intensities in a small structured setting."

3

21. As a result of this request, DCF expects to significantly expand the number of therapeutic foster homes as well as group homes and support teams to maintain children with their biological or foster family

22. Currently DCF has 21 group homes.


Karen Snyder

Subscribed and sworn to before me on the 20th day of May, 2005.


Notary Public/Commissioner of the Superior Court

4

W.R. v. CT DCF

3/31/2004                                                      Jeanne Milstein

```
                                                           Page 1
 1                   UNITED STATES DISTRICT COURT
                       DISTRICT OF CONNECTICUT
 2
                        Civil Action No. 302CV429(RNC)
 3    _____
                                    )
 4    W.R., individually and on behalf of )
      her minor son, JOSEPH R., ET AL.    )
 5                                        )        COPY
      VS.                                 )
 6                                        )
      CONNECTICUT DEPARTMENT OF           )
 7    CHILDREN AND FAMILIES, ET AL.       )
      _____)
 8            VOLUME I
              DEPOSITION OF: JEANNE MILSTEIN
 9            DATE: March 31, 2004
              HELD AT: Offices of the Assistant Attorney General
10                     55 Elm Street
                       Hartford, CT 06106
11    APPEARANCES:

12    ENGLEMAN & WELCH-RUBIN, LLP
              195 Church Street, 11th Floor
13            New Haven, CT 06510
              representing the Child Advocate.
14    BY:     LORI WELCH-RUBIN, ESQUIRE

15    LAW OFFICES OF THE ASSISTANT ATTORNEY GENERAL
              MacKenzie Hall
16            110 Sherman Street
              Hartford, CT 06106
17            representing the Defendant.
      BY:     SUSAN T. PEARLMAN, ESQUIRE
18                 - and -
                   CAROLYN SIGNORELLI
19
      CONNECTICUT LEGAL SERVICES
20            872 Main Street
              Willimantic, CT 06226
21            representing the Plaintiffs.
      BY:     ANNE LOUISE BLANCHARD, ESQUIRE
22                 - and -
                   CATHERINE WILLIAMS, ESQUIRE
23
                      Reporter:  Aretha S. Martin, LSR
24                 BRANDON SMITH REPORTING SERVICE
                       44 Capitol Avenue
25                Hartford, Connecticut  06106
                       (800) 852-4589
```

26d222f1-2614-48e3-b70a-e20bb5534c5c

W.R. v. CT DCF

3/31/2004                                                    Jeanne Milstein

Page 14

```
1         A    She's in child welfare.  I would have to ask

2    her the specific, you know, degrees that she has, but she

3    has spent years as a hands-on person.  And then she spent

4    time as an administrator in Massachusetts.  She worked for

5    the general accounting office in Washington.  She worked

6    for a group called MACRO.  She is, again, an expert in

7    child welfare.

8         Q    Do you consider yourself an expert in children

9    mental health issues?

10        A    No.

11        Q    What is your background?

12        A    My background professionally or  --

13        Q    Yes.

14        A    Professionally, prior to this position, I was

15   the head of government relations for the Department of

16   Children and Families.  I was the legislative liaison for

17   the Connecticut Commission on Children.  Prior to that, I

18   was the director of the Women's Center of Southeastern

19   Connecticut, which was a rape crisis, battered women's

20   shelter, a transitional housing.  Prior to that, I owned

21   two day care centers.  Prior to that, I was the head of

22   family day care in the -- well, what was then the Purchase

23   of Service Program.  It is an employer-related day care

24   initiative at the now defunct Department of Human

25   Resources.  And prior to that, I was the legislative
```

