95. Since 2002, the number of families served by care coordination services has increased from 150 annually to 750 annually. This is a result not only of the greater awareness of the program and of mental illness in children but also the fact that most private insurance companies limit the type and duration of services covered for these children. (Snyder Aff. ¶ 32)

96. The General Assembly also established the Children's Behavioral Health Advisory Committee (CBHAC) that includes families, advocates and providers. The committee meets monthly to address policy and practice issues and also strives to educate the public about the services available. (Snyder Aff. ¶ 33)

97. Community education is required for all services funded through KidCare. Through public service announcements, distribution of information about KidCare in schools, public meetings and other means, DCF has made every effort to inform families about the agency's commitment to make mental health services available to assist them care for their mentally ill children in their own communities. (Snyder Aff. ¶ 34)

98. KidCare services have been very successful in avoiding unnecessary hospitalization and out-of-home treatment of children with serious mental illness. Over 12,000 children have been served by 16 mobile crisis teams with few children (approximately 10%) requiring hospitalization or a higher level of care. This is triple the number of children that used the program in its first year of operation. (Snyder Aff. ¶ 35)

99. Over 3200 children have been involved with care coordination to date. (Snyder Aff. ¶ 36)

100. DCF has recently expanded the types of community-based services for families with mentally ill children. Some of these programs were not even in existence ten years ago in this state. (Snyder Aff. ¶ 37)

101. Among the types of in-home services is Intensive In-Home Child and Adolescent Psychiatric Services (IICAPS), which uses teams of clinicians and paraprofessionals to work in the home with the family to develop and implement treatment plans and provide psychiatric services for the child. (Snyder Aff. ¶ 38)

102. Other in-home services are: Multidimensional Family Therapy, Functional Family Therapy and Multisystemic Therapy. Each type is directed at a particular array of problems. Each is considered either evidence-based, meaning that the service has been shown to be successful through a peer review and evaluation or "a promising practice" meaning currently subject to peer review and evaluation. (Snyder Aff. ¶ 39)

103. Flexible funds as well as mentors and respite care are also available to assist families in keeping children in their homes. (Snyder Aff. ¶ 40)

104. Another new service is the crisis stabilization program which provides short-term care for children who are going through a mental health crisis; crisis stabilization beds are available to help children who are at risk of disrupting from their homes avoid hospitalization or more restrictive placements by offering short-term services and treatment to integrate back into their community. These beds served 48 children in the last quarter of 2004, with 32 returning home or to foster care with services in place. (Snyder Aff. ¶ 41)

105. Another new service offered to families is family support teams – at a cost of over $7 million, the state is making these professional teams available to families who have children in residential treatment who will be returning home or to foster care. The teams are designed to help these families integrate the children back into the community. (Snyder Aff. ¶ 42)

106. DCF also expects residential treatment facilities to engage in discharge planning earlier and work more closely with local care coordinators to assist children return to their community more expeditiously and planfully. (Snyder Aff. ¶ 43)

107. Families do not need to be clients of DCF in order to qualify for KidCare services. A majority (over 60%) of families using Emergency Mobile Crisis services are not clients of DCF. (Snyder Aff. ¶ 44)

**FUNDING**

108. Additional mental health funding was provided in 2001, when the General Assembly established the Community Mental Health Strategic Investment Fund, to be used for community mental health facilities and services. A Community Mental Health Strategy Board determines how the funds are to used. (Snyder Aff. ¶ 45)

109. DCF's efforts to provide new community-based services for mentally ill children were boosted in 2002 when the Community Mental Health Strategy Board allocated $5 million in 2002 for early childhood consultation for mentally ill children under six, expanded in-home mental health services, flexible funds to provide "wrap-around" services for the family, mental health supports for educational success and intensive juvenile justice intermediate assessments to prevent children from being placed in hospitals for evaluations. (Snyder Aff. ¶ 46)

