placements could result in more children ordered to the Connecticut Juvenile Training School. (Snyder Aff. ¶ 91)

174.   Another factor affecting the number of children in residential placement is the reduction in population at Connecticut Juvenile Training School and the closure of Long Lane School for delinquents which has resulted in fewer placement options for delinquent girls. While this issue is being addressed by the development of more community-based resources, there still is a compelling need to maintain some residential treatment programs for this population.   (Snyder Aff. ¶ 92)

175.   Because few private hospital beds are available for children with serious mental illness, reallocating funds from Riverview Hospital for community-based services would be at the expense of children most in the need of intensive in-patient treatment. (Snyder Aff. ¶ 93)

176.   The state must continue to maintain a public hospital for children who cannot be safely maintained in less restrictive settings.   Further reduction in the number of public hospital beds is difficult because of the increased demand for beds from patients who would otherwise be treated in private hospitals but whose insurance will not cover such services. (Snyder Aff. ¶ 94)

177.   The General Assembly is concerned that there may be insufficient number of psychiatric hospital beds to care for children who require intensive in-patient treatment.   (Snyder Aff. ¶ 95)

178.   This past session, the General Assembly enacted legislation requiring the Commissioner of the Office of Health Care Access to establish a committee comprised of representatives from DCF and DSS as well as hospital staff and advocacy representatives to examine the need to expand the number of inpatient beds.   The committee's report is due January 1, 2006.   (Snyder Aff. ¶ 96)

179.   Diversion of DCF's mental health funds for more therapeutic group homes would be harmful to other mentally ill children because prevention, including home-based and crisis services would likely need to be reduced; and if funds were diverted from residential treatment, that would be detrimental to those children requiring that level of care and would not be cost-effective. (Snyder Aff. ¶ 97)

**COMMITMENT TO DEINSTITUTIONALIZATION**

180.   DCF has made a full commitment to the systems of care model for community-based mental health services.  This administration has dedicated itself to incorporating these principles at every level of the organization.  Planning for and creating greater community resources is occurring both locally and through the ongoing budget process conducted by central office staff.  (Snyder Aff. ¶ 98)

181.  The state's commitment to prevent institutionalization of mentally ill children is reflected as well in new legislation adopted this past session, formally establishing the Behavioral Health Partnership between DCF and DSS whose stated purposes include expansion of community-based services, and reduction of unnecessary use of residential services. (Snyder Aff. ¶ 99)

182.  A greatly expanded effort has been made to prevent unnecessary institutionalization of children. This philosophy has been imparted to the professionals involved in assessing children, as well as all DCF staff. (Snyder Aff. ¶ 100)

183.  Before a child may be placed in a residential treatment facility, the child's records are reviewed by a central placement team and then by the director of the bureau of behavioral health and medicine to assess whether less restrictive placements would be able to address the child's mental health needs. (Snyder Aff. ¶ 101)

184.  The fact that DCF has greatly expanded the resources and staffing devoted to mental health issues demonstrates that there has been a sea change within the organization, placing much greater emphasis on the agency's mental health mandate, and particularly on efforts to expand community mental health services. (Snyder Aff. ¶ 102)

185.  DCF's efforts to reduce the number of children in residential placement are being directed equally at children who have been abused and neglected and children who are in the voluntary service program. (Snyder Aff. ¶ 103)

186.  In the current budget, DCF has sought additional funding for these services, as they are a high priority for the agency. (Snyder Aff. ¶ 104)

187.  As more community-based services and placements become available and children who are successfully treated are able to return home or to another permanent arrangement, it is expected that length of stays in residential treatment facilities will shorten and many placements will be diverted. (Snyder Aff. ¶ 105)

**PETER MENDELSON**

188.  Peter Mendelson is the Director of the Bureau of Behavioral Health and Medicine for the Department of Children and Families (DCF). (Mendelson Aff. ¶ 1)

