UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | |
|---|---|
| W.R., individually and on behalf of her minor son, JOSEPH R.; SUSAN K.; M.O., individually and on behalf of her minor son, OMAR S.; and on behalf of all others similarly situated; <br><br> JEANNE MILSTEIN, CHILD ADVOCATE OF THE STATE OF CONNECTICUT <br>    *Plaintiffs,* <br><br> VS. <br><br> CONNECTICUT DEPARTMENT OF CHILDREN AND FAMILIES, and <br><br> DARLENE DUNBAR, in her official capacity as Commissioner of the Connecticut Department of Children and Families <br>    *Defendants.* | <br><br><br><br><br><br><br><br><br><br><br> CIV NO. 302CV429 (RNC) <br><br><br><br><br><br><br><br> JULY 21, 2005 |

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

INTRODUCTION..................................................................................................3

Summary of Relevant Facts Regarding the Plaintiffs..........................................4
Summary of Relevant Facts Regarding the Defendants ......................................7

ARGUMENT.......................................................................................................13
I.   Standard of Review for Summary Judgment ...........................................13
II.  The Case Should Be Dismissed as Moot as to Susan K. and Omar S. ....14
III. Omar's Claims are Barred by Res Judicata ..............................................16
IV.  The Plaintiffs Are Not Entitled to Relief Under Either the ADA or the Rehabilitation Act...18
     A.   Olmstead and the Americans with Disabilities Act..........................18
     B.   Under the *Olmstead* test, Joseph does not qualify for placement
          in a less restrictive environment.......................................................21
     C.   Joseph R.'s claim is not ripe, given that his clinical team has concluded that
          he is not currently ready to move to a less restrictives setting........21
     D.   The Plaintiffs have not met their burden of articulating a reasonable
          accommodation..................................................................................23
     E.   The Development of 41 Therapeutic Group Homes Satisfies the Defendants'
          Obligation for a Reasonable Accommodation .................................26
     F.   Under the *Olmstead* test, the plaintiffs are seeking relief that would
          require a "fundamental alteration."...................................................27
          1.   Existing Obligations and Constraints on DCF's Budget ...............27
          2.   DCF's Mental Health Budget .........................................................28
          3.   The State has developed and is implementing a plan that comports
               with *Olmstead* ................................................................................30
               a.   Court-Approved Plans ............................................................32
               b.   Other Plans ..............................................................................33
               c.   New Legislative Mandates for Community-Based Mental
                    Health Services.......................................................................34
               d.   DCF's Implementation of KidCare .........................................35
               e.   Other Efforts by DCF .............................................................38
               f.   Risk of Reallocating Funds ....................................................42
               g.   Commitment to Change .........................................................45
V.   The Court Should Abstain under *Burford* from Considering these Claims ...........45
VI.  This Court Should Decline to Exercise Supplemental Jurisdiction Over Pending
     State Law Claims .....................................................................................49
VII. The State Law Claims Should Be Dismissed for Failure to Exhaust Administrative
     Remedies ..................................................................................................50

CONCLUSION ..................................................................................................50

## Introduction

This matter was brought on behalf of three mentally ill individuals[1] against the Connecticut Department of Children and Families and the Commissioner of the Department of Children and Families. The principal claim is that the defendants violated the Americans with Disabilities Act, 42 U.S.C. §12132 (ADA) and Section 504 of the Rehabilitation Act, 29 U.S.C. §794 (a) (the Rehabilitation Act) by not providing less restrictive placements for the plaintiffs. The complaint also alleges that there have been violations of state law and constitution. The plaintiffs sought to be treated as a class but this court denied the request for class certification without prejudice on September, 30, 2004. A second motion for class certification is pending. On March 24, 2003, this court granted in part the state's motion to dismiss, finding that the plaintiffs were not entitled to damages. *See, W.R. v. Conn. Dep't of Children and Families, 2003 U.S. LEXIS 5128 (D. Conn. 2003).*

The plaintiffs here contend that despite the numerous new programs and services, legislative and executive initiatives, and court orders directing the defendants' resources and efforts to implement a community-based mental health system, this court should nevertheless impose its authority to order the development of community-based supervised residential placements. There is no evidence of any discrimination against mentally ill children – indeed, the evidence will indicate that any reallocation of resources would only harm other disabled children and disrupt state plans and court orders designed to implement a community-based system of care. This motion for summary judgment will demonstrate that the defendants, indeed the state, is fully engaged in an immense undertaking to provide a wide range of localized services and placements for mentally ill children. Hundreds of millions of public funds are being poured into this endeavor and many professionals are involved in the planning and provision of

these services. All branches of state government are participating in this enormous and complicated effort.

The plaintiffs' demands reflect an oversimplistic and uninformed view of the problems; this is a highly complicated area, and consequently, the state defendants should be allowed to develop responses without judicial intervention. The defendants now move for summary judgment, asserting that the matter is moot with regard to two of the plaintiffs, Susan K. and Omar S.; that Omar's claims are also barred by res judicata; and that the court should abstain from hearing this case. As to all plaintiffs, the defendants assert there is no violation of either state or federal law and therefore judgment should enter for the defendants.

**Summary of Relevant Facts Regarding the Plaintiffs**

Susan K. is now 21 years old. (SUF ¶ 9) She has a long history of mental illness and has been in the state's care since she was nine years old. (SUF ¶ 3) She has been in a variety of placements, including foster care, residential treatment facilities, hospitals and shelters. (SUF ¶ 4) In 2004, Susan was placed in Supervised LifeStyles (SLS), a residential mental health program in Brewster, New York. (SUF ¶ 6) She received mental health services at this facility and was able to make sufficient progress in treatment that she was placed in a large house with five other women. *Id.* Since she was placed at SLS, she has not been restrained, has not injured others or been arrested, nor has she requested that DCF move her to a different placement. (SUF ¶ 7)

---

[1] On April 5, 2002, this court granted the plaintiffs permission to prosecute the suit in fictitious names and to seal the case.

When Susan turned 21 in the fall of 2004, DCF transitioned her to the care of the Department of Mental Health and Addiction Services (DMHAS) as that agency has responsibility for providing mental health services to adults. (SUF ¶ 8 & 9) The two agencies have implemented an interagency agreement that is designed to transfer jurisdiction and services for mentally ill children to DHMAS as they age out of DCF's authority. (Ex. I; SUF ¶ 8) DCF's jurisdiction is generally limited to providing services to children up to age 18; however, under state law, children who are in a full-time educational program may continue to receive services voluntarily from DCF until they turn 21. Conn. Gen. Stat. § 46b-129 (j). At this time, DCF is no longer providing services to Susan, nor does the agency have the authority to do so. (SUF ¶ 10) Susan is now receiving services from DHMAS. (SUF ¶ 9)

Omar S. is 17 years old. (SUF ¶ 17) He has been diagnosed as mentally ill and has been in the state's care since 2001. (SUF ¶ 13) He was committed to the care of the Department as an "uncared for" child due to his specialized needs. (SUF ¶ 15). He was placed in a variety of placements, including most recently a group home. (SUF ¶ 16) In the spring of 2005, Omar left the group home without permission and moved to New York City to live with his mother, who represents him in this action. (SUF ¶ 23) On May 31, 2005, a DCF social worker assigned to Omar's case met with the family and learned that Omar and his mother were signing him out of care; they asked the worker to close DCF's case on Omar. (Ex. J; SUF ¶ 29)

Joseph R. is 16 years old and is in the voluntary services program of DCF. (SUF ¶ 41, 42) He has had mental health problems for most of his life and has been hospitalized at least four times. (SUF ¶ 44 & 49) Joseph has been in a number of placements since he was first admitted in 1999 to DCF's voluntary services program. (SUF ¶ 44) This program, established by the General Assembly, permits the commissioner, at her discretion, to admit "on a voluntary basis any child or youth who, in the

commissioner's opinion, could benefit from any of the services offered or administered by, or under contract with, or otherwise available to, the department." Conn. Gen. Stat. §17a-11(a). (Ex. K). Under DCF regulations, the program is available for children and youth "with an emotional, behavioral or substance abuse disorder diagnosable under the most recent issue of the Diagnostic and Statistical Manual of Mental Disorders." Reg. of Conn. State. Agencies, 17a-11-7(a)(1).[2]

Joseph has exhibited assaultive behavior and has been prescribed medications for his problems. (SUF ¶ 43) Joseph's behavior has led to several arrests and he's been adjudicated a delinquent three times since 2001. (SUF ¶ 45) In 2002, he was placed at Riverview Hospital and he remained there until July, 2003. (SUF ¶ 44) Then Joseph was placed at Brightside residential treatment facility in Springfield, Massachusetts. *Id.* During his stay at Brightside, Joseph was on probation from his delinquency charges and was required to cooperate with both DCF and Brightside until medically discharged. (SUF ¶ 45) Brightside eventually placed Joseph in a group home operated by that program. (SUF ¶ 44) He was released home in August, 2004. However, he became aggressive again and was returned to Brightside in September, 2004. (SUF ¶ 46)

Since last fall, Joseph's assaultive behaviors have continued and in March 2005, he assaulted staff at Brightside and refused to take medication or follow orders. (SUF ¶ 47) As a consequence, Joseph was placed at Providence Hospital. (SUF ¶ 48). From Providence Hospital, Joseph was placed at Connecticut Children's Place, a residential treatment facility operated by DCF. (SUF ¶ 34, 44)

---

[2] Although the Commissioner has the authority to limit the number of children receiving voluntary services, the Commissioner has chosen not to do so. As a consequence, the number of families seeking these services increases, resulting in some families waiting longer for services. However, few wait more than a few months for services.(SUF ¶ 166)

6

Due to his difficult behavior, Joseph has been placed on one-to-one supervision. (SUF ¶ 52). His current therapeutic team is not recommending a less restrictive placement at this time. (SUF ¶ 63)

**Summary of Relevant Facts Regarding the Defendants**

The Department of Children and Families, in addition to its mandates to protect and provide services for children who have been abused and neglected, for delinquent children and children of families with service needs, is also the mental health agency for children. (SUF ¶ 67) The multiple mandates of the agency can be found in Conn. Gen. Stat. §17a-3. (Ex. L).

Over the last five years, the agency has greatly expanded its mental health focus, staffing and budget, particularly for community-based mental health services. (SUF ¶ 72) DCF's own mission statement also adopts the principle that "children and families are best served when they are part of and supported by their community. The Department is part of this community, works in association with community members, and is committed to its services being localized, accessible and individualized to meet the variety of children and families' needs." (SUF ¶ 68)

In 2003, DCF, as part of a resolution of a then fourteen-year old federal class action lawsuit concerning abused and neglected children, and children at risk of being abused or neglected, entered into a court-approved Exit Plan. *Juan F. v. Rowland*, H-89-859 (AHN). That case concerned services and care, including mental health treatment, provided to these children by the state. (Ex. M) In October, 2003, the federal court established a Transition Task Force (TTF) with broad authority to direct the resources of the agency to help the agency reach compliance with the Exit Plan. (Ex. N) The TTF is comprised of the court-appointed monitor, the Commissioner of DCF and the Secretary of the Office of Policy and Management. (SUF ¶ 120)

The Exit Plan provides, inter alia, that the agency will reduce the number of children placed in privately operated residential treatment care; according to Outcome Measure 19, the total number of children in residential placements must not exceed 11% of the total number of children in DCF out-of-home care. (Ex. O, p. 30; SUF ¶ 122) Furthermore "the circumstances of all children at in-state and out-of-state residential facilities shall be assessed after the Court's approval of this Exit Plan on a child specific basis to determine if their needs can be met in a less restrictive setting. The placement of any additional children out-of-state after the approval of this plan shall require the approval of the Transition Task Force." (Ex. O, p. 30; SUF ¶ 121) The universe of children covered by Outcome Measure 19 includes children in the voluntary services program. (SUF ¶ 122, Ex. P).

To carry out the obligations outlined in the Exit Plan, DCF, in May, 2004 adopted and circulated a Positive Outcomes for Children Plan (POC plan). (Ex. Q; SUF ¶ 123) With respect to addressing Outcome Measure 19, the POC Plan calls for the development of a localized managed mental health service system along with an expansion of local services for these children and their families. (SUF ¶ 125, 127) The POC Plan stated that requests for proposals would be issued for group homes, family support teams, treatment foster care, treatment group homes, alternatives to hospitalization, and flexible funding to "enhance the ability of local communities to service children in less restrictive, more local settings." (Ex. Q, p. 3)

In September, 2004, DCF also filed a Child and Family Service Plan with the Administration for Children and Families, U.S. Department of Health and Human Services. (SUF ¶ 144, Ex. R) This plan is required for states who utilize federal funds to help defray the costs of foster care, under the Child Abuse Prevention and Treatment Act, 42 U.S.C. 5101 et. seq. *Id.*

The Service Plan cites the POC plan and explains that the POC plan was accepted by the TTF and is now being implemented. (SUF ¶ 141) The Service Plan was publicly circulated and describes how the department will carry out its obligations under the Exit Plan, explaining that target numbers for each office will be set to reduce the number of children placed in residential treatment facilities. (SUF ¶ 126, 146) Also, the Service Plan outlines DCF's plans to use a private non-profit agency (an administrative service organization) to work with each area office to identify children ready for discharge from residential facilities who require community-based services and to assess needs for expanded community-based programs to prevent children with mental illness from leaving their communities. (SUF ¶ 145)

Long before before the Exit Plan was adopted, DCF had been working with other state agencies and the legislature to implement a new community-based mental health initiative. In 2001, this reform effort culminated in Connecticut Community KidCare, designed to improve the way the state coordinates and finances children's mental health and substance abuse services. (SUF ¶ 85) KidCare grew out of the Behavioral Health Partnership, involving DCF, Department of Social Services (DSS) and DHMAS, which was intended to establish an integrated system of care for children and adults. (SUF ¶ 84)[3]

Legislation authorized the three agencies to share responsibility and funding for this vast undertaking. Specifically, the Behavioral Health Partnership and the KidCare initiative arose from the

---

[3] KidCare is a federally endorsed model of systems of care, as recommended by the Center for Mental Health Services, part of the Substance Abuse and Mental Health Administration of the U.S. Department of Health and Human Services. (SUF ¶ 90) The federal model is premised on a local consortium of public and private health care providers, parents, service agencies, and educational agencies working together to coordinate community resources and services for mentally ill children. (SUF ¶ 91)

enactment of Public Act 00-2, Sec. 5 by the Connecticut General Assembly. (Ex. S). That legislation, now codified in Sec. 17a-22a (c), provides that:

> Connecticut Community KidCare shall include: (1) A system of care model in which service planning is based on the needs and preferences of the child or youth and his or her family and that places an emphasis on early identification, prevention and treatment; (2) a comprehensive behavioral health program with a flexible benefit package that shall include clinically necessary and appropriate home and community-based treatment services and comprehensive support services in the least restrictive setting; (3) community-based care planning and service delivery, including services and supports for children from birth through early childhood that link Connecticut Community KidCare to the early childhood community and promote emotional wellness; (4) comprehensive children and youth behavioral health training for agency and system staff and interested parents and guardians; (5) an efficient balance of local participation and state-wide administration; (6) integration of agency funding to support the benefit package; (7) a performance measurement system for monitoring quality and access; (8) accountability for quality, access and cost; (9) elimination of the major gaps in services and barriers to access services; (10) a system of care that is family-focused with respect for the legal rights of the child or youth and his or her parents and provides training, support and family advocacy services; (11) assurances of timely payment of service claims; (12) assurances that no child or youth shall be disenrolled or inappropriately discharged due to behavioral health care needs; and (13) identification of youths in need of transition services to adult systems.

The plan was to blend federal, state and local resources to provide wrap-around and other services for children to allow them to remain in their communities, rather than be placed in treatment facilities. (SUF ¶ 86). In January, 2001, DCF and DSS issued "Connecticut Community KidCare: A Plan to Reform the Delivery and Financing of Children's Behavioral Health Services." (Ex. T) This plan, required by state law, spelled out how the two agencies intended to carry out this extensive undertaking, including integrating funding, establishing an organizational structure to administer the program, assess elgibility for the program, etc.

KidCare was founded on the principle that children with behavioral health needs should receive services in their communities whenever possible, with families and caregivers part of the planning and

10

decision-making. (SUF ¶ 86) DCF adopted a mission statement communicating its commitment to strengthen families' capacity to help children with behavioral health needs, with a strong preference to deliver and manage services within the local community. (SUF ¶ 68, 87)

KidCare initially provided funds to create three new types of non-traditional mental health services to help families find treatment in their own areas: mobile crisis teams, intensive home-based supports and care coordination. (SUF ¶ 89) Extended day treatment was also expanded. *Id*. Since then, funding and services for the KidCare initiative have grown significantly. This past fiscal year, State Fiscal Year (SFY) 2005, KidCare funding totalled $23 million and and covered extended day treatment, emergency mobile crisis, 59 local care coordinators, home-based therapy, family advocacy, crisis stabilization beds, and related services. (SUF ¶ 239)

A related funding strategy was undertaken in 2001 by the General Assembly when it established the Community Mental Health Strategic Investment Fund to be used for "new or expanded community mental health clinical and nonclinical facilities, related mental health services and supportive housing for persons with mental health needs." Conn. Gen. Stat. §17a-485. The funds were to be spent "in accordance with a community mental health strategic plan" adopted by a new Community Mental Health Strategy Board, whose members are appointed by the legislature and the Governor. Conn. Gen. Stat. §17-485a and §17-485b. The board has authority to determine how the funds will be used. *Id.*

Since the fund was established, the board has approved expenses totaling over $5 million for children with mental illness, with funds earmarked for new juvenile justice intermediate evaluations to prevent children from being placed in hospitals for evaluations, mental health supports in five school systems, flexible funding for children requiring behavioral health supports, early childhood consultation

for mentally ill children under age six, and in-home mental health services. (SUF ¶ 240) The most recent budget allocation allows DCF to continue in-home mental health services, flexible funding, early childhood consultation, and intermediate evaluations. (SUF ¶ 241) An additional $1 million has been provided by the Community Mental Health Strategy Board and is earmarked for flexible funding, in-home services and early childhood consultation. (SUF ¶ 242)

As part of this expansion of community-based services, DCF is developing forty-one new therapeutic group homes. (SUF ¶ 251) In the fall of 2004, DCF asked for "creative and innovative proposals from providers that are designed to help…meet [DCF's] goal of returning children to Connecticut who are currently out-of-state; to assure that fewer children are placed in residential care and that no child who is removed from his or her home or community remains in an institutional setting for any longer than is absolutely necessary." (SUF ¶ 156) In March, 2005, the department issued another RFP for the development of group homes for youth "who may have required psychiatric hospitalizations, are at increased risk for psychiatric hospitalizations or require clinical services of different intensities in a small structured setting." (SUF ¶ 157) Currently DCF has 23 group homes, including three group homes that offer intensive services for severely disabled or retarded individuals. (SUF ¶ 158)

Although DCF is moving ahead with plans to deinstitutionalize children, its efforts to reallocate funds from residential care to community care must be done in a planful way to avoid reducing critically needed services for those children requiring intensive 24-hour treatment. (SUF ¶ 171) The state must continue to maintain a public hospital for children who cannot be safely cared for in less restrictive settings. (SUF ¶ 176). In the past few years, the number of beds at Riverview has been

reduced from 107 to 96; continued reduction would be virtually impossible due to the shortage of private hospital beds for mentally ill children and lack of sufficient insurance coverage. (SUF ¶ 81, 176 & 177) In fact, the General Assembly enacted legislation this year requiring the Office of Health Care Access to establish a committee to study the need for expanded capacity. P.A. 05-280 §90(a). (Ex. U) Any court order to reduce the number of hospital or residential treatment beds could have a severe impact on the children DCF serves.

## ARGUMENT

### I.   Standard of Review for Summary Judgment

When the court finds that "there is no genuine issue as to any material fact and …the moving party is entitled to judgment as a matter of law." FRCP ¶56 (c). "Facts are deemed material only when they might affect the outcome of the case under the governing law." *Messier v. Southbury Training Sch.*, 1999 U.S. Dist. LEXIS 1479 (D. Conn. 1999). To present a "genuine" issue of material fact, the contradictory evidence must be "such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A plaintiff defending a motion for summary judgment may not rest upon the allegations of the complaint, but rather must "designate specific facts showing there is a genuine issue for trial." *Park Ave. Tower Assocs. v. City of New York*, 746 F.2d 135, 141 (2d Cir. 1984). "Because the purpose of summary judgment is to isolate and dispose of claims that lack evidentiary support, the nonmoving party may not rest on the allegations of its pleadings, but must point to evidence." *Lucibello v. Yale-New Haven Hosp.*, 2005 U.S. Dist. LEXIS 3604 at *12.