## II.    The Case Should Be Dismissed as Moot as to Susan K. and Omar S.

The jurisdiction of federal courts is limited to cases and controversies. U.S. Const. Art. III, § 2, cl. 1. In order to satisfy this constitutional requirement, litigants must establish that they have standing to set the judicial process in motion by demonstrating a "personal stake" or "legally cognizable interest in the outcome" of their case. *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 395 (1980), (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969))*. Under Supreme Court jurisprudence regarding the "case and controversy" condition of Article III, this Court lacks subject matter jurisdiction over a case "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Murphy v. Hunt*, 455 U.S. 478, 481 (1982).

A case that is "live" at the outset may become moot "when it becomes impossible for the courts, through the exercise of their remedial powers, to do anything to redress the injury." *Alexander v. Yale Univ.*, 631 F.2d 178, 183 (2d Cir. 1980). The mootness doctrine serves as an extension of the jurisdictional concept of standing by ensuring that the litigant's interest in the outcome continues to exist throughout the life of the lawsuit. See *Cook v. Colgate Univ.*, 992 F.2d 17, 19 (2d Cir. 1993) (equitable claims against university mooted by graduation of student- plaintiffs). "When a plaintiff cannot show that an injury is likely to occur immediately, the plaintiff does not have standing to seek prospective relief even if he has suffered past injury." *31 Foster Children v. Bush*, 329 F.3d 1255, 1265 (11th Cir. 2003).

In the present case, neither Susan nor Omar have standing to assert their own claims for injunctive and declaratory relief because their claims are moot. The gravamen of this lawsuit is that the plaintiffs have a right to be placed in a community based group home. The complaint seeks an order that DCF provide such placements for the plaintiffs. However, due to changed circumstances, this remedy

can no longer be granted by the court to these plaintiffs. Nor can either Omar or Susan show an injury that is likely to occur immediately; consequently they both lack standing to pursue this action for injunctive relief.

Susan K. has turned 21 years of age and she is no longer eligible for DCF services. (SUF ¶ 9, 10) Another agency, the Department of Mental Health and Addiction Services (DHMAS) has assumed responsibility for her care. (SUF ¶ 9) At this point, there is no relief this court can offer Susan by way of an order against DCF, as she is not a client of DCF and DCF has no authority to provide any services to her. (SUF ¶ 10)

Similarly, Omar S. is not seeking services or placement from DCF. He is currently 17 years of age. (SUF ¶ 17) On October 18, 2004, Omar was placed at a licensed group home that provided 24 hour supervision, case management services, counseling, independent living skills and vocational services. (SUF ¶ 18-20) He left the group home on April 9, 2005 and went to live with his mother in New York. (SUF ¶ 23) Subsequently, both he and his mother signed a Refusal of Services letter indicating he no longer wishes to participate in DCF programs. (SUF ¶ 29, Ex. J)

At this juncture, neither of these plaintiffs is requesting any type of services from DCF. Even assuming, for purposes of this motion, that the plaintiffs were not appropriately placed for a period of time in the past, the complaint does not seek any practical relief that could be afforded these named plaintiffs at this time to redress that alleged violation. As such, there is no live controversy between the plaintiffs and DCF. *See Calderon v. Moore*, 518 U.S. 149, 150 (1996). Accordingly, they no longer have a cause of action on the merits of their specific claims and their claims should be dismissed as moot.[4]

---

[4] A plaintiff who brings a class action presents two separate issues for judicial resolution. One is the claim on the merits; the other is the claim that he is entitled to represent a class. *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 402 (1980). For purposes of this Motion for Summary Judgment,

15

### III. Omar's Claims are Barred by Res Judicata

"Res judicata operates as "claim preclusion." Generally, a judgment in an action "precludes the party from relitigating issues that were or could have been raised in that action." *Interoceanica Corp. v. Sound Pilots, 107 F.3d 86, 90 (2d Cir. 1997).* (Citations omitted). Res judicata applies to the parties "and those in privity with them." *S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1463 (2d Cir. 1996).*

Where the first action involves a class, rules of res judicata apply as well and "members of a class not present as parties to the litigation may be bound by the judgment where they are in fact adequately represented by parties who are present." *Hansberry v. Lee, 311 U.S. 32, 42-43 (1940).* "The only question, therefore, [is] whether, to be barred by res judicata, the claims in the prior and successive actions are "integrally related." *Muhammad v. Warithu-Deen Umar, 98 F. Supp. 2d 337, 342 (W.D.N.Y. 2000).*

A similar question arose in *Figueroa v. Dean, 2002 U.S. Dist. LEXIS 20725 (S.D.N.Y. 2002).* There the district court determined that an action by two deaf inmates against prison officials alleging violations of the Americans with Disabilities Act was barred by res judicata because an earlier class action lawsuit resulting in a consent judgment included these inmates in the class and covered the same issues. "As a member of the class of plaintiffs certified in [the earlier case], Figueroa and Duquin have the benefit of the resolution of that case, and cannot relitigate any issue which was addressed in that case." *Id. at *5.* The court found that the earlier matter dealt with the same claims raised by the second case and therefore determined that the second matter was barred by res judicata.

---

the defendants are only dealing with the first issue. The second issue is the subject of the defendant's pending objection to the plaintiff's second request for class certification.

Here, Omar S. is a member of the *Juan F.* class,[5] having been adjudicated uncared for. (SUF ¶ 15, 119) *Juan F.* classmembers include all children adjudicated neglected or uncared for. (SUF ¶ 119) When his mother filed the present action in 2002 on his behalf, she ignored the fact that the issues presented here had already been raised and addressed in the earlier litigation. The *Juan F.* complaint specifically alleged lack of mental health services for children in the state's care, including "failure to place children in the least restrictive, most family-like settings." (Ex. M, ¶ I(c), p. 2). ¶ 148-152 of the Complaint alleged "failure to provide adequate mental health treatment." (Ex. M, p. 45). Specifically, the Complaint stated that "children in need of mental health… treatment services…encounter…overly restrictive placements." (Ex. M, ¶ 151(h), p. 48). ¶ 188 of the Complaint alleged DCF has "caused children …to be unnecessarily institutionalized or remain institutionalized beyond the time that care in such restrictive settings has been necessary; children have been released from residential and psychiatric facilities to inappropriate placements…" (Ex. M, p. 60). The Sixth Cause of Action stated that DCF has violated the constitutional rights of classmembers to least restrictive, appropriate placements. (Ex. M, p. 80). Therefore, because this action is based on the same "claims" or "nucleus of operative facts" *(See Waldman v. Village of Kiryas Joel,* 207 F.3d 105, 109 (2d Cir. 2000)), as alleged in the *Juan F.* complaint, Omar's claims are barred by res judicata and must be dismissed.

---

[5] The plaintiffs have claimed that the *Juan F.* class did not include either Susan as she was 18 at the time the action was filed or Joseph, who is in the voluntary services program. (see March 10, 2004 letter to the court; Attachment F to the Plaintiff's Reply to Defendant's Objection to Plaintiff's Second Motion for Class Certification.) However, both plaintiffs are clearly beneficiaries of the class action, as the Exit Plan makes clear. See Outcome Measure 20 – "at least 85% of all children age 18 or older shall have achieved one or more of the following [goals] prior to discharge from DCF custody;" and Outcome Measure 19 providing that the total number of children in residential placements must not exceed 11% of the total number of children in DCF out-of-home care, including the children in voluntary services. (Ex. P).

## IV. The Plaintiffs Are Not Entitled to Relief Under Either the ADA or the Rehabilitation Act.

### A. Olmstead and the Americans with Disabilities Act

The plaintiffs filed this action under the Americans with Disabilities Act (ADA) and the Rehabilitation Act. Section 504 of the Rehabilitation Act provides that "no otherwise qualified individual with a disability …shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. §794(a). The ADA mandates that "a public entity may not discriminate against qualified individuals based on a disability: No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

Because of their similarity, claims brought under the ADA and Section 504 of the Rehabilitation Act are usually treated identically and considered together. "[T]he standards adopted by Title II of the ADA for State and local government services are generally the same as those required under section 504 of the federally assisted programs and activities." *Henrietta D. v. Bloomberg, 331 F. 3d 261, 272 (2d Cir. 2003) (internal citations omitted)*. Thus, for the same reasons that the Plaintiffs' claims fail under the ADA, they also fail under the Rehabilitation Act. *Fetto v. Sergi, 181 F. Supp. 2d 53, 65 (D. Conn. 2001)*.

> The goal of the Americans with Disabilities Act is to "assure that disabled individuals receive 'evenhanded treatment' in relation to the able-bodied." *Doe v. Pfrommer*, 148 F.3d 73, 83 (2d Cir. 1998). The ADA does not require, however, that disabled persons be accommodated with new varieties of public benefits currently unavailable to anyone: "Even [when] plaintiffs have demonstrated that they are entitled to a reasonable accommodation, an accommodation that served as a grant of special substantive rights would not constitute appropriate relief."

*Leocata v. Wilson-Coker,* 343 F. Supp. 2d 144, 154 (D. Conn. 2004), *citing Henrietta D. v. Bloomberg,* 331 F.3d 261, 282 (2d Cir. 2003)."

Regulations issued by the Attorney General implement the ADA; in particular, 28 C.F.R. § 35.130(d) known as the "integration regulation" or "integration mandate," provides that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities," 28 C.F.R. § 35.130(d).

However, the mandate to integrate public services for disabled individuals is not unlimited. The so-called "fundamental alteration regulation," 28 C.F.R.§ 35.130(b)(7), provides that while public entities are required to "make reasonable modifications in policies, practices, or procedures" in order to avoid the discrimination inherent in the unjustified segregation of the disabled, a public entity is relieved of its duties under the ADA's integration mandate if "the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

The seminal case on the application of these provisions to institutionalized individuals[6] is the Supreme Court ruling in *Olmstead v. L.C.,* 527 U.S. 581 (1999). In *Olmstead,* the Supreme Court addressed whether Georgia had violated the ADA integration requirement by failing to place mentally ill patients in community-based treatment programs. "*Olmstead* does not…stand for the proposition that states must provide disabled individuals with the opportunity to remain out of institutions. Instead it holds only that 'States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide.'" *Rodriguez v. City of New York,* 197 F.3d 611, 619 (2d Cir. 1999), quoting *Olmstead,* 527 U.S. at 603 n.14.

The *Olmstead* court ruled that "unnecessary institutionalization" violates the ADA only under the following conditions: 1) the state's treatment professionals have determined that community placement is appropriate; 2) the transfer to a less restrictive setting is not opposed by the disabled individual; and 3) the placement can be reasonably accommodated, taking into account the resources available to the state and the needs of others with mental disabilities. *Olmstead, supra at 587.*

The *Olmstead* ruling also reviewed the fundamental alteration provision cited in the federal law: "[s]ensibly construed, the fundamental alteration component of the reasonable-modifications regulation would allow the State to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with disabilities." *Id. at 604.* The ruling "does not compel states to provide relief where the requested relief would require the state to neglect the needs of other segments of the mentally disabled population who are not litigants before the court." *Frederick L. v. Dep't of Pub. Welfare,* 364 F.3d 487, 494 (3d Cir. 2004), citing *Olmstead at 597.* As long as the state has a "comprehensive, effective working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace ...." the state could avoid liability. *Olmstead, supra at 605-606.* "[T]he presence of a plan indicating a commitment to future progress toward deinstitutionalization is an essential prerequisite of the fundamental alteration defense." *Frederick L. v. Dep't of Pub. Welfare,* 2004 U.S. Dist. LEXIS 17810 at *16, citing *Frederick L. v. Dep't of Pub. Welfare,* 364 F.3d 487, supra at 500.

---

[6] The present case differs significantly from *Olmstead* and its progeny in that mentally ill children in DCF's care are not kept indefinitely in institutional care, but rather remain in residential treatment on average less than a year before being discharged. (SUF ¶ 150)

20

### B. Under the *Olmstead* test, Joseph does not qualify for placement in a less restrictive environment.

For Joseph R., the only plaintiff with a live case, to prevail under his ADA claim, he would need to demonstrate that the state's treatment professionals have determined that community placement is appropriate. *Olmstead, supra at 587.* However, his current treatment team has assessed him as currently too volatile and aggressive to manage in a less restrictive environment, out of concern for Josepth's safety and that of those around him. (SUF ¶ 63) Within the last six months, Joseph has required hospitalization, due to his mental illness. (SUF ¶ 44) He has periodically refused to take prescribed medication and has repeatedly demonstrated aggressive and assaultive behavior against staff. (SUF ¶ 43) Since May, 2005, he has been at the Connecticut Children's Place in Windsor Locks, a facility operated by DCF. (SUF ¶ 34, 50) Because of his behavior, Joseph required continuous one-to-one supervision. (SUF ¶ 52) His assaultive behavior has continued and his current therapy team is not recommending a less restrictive placement at this time. (SUF ¶ 50, 63) Therefore, he cannot meet the first prong of the *Olmstead* test, namely that the state clinicians recommend a less restrictive placement. On this basis alone, following the *Olmstead* analysis, Joseph's federal claims must be dismissed.

### C. Joseph R.'s claim is not ripe, given that his clinical team has concluded that he is not currently ready to move to a less restrictive setting.

"Ripeness is a doctrine rooted in both Article III's case or controversy requirement and prudential limitations on the exercise of judicial authority. At its heart is whether we would benefit from deferring initial review until the claims...have arisen in a more concrete and final form. As the Supreme Court has explained, the ripeness doctrine's basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." (Citations omitted; internal quotation marks omitted.) *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir.

2005). The ripeness doctrine "prevents courts from declaring the meaning of the law in a vacuum and from constructing generalized legal rules unless the resolution of an actual dispute requires it." *Simmonds v. I.N.S.*, 326 F.3d 351, 357 (2d Cir. 2003) (Prisoner's claims against the INS were not ripe, even though the INS had a final order of removal to be executed upon his release from prison, because it was not clear when or if he would be released.)

One of the essential elements of a claim under the Rehabilitation Act and the ADA is that the plaintiff has been deemed appropriate for a less restrictive placement. In this case, Joseph currently needs the more restrictive milieu in which he is placed. (SUF ¶ 63) This court should defer to his clinicians' judgment. "[T]he State generally may rely on the reasonable assessments of its own professionals in determining whether an individual "meets the essential eligibility requirements" for habilitation in a community-based program. Absent such qualification, it would be inappropriate to remove a patient from the more restrictive setting." *Olmstead, supra at 602.* It is premature for Joseph to seek relief from the federal courts for which he is not clinically ready.

Further, given the number of therapeutic group homes currently being built and those already opened, it is very likely that an opening in such a group home or other less restrictive setting will be available for Joseph if and when he is ready to "step down" to a less intensive level of care. If he is not so accommodated once he is clinically ready for the move, that would be the appropriate time for Joseph to raise his claim. As it stands, there is no practical relief which the court currently could order on Joseph's behalf, and his claim would therefore be better considered later, once his clinical readiness has been certified. Then his current treatment needs, and all other relevant facts, could be accurately known and taken into consideration by the court in any intervention it made in Joseph's placement.

Nor should the court consider the case now with the intent to ensure that appropriate placements are available when Joseph is ready. For while the court does consider potential hardship to a party in deciding whether to invoke the ripeness doctrine, "[t]he mere possibility of future injury, unless it is the cause of some present detriment, does not constitute hardship." *Murphy, supra* at 360, citing *Marchi v. Board of Cooperative Education Services*, 173 F.3d 469, 478-79 (2d Cir. 1999). Joseph is not suffering a present detriment from his placement in a clinically appropriate setting, and it is purely speculative to assert that no appropriate, less restrictive placement will be available if one is required by Joseph. This is especially true in light of DCF's extensive efforts to improve and increase the number of treatment and placement options for mentally ill children. Thus this court should dismiss Joseph's claims as not ripe.

D. **The Plaintiffs have not met their burden of articulating a reasonable accommodation.**

Under the procedure established by *Olmstead,* once the plaintiffs demonstrate that the state's treatment professionals have determined that community placement is appropriate and the transfer is not opposed by the disabled individual, the plaintiffs must futher show that the placement can be reasonably accommodated taking into account the resources available and the needs of others with mental disabilities. "Under this scheme, the plaintiff first bears the burden of articulating a reasonable accommodation." *Frederick L. v. Dep't of Pub. Welfare*, 364 F.3d 487, 492 n.4 (3d Cir. 2004). While this burden may not be a "heavy one," *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995), nevertheless the plaintiff still must "suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefit." *Id. at 138*, cited in *Henrietta D., supra* at 280.

In the present case, the plaintiffs assert that they are seeking "community-based professionally staffed residential placements." *Amended Complaint, p. 20.* The plaintiffs have rejected the more reasonable, less costly accommodation – namely foster care. By ignoring this very real and preferred option for mentally ill children, the plaintiffs have failed to meet their burden under *Olmstead*.

DCF has poured resources and energies into recruiting, training and supporting foster homes that can care for children with serious mental illness. (SUF ¶ 248) DCF has been provided with a sizeable recruitment budget ($500,000 in SFY 2005, $1 million in SFY 2006) and targets recruitment efforts at finding homes for children who are hard to place. (SUF ¶ 248) Local churches are under contract with DCF to help in recruiting foster families and a national consultant is presently assisting DCF to improve recruitment efforts. (SUF ¶ 223)

The department's commitment to expand the numbers and types of foster homes is based on the philosophy that family care settings for children of any age are usually the best settings to raise children who cannot live with their parents. (SUF ¶ 209) DCF's recruitment efforts have been largely successful with a 20% increase in specialized/therapeutic foster care usage in the last three years: as of March, 2005, 961 children were placed in private agency specialized/therapeutic foster care. (SUF ¶ 214) In March 2004, there were only 883 children in such placements. *Id.* In the prior year, there were 800 children in such placements. *Id.*

Moreover, DCF is in the process of expanding the types of foster care available for children. DCF has allocated additional funds for even more intensive level of foster care: treatment foster care is designed for children with a serious mental illness diagnosis who are at imminent risk of entering or returning to hospitals or residential placements. (SUF ¶ 216) These families collaborate closely with family support teams and community providers and have crisis intervention services available round

the clock. (SUF ¶ 217)  In fiscal year 2005, there were nine children in treatment foster care, with five more placements imminent; funding has been allocated for fiscal year 2006 to enable 62 more children to enter treatment foster care. (SUF¶ 218)

Finally, DCF is developing up to 35 new multidimensional foster care beds for children in the juvenile justice system who would otherwise require placement in a residential treatment facility. (SUF ¶ 219) These foster care beds are required under the *Emily J.* settlement agreement; additional slots must be developed in the coming fiscal year. (Ex. Y, p. 12) All of these types of specialty foster care are designed to provide care and treatment for the child who suffers from serious mental illness.

Foster care, even the most expensive foster care, is still considerably less expensive than therapeutic group homes. Average annual costs of therapeutic foster care per child is $30,426; average annual costs of treatment foster care is $35,000 per child; projected average annual costs of multidimensional foster care is $34,667 per child; average annual costs of in-state residential treatment is $77,000 per child; average annual costs of therapeutic group homes per child is $180,000.  (SUF ¶ 249).

The plaintiffs have dismissed foster care as a reasonable accommodation, claiming that these homes are "unable to provide sufficient support" to keep children out of more restrictive placements. (Amended Complaint, ¶ 26, 84).  In fact, therapeutic foster families are trained and supervised by qualified licensed child placement agencies, as well as supported with an integrated constellation of services, including individual, group and/family therapy and other assistance as needed. (SUF ¶ 213) Many of these homes have been very successful in caring for disturbed children. (SUF ¶ 212)

An added benefit, ignored by the plaintiffs, is that for mentally ill children who cannot return home, foster care may offer an opportunity for adoption or at least a long-term commitment by the

family. (SUF ¶ 222) Permanency is just as important to a mentally ill child as it is for a child who is not mentally ill. *Id.* While group homes can provide for many of the child's needs, even the best group homes cannot offer the opportunities for familial bonding and permanency that a foster family can. DCF's successful efforts to recruit and support therapeutic foster families should not be discounted. By not recognizing foster care as a very reasonable and less costly accommodation for mentally ill children, the plaintiffs have failed to meet their burden.

E. **The Development of 41 Therapeutic Group Homes Satisfies the Defendants' Obligation for a Reasonable Accommodation**

DCF has funding and developers for 35 therapeutic group homes which will be open in the next year; three are already operational. (SUF ¶ 158, 159) An additional six therapeutic group homes are slated for development in SFY 2007. (SUF ¶ 158) Over $39 million per year will be spent on these new group homes. (SUF ¶ 251) There are less than 1,000 children currently in private residential treatment facilities (SUF ¶ 149), so clearly the opening of 41 new group homes will provide ample new placements (SUF ¶ 251), when combined with the many new specialized foster care beds that are also being developed. (SUF ¶ 214) Moreover, there are multiple home-based services now available to help children return to their own communities. (SUF ¶ 101-105) All of these placements and services demonstrate that DCF has satisfied its obligations to reasonably accommodate the needs of mentally ill children.[7]

---

[7] Of the 1,263 children in voluntary services, only 173 are in placement in private residential facilities; some of them are mentally retarded and will be transferring shortly to Department of Mental Retardation. (SUF ¶ 167)