### F. Under the *Olmstead* test, the plaintiffs are seeking relief that would require a "fundamental alteration."

"Integration cannot be achieved at any cost." *Messier, supra at *37*. "The "fundamental alteration" defense recognizes that the State's responsibility to treat qualified disabled persons is not boundless. *Olmstead, supra at 603.* Where shifting of existing funds to accommodate a community-based placement would drain scarce resources needed for others with mental illness, then a fundamental alteration would result. *Williams v. Wasserman, 164 F. Supp. 2d 591, 638 (D. Md. 2001).*

Moreover, as Justice Kennedy explained in his concurring opinion in *Olmstead*, the federal court should refrain from interfering or second-guessing the budgetary process.

"No State has unlimited resources, and each must make hard decisions on how much to allocate to treatment of diseases and disabilities.....The judgment [of who should benefit from these resources] ...is a political one and not within the reach of the state. Grave constitutional concerns are raised when a federal court is given the authority to review the State's choices in basic matters such as establishing or declining to establish new programs. It is not reasonable to read the ADA to permit court intervention in these decisions."

*Olmstead, supra at 612-613.*

#### 1. Existing Obligations and Constraints on DCF's Budget

In Connecticut, the state budget is developed under a variety of constitutional and statutory constraints. The state has adopted a constitutional provision requiring a balanced budget and imposing a cap on annual spending increases. Article XXVIII, Connecticut Constitution.[8] The state operates under a biennial budget and agencies are appropriated funds that establish spending limits for each agency. (SUF ¶ 230) Agencies are also precluded from transferring funds from one account to another

---

[8] That provision prevents the General Assembly from authorizing an increase in budget expenditures above the amount expended the year before by more than either the percentage increase in personal income or percentage increase in inflation, unless the governor declares "an emergency or the existence of extraordinary circumstances and at least three-fifths member of each house of the general assembly votes to exceed such limit."

without prior legislative approval. Conn. Gen. Stat. § 4-87(a). Despite having a huge and growing budget, DCF has had to seek deficiency funding over the past few years: $2.5 million in SFY 2003, $23.1 million in SFY 2004 and $11.8 million in SFY 2005. (SUF ¶ 233)

Another constraint on DCF's budget is the fact that the great bulk of DCF's money is already under the control of the Transition Task Force (TTF) appointed by a federal judge to oversee DCF's compliance with the *Juan F.* Exit Plan or are being used for community-based services for children not covered by *Juan F.* (SUF ¶ 236). Because another court is already overseeing DCF's use of these resources in a related lawsuit, this court should refrain from interfering in the management of these resources.

Furthermore, this court is already overseeing DCF's mental health resources directed at children who were detained as delinquents and require mental health treatment. Under *Emily J. v. Rell*, 3:93cv1944 (RNC), DCF, as a defendant in that action and party to a settlement agreement, must commit over $8 million over the next two fiscal years for community-based mental health services, including a therapeutic group home and specialized foster care, for this population of mentally ill children served by DCF. (Ex. Y, p. 9-13) Again, as these funds will be committed under a different federal class action lawsuit, this court should recognize that reallocation of those funds could jeopardize the agency's ability to comply with that court-ordered agreement.

2.    **DCF's Mental Health Budget**

When examining DCF's resources, this court should consider only the agency's mental health resources, not its entire budget. This follows from *Olmstead,* since the Supreme Court there limited its examination of available resources to the state's mental health budget. "The Court never balanced

28

costs against any resources beyond the state's existing mental health budget." *Bruggeman v. Blagojevich,* 219 F.R.D. 430, 434 (N.D. Ill. 2004).

The Third Circuit addressed this very question in *Frederick L. v. Dep't of Pub. Welfare,* 364 F.3d 48 (3d Cir. 2004). In that case, the plaintiffs sought to have the district court examine a state public welfare agency's entire budget, not just the mental health items, but the court of appeals found that "DPW's myriad non-mental health responsibilities....have no nexus to the "care and treatment" of the mentally ill...we agree with the District Court that it is DPW's mental health budget, rather than DPW's more general budget, that must be considered." *Id.* at 496 n. 6.

In the present case, the "existing mental health budget" for children is not readily identifiable, because DCF has many missions besides providing mental health services and operates under a consolidated budget. (SUF ¶ 234) Many of the services that DCF provides fulfill more than one mandate, making it difficult to tie a service to a particular mandate. *Id.* Expenditures are not budgeted by type of child or case and there are no separate line items for the various type of cases. (SUF ¶ 235) Therefore, it would be very difficult to break down expenses by each category of child. *Id.*

Moreover, as stated earlier, the majority of DCF's budget is earmarked for *Juan F.* and is under the control of the TTF or already being used for community-based services for children not covered by *Juan F.* or *Emily J.* (SUF ¶ 236). Therefore, this court should be very wary of ordering reallocation of DCF's resources, as that surely would have an adverse impact on other aspects of DCF's work and particularly on DCF's court-ordered mandates.

Even if DCF could divert these resources to develop more group homes than are already slated, the high costs of such facilities, approximately $900,000 per group home (SUF ¶ 251), would force the agency to forego critically needed services for other mentally ill children. (SUF ¶ 171) The

consequence would be children needing intensive residential treatment will have fewer resources available and prevention, home-based and crisis services to keep children out of hospitals and treatment facilities would be jeopardized. (SUF ¶ 175, 179) This would clearly cause an undue hardship for many of the disabled children served by DCF. Additionally, requiring DCF to expend more of its resources on deinstitutionalization would likely have an adverse effect on abused and neglected children in the *Juan F.* class action who are not mentally ill but are just as legally entitled to services as are the plaintiffs in this action. An order mandating significant reallocation of resources would undoubtedly be a fundamental and unjustifiable alteration of DCF's existing mental health programs.

### 3. The State has developed and is implementing a plan that comports with *Olmstead*

[T]he only sensible reading of the integration mandate consistent with the Court's *Olmstead* opinion allows for a fundmanental alteration defense only if the accused agency has developed and implemented a plan to come into compliance with the ADA and RA....When such a plan exists, a remedy that would force the agency to abandon or alter its long-term compliance efforts could sacrifice widespread compliance for immediate, individualized relief. Imposing such a remedy might be penny-wise and pound-foolish.

*Pennsylvania Protection & Advocacy, Inc. v. Pennsylvania Dep't of Pub. Welfare*, 402 F.3d 374, 381 (3d Cir. 2005).

The plan must show there will be "ongoing progress toward community placement" under the plan, *Id.* at 382, *citing Frederick L., supra* at 500. The Third Circuit stated "[t]he issue is not whether there is a piece of paper that reflects that there will be ongoing progress toward community placement, but whether the Commonwealth has given assurance that there will be. In that connection what is needed at the very least is a plan that is communicated in some manner." *Frederick L., supra at 500.* When a sufficient plan could be demonstrated, the court "must be wary of judicial mandates that could thwart or undermine the agency' authority to carry out that plan as it sees fit." *Pennsylvania, supra at 381-382.*

On remand from the court of appeals, the district court, in *Frederick L. v. Dep't of Pub. Welfare,* 2004 U.S. Dist. LEXIS 17810, found the state agency met its obligation to show an effective plan for future deinstitutionalization of hospitalized mentally ill patients. The district court considered that the state had a written integration plan with goals to: 1. develop a comprehensive array of support services, 2. maintain a commitment to focus the system away from reliance on hospital beds, 3. build a mental health system founded on principles of community support and recovery, 4. assure continuous quality improvement, and 5. base the system on a strong fiscal foundation. Regional planning groups worked on submitting five-year plans to implement the goals, including establishing an infrastructure to avoid hospitalization of the mentally ill. The agency submitted data that showed numbers of admissions and discharges and lengths of stay and also submitted affidavits reflecting agency administrators' commitment and plans to continue these efforts. *Frederick L., supra,* 2004 U.S. Dist. LEXIS 17810 at *11-12.

The plaintiffs in that case argued that the court should find DPW's plan deficient because it lacked timelines or measurable outcomes and failed to set minimum number of patients that would be discharged to community placements. The district court disagreed, concluding that the "*Olmstead* plurality was careful to protect states' ability to distribute services equitably and manage mental health programs in general; the court further found the "the level of micromanagement Plaintiffs seek would be inappropriate." The court also rejected the plaintiffs' proposal that the court order the agency to seek future funding, finding "the prebudgetary process is 'beyond judicial scrutiny.'" *Frederick L.,* 2004 U.S. Dist. LEXIS 17810 at *22-25. *(citations omitted).*

31

a.  **Court-Approved Plans**

In this case, Connecticut has much more than Pennsylvania's "implementation plan." The Department is already subject to a federally-ordered Exit Plan, giving outcome measures and timelines to achieve each goal. Connecticut's Exit Plan has far more "teeth" than Pennsylvania's plan in that the TTF not only oversees the agency's work to achieve the plan but also has the authority to "provide funding and other resources necessary to fully implement the Exit Plan." *See, Juan F. v. Rowland*, 2004 U.S. Dist. LEXIS 1872 (D. Conn. 2004) (affirming this provision of the Exit Plan) (Ex. Z). This same task force has full authority to review all out-of-state placements. Evidence that the TTF has flexed its muscles to ensure DCF has resources to implement the plan is the fact that DCF's budget, since 2001, has increased by nearly $362 million! (SUF ¶ 231, Ex. AA) During this same time period, most state agencies were seeing little budget growth, if any. (SUF ¶ 232)

DCF's work on the federally required *Exit Plan* alone shows more than good faith effort and commitment toward deinstitutionalization. DCF has set a timeline of May, 2006 to substantially achieve Outcome Measure 19, the goal of which is to reduce the percentage of children in private residential facilities to 11% of all children in out-of-home care. (Ex. Q, p. 23) In fact, the total number of children placed in private residential facilities has already substantially declined. As of January, 2004, 1215 children were placed in residential placement; by June, 2005, that number had been reduced to 993. (SUF ¶ 149). The number of children placed out-of-state has declined from 524 in June, 2004 to 393 in May, 2005. (SUF ¶ 148) DCF's efforts to reduce the number of children in residential placement are being directed equally at children who have been abused and neglected and children who are in the voluntary service program. (SUF ¶ 185) Joseph is clearly a beneficiary of these efforts.

DCF's commitment to prevent unnecessary institutionalization of children is also evidenced in the recently approved settlement agreement in *Emily J.* As a result of that agreement, DCF has committed over $8 million over the next two years to expand community-based options for children who have been detained as delinquents and who would otherwise end up in residential treatment. (Ex. Y, p. 9-13) Failure to carry out this plan would result in noncompliance hearings in this court. (Ex. Y, p. 15)

The mandates outlined in the Exit Plan and the *Emily J.* Settlement Agreement and the substantial investment of public funds provide proof that Connecticut has gone far beyond Pennsylvania in implementing a plan to keep children out of institutional care whenever possible. The only logical conclusion is that DCF's duties under these two federal court orders, requiring substantial and measured progress in moving children out of residential treatment and diverting children from such placements, meet and indeed exceed any reasonable expectation for an *Olmstead* implementation plan.

    **b.**    **Other Plans**

Although a written plan is not required, as explained in the statement of facts, DCF's plans and efforts to achieve deinstitutionalization have been outlined in several important documents. DCF's commitment to this mission is spelled out in greater detail in the Positive Outcomes for Children (POC) plan, as well as the state's Child and Family Services Plan (Services Plan) submitted to the U.S. Department of Health and Human Services. (Ex. Q, R). These publicly circulated plans both reflect DCF's pledge to build and maintain a community mental health system. (SUF ¶123, 146)

The POC plan reviews DCF's proposal to have goals set by each office with localized plans for achieving the outcome measures established in the Exit Plan. (Ex. P, p. 3, 17-18) (SUF ¶ 127, 147) Also, in every area office, a new operational structure was planned to "manage all DCF funding of

33

behavioral health and residential services within the local system of care…to assure that local community-based services are accessible and responsive to the needs of children and youth with complex behavioral health needs and sometimes challenging behavioral presentations." (Ex. Q, p. 18) The progress that has been made in executing these plans clearly demonstrates DCF's dedication to deinstitutionalization.

    **c.**     **New Legislative Mandates for Community-Based Mental Health Services**

Other efforts at deinstitutionalizing children are being directed by the General Assembly, which adopted Special Act 05-11 this session. (Ex. BB) That act requires DCF to submit a feasibility plan to the Governor by August 1, 2005 concerning "the future of Connecticut Juvenile Training School, including its closing and the transfer of its students to community-based, residential or other types of treatment programs."

The General Assembly also required DCF to study the needs of girls in the juvenile justice system. Special Act 04-05 mandates DCF, in collaboration with the Department of Social Services, the Judicial Department, advocates and providers, to "establish a plan for the development of a continuum of community based services for female juvenile status offenders and delinquents." (Ex. CC) DCF has prepared such a plan (Ex. DD), which has very specific recommendations, including in Year 1, expanded respite care, realignment of residential beds for "high public safety risk girls," use of mentors, two therapeutic group homes for girls, and realignment of hospital beds for services designed for girls. (Ex. DD, p. 8-9).

### d. DCF's Implementation of KidCare

In addition to the efforts already required by the federal court orders and recent legislation, DCF has given full its commitment to the KidCare initiative and to continue its plans to expand the state's community-based mental health system. The goals of KidCare reflect the same goals that Pennsylvania's implementation plan discusses: to develop a comprehensive array of support services, to divert children away from residential treatment, to build an infrastructure for a community-supported mental health system, to maintain continuous quality improvement, and to base the system on a strong fiscal foundation. See, Conn. Gen. Stat. § 17a-22a(c) (Ex. S)

Under KidCare legislation, P.A. 5-280, §100, DCF is negotiating a contract with an administrative services organization (ASO) to help strengthen both the development and utilization of community resources for mentally ill children. (SUF ¶ 164) The ASO will work with DCF to determine levels of care, working with providers and local offices to develop discharge plans that meet the child's clinical needs. (SUF ¶ 145)

Through KidCare, in the last few years, DCF has expanded the types of community-based services for families with mentally ill children. Thousands of mentally ill children have already benefited from these new services. Over 12,000 children have been served by the mobile psychiatric crisis service, triple the number that used this service its first year, with only 10% of these children requiring a higher level of care. (SUF ¶ 98) There are currently 16 mobile crisis teams. *Id.* The purpose of the teams is to help children who would otherwise end up hospitalized.

Over 3,200 children have received care coordination services. (SUF ¶ 99) Fifty-nine care coordinators assist families navigate through the sometimes confusing service delivery system. (SUF ¶ 92) The coordinators are responsible for assembling a local team of service providers to implement a

35

plan for the child. *Id.* The care coordinators work closely with the community collaboratives, comprised of representatives from local organizations, including child guidance centers, schools, and non-profit organizations. (SUF ¶ 91, 92) The coordinators are encouraged to utilize both traditional and nontraditional services to assist families with mentally ill children, and they serve every town in the state. (SUF ¶ 92)

DCF has introduced in-home service programs that did not exist in the state ten years ago, and recently expanded the types of in-home services offered to families with mentally ill children. (SUF ¶ 100) Among the types of in-home services is Intensive In-Home Child and Adolescent Psychiatric Services (IICAPS), which uses teams of clinicians and paraprofessionals to work in the home with the family to develop and implement treatment plans and provide psychiatric services for the child. (SUF ¶ 101) Other in-home services are: Multidimensional Family Therapy, Functional Family Therapy and Multisystemic Therapy. Each type is directed at a particular array of problems. (SUF ¶ 102)

Another new service is the crisis stabilization program, which provides short-term care for children who are going through a mental health crisis; these beds served 48 children in the last quarter of 2004, with 32 children returning home or to foster care with services in place. (SUF ¶ 104). DCF is also offering family support teams. (SUF ¶ 105) At a cost of over $7 million, the state is making these professional teams available to families who have children in residential treatment who will be returning home or to foster care. *Id.* Flexible funds are also available to assist families in keeping children in their homes, as well as mentors and respite care. (SUF ¶ 103)

The KidCare initiative not only is further proof of DCF's *Olmstead* plan but has been shown to to be very effective in preventing mentally ill children from being removed from their communities. For example, as a result of DCF's new community-based services, fewer children leaving Connecticut

Children's Place are sent to other residential treatment facilities and more are discharged home or to therapeutic foster care. (SUF ¶ 37). The average length of stay in private residential facilities has been reduced from 422 days for the period January 1, 2003 through March 31, 2003 to 359 days from January 1, 2005 through March 31, 2005. (SUF ¶ 150)

The number of days children are spending in private hospitals has also decreased over time. In May, 2005, the average length of stay was 16 days, compared to 37 days in May, 2004. (SUF ¶ 152) High Meadows average length of stay has dropped as well, from 290 days in fiscal year 2003 to 212 days in fiscal year 2005. (SUF ¶ 82)

Riverview Hospital also has reduced the average length of stays from 166 days in 2003 to 153 days in 2005. (SUF ¶ 77) This reduction is attributed to the wide variety of community-based services available, enabling the hospital to serve more children. (SUF ¶ 77, 78) This has been an important achievement because there are a limited number of private hospital beds for mentally ill children, and private hospitals generally have shorter lengths of stay, with the result that more families look to Riverview as the only longer-term mental hospital for children. (SUF ¶ 78)

To support all of these new programs, funding for KidCare has increased exponentially since the program was instituted, and the General Assembly has continued to back the program by significantly increasing funding over the next few years. In SFY 2001, the legislature provided $3.5 million for KidCare; in SFY 2002, $11.4 million; in SFY 2003, $21 million; in SFY 2004, $22 million; in SFY 2005, $23 million; and in SFY 2006, $32 million. (SUF ¶ 246).

e.  **Other Efforts by DCF**

DCF has entered into agreements with other agencies involved in providing services for mentally ill children. Within the last month, DCF signed a memorandum of agreement with Department of Mental Retardation (DMR) under which the number of children in residential placements is expected to drop as approximately 150 mentally retarded children in DCF's care transition to DMR; that agency is developing community placements that will be available for these children. (Ex. EE, SUF ¶ 198-204). The interagency agreement to transfer responsibility and funding for this population is expected to result in greater treatment options for the children and more family and community involvement. (SUF 200, 201).

Another entity involved in joint planning for services is the Judicial Department, DCF's co-defendant in the *Emily J.* litigation. DCF is working more closely with the Judicial Department to ensure mentally ill children receive services in the community whenever possible. In the past three years, DCF has engaged in discussions and planning with the Judicial Department regarding both delinquent and Family with Service Needs (FWSN) children who require assistance from both agencies. (SUF ¶ 113) The two agencies are now involved in a joint strategic planning process, under the direction of the Child Welfare League of America. (SUF ¶ 114) Among the goals of this effort is the coordination of services for these youth in order to increase the opportunities they have to remain in their own communities. *Id.*

DCF has also worked hard to find resources for these new services. The agency has requested a number of budget options.[9] (Ex. FF, SUF ¶ 238) The agency has also applied for and received federal

---

[9] For 2006, DCF has requested numerous "priority one" budget options (Ex. FF), seeking increased funding "to expand early childhood intervention" (p. 7), "for enhanced care coordination" (p. 10), for

grant funds to underwrite the costs of community-based services. (SUF ¶ 243). Federal community mental health block grant funding, provided by the Substance Abuse and Mental Health Services Administration (SAMHAS) of the Department of Health and Human Services, has been used most recently for care coordination, respite care, flexible funding and family advocacy services. *Id.* In 2002, DCF applied for and received a six year $9.5 million federal SAMSHA grant, used for a school-based system of care in Bridgeport. (SUF ¶ 244) Additional SAMSHA grants are being sought for two more urban areas. *Id.*

As explained above, DCF receives funds from the Mental Health Strategy Board, as well as funds specifically earmarked for KidCare. Even apart from these funds, increased state funding has been provided to expand the array of community-based service options available to mentally ill children. (SUF ¶ 245). For SFY 2005, DCF received a $6 million budget increase, apart from KidCare, in community-based services, including wrap-around services, two therapeutic group homes, treatment foster care and family support teams. *Id.* This increase came at a time when most state agencies were experiencing budget reductions. (SUF ¶ 232) In the current budget, DCF has sought additional funding for community-based services, as they are a high priority for the agency. (SUF ¶ 186)

DCF has also worked to maximize federal funds, particularly reimbursement for costs of foster and residential care. Over the last two years, DCF's federal reimbursement has increased from $45 million to over $100 million; although these funds are recouped for the General Fund, and are not

---

"intensive in-home services and other intensive community-based, family-focused services" (p. 15), for "juvenile justice program enhancement" (p. 17), and for "management and coordination of medication for children" (p. 19). The agency also made a "priority two" request for "expansion of multidimensionsal family therapy" (p. 28), and a "priority three" request for increased funds for "emergency needs" (p. 33).