designated for DCF's own budget, the additional revenue provides support at the legislature for DCF's efforts to expand community-based mental health services. (SUF ¶ 162, 163)

DCF has made internal organizational changes to emphasize the need for more concerted efforts to help families on a local level.[10] (SUF ¶ 69) Thirteen area offices were developed to replace five regional offices; there are currently fourteen offices. *Id.* Additional behavioral health staff were added to each area office to enhance the focus on behavioral health needs of children and their families. (SUF ¶ 70) As explained supra, each area office has a written plan, called a quality improvement plan, to meet the requirements of the Exit Plan. (SUF ¶ 147) Each plan includes specific strategies customized for each office to meet the Exit Plan goals. *Id.* In addition, 14 new mental health professionals are being hired to assist the regional offices in assessing children with mental health problems who are currently in the community, with the hope to avoid placement for these children. (SUF ¶ 71)

Practices and procedures at DCF have also been modified to reflect the need for early discharge planning and diversion from residential treatment.[11] DCF has adopted a special protocol to more closely review placement recommendations for children who are being considered for placement in

---

[10] DCF has also established the Children's Behavioral Health Advisory Committee (CBHAC) made up of families, advocates and providers. (Ex. GG) CBHAC meets monthly to discuss new mental health services, policy and practice issues and also works on ways to educate families and communities about the services that are available. (SUF ¶ 96) Community education is required for all services funded through KidCare. (SUF ¶ 97) Through public service announcements, distribution of information about KidCare in schools, public meetings and other means, DCF has made every effort to inform families about the agency's commitment to make mental health services available to assist them care for their mentally ill children in their own communities. *Id.*

[11] Karen Snyder, Chief of Program Operations, has instituted a practice at state facilities to begin discharge planning within the shortest appropriate time during the assessment and treatment process for children placed at the facility and to closely scrutinize requests for admission to determine if the child could be served in their own community. (SUF ¶ 74)

residential treatment facilities. (SUF ¶ 193) Such recommendations are reviewed by a central placement team and then by Dr. Peter Mendelson, the Director of the Bureau of Behavioral Health and Medicine, to assess whether a less restrictive placement would be able to address the child's mental health needs. (SUF ¶183) Dr. Mendelson's personal review is a high level screen to reduce the number of children placed in residential facilities. (SUF ¶ 193) He also conducts biweekly meetings with his staff, facility staff, and local office staff to review discharge planning for mentally ill children in residential care or hospitals. (SUF ¶ 191). Weekly regional office meetings are scheduled to review discharge planning for all children in residential placement, to consider the child's progress in treatment and how to expedite their return to their community. (SUF ¶ 147)

No child is exempt from such discharge planning or review, and regardless of the degree of disability, DCF staff continually considers clinically appropriate options to help the child live in a community, rather than an institution. (SUF ¶ 76) As more community-based services and placements become available and children who are successfully treated are able to return home or to another permanent arrangement, it is expected that length of stays in residential treatment facilities will shorten and many placements will be diverted. (SUF ¶ 187) This has already been seen in the reduction in the number of delinquent children placed in residential treatment facilities. In fiscal year 1997-98, 452 children were placed in such facilities, whereas in 2003-4, only 277 children were placed. (SUF ¶ 151).

Furthermore, due to the increased availability of community-based services, fewer Riverview patients are discharged to residential treatment facilities and more are discharged to their own communities or other community-based programs, such as group homes. (SUF ¶ 80) The patients who usually remain the longest at Riverview are patients who are also developmentally delayed, mentally

retarded or have serious medical problems that make it difficult to provide less restrictive placement options. (SUF ¶79)

DCF has made a full commitment to the systems of care model for community-based mental health services. DCF's administration has dedicated itself to incorporating these principles at every level of the organization. (SUF ¶180) Planning for and creating greater community resources is occurring both locally and through the ongoing budget process conducted by central office staff. *Id.* The increase in the number of therapeutic group homes, therapeutic foster care slots, treatment foster care slots and multidimensional foster care slots, and DCF's commitment of $1 million toward recruitment of more foster homes all demonstrate "ongoing progress toward community placement." *Pennsylyvania Protection and Advocacy, supra at 382.*

The fact that DCF has greatly expanded the resources and staffing devoted to community mental health issues and has advised mental health professionals assessing children to avoid recommending residential placement unless clinically required demonstrates that there has been a sea change within the organization. (SUF ¶ 182, 184). At every level at DCF, work is being done to find community services and placements for children in hospitals and residential treatment, to divert children from placement and to expedite discharges when children are clinically ready for a less restrictive placement.

### f. Risk of Reallocating Funds

This progress notwithstanding, DCF cannot simply close its facilities or reduce their bed capacity, particularly at Riverview Hospital. (SUF ¶ 171-179) As the General Assembly has determined, the state must examine closely whether there is a shortage of hospital beds for children who are mentally ill. (Ex. U, § 90; SUF ¶ 177, 178) To suggest a cost reallocation based on reducing the number of residential treatment or hospital beds is irresponsible and clearly not in the best interest

of the many children who require that level of care. As the Third Circuit cautioned, "[I]f DPW had siphoned off monies appropriated for institutional care for mental health patients in order to increase community placements, DPW would run afoul of *Olmstead* prohibition on favoring those 'who commenced civil actions' at the expense of institutionalized mental health patients who are not before the court. Any effort to institute fund-shifting that would disadvantage other segments of the mentally disabled population would thus fail under *Olmstead*." *Frederick L., supra*, 364 F.3d at 497, citing *Olmstead*, 527 U.S. at 604-06.[12]

Similarly, DCF cannot close or limit access to residential treatment facilities when such placements are clinically appropriate. The fact is that more children in Connecticut are seeking mental health treatment from DCF and many of these children require residential treatment.[13] (SUF ¶ 165) Although DCF has been increasing its spending on mental health services, the demand for these services have grown, due to increased awareness of DCF's mental health mandate and because more children are being referred to DCF for treatment since most private insurance companies limit the type and duration of services covered for these children. (SUF ¶ 93, 95) Since 2002, the number of families served by care coordination services has increased from 150 annually to 750 annually.[14] (SUF ¶ 95)

---

[12] Nor should this court consider ordering DCF to transfer funds from other accounts to underwrite community placements. "Because the judiciary is not well-suited to superintend the internal budgetary decisions of DPW ..., we decline to [do so]." *Frederick L., supra* at 498.

[13] Adverse consequences could arise from reducing further the number of residential treatment facility beds available in Connecticut. Some delinquent children are placed through orders of the juvenile court in such facilities, and reducing the number of such placements could result in more children ordered to the Connecticut Juvenile Training School. (SUF ¶ 173)

[14] Although more community-based services funded by the state are available for mentally ill children, even with additional resources, the state would have problems attempting to quickly expand existing services because there is a shortage of nurses, psychiatrists, and mental health professionals and paraprofessionals, especially those who speak Spanish, to meet the demands for these services. (SUF ¶ 170)

The number of children seeking voluntary mental health services from the state has increased from 853 in 2002 to 1,263 in 2005. (SUF ¶ 165)

Furthermore, the plaintiffs' proposal to expand the number of therapeutic group homes is not without problems. DCF and providers have experienced delays because, although zoning approval is not required, school systems, neighbors, local officals and others can raise issues that need to be addressed before plans proceed. (SUF ¶ 160) In one instance, a provider had to forego plans and move the site to another town due to local resistance. *Id.* Further, because the homes are quite costly to operate, at $900,000 per year, the number that can be built at one time is limited. (SUF ¶ 251) These homes are considerably more expensive than residential facilities because they cannot offer the equivalent economies of scale. (SUF ¶ 249, 250)

Another factor affecting the number of children in residential placement is the reduction in population at Connecticut Juvenile Training School which has resulted in more delinquent boys needing residential treatment, and the closure of Long Lane School for delinquents, resulting in fewer placement options for delinquent girls. (SUF ¶ 174) While these issues are being addressed by the development of more community-based resources, there still is a compelling need to maintain some residential treatment programs for this population. *Id.*

The plaintiffs' proposal to develop more therapeutic group homes would divert funds that might be used for less-expensive residential placements, as well as for community-based services. It is very likely that services to other mentally ill children would be adversely affected. "…[A] defendant will not be required to adopt an accommodation if it successfully demonstrates that the proposed accommodation is unreasonable, i.e. that 'it would cause it to suffer an undue hardship.'" *Henrietta D. v. Bloomberg, supra* at 281, citing *Borkowski v. Valley Cent. Sch. Dist. 63 F. 3d 131, 138 (2d Cir. 1995).*

44

### g. Commitment to Change

Based on DCF's multitude of public pledges, legal commitments and enormous resources devoted to "turning the ship" toward community-based services, this court should conclude that the state is fully and unequivocally dedicated to expanding community placements for mentally ill children, both in word and deed. All the evidence presented demonstrates the defendants' will to carry through with this mission. A planning process, targeted at reducing the numbers of children in placement as well as focused on each individual child in placement, is being carried out each day at every level of DCF, through frequent meetings about children in residential care. The monitoring and control exercised by the TTF and the court monitor in the *Emily J.* case ensure that DCF will have the resources for this commitment. DCF has selected developers for 35 therapeutic group homes, with six more homes in planning; the agency has also spent $500,000 on recruitment of new therapeutic and treatment foster families; all this demonstrates the good faith effort being made.

The amazing transformation of the state's mental health system for children, through KidCare, and the creation and expansion of a range of community-based services also provides proof that the state is making reasonable progress in averting institutionalization of mentally ill children. In countless other ways, DCF carries out the principle of deinstitutionalization. This court should find that DCF has an effective plan, which should not be disrupted, to move away from institutionalization of mentally ill children and toward community-based services.

### V.     The Court Should Abstain under *Burford* from Considering these Claims

Besides the federal claims, the plaintiffs have raised two state law claims, one statutory and one constitutional. In an earlier motion to dismiss, the defendants urged this court to abstain from hearing this case, including the state law claims, asserting a *Burford* abstention theory. Under that theory,

45

federal courts should refrain from exercising jurisdiction over cases raising state law claims involving issues of substantial public import. *Burford v. Sun Oil Co.,* 319 U.S. 315 (1943), *Minot v. Eckardt-Minot,* 13 F.3d 590, 593 (2d Cir. 1994).

> ...[W]here timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*Russell v. Giles County,* 105 F. Supp. 2d 841, 848 (M.D. Tenn. 2000), citing *New Orleans Pub. Serv., Inc. v. Council of New Orleans,* 491 U.S. 350, 361 (1989).

Abstention "reflect(s) principles of federalism and comity." *Quackenbush v. Allstate Ins Co.* 517 U.S. 706, 728 (1996). Courts should "exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy." *Burford, supra* at 318.

In declining to dismiss this case earlier on abstention grounds, this court stated: "It is undisputed that the KidCare initiative is complex and involves matters of great public concern. ...the record does not provide sufficient information to permit a determination of whether, and to what extent, exercising jurisdiction over this action would be disruptive of the State's effort to restructure and reform the delivery of mental health care services to children." *W.R., supra* at *6.

This court now has ample information to conclude that it should abstain from hearing this case under *Burford*. First, the only plaintiff with any standing to continue this matter, Joseph R., has two options for state court review available for his claims. On his behalf, his mother asserts that he has been denied "clinically indicated and appropriate community based placements" and has been exposed

to "inhumane and undignified treatment," in violation of Conn. Gen. Stat. § 17a-16 and Article First, §20 of the Constitution of Connecticut.

Joseph has two different remedies available to him in state court for these claims: first, under Sec. 17a-16 (i), he could "petition the superior court ...for appropriate relief, including temporary and permanent injunctive relief." Second, as a child in the voluntary service program, he may raise these issues in probate court, under Sec. 17a-11; that provision requires annual permanency hearings before the probate court to consider "the appropriateness of the department's plan for service to the child." Unquestionably, Joseph and his mother have recourse through at least two different state court proceedings.

Thus the only abstention question remaining is whether the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *New Orleans Pub. Serv., Inc. v. Council of New Orleans,* 491 U.S. 350, 361 (1989). In its 2003 ruling, this court only addressed the court's possible interference in the KidCare initiative; however, the current reality is that the state is engaged on many fronts, not just KidCare, to restructure, reform and develop a coherent policy and practice regarding community mental health services for children.

A federal court may abstain from hearing a case or claim over which it has jurisdiction to avoid needless disruption of state efforts to establish a coherent policy in an area of comprehensive state regulation. *Friedman v. Revenue Management of New York, Inc.* 38 F. 3d 668, 671 (2d Cir. 1994). In that case the Second Circuit determined that because New York had a comprehensive regulatory scheme governing corporations, the federal court should not interfere. A similar issue was reviewed by that court in *Law Enforcement Insurance Co. v. Corcoran*, 807 F. 2d 38, 43 (2d Cir. 1986) where the court explained that the state's regulations governing insurance companies were a matter of "special state concern" and not an area for federal court involvement.

In the present case, there are two state regulatory schemes that are involved: DCF's authority over children in the state's care, and the massive legislative effort to establish community-based mental health services. As to the first, both the statutory and regulatory schemes are detailed, well-established and provide amply opportunity for the plaintiffs to challenge the services provided to children receiving care from the state. As to the second, the defendants, along with the General Assembly, have been working hard for the last five years to implement a highly detailed, comprehensive and complex new community-based mental health system, with localized teams implementing plans for mentally ill-children. Hundreds of millions of dollars have already been provided to carry out these plans. Here too families not satisfied with the services their child is receiving may utilize consumer grievance and appeal procedures being established by DCF. *See, P.A. 05-280, Sec. 96.*

Thus, far more than New York's interest in regulating private corporations, as explained in *Friedman* and *Law Enforcement Insurance Co, supra,* Connecticut has a compelling concern, interest and investment not only in directing the services and programs provided to children in the state's care but also in the creation and implementation of a community-based mental health scheme.

This court must also consider the two other federal lawsuits brought on behalf of children receiving these services, and the mandates, commitments and huge fiscal and administrative implications of those cases; other factors to be weighed are the new public acts requiring a further study of hospital bed capacity, mandating that DCF prepare a plan for community-based services for adolescent delinquent females, and requiring DCF to examine the possible closing of the training school. Furthermore, the court should take into account the joint juvenile justice strategic plan, the MOA transferring responsibility for mentally retarded children back to DMR, as well as the enormous commitment made to the KidCare initiative. All of these activities and programs show that the defendants are well engaged in this effort. The only logical conclusion is that deinstitutionalization, diversion and building a community-based mental health system are not only issues of critical public importance among state officials at all levels, but are problems being actively tackled on many levels and in different areas. Any orders from this court could only jeopardize the state's ability to comply with existing court obligations and interfere with the multiple reform efforts already underway. Because of the state court options available to challenge the defendants' actions, the plaintiffs would not be prejudiced by dismissal based on abstention. For all of these reasons, this court should dismiss the case under *Burford*.

### VI. This Court Should Decline to Exercise Supplemental Jurisdiction Over Pending State Law Claims

The second and third causes of action are based on alleged violations of state law. However, this court should dismiss these counts as well if the federal counts are dismissed. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966); *Baylis v. Marriott Corp.*, 843 F.2d 658, 665 (2d Cir. 1988). The defendants have already requested the court to dismiss the state law claims on this basis. *See, Defendants' Motion to Dismiss, August 16, 2002.* For the same reasons cited in the brief filed in support

of that motion, the defendants again request the court to decline to accept supplemental jurisdiction to consider the pending state law claims.

### VII. The State Law Claims Should Be Dismissed for Failure to Exhaust Administrative Remedies

Both the second and third causes of action allege violations of state law, to wit, Conn. Gen. Stat.§§17a-3 and 17a-16[16] as well as constitutional violations. Because the plaintiffs have failed to exhaust their administrative remedies before pursuing this federal action, these two counts should be dismissed. The plaintiffs had the option of pursuing administrative remedies by way of a review of their treatment plan and if not satisfied, an administrative appeal under the Uniform Administrative Procedures Act, Conn. Gen. Stat. § 4-183. This issue too was fully briefed in connection with the prior motion to dismiss and the defendants' arguments there are hereby incorporated.

### CONCLUSION

For all the reasons stated above, the defendants respectfully request the complaint be dismissed.

---

[16] Sec. 17a-3 authorizes the defendant to create a program of services for children and youth who are mentally ill, and specifies that "[s]ervices shall not be denied to such child or youth solely because of other complicating and multiple disabilities." The statute further states, "The program shall provide services and placements that are clinically indicated and appropriate to the needs of the child or youth." Sec. 17a-16 provides, *inter alia*, that "(b) Each child or youth placed or treated under the direction of the Commissioner of Children and Families in any public or private facility shall receive humane and dignified treatment at all times, with full respect for his personal dignity and right to privacy, consistent with his treatment plan as determined by the commissioner.... (i) Any child aggrieved by a violation of subsections (a) to (h), inclusive, of this section, may petition the superior court ...for appropriate relief, including temporary and permanent injunctive relief."

DEFENDANTS

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY: /s/ Susan T. Pearlman
Susan T. Pearlman
Assistant Attorney General
Federal Bar No. 06338
110 Sherman Street
Hartford, CT 06105
Tel: (860) 808-5480
Fax: (860) 808-5595
Susan.Pearlman@po.state.ct.us


/s/
Carolyn Signorelli
Assistant Attorney General
Fed. Bar No. 17534
55 Elm St. 3rd Floor Annex
Hartford, CT. 06106

51

**CERTIFICATION**

I hereby certify that a copy of the foregoing was mailed in accordance with Rule 5(b) of the Federal Rules of Civil Procedure on this 21st day of July, 2005 first class postage prepaid to:

Attorney Catherine L. Williams
Connecticut Legal Services
211 State Street
Bridgeport, CT 06604
Phone: 203 336-3851
Fax: 203 333-49776

Attorney Lori Welch-Rubin
129 Whitney Avenue
New Haven, CT 06515
Phone: 203 772-6680
Fax: 203 772-2194

Attorney Bet Gailor
Attorney Anne Louise Blanchard
Connecticut Legal Services
872 Main Street
Willimantic, CT 06226
Phone: 860 451761
Fax: 860 456-7420

Susan T. Pearlman
Assistant Attorney General