UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

W.R, individually and on behalf of her
Minor son, Joseph R; Susan K, MO,
individually and on behalf of all others
similarly situated,

Plaintiffs

v.

Connecticut Department of Children and
Families, and
Darlene Dunbar, in her official capacity as
Commissioner of the Connecticut
Department of Children and Families,
Defendants

CIVIL ACTION NO.
3:02-CV-429(RNC)

September 26, 2005

## Plaintiffs' Local Rule 56(a) 2 Statement

SUSAN K.

1. Gina Mangano is a social worker, employed by the Department of Children and Families (DCF). (Mangano Aff. ¶ 1).

*Admit.*

2. In 2004, Gina Mangano was assigned to provide services to Susan K., who was in the care of the department. (Mangano Aff. ¶ 2).

*Admit.*

3. Susan K. has a long history of mental illness and has been in the state's care since she was nine years old. (Complaint, ¶23-25).

*Admit.*

4. Susan K. has been in a variety of placements, including foster care, residential treatment facilities, hospitals and shelters.

*Admit that Susan K. has been in a variety of placements, but **deny** that all of the placements were appropriate placements (Grant-Hall Deposition, Exh 1, (hereinafter Grant-Hall) at 44-45, 84, 86; Defendant's Revised Response to Plaintiffs Third Request for Admission dated August 17, 2005 (hereinafter Third Admission), Exh. 2 ¶¶ 10-13, 18-23, 30-43, 49, 51, 56, 59, 60-64, 67, 70; Answer and Special Defenses (hereinafter Answer) ¶¶ 30, 31, 32, 33, 35, 36, 37).*

5. Susan K has received services from DCF since 1991. Susan K. continued to receive voluntary services after she turned 18. (Mangano Aff ¶ 3)

*Admit that Susan K. received voluntary services through DCF after age 18 as a consequence of In Re: Shonna K., 77 Conn. App. 246 (2003), Exh. 3.*

6. In 2004, Susan K was placed in a self directed living program at the Supervised LifeStyles (SLS), a mental health program in Brewster, New York. She was living with five other girls in a large house, and receiving mental health services. (Mangano Aff ¶ 4)

*Admit.*

7. Since Susan K has been placed at SLS, she has not been restrained, has not injured others or been arrested, nor has she requested that DCF move her to a different placement. (Ex. H, Susan K. ¶ 15-16)

*Admit.*

8. DCF and the Department of Mental Health and Addiction Services (DMHAS) have implemented an interagency agreement that is designed to transfer jurisdiction and services for mentally ill children to DHMAS as they age out of DCF's authority (Ex. I).

*Admit.*

9. In the fall of 2004, Susan K. turned 21 and was transitioned out of care with DCF and into care with the Department of Mental Health and Addiction Services (DMHAS). DHMAS is currently responsible for providing care to Susan K. (Mangano Aft ¶ 6)

*Admit that Susan transitioned to DMHAS at age 21 as a result of In Re Shonna K., 77 Conn. App. 246 (2003)(Exh. 3).*

10. Susan K. is no longer receiving services from DCF and is no longer eligible for services (Mangano Aff. ¶ 7)

*Admit.*

OMAR S.

11. Eric Moore is employed as a social worker by the Department of Children and Families. (Moore Aff ¶ 1).

*Admit.*

12. Enc Moore has been assigned to the case of Omar S, a youth committed to the care of the Department. (Moore Aff. ¶ 2).

*Admit.*

13. Omar S. has been diagnosed as mentally ill and has been receiving services from DCF since 2001. (Ex. H, Omar S. ¶ 2)

*Admit.*

14. On September 6, 2001, Omar's guardian ad litem made an oral motion for temporary custody on the grounds that he was uncared for, in that his needs could not be met in his home, and because he was abandoned. The motion was granted.

*Admit.*

15. Omar was committed to the care of DCF as an "uncared for" child. (Ex. H, Omar S. ¶2)

*Admit.*

16. Omar was placed in a variety of placements, including most recently a group home (Complaint, ¶ 64, 70, 71; Ex. H, Omar, ¶9)

*Admit that as of the date of filing of defendants' Motion for Summary Judgment, Omar's most recent placement was a group home.*

17. Omar will be turning 18 years old in August. (Moore Aff ¶ 4)

*Admit.*

18. On October 18, 2004, Omar was placed in the Barnard House, in Hartford. (Moore Aff. ¶ 5)

*Admit.*

19. The Barnard House is a licensed group home serving up to 16 residents ages 17 to 25, in four 2-bedroom apartments, with the goal of transitioning psychosocially challenged individuals to independent living. (Moore Aff. ¶ 6)

*Admit.*

20. The Barnard House has round the clock supervision by trained residential counselors who provide case management, counseling and independent living skill training. Vocational services are provided by a trained vocational counselor. (Moore Aff. ¶ 7)

*Admit.* **Deny** *that the Barnard House was an appropriate placement for Omar. Grant-Hall Evaluation dated May 10, 2004, Exh. 23, Andersson deposition, Exh. 8, pp 67, 71.*

3

21. Barnard House is supervised by a full-time MSW program manager and a psychiatric consultant is available on call at all hours (Moore Aff ¶ 8)

*Admit.*

22. On April 8, 2005, Omar stated that he was leaving the Barnard House and planned to move in with his mother in New York. (Moore Aff ¶ 9)

*Admit.*

23. On April 9, 2005, Omar left the Barnard House and went to New York. He did this against Eric Moore's advice. (Moore Aff ¶ 10)

*Admit.*

24. Between April 9 and May 9, 2005, Eric Moore repeatedly tried to speak to Omar as well as his mother to encourage him to return to Connecticut, (Moore Aff ¶ 11)

*Admit.*

25. Between April 25, 2005 and May 9, 2005, Eric Moore left a number of messages for Omar to return his call to discuss returning to Connecticut. (Moore Aff ¶ 12)

*Admit.*

26. On May, 3, 2005, Eric Moore spoke to Omar who indicated he was not sure whether he wanted to return to Connecticut. Eric Moore asked him to call on May 4, to discuss participating in Job Corp in Connecticut (Moore Aff ¶ 13)

*Admit.*

27. Neither Omar nor his mother ever called Eric Moore and on May 9, 2005, Eric Moore learned that their phone was disconnected. (Moore Aff ¶ 14)

*Admit.*

28. On May 23, 2005, Eric Moore was in contact with Omar's aunt and learned of the family's new phone number. (Moore Aff ¶15)

*Admit.*

29. On May 31, 2005, Eric Moore visited Omar in New York and his mother told him that she did not wish any further services from the department for herself or her son Omar and that she intended to care for her son. Both Omar and his mother signed letters stating that they did not wish any further services from the department. (Ex. J., Moore Aff ¶ 16)

4

*Admit that Eric Moore visited Omar in New York and that his mother and Omar indicated they did not wish any further services and that his mother intended to care for her son. Admit that Omar and his mother signed letters stating that they did not wish any further services from the DCF.* **Deny** *that Omar and his mother had the legal capacity to refuse services because Omar was a minor and DCF was his custodial parent. See Conn Gen. Stat. §46b-129(j).*

30. On behalf of DCF, Eric Moore filed a motion to revoke commitment of Omar with the Superior Court for Juvenile Matters in Willimantic. The motion was based on the family's refusal of services and the child's wishes to remain with his mother. (Moore Aff. ¶ 19)

*Admit statement was true when written.* **Deny** *insofar as Omar's re-entered the care of the DCF on August 26, 2005 when, on motion made on behalf of Omar and his mother, the Superior Court for Juvenile Matters, Bear, J., vacated his prior order vacating the commitment and ordered Omar returned to the care of the DCF. Application for Temporary Injunction (Exh. 4).*

JOSEPH R.

31. Colleen Kaplan is a licensed clinical social worker. (Kaplan Aff. ¶ 1)

*Plaintiffs have no independent knowledge of Ms. Kaplan or her statements as she was not disclosed by defendants through discovery as a potential witness in accordance with Fed. Rule Civ. Pro. 26(e). Plaintiffs assume the veracity of the employment and educational statements in Ms. Kaplan's affidavit.*

32. Colleen Kaplan's education includes a Bachelors degree from the University of Connecticut and a masters degree in social work from the University of Connecticut. (Kaplan Aff. ¶ 2)

*Plaintiffs have no independent knowledge of Ms. Kaplan or her statements as she was not disclosed by defendants through discovery as a potential witness in accordance with Fed Rule Civ. Pro. 26(e). Plaintiffs assume the veracity of the employment and educational statements in Ms. Kaplan's affidavit.*

33. Colleen Kaplan has been employed by the Department of Children and Families (hereinafter DCF) since March 27, 1987. (Kaplan Aff. ¶ 3)

*Plaintiffs have no independent knowledge of Ms. Kaplan or her statements as she was not disclosed by defendants through discovery as a potential witness in accordance with Fed Rule Civ. Pro. 26(e). Plaintiffs assume the veracity of the employment and educational statements in Ms. Kaplan's affidavit.*

34. Colleen Kaplan is the clinical director at the Connecticut Children's Place (hereinafter CCP), a state facility in East Windsor, CT operated by DCF for the care of mentally ill children. (Kaplan Aff. ¶ 4)

*Plaintiffs have no independent knowledge of Ms. Kaplan or her statements as she was not disclosed by defendants through discovery as a potential witness in accordance with Fed Rule Civ. Pro. 26(e). Plaintiffs assume the veracity of the employment and educational statements in Ms. Kaplan's affidavit.*

35. CCP engages in early discharge planning for children upon placement at this facility. Very shortly after a child is placed at CCP, the child's treatment team begins to consider how the child may be returned to his or her family, placed in foster care or another appropriate treatment setting can be found. (Kaplan Aff. ¶ 5)

*Plaintiffs have no independent knowledge of when discharge planning commences at CCP since no information pertaining to discharge planning at CCP was disclosed by defendants through discovery in accordance with Fed Rule Civ. Pro. 26(e).* **Deny** *that appropriate treatment settings are available for children and youth consistent with their treatment needs. DCF 2004 Needs Assessment, Exh. 5, pp. 27, 28; Defendants' Response to Plaintiffs' Second Request for Admissions (hereinafter Second Admission), Exh 6), ¶15, p. 3.*

36. CCP makes every effort to recommend less restrictive settings for children who can be safely treated in such a setting. CCP often recommends that children return home or to foster care, with additional services available to maintain the child in the community. (Kaplan Aff. ¶ 6)

*Plaintiffs have no independent knowledge of CCP discharge planning since no information pertaining to discharge planning at CCP was disclosed by defendants through discovery in accordance with Fed Rule Civ. Pro. 26(e).* **Deny** *that appropriate treatment settings are available for children and youth consistent with their treatment needs. DCF 2004 Needs Assessment, Exh. 5, pp. 27, 28; Defendants' Response to Plaintiffs' Second Request for Admissions (hereinafter Second Admission), Exh. 6, ¶15, p. 4.*

37. As more community-based resources are made available, CCP has been able to reduce the number of multiple placements a child endures. CCP can now provide longer term residential treatment, specific to the treatment needs, not time frame specific, of a child. CCP has also increased the number of children discharged to therapeutic foster homes or their parents' case, rather than to residential treatment facilities or hospitals. (Kaplan Aff ¶ 7).

*Plaintiffs have no independent knowledge of whether the number of multiple placements a child endures has been reduced or whether CCP can now provide longer term residential treatment, specific to the treatment needs of a child, or whether CCP has increased the number of children discharged to therapeutic foster homes or their parents'*

*care, rather than to residential treatment facilities or hospitals since defendants have failed to disclose any information regarding CCP for any time period from 2002 to the present to plaintiffs in accordance with Fed. Rule Civ. Proc. 26(e).*
*Defendants have also failed to disclose any information regarding multiple disruptions as mandated by the DCF Positive Outcomes for Children Plan May 2004, p. 13, Defendants' Exhibit Q. Otherwise,* **deny**. *DCF 2004 Needs Assessment, Exh. 5, pp. 4, 27, 28; Second Admission, Exh. 6, ¶15, p. 3.*

38. In Colleen Kaplan's role as clinical director, she oversees the clinical staff at CCP and participates, as needed, in clinical reviews and treatment team meetings for individual children (Kaplan Aff. ¶ 8)

*Plaintiffs have no independent knowledge of Ms. Kaplan or her statements as she was not disclosed by defendants through discovery as a potential witness in accordance with Fed. Rule Civ. Pro. 26(e). Plaintiffs assume the veracity of her role as clinical director at CCP as discussed in Ms. Kaplan's affidavit.*

39. Colleen Kaplan is familiar with Joseph R., a child who has been placed at CCP several times over the last five year's. (Kaplan Aff. ¶ 9)

*Admit.*

40. Colleen Kaplan recently reviewed Joseph R's files and treatment plan as he is currently placed at CCP. (Kaplan Aff. ¶ 10)

*Plaintiffs have no independent knowledge of Ms. Kaplan and whether she reviewed Joseph R's files and treatment plan since she was not disclosed by defendants through discovery as a potential witness in accordance with Fed. Rule Civ. Pro. 26(e), but assume the veracity of the statements in her affidavit.*

41. Joseph R. was born on June 5, 1989 and is now 16 years old. (Kaplan Aff. ¶ 11)

*Admit.*

42. Joseph R. was accepted into the Department's Voluntary Services program on November 3, 1999. (Kaplan Aff. ¶ 12)

*Admit.*

43. Joseph has periodically refused to take prescribed medication and has repeatedly demonstrated aggressive and assaultive behavior against staff. (Ex. H, Joseph ¶23)

*Admit.*

44. Joseph R. has the following placement history, since being accepted into the voluntary services program: Harmony Hills residential program; 1/7/00-12/27/00;

7

Children's Place; 12/27/00-9/11/01; Institute of Living; 9/22/01-11/9/01; Children's Place; 11/9/01-7/19/02; home; 7/12/02-10/7/02; Natchaug Hospital; 10/7/02-11/8/02; Riverview Hospital; 11/8/02- 7/15/03; Brightside residential program; '7/15/03-4/4/04; Brightside group home; 4/4/04-8/25/04; home; 8/25/04-9/8/04; Brightside; 9/8/04-31:3/OS, Providence Hospital; 3/3/05 — 5/05; CCP 5/17/05 to the present. (Kaplan Aff. ¶ 13)

*Admit.*

45. Joseph was on probation from his delinquency charges and was required to cooperate with both DCF and Brightside until medically discharged (Ex. H, Joseph R. ¶ 18)

*Admit.*

46. After he was returned home in August, 2004, he became aggressive again and was returned to Brightside in September, 2004. (Ex. H, Joseph ¶22)

*Admit.*

47. Since last fall, Joseph's assaultive behaviors have continued and in March, 2005, he assaulted staff at Brightside and refused to take medication or follow orders. (Ex. H, Joseph ¶27)

*Admit.*

48. As a result of his behaviors, Joseph was placed at Providence Hospital. (Ex. H, Joseph ¶28)

*Admit*

49. Joseph R has a history of serious mental illness and assaultive behavior. His current Axis I diagnosis is: Bipolar Disorder- severe psychotic features, Oppositional Defiant Disorder, Post Traumatic Stress Disorder. (Kaplan Aff. ¶ 14)

*Admit.*

50. Since arriving at CCP in May of 2005, Joseph assaulted a staff member once. On May 26, 2005, he threw a stapler at a staff member, who was injured. The incident resulted in Joseph's arrest. There was a second incident on 6/13/2005, in which he became aggressive. This resulted in a restraint and a staff member's face and eye was scratched (Kaplan Aff. ¶ 15)

*Admit as of July 21, 2005.*

51. As a result of the May 26, 2005 assault, Joseph R. was suspended from school for three days. (Kaplan Aff. ¶16).

*Admit as of July 21, 2005.*

52. Joseph R. is on an S.O.S. intervention (Supervised Observed Support), a one-on-one supervision whereby he is accompanied during all waking hours by a staff member. This staff member is assigned to him only. (Kaplan Aff: ¶ 17)

*Admit.*

53. There are 52 children in residence at CCP. All are between the ages of 10 and 21 and suffer from varying degrees of mental illness. Few children at CCP require the degree of individualized supervision and monitoring that Joseph currently requires. (Kaplan Aft ¶ 18)

*Plaintiffs have no independent knowledge of CCP and the children and youth who are currently living there since defendants did not disclose this information through discovery in accordance with Fed. Rule Civ. Proc. 26(e).*

54. CCP has placed Joseph on SOS for his own safety and the safety of those around him. He was informed at his treatment planning meeting on June 22, 2005 that in order to get off SOS, he would need to demonstrate better coping skills, consistently accept personal responsibility, and refrain from physical aggression. (Kaplan Aff. ¶ 19)

*Admit.*

55. CCP's method of dealing with inappropriate behavior is to issue an instruction to stop the situation, identify for the child which behavior is inappropriate, describe an alternative, more appropriate behavior', remove the child from the situation if necessary, and process the interaction with the child. This is known as an intensive teaching interaction. Joseph has been averaging approximately one "intensive" per day. (Kaplan Aff. ¶ 20)

*Admit that Joseph might have an average of approximately one "intensive" per day. Plaintiffs have no independent knowledge of CCP's methods of dealing with inappropriate behavior because defendants failed to disclose such information to plaintiffs in accordance with Fed. Rul. Civ. Proc. 26(e).*

56. Joseph's "intensives" often result from him ignoring or defying teachers or staff, refusing to get up in the morning for school, and sleeping in class. He attributes his sleeping to his medication but Joseph has been experiencing no trouble waking up and staying awake on days when there is no school. Dr. Milind Kale, CCP psychiatrist, is in the process of determining whether, in fact, the medication is responsible for his sleepiness or whether this is a behavior issue with Joseph. (Kaplan Aff. ¶ 2.1)

*Admit that Joseph's "intensives" often result from him ignoring or defying teachers or staff, refusing to get up in the morning for school, and sleeping in class. Admit that Dr.*

*Kale is in the process of determining whether Joseph's medications are responsible for his sleepiness.* **Deny** *that Joseph's difficulty waking up and staying awake is limited to days when there is school. Exh. 7, Brightside Residential Treatment Center Treatment Report dated June 10, 2004*

57. Joseph's aggression is easily triggered and escalates rapidly. When in this state, Joseph has a limited ability to identify and utilize options to de-escalate the situation, such as leaving the room or requesting a PRN ("pro re nata" or medication as needed). Suggestions by staff to utilize these de-escalation techniques can further antagonize him. (Kaplan Aff. ¶ 22).

*Admit.*

58. Joseph suffers from a mental disorder (see Diagnosis above) that distorts his interpretation of reality. Particularly in times of stress, he is unable to think clearly and is limited in his ability to control his anger' and make choices that would decrease the danger to himself and those around him. These are his treatment issues and why he needs this level of care and services. (Kaplan Aff. ¶ 23)

*Admit.* **Deny** *that the intensity of services Joseph requires can only be provided in a residential setting. Exh. 8, Andersson deposition, p. 67.*

59. Joseph's explosiveness is reduced somewhat by medication, but he continues to have difficulty managing his anger, aggression, and frustration- even with medication- due to his distortions of reality. Furthermore, although he is currently compliant, he has a history of refusing to take his medication, which can result in rapid escalation of his problem behavior. A current treatment plan goal at CCP is to continue to be compliant with his medications. (Kaplan Aff. ¶ 24)

*Admit.*

60. On at least two occasions (one during his prior stay at CCP and one at Brightside), Joseph's refusal to take prescribed medication for several days precipitated assaultive and aggressive behavior that lead to his hospitalization. (Kaplan Aff. ¶ 25)

*Admit*

61. While at CCP, Joseph has been attending individual, group, and family therapy. (Kaplan Aff. ¶ 26)

*Admit*

62. Joseph is in the superior range of intelligence and performs at grade level academically, although his emotional and social difficulties significantly affect his success in school. He is also currently enrolled in an independent living skills class. (Kaplan Aff, ¶ 27)

*Admit.*

63. After lengthy discussion, CCP's treatment team takes the position that Joseph currently needs this level of residential care and is not ready for a less restrictive setting. He would need to stabilize, be taken off SOS and maintain an ability to stay off SOS, and demonstrate more appropriate coping skills than his current use of aggression. This would indicate an internalized ability on Joseph's part to self regulate and access coping mechanisms and hence, a safe move to a less restrictive setting. The current CCP plan, in consultation with the DCF Central Office placement team, is to seek a community placement that can replicate the treatment services the CCP provides, including the capacity to safely intervene when Joseph becomes highly aggressive. (Kaplan Aff. ¶28)

*Admit that the CCP treatment team takes this position and that this is what the CCP treatment plan provides. **Deny** that CCP is an appropriate placement for Joseph. Andersson deposition, Exh. 8, at pp. 26-27; Ando deposition, Exh. 9, at pp. 38-40.*

KAREN SNYDER

64. Karen Snyder is the Chief of Program Operations for the Department of Children and Families. (Snyder Aff ¶1)

*Admit.*

65. Karen Snyder has worked in the mental health field for 25 years. She has been Director of Operations at the Department of Mental Health and Addiction Services and executive director of the North Central Connecticut Mental Health Services. She has a master's degree in clinical psychology. (Snyder Aff. ¶ 2)

*Admit.*

66. In her current position, Karen Snyder is responsible for directing the work of the Bureau of Child Welfare, the Bureau of Adolescent Services, the Bureau of Adoption and Interstate Compact Services, and the Bureau of Behavioral Health and Medicine. (Snyder Aff. ¶ 3)

*Admit.*

67. DCF has a very broad statutory mandate: to provide services, including preventive services, for children who are from families with service needs, and children who are mentally ill, emotionally disturbed, substance abusers, delinquents, abused, neglected or uncared for. (Snyder Aff. ¶ 4)

*Admit.*

11

68. DCF's mental health mandates focus on providing services to help families care for children who are mentally ill. The department has adopted a mission statement that recognizes that "children and families are best served when they are part of and supported by their community. The Department is part of this community, works in association with community members, and is committed to its services being localized, accessible and individualized to meet the variety of children and family needs." (Snyder Aff. ¶ 5)

*Admit.*

69. To achieve this goal, in 2004 DCF reorganized, expanding the number of field offices from five to thirteen. Currently there are fourteen local offices. (Snyder Aff. ¶ 6)

*Admit.*

70. In each office, DCF has established new mental health positions to promote a community-based mental health system; specifically, care coordinators, mental health directors and psychologists/licensed social workers have been added to the staff in the local offices. (Snyder Aff. ¶ 7)

*Admit.*

71. Among these new positions are 14 new mental health professionals who are in the process of being hired to assist the local offices assess children with mental health problems who are currently in the community, with the hope to avoid placement for these children. These additional positions were created to enhance the focus on mental health needs of children and families, develop greater community resources and expand the access to these resources. (Snyder Aff. ¶ 8)

*Plaintiffs have no independent knowledge regarding new staff changes at DCF, since this information was not disclosed to plaintiffs by defendants through discovery in accordance with Fed. Rul. Civ. Proc. 26(e).*

72. Over the last few years, the agency has greatly expanded its mental health work, establishing many more mental health positions in the central office, as well as the local offices, and focusing particularly on community-based mental health services (Snyder Aff. ¶ 9)

*Admit that the DCF is focusing on community-based mental health services.* **Deny that the KidCare initiative includes funding for residential community-based placements.** *Exh. 5, DCF 2004 Needs Assessment, ¶1, Community-based services, p. 9; Conn. Gen. Stat. §17a-22a.*

73. Karen Snyder also directs three of the facilities operated by DCF. These facilities are: Connecticut Children's Place, a residential treatment facility in East Windsor, High Meadows, a residential treatment facility in Hamden and Riverview Hospital in

Middletown. (Snyder Aff. ¶ 10)

*Admit.*

74. Karen Snyder has instituted a practice at these facilities to begin discharge planning within the shortest appropriate time during the assessment and treatment process for children placed at the facility and to closely scrutinize requests for admission to determine if the child could be served in their own community. (Snyder Aff. ¶ 10)

*Plaintiffs have no independent knowledge of whether such discharge planning is taking place or whether, and by whom, requests for admission to determine if the child could be served in their own community are taking place since defendants have failed to provide any such information through discovery in accordance with Fed. Rul. Civ. Proc 26(e)* **Deny** *that there are adequate community based residential placements for children and youth who are ready for discharge. Exh. 5, DCF 2004 Needs Assessment, pp. 27, 28.*

75. Karen Snyder has instituted bi-monthly discharge meetings between Riverview staff and local mental health director's to engage in active discharge planning for each child in the facility (Snyder Aff. ¶ 12).

*Plaintiffs have no independent knowledge of whether bi-monthly discharge meetings are held since defendants have failed to provide any information pertaining to discharge planning at Riverview Hospital to plaintiffs through discovery in accordance with Fed. Rul. Civ. Proc. 26(e).*

76. No child is exempt from such discharge planning or review and regardless of the degree of disability, DCF staff continually consider clinically appropriate options to help the child live in a community, rather than an institution. (Snyder Aff. ¶ 13).

*Admit that DCF staff considers clinically appropriate options to help the child live in a community, rather than an institution.* **Deny** *that appropriate options exist for children and youth with the most severe disabilities. Exh. 10, Paul Affidavit, Exh. 11. Rudin deposition pp. 99; Exh. 8, Andersson deposition, pp. 25-27, 65-67.*

77. Because of the wide variety of community-based services available, it has been possible to reduce the time spent at Riverview Hospital for many children the average time spent at Riverview has dropped from 166 days in 2003 to 153 days in 2005. (Snyder Aff. ¶ 14).

**Deny** *that there are a wide variety of community-based services available for children and youth with severe mental illness. Exh. 10, Paul Affidavt; Exh. 11,Rudin deposition pp. 99; Exh. 8, Andersson deposition, pp. 25-27; 65-67.*

*As to the average length of time spent at Riverview and the reduction of time spent at Riverview Hospital for the time period from 2003 to 2005, plaintiffs have no independent knowledge of the data regarding Riverview Hospital since defendants failed to disclose*

13

*any data pertaining to Riverview Hospital through discovery in accordance with Fed. Rule Civ. Proc. 26(e).*

78. Reduction in stays has enabled Riverview to serve more children and this has been helpful because of the fact there are fewer private hospital beds for mentally ill children and private hospitals generally have shorter lengths of stay. (Snyder Aff. ¶ 15).

*Plaintiffs have no independent knowledge regarding reduction in stays at Riverview because defendants failed to disclose any data pertaining to Riverview Hospital to plaintiffs in accordance with Fed. Rule. Civ. Proc. 26(e).* **Denied.** *See Hospital Census Report, Exh. 12.*

79. The children who tend to remain the longest at Riverview are children who are autistic or mentally retarded or who also have serious medical problems. These children are the most difficult to treat and often have the fewest options for less restrictive placements. (Snyder' Aff ¶ 16)

*Admit.*

80. Due to expanded community-based services, fewer children treated at Riverview are being placed in residential treatment and more children are either going home or to foster care. (Snyder Aff. ¶ 17)

*Plaintiffs have no independent knowledge of the numbers of children currently being discharged from Riverview or where they are placed on discharge since defendants have failed to provide plaintiffs with data pertaining to Riverview Hospital through discovery in accordance with the Fed. Rule Civ. Pro. 26(e). Admit that the DCF opened a group home in Windsor, CT, for five boys in the custody of DCF who had been living at Riverview Hospital for a year or more and whose parents' parental rights had been terminated. Plaintiffs also admit that a group home in Bristol was being developed in 2004 for boys between the ages of 16 and 22 in the custody of the DCF who were also mentally retarded.* **Deny** *that appropriate community-based services for children and youth with severe mental illness are otherwise available. Exh. 8, Andersson deposition at pp. 41, 49, 54-6, 25-27, 65-67; Exh. 10, Paul Affidavit; Exh. 11, Rudin deposition pp. 99.*

81. In the past few years, the number of beds at Riverview has been reduced from 107 to 96; further reduction would be very difficult due to the shortage of private hospital beds. (Snyder Aff ¶ 18).

*Plaintiffs have no independent knowledge of the number of beds at Riverview since this data was not disclosed by defendants through discovery in accordance with Fed. Rule Civ. Proc. 26(e).* **Deny** *that plaintiffs are requesting a reduction in the number of beds. See Amended Complaint.*