26d222f1-2614-48e3-b70a-e20bb5534c5c

3/31/2004                                                        Jeanne Milstein

Page 36
```
1        A    Oh, the mental health services are under the

2   consent decree.  But has that need been addressed, that's

3   where I was going, but that's not really the question.

4        Q    Have you had any conversations with the court

5   monitor in that case about mental health issues?

6        A    Yes.

7        Q    Is that Ray Sirry?

8        A    Yes.

9        Q    Have you also been in contact with Ray

10  Mancuso?

11       A    Yes.

12       Q    What was the last time you had discussions

13  with either Ray Sirry or Ray Mancuso about this issue?

14       A    Specific to mental health?

15       Q    Yes.

16       A    Probably, last fall.

17       Q    Okay.  And what was the nature of the

18  discussions?

19       A    The nature of the discussion was, essentially,

20  that we are warehousing children.  We are seeing children

21  languish in inappropriate residential facilities for

22  months and sometimes years.  We're seeing a lack of

23  monitoring of the care that these children are getting.

24  We are seeing increasing numbers of children going into

25  high-end residential care.  We are seeing that children
```

26d222f1-2614-48e3-b70a-e20bb5534c5c

W.R. v. CT DCF

3/31/2004                                                    Jeanne Milstein

Page 61

1                          STATE OF CONNECTICUT

2

3        I, Aretha S. Martin, a Notary Public duly

4   commissioned and qualified in and for the State of

5   Connecticut, do hereby certify that pursuant to notice

6   there came before me on the 31st day of March, 2004, the

7   following-named person, to wit: Jeanne Milstein, who was

8   by me duly sworn to testify to the truth and nothing but

9   the truth; that she was thereupon carefully examined upon

10  her oath and examination reduced to writing under my

11  supervision; that this deposition is a true record of the

12  testimony given by the witness.

13       I further certify that I am neither attorney nor

14  counsel for nor related to nor employed by any of the

15  parties to the action in which this deposition is taken,

16  and further that I am not a relative or employee of any

17  attorney or counsel employed by the parties hereto, or

18  financially interested in this action.

19       IN WITNESS THEREOF, I have hereunto set my hand this

20  6th day of April, 2004.

21                          _____

22                          Aretha S. Martin, Notary Public

23  My Notary Expires:  June 30, 2007.

24

25

Brandon Smith Reporting

Attachment 6

# ATTACHMENT 6

W.R. v. Connecticut DCF

6/1/2004                                                    Jeanne Milstein

Page 1

1              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF CONNECTICUT

2

3                                        COPY

4        -----------------------}
         W.R. individually and  }
5        on behalf of her minor }
         son, JOSEPH R. ET AL.  }
6              Plaintiffs,      } Civil Action No.
                                }   302CV429(RNC)
7              VS.              }
                                }
8        CONNECTICUT DEPARTMENT }
         OF CHILDREN AND        }
9        FAMILIES, ET AL.,      }
               Defendants.      }
10       -----------------------}

11                    DAY TWO

12

13        DEPOSITION OF:  JEANNE MILSTEIN

14        DATE:  June 1, 2004

15        HELD AT:  Office of the Attorney

16                  General

17                  State of Connecticut

18                  110 Sherman Street

19                  HARTFORD, CONNECTICUT

20

21   Reporter:  Vincent J. DeLaria, RPR, LSR #00138

22        Brandon Smith Reporting Service

23             44 Capitol Avenue

24             Hartford, CT 06106

25             Tel (860) 549-1850

d9b71c02-33d1-4aff-baa1-d3da4e4eec81

W.R. v. Connecticut DCF

6/1/2004                                                    Jeanne Milstein

Page 28

1    A.  Yes.

2    Q.  Is this information solely from the DCF on

3    this child?

4    A.  I think so, yes, yes.

5    Q.  Now, what can you tell me about this child

6    that led you to believe that this child was

7    inappropriately placed?

8        MS. WELCH-RUBIN:  I'm going to object to

9    the form of the question because that's not what

10   is testimony has been.

11   Q.  (BY MS. PEARLMAN)      I'll withdraw it.

12   Can you tell me why this child, in your view,

13   would fit into the class of children for whom this

14   lawsuit was filed?

15   A.  You know what I would like to do, I would

16   prefer to have somebody from my staff come in and

17   talk about this because they're much more familiar

18   with the details.  It's not my area of expertise

19   at all.

20   Q.  When you had these files pulled, did you

21   look at anything beyond the individual documents

22   that you provided to me?

23       MS. WELCH-RUBIN:  Just to be clear, her

24   staff pulled the documents.  Ms. Milstein didn't

25   look at them.

W.R. v. Connecticut DCF

6/1/2004                                                        Jeanne Milstein

Page 30

1    question.  I'm not familiar with these individual

2    cases; therefore-- so that's the first part.

3         The second is I have complete confidence in

4    my staff.  They pulled all of the children who fit

5    the criteria as was mentioned earlier, children

6    who have been in out of state placement, children

7    who have been bounced around from placement to

8    placement, children who aren't succeeding in the

9    kind of placement they have now.

10   Q.  Now, and that's true for all of these

11   children, right?  You're not familiar with any of

12   them?

13   A.  Yes.

14   Q.  Now, with respect to the three named

15   Plaintiffs, you've also given me records?

16   A.  Yes.

17   Q.  Now, are you familiar with these children?

18   A.  Not in great detail.

19   Q.  Before we mark any of them as exhibits, what

20   steps did you take to become familiar with the

21   individual situations of the named Plaintiffs?

22   A.  I had professionals on my staff look in

23   detail at the records of these children, and I've

24   relied on their professional advice.

25   Q.  Well --

d9b71c02-33d1-4aff-baa1-d3da4e4eec81

Page 31

```
 1    A.   I'm somewhat familiar with the files but not

 2    --

 3    Q.   You haven't met any of these children,

 4    right?

 5    A.   No.

 6    Q.   And you haven't intervened in any of the

 7    court proceedings involving any of these children?

 8    A.   No.

 9    Q.   Do you know where any of the three children

10    are currently placed?

11    A.   I have to refresh my memory.

12    Q.   So it's fair to say that your opinions about

13    systemic issues are founded on the information

14    that your own staff has provided to you?

15    A.   Well, no, my knowledge of the systemic

16    issues is provided somewhat from the individual

17    cases of these children, but it's also what I see

18    on a daily basis in the work that I do, the fact

19    that we now have the record numbers of children

20    placed out of state, 500 plus, 400-- approximately

21    450 of whom have serious mental health issues and

22    are developmental delays.

23         I see, anecdotally, on a daily basis

24    children who are not succeeding at all and the

25    various placements that they're in.  I see on a
```

d9b71c02-33d1-4aff-baa1-d3da4e4eec81

W.R. v. Connecticut DCF

6/1/2004                                                      Jeanne Milstein

Page 82

```
 1         STATE OF CONNECTICUT
               I, VINCENT J. DELARIA, a Registered
 2         Professional Reporter/Notary Public within
           and for the State of Connecticut, do hereby
 3         certify that I took the deposition of
           JEANNE MILSTEIN, on June 1, 2004, at the
 4         offices of Office of the Attorney General,
           State of Connecticut, 110 Sherman Street,
 5         HARTFORD, Connecticut.

 6             I further certify that the above-named
           deponent was by me duly sworn to testify to
 7         the truth, the whole truth and nothing but
           the truth concerning his/her knowledge in
 8         the matter of the case of, W.R.,
           individually and on behalf of her minor
 9         son, JOSEPH R., ET AL.  VS. CONNECTICUT
           DEPARTMENT OF CHILDREN AND FAMILIES, ET
10         AL., now pending in the United States
           District Court, District of Connecticut.
11
               I further certify that the testimony was
12         taken by me stenographically and reduced to
           typewritten form under my direction by
13         means of COMPUTER ASSISTED TRANSCRIPTION;
           and I further certify that said deposition
14         is a true record of the testimony given by
           said witness.
15
               I further certify that I am neither
16         counsel for, related to, nor employed by
           any of the parties to the action in which
17         this deposition was taken; and further,
           that I am not a relative or employee of any
18         attorney or counsel employed by the parties
           hereto, nor financially or otherwise
19         interested in the outcome of the action.

20             WITNESS my hand and my seal this 7th day
           of June, 2004.
21

22
               Vincent J. DeLaria, RPR, LSR
23             Notary Public

24         My Commission Expires:
           March 31, 2005
25
```

Brandon Smith Reporting