110. The most recent budget allocation allows DCF to continue in-home mental health services, flexible funding, early childhood consultation, and intermediate evaluations. An additional $1 million has been provided for flexible funding by the Community Mental Health Strategy Board. (Snyder Aff. ¶ 47)

111. In 2002, DCF applied for and received $9.5 million for a federal SAMHSA (Substance Abuse and Mental Health Services Administration) demonstration grant for a school-based system of care program in Bridgeport. (Snyder Aff. ¶ 48)

112. Recently, DCF applied for two more SAMSHA grants of $9.5 million each for systems of care projects in Hartford and New London. (Snyder Aff. ¶ 49)

### EFFORTS AND LAWSUITS INVOLVING JUDGMENT DEPARTMENT

113. In the past three years, DCF has worked more closely with the Connecticut Judicial Department to jointly plan mental health programs for children who are delinquents or from families with service needs. (Snyder Aff. ¶ 50)

114. The two agencies are currently engaged in a joint strategic planning process under the direction of the Child Welfare League of America. Among the goals of this effort is to coordinate services for these youth, to increase the opportunities these children have to remain in their own communities. (Snyder Aff. ¶ 51)

115. The two agencies are defendants in a federal class action lawsuit, *Emily J. v. Rell*, *3:93cv1994 (RNC)*, pending before this court; the action centers on mental health services to children with serious mental illness who are detained by the courts as delinquents. (Snyder Aff. ¶ 52)

116. As a result of a settlement agreement in that action, DCF and the Judicial Department will be substantially expanding the array of community-based services provided to these children. The department will also continue to offer intensive evaluations for children in detention to expedite their return to the community. These assessment have reduced the need to send these mentally ill children to Riverview Hospital for in-patient evaluations. (Snyder Aff. ¶ 53)

117. DCF is also engaged in planning for delinquent and FWSN females who require community-base services. Attached is a true and accurate copy of the "Plan for a Continuum of Community-Based Services for Female Status Offenders and Delinquents" which was prepared by DCF to comply with Special Act 04-05. (Snyder Aff. ¶ 54)

### JUAN F.

118. In another class action lawsuit, *Juan F. v. Rell, H89-859 (AHN)*, brought on behalf of children who were abused or neglected or at risk of being abused and neglected, DCF has entered into a settlement agreement, denominated an Exit Plan, whereby the state is committed to reducing the number of these children placed in residential treatment facilities. A true and accurate copy of the Exit Plan and the most current description of the Outcome Measures are attached. (Snyder Aff. ¶ 55, Ex. O,P )

119. The *Juan F.* class members are children who are abused, neglected, or at risk of being abused and neglected, and includes all children adjudicated neglected or uncared for by the juvenile court. (Snyder Aff. ¶ 56)

120. The Exit Plan establishes a transition task force (TTF), comprised of a monitor appointed by the federal court, the Commissioner of Children and Families and the Secretary of the Office of Policy and Management, to oversee the implementation of the Exit Plan, including assuring resources needed to carry out the plan are available. (Snyder Aff. ¶ 57)

121. Under the Exit Plan, all out-of-state placements are reviewed by the TTF; if the TTF doesn't approve the placement, the department must come up with another plan for the child. (Snyder Aff. ¶ 58)

122. Under Outcome Measure 19, DCF is required to reduce the number of children, including abused and neglected children and children at risk of being abused or neglected, as well as children in the voluntary services program, placed in privately operated residential treatment care to not more than 11% of the total number of these children in out-of-home care. To date, DCF has reduced the number of children from 887 in the first quarter of 2004 to 814 in the first quarter of 2005. (Snyder Aff. ¶ 59)

**POSITIVE OUTCOME PLAN**

123. DCF adopted and circulated the Positive Outcome for Children Plan (POC Plan) to explain how it would reach the outcome measures of the Exit Plan. The TTF approved the POC Plan. A true and accurate copy of the POC Plan is attached. (Snyder Aff. ¶ 60, Ex. Q)

124. A major contribution in the development of the POC was made through the formation of an Advisory Board organized by the Court Monitor. The advisory board, which provided valuable insight on each of the measures, represented a diverse cross section of individuals both professionally and culturally...(Ex. R, p. 62)

125. All children and youth in out-of-home care will have their level of care and length of stay actively managed by local area offices in order to reduce the number of children requiring out-of-home care. (Ex. R, p. 79)

126. Area offices will be assigned target numbers relative to every type of out-of-home care, and every area office will utilize a common data reporting / tracking protocol to monitor their progress toward achieving goals. (Ex. R, p. 79)

127. Every area office will, in collaboration with a contracted local private non-profit agency, clinically evaluate all children in out-of-home placement and their readiness for discharge; they will further identify the community services necessary to effectuate a discharge and they will implement the discharge plan within the local system of care. (Ex. R, p. 79)

128.    The Bureau of Behavioral Health will develop a residential utilization management authorization process in anticipation of the operationalization of an ASO through the Kid Care initiative. (Ex.R, p. 79)

129.    The Bureau of Behavioral Health will work with provider agencies to better match children requiring residential treatment to the types and levels of care for which DCF contracts with residential providers. (Ex.R, p. 79)

130.    Another Outcome Measure 3, covering treatment plans, requires that at least 90% of the cases shall have clinically appropriate, individualized family and child specific treatment plans developed in conjunction with parents, children, providers and others involved with the case and approved by the DCF supervisor within sixty days of case opening or child's placement out-of-home whichever comes sooner, and for each six months period thereafter. (Ex. R, p. 66)

131.    With respect to Outcome Measure 3, the POC states that the Bureau Chief of Continuous Quality Improvement will assure that timeframes are met on out-of-home cases. (Ex R, p.67)

132.    Another Outcome Measure #7 covering reunification, requires that 60% of children who are reunified with parents/guardians shall be reunified within 12 months of their most recent removal from home. (Ex. R, p. 69)

133.    With respect to Outcome Measure #7, the POC states that the Bureau Chief for Child Welfare will establish a process of case supervision to determine viability of planning for reunification on a quarterly basis following the child's entry into care. Case conferences will be conducted on a semi-annual basis on all reunification cases to identify any case missing a definitive date for return. (Ex.R, p.70)

134.    DCF will build upon existing forms of collaboration, which enhance the reunification process (Ex. R, p. 70)

135.    Another Outcome Measure #15, covering children's needs, requires that at least 80% of all families and children shall have all their medical, dental, mental health and other service needs provided as specified in their most recently approved treatment plan. (Ex. R, p. 76)

136.    With respect to Outcome Measure #7, the POC states that area directors will develop their own strategies/ protocols for supervisors to ensure that all identified needs are met as outlined in the treatment plan. Area directors will establish their own quality improvement strategies and protocols for quarterly case reviews (Ex. R. p. 76)

137.    With respect to Outcome Measure #7, the POC states that the mental health program director will track barriers and identify gaps in services in each area office and report these findings to Resource Management on a quarterly basis. (Ex.R, p.76)

138. With respect to Outcome Measure #7, the POC states that the Bureau Chiefs of Child Welfare and Behavioral Health will facilitate the utilization of the newly created therapeutic community service teams. (Ex. R, p. 76)

139. With respect to Outcome Measure #7, the POC states that the director of KidCare, Planning and Development with Area Directors will integrate the activities of the Administrative Service Organizations into each area. (Ex. R, p. 76)

140. The POC Plan stated that requests for proposals would be issued for group homes, family support teams, treatment foster care, treatment group homes, alternatives to hospitalization, and flexible funding to "enhance the ability of local communities to service children in less restrictive, more local settings." (Ex. Q, p. 3).

141. The Child and Family Service Plan cites the POC plan and explains that the POC plan was accepted by the TTF and is now being implemented. (Ex, R, p. 62)

142. A localized mental health service system and expanded local services are included in the POC plan, along with plans for expanded foster care, group homes, family support teams, and flexible funding. (Snyder Aff. ¶ 61)

143. A new operational structure for the local offices is included in the POC Plan to manage treatment planning and utilization of out-of-home treatment care. (Snyder Aff. ¶ 62)

**CHILD AND FAMILY SERVICES PLAN**

144. In September, 2004, DCF filed a Child and Family Services Plan (CFS Plan) with the Administration for Children and Families, U.S. Department of Health and Human Services. The plan is required for states utilizing federal funds to help defray the costs of foster care, under the federal Child Abuse Prevention and Treatment Act. A true and accurate copy of the plan is attached. (Snyder Aff. ¶ 63)

145. The Child and Family Services Plan outlines DCF's plans to use a private non-profit agency to work with each area office to identify children ready for discharge from residential facilities who require community-based services and to assess needs for expanded community-based programs to prevent children with mental illness from leaving their communities. (Service Plan, p. 79).

146. The CFS Plan, which was made public, incorporated the POC; it explains in greater detail how the department will carry out its obligations under the Exit Plan, and cites that target numbers have been established for each office to reduce the number of children placed in residential treatment facilities. (Snyder Aff. ¶ 64)

147. DCF is implementing the POC Plan. Each area office has a written plan, called a quality improvement plan, to meet the requirements of the Exit Plan, including the goals of reducing the number of children in residential treatment. Each plan includes specific strategies customized for each office to meet the Exit Plan goals. Weekly discharge planning meetings are required in all regions to expedite the return of children from residential placements. (Snyder Aff. ¶ 65)

15

**DEINSTITUTIONALIZATION**

148. The number of children placed out-of-state has declined from 524 in June, 2004 to 393 in May, 2005. (Snyder Aff. ¶ 66)

149. The total number of all children (includes delinquent and FWSN cases) placed in private residential facilities has also declined. As of January, 2004, 1215 children were placed in residential placement, by June, 2005, that number had been reduced to 993. (Snyder Aff. ¶ 67)

150. The average length of stay in these facilities has also been reduced from 422 days for the period January 1, 2003 through March 31, 2003 to 359 days from January 1, 2005 through March 31, 2005. (Snyder Aff. ¶ 68)

151. An even greater reduction in placement was seen among children who were adjudicated delinquent. In fiscal year 1997-98, 452 children were placed in such facilities, whereas in 2003-04, only 277 children were placed. (Snyder Aff. ¶ 69)

152. The number of days children are spending in private hospitals has also decreased over time; in May, 2005, the average length of stay was 16 days compared to 37 days in May, 2004. (Snyder Aff. ¶ 70)

153. DCF's current administration is fully and deeply committed to avoiding residential placements for children who are mentally ill but can be treated in less restrictive settings, including foster care and group homes. (Snyder Aff. ¶ 71)

154. DCF has been successful in expanding the number of therapeutic foster care homes available for children. In April 2004, 423 children were placed in such foster care; by May, 2005, 492 children were placed in therapeutic foster care. (Snyder Aff. ¶ 72)

155. DCF has also been expanding the numbers and types of group homes available to serve mentally ill children. (Snyder Aff. ¶ 73)

**THERAPEUTIC GROUP HOMES**

156. In the fall of 2004, DCF issued a request for proposals (RFPs) to develop therapeutic community services for children, including treatment foster homes, family support teams, and therapeutic group homes. The request asked for "creative and innovative proposals ...designed to help...meet [DCF]'s goal of returning children to Connecticut who are currently out-of-state; to assure that fewer children are placed in residential care and that no child who is removed from his or her home or community remains in an institutional setting for any longer than is absolutely necessary." (Snyder Aff. ¶ 74)

157. In March, 2005, the department issued another RFP for the development of group homes for youth "who may have required psychiatric hospitalization, are at increased risk of psychiatric hospitalizations or require clinical services of different intensities in a small structured setting." (Snyder Aff. ¶ 75)

158. As a result of these requests for proposals, DCF has funding and developers for 35 new therapeutic group homes. Currently, DCF operates 23 group homes, including three that are considered therapeutic in that they offer intensive services for severely disturbed or retarded individuals. An additional six group homes are slated for development in SFY 2006. (Snyder Aff. ¶ 76)

159. The department is moving as expeditiously as possible, has the funding and is currently working with the developers to have these homes open quickly. It is anticipated that all thirty-five homes will be open within the next year. (Snyder Aff. ¶ 77)

160. DCF and providers have occasionally experienced problems with developing group homes. Although zoning approval is not required, DCF and group home developers work hard to build a welcoming community for the children who will living in the home. School systems, neighbors and local officials often raise issues that need to be addressed before plans can be finalized. In one instance, a provider had to forego plans and move the site to another town due to local resistance. (Snyder Aff. ¶ 78)

161. Therapeutic group homes cost approximately $900,000 a year to operate and are more costly than residential treatment but may offer greater benefits to the children. (Snyder Aff. ¶ 79)

**EFFICIENCY IN OPERATIONS**

162. DCF staff work hard to maximize federal funds, particularly social security and medicaid funds, that reimburse the state for the costs associated with foster care, residential care and adoption. In the last year, DCF's federal reimbursement has doubled in the last two years- from $45 million to over $100 million. (Snyder Aff. ¶ 80)

163. Although these funds are recouped for the General Fund, rather than DCF's own budget, the additional revenue provides support at the legislature for DCF's efforts to expand community-based mental health services as offsets to residential care. (Snyder Aff. ¶ 81)

164. DCF is expecting to better manage its utilization of community-based service resources through a contract currently under negotiation with a private administrative service organization (ASO). The ASO will assist DCF in expanding resources for mentally ill children. (Snyder Aff. ¶ 82)

**DEMAND FOR SERVICES**

165. A problem facing DCF currently is the increasing number of families seeking voluntary services. The number of families seeking these services has grown substantially. Families seeking voluntary services from DCF have increased from 853 as of July 1, 2002 to 1263 on June 22, 2005. (Snyder Aff. ¶ 83)

166. Although the Commissioner has the authority to limit the number of families receiving voluntary services, she has chosen not to do so. As a consequence, as the number of families seeking these services increase, some families have longer waits for services. However, it is very rare that a family is required to wait more than a few months for services. (Snyder Aff. ¶ 84)

167. Of the 1263 children currently in voluntary services, only 173 are in residential treatment. Some of these children are mentally retarded and will be transferred shortly to the jurisdiction of the Department of Mental Retardation. (Snyder Aff. ¶ 85)

168. Attached is a true and accurate copy of the memorandum of agreement between DCF and DMR, outlining the transfer of funds and responsibility for mentally retarded children in the voluntary service program. (Snyder Aff. ¶ 86)

169. Currently private insurance companies rarely cover the cost of home-based treatment, despite the fact that these services can cost less than residential treatment. (Snyder Aff. ¶ 87)

170. A problem impeding DCF's ability to expand mental health services is the shortage of qualified professionals, particularly Spanish-speaking professionals. In some communities, it is difficult to find or recruit mental health professionals needed to provide needed services. (Snyder Aff. ¶ 88)

**RISK OF REALLOCATION**

171. DCF's efforts to reallocate funds from residential care to community care must be done in a planful way to avoid reducing critically needed services for those children requiring intensive 24-hour treatment. (Snyder Aff. ¶ 89)

172. Children who are placed out-of-state are typically children presenting the greatest risk to the community, namely children who are acting out sexually, or are physically aggressive; such children cannot be handled in a less-restrictive setting and very few Connecticut residential treatment facilities will accept such children. (Snyder Aff. ¶ 90)

173. Adverse consequences could arise from reducing further the number of residential treatment facility beds available in Connecticut. Some delinquent children are placed, through orders of the juvenile court, in such facilities, and reducing the number of such