189.  Peter Mendelson has worked in the mental health field for over 25 years. Peter Mendelson has held a variety of position at the Department of Mental Health and Addiction Services (DMHAS) including chief administrative director, associate medical director, director of young adult services and director of the mental health division. Peter Mendelson has a Ph.D degree in sociology with a focus on social psychology. (Mendelson Aff. ¶ 2)

190.  In his current position, Peter Mendelson is responsible for behavioral health services delivered to children associated with DCF. (Mendelson Aff. ¶ 3)

191.  Twice a month Peter Mendelson conducts a meeting with mental health staff from the bureau, facility staff and mental health directors from all local offices to review children in DCF facilities, shelters and safe homes who require discharge planning.  (Mendelson Aff. ¶ 4)

192.  The goal of this meeting is to review the child's treatment needs, and formulate a discharge plan designed to meet those needs as quickly as possible. (Mendelson Aff. ¶ 5)

193.  Peter Mendelson also is personally involved in most decisions involving children placed in residential treatment facilities.  The rationale for his involvement is to reduce the number of children placed in such facilities by considering less restrictive options when clinically appropriate. (Mendelson Aff. ¶ 6)

194.  Prior to Peter Mendelson's review of these requests, the local office must also examine the request.  No child is placed in a residential treatment facility without a written recommendation from a mental health professional involved in the child's assessment and/or treatment. (Mendelson Aff. ¶ 7)

195.  Both central office and local office professionals review such requests before they are sent to Peter Mendelson for review. All staff have been instructed to consider any type of program or service that might be available to eliminate the need for residential placement when clinically appropriate. (Mendelson Aff. ¶ 8)

196.  A fundamental principle that guides all of the work is that each child should be placed in the least restrictive clinically appropriate treatment setting as meets the child's needs.   As much as possible, DCF tries to find a home-like placement for each child, or a community-type setting. (Mendelson Aff. ¶ 9)

197.  Peter Mendelson also oversees the transition of children who are aging out of DCF's care and require adult services from DMHAS or the Department of Mental Retardation (DMR). (Mendelson Aff. ¶ 10)

198.  As a result of many discussions between Peter Mendelson's office and officials from the Department of Mental Retardation (DMR), and budget decisions made by the General Assembly, the two agencies have entered into a memorandum of agreement whereby mentally retarded children who are seeking voluntary services from DCF will become the responsibility of DMR.  (Mendelson Aff. ¶ 11)

199.  As of October 1, 2005, DMR will assume sole responsibility for all mentally retarded children receiving voluntary services from DCF.  (Mendelson Aff. ¶ 12)

200.  Currently, many of these children have been placed in residential treatment facilities, in some cases, out of Connecticut, due to the lack of resources available to DCF.  Through this joint initiative, many of these children will be moved to smaller community settings operated by DMR.  (Mendelson Aff. ¶ 13)

201.  DMR and DCF officials anticipate that this transfer of responsibility and funding will allow the families of these children to have more contact and involvement with their children and will also increase the opportunities of these children to be involved in their communities. (Mendelson Aff. ¶ 14)

202. Another benefit of this agreement is that it should provide a more efficient transition for these children as they become adults and require adult services. (Mendelson Aff. ¶ 15)

203. Currently, DCF has approximately 150 mentally retarded children placed out-of-home through the voluntary service program. (Mendelson Aff. ¶ 16)

204. As a consequence of this agreement, DCF also expects the number of children in residential treatment facilities to drop significantly over the next year. (Mendelson Aff. ¶ 17)

**MARY SOLERA**

205. Mary Solera is assistant bureau chief of the Bureau of Child Welfare of the Department of Children and Families (DCF). (Solera Aff. ¶ 1)

206. Mary has a masters degree in social work and has worked in the field of child welfare for thirty years. Prior to her current position, she held the following positions at DCF: social worker, supervisor, program supervisor, program director and area director. (Solera Aff. ¶2)

207. Among Mary Solera's responsibilities is to oversee foster care services of the agency. One of her main goals is to expand the number of foster families and the types of foster care services available for children in the state's custody. (Solera Aff. ¶3)

208. Many children served by DCF have behavioral/mental health issues and require special services. However, even children with serious behavioral health needs often can benefit from being placed in a foster family, rather than being placed in a residential treatment facility. (Solera Aff. ¶ 4)

209. Foster care is often the preferred placement option because children, even children with behavioral/mental health issues, develop optimally in family-type settings, not in institutions. Family care settings for children of any age is usually the best setting to raise a child who cannot live with their parents. (Solera Aff. ¶ 5)

210. For children with behavioral/mental health issues, who may benefit from a foster home, DCF contracts with private agencies who recruits and train foster families known as specialized/therapeutic foster families, to address the children's behavioral problems and assist with their treatment needs. These families are paid a higher stipend than regular foster families and receive additional supports to maintain the placement. (Solera Aff. ¶ 6)

211. Specialized/therapeutic foster homes have been successful placements for many children with behavioral/mental health needs. These placements tend to provide greater stability for these children than regular foster care. (Solera Aff. ¶ 7)

212. Because of the nurturing atmosphere, individualized attention, and close supervision offered by the families, many children with behavioral/mental health challenges have thrived in these homes. (Solera Aff. ¶ 8)

213.    Specialized/therapeutic foster families are trained and supervised by qualified licensed child placement agencies, and supported with an integrated constellation of services, including individual, group, and/or family therapy, and other assistance as needed. (Solera Aff. ¶ 9)

214.    As of March, 2005, 961 children were placed in private agency specialized/ therapeutic foster care.  In March 2004, there were only 883 children in such placements, in the prior year, there was only 800 children in such placements. (Solera Aff. ¶ 10)

215.    Specialized/therapeutic foster care is intended for children leaving a hospital or residential placement, for children who have not been able to manage in regular foster homes and for children who have experienced multiple placements. (Solera Aff. ¶ 11)

216.    DCF has allocated additional funds to create a new, even more intensive level of placement services for children who have mental health needs, referred to as treatment foster care. The target population for treatment foster care is children with a serious mental illness diagnosis who are at imminent risk of entering or returning to hospitals or residential placements.  (Solera Aff. ¶ 12)

217.    Treatment foster families collaborate closely with Family Support Teams and community-based providers, and crisis intervention services are available around the clock.  (Solera Aff. ¶ 13)

218.    In fiscal year 2005, there were nine children in treatment foster care, with five more placements imminent.  Funding has been allocated for fiscal year 2006 to enable 62 more children to enter treatment foster care. (Solera Aff. ¶ 14)

219.    In addition, pursuant to the *Emily J.* settlement agreement, in the next year, DCF will be contracting for the development of up to thirty-five new multidimensional foster care beds for children who are in the juvenile justice system and would otherwise require placement in a residential treatment facility; additional slots will be developed in the next fiscal year. (Solera Aff. ¶ 15)

220.    To encourage foster families to adopt, the Department now provides college tuition reimbursement for children adopted from DCF's care after January, 2005. (Solera Aff. ¶ 16)

221.    In addition, to encourage foster families to consider adoption, DCF provides adoption support to families, which will soon include an adoption assistance program, modeled after the employee assistance program.  Even without an open case, the family may receive immediate assessment and referral for services, including therapeutic services, counseling, behavioral supports, and respite care. (Solera Aff. ¶ 17)

222.  One of the added benefits of placing children who have behavioral/mental health needs in foster care is that some of them who cannot be returned to their parents may be adopted by their foster family. The opportunity for adoption or at least a long-term commitment by the family is a major advantage of some foster care placements. Permanency is just as important for children with behavioral/mental health needs as it is for children who do not have such needs. (Solera Aff. ¶ 18)

223.  DCF expended $500,000 in FY2004-05 for targeted recruitment and has the same level of funding for the current fiscal year. The money is spent to recruit homes for children of color, adolescents, sibling groups, medically complex and other hard to place children. Half of the money will be used for the Queen Esther Project to work closely with churches around the state to help in the recruitment effort. The remaining funds are being used for media campaigns, in English and Spanish. A national consultant is presently working with DCF to improve recruitment efforts. (Solera Aff. ¶ 19)

224.  DCF is making every effort to recruit and train more foster families, including therapeutic and treatment foster families, and to obtain the funding necessary to support such services. (Solera Aff. ¶ 20)

**CASAMENTO**

225.  Charlene Casamento is the Assistant Chief Fiscal Officer for the Department of Children and Families. She has held this position since December 2002. Prior to that she was employed by Department of Social Services from March 1999 to December 2002. (Casamento Aff., ¶1)

226.   During this time she worked in the Office of Quality Assurance and in the Office of the Deputy Commissioner of Administration. (Casamento Aff. ¶ 2)

227.  Charlene Casamento has a master's degree in business administration and have had over 13 years of experience in the accounting, auditing and project management. (Casamento Aff. ¶ 2)

228.  Part of Charlene Casamento's responsibilities is to oversee the development of the department's budget and to assure that DCF's expenditures comply with all budget restrictions. (Casamento Aff. ¶ 3)

229.  The majority of DCF's funding is appropriated through the state's general funds. (Casamento Aff. ¶ 4)

230.  The state operates under a biennial budget, and agencies are appropriated funds that establish spending limits for each agency. (Casamento Aff. ¶ 5)

231. Since SFY 2002, DCF's total appropriation has grown from $464,516,600 to $726,169,733 in SFY 2006. Attached is a true and accurate copy of DCF's Appropriation for each state fiscal year (SFY). (Casamento Aff. ¶ 6)

232. Appropriation increases for DCF have come at a time when most state agencies have been experiencing budget reductions. (Casamento Aff. ¶ 7)

233. Despite budget increases, DCF has had to seek deficiency funding over the past few years: $2.5 million in SFY 2003, $23.1 million in SFY 2004 and $11.8 million in SFY 2005. (Casamento Aff. ¶ 8)

234. Mental health expenditures in DCF's budget cannot be readily identified because the agency operates under a consolidated budget, with many of the services provided serving more than one mandate, making it difficult to tie a service to one mandate. (Casamento Aff. ¶ 9).

235. Expenditures are not budgeted by type of child or case and there are no separate line items for the various type of lawsuit. Therefore, it would be very difficult to break down expenses by each category of child. (Casamento Aff. ¶ 10)

236. The majority of DCF's budget is earmarked for *Juan F.* or already being used for community-based services for children not covered by *Juan F.* or *Emily J.* consent judgments. (Casamento Aff. ¶ 11)

237. DCF has increased federal reimbursement from the Federal Foster Care (IV-E) and Adoption Assistance programs from $45 million in SFY 2003 to over $106.7 million in SFY 2005. (Casamento Aff. ¶ 12)

238. DCF has been allowed to submit budget expansion options during the last two years. Attached is a true and accurate copy of the budget option requests for the last two fiscal years. (Casamento Aff. ¶ 13)

239. Since SFY 2000, DCF has received funds to carry out the KidCare initiative. This past fiscal year (SFY 2005), the funds totaled $23 million and supported extended day treatment, emergency mobile crisis teams, 59 local care coordinators, home-based therapy, family advocacy and related services. (Casamento Aff. ¶ 14)

240. DCF also has received funding through the Community Mental Health Strategic Investment Funds. Since the fund was established in 2001, DCF received over $5 million to cover new juvenile justice intermediate evaluations to prevent children from being hospitalized for evaluations, mental health supports in five school systems, flexible funding, early childhood consultations for mentally ill children under six, and In-Home Therapeutic Psychiatric Services (IICAPS). (Casamento Aff. ¶ 15)

241.    DCF's appropriation for SFY 2006 includes funds to support the continuation of in-home services, flexible funds, intermediate evaluations, and early childhood consultations that was previously funded via the Community Mental Health Strategy Board. (Casamento Aff. ¶ 16)

242.    The Community Mental Health Strategy Board has provided an additional $1 million in funding for SFY 2005 for flexible funding, in-home services and early childhood consultation. (Casamento Aff. ¶ 17)

243.    DCF utilizes both state and federal funds to expand community-based services. Federal community mental health block grant funding has been used most recently for care coordination, respite services, flexible funding and family advocacy. These funds come from the Substance Abuse and Mental Health Administration (SAMSHA). (Casamento Aff. ¶ 18)

244.    In 2002, DCF applied for and received a six-year $9.5 million in federal SAMHSA grants for "Partnership for Kids Project" in Bridgeport, to implement a school-based system of care collaborative. Additional SAMHSA grants are being sought for two more urban areas. (Casamento Aff. ¶ 19)

245.    Apart from KidCare funds, DCF received in SFY 2005 a budget increase of $6 million in community-based mental health services, to cover wrap-around services, two therapeutic group homes, treatment foster care and family support teams. (Casamento Aff. ¶ 20)

246.    KidCare funding has increased since the program began: in SFY 2001, the legislature provided $3.5 million for the program, in SFY 2002, $11.4 million, in SFY 2003, $21 million, in SFY 2004, $22 million, in SFY 2005, $23 million and in SFY 06 $32 million. (Casamento Aff. ¶ 21)

247.    DCF has received funding to develop family support teams, at a cost of $7 million during SFY 2005, increasing to $7.5 million in SFY 2006. These teams are intended to help families with children either transitioning to community-based services or being diverted from residential treatment. (Casamento Aff. ¶ 22)

248.    In SFY 2005 DCF has been allocated $500,000 to recruit foster and adoptive families for difficult to place children (older children, multiple behavioral or developmental problems and targeted recruitment). In SFY 2006, the Department received the $500,000 in SFY 05, as well as an additional $500,000 to enhance adoption and fostercare recruitment. (Casamento Aff. ¶ 23)

249.    Average annual costs for SFY 05 for therapeutic foster care per child is $30,426; average annual costs of treatment foster care for SFY 05 is $35,000 per child; projected average annual costs of multidimensional foster care is $34,667 per child; average annual costs of in-state residential treatment in private facilities for SFY 05 is $77,000 per child; and the

projected average annual costs of therapeutic group homes per child is $180,000. (Casamento Aff. ¶ 24)

250.   Therapeutic group homes are more expensive than residential care because homes cannot offer the economies of scale of residential facilities and the services are more individualized. (Casamento Aff. ¶ 25)

251.   Over the course of SFY 2005 and SFY 2006, DCF has funding to develop 41 therapeutic group homes at a cost of $900,000 per home; once the group homes are fully operational the annualized cost of the group homes will be approximately $39 million. (Casamento Aff. ¶ 26)

DEFENDANTS

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY:   Susan T. Pearlman
Assistant Attorney General
Federal Bar No. 06338
110 Sherman Street
Hartford, CT  06l05
Tel: (860) 808-5480
Fax: (860) 808-5595
Susan.Pearlman@po.state.ct.us

## **CERTIFICATION**

I hereby certify that a copy of the foregoing was mailed in accordance with Rule 5(b) of the

Federal Rules of Civil Procedure on this 21st day of July, 2005  first class postage prepaid to:

Attorney Catherine  L. Williams
Connecticut Legal Services
211 State Street
Bridgeport, CT 06604
Phone: 203 336-3851
Fax: 203 333-49776

Attorney Lori Welch-Rubin
129 Whitney Avenue
New Haven, CT 06515
Phone: 203 772-6680
Fax: 203 772-2194

Attorney Bet Gailor
Attorney Anne Louise Blanchard
Connecticut Legal Services
872 Main Street
Willimantic, CT  06226
Phone:  860 451761
Fax: 860 456-7420

Susan T. Pearlman
Assistant Attorney General