82. High Meadows length of stay has dropped from 290 days in fiscal year 2003 to 212 days in fiscal year 2005. (Snyder Aff. ¶ 19).

*Plaintiffs have no independent knowledge of whether the length of stay has dropped between 2003 to 2005 at High Meadows since defendants failed to provide any data pertaining to High Meadows through discovery in accordance with Fed. Rule Civ. Proc. 26(e).*

KIDCARE

83. Part of Karen Snyder's responsibilities includes the implementation of the KidCare program, a system of care program for mentally ill children. (Snyder Aff ¶ 20)

*Admit.*

84. The KidCare program was the result of a Behavioral Health Partnership established in 2000 by the General Assembly, involving DCF, Department of Mental Health and Addiction Services (DHMAS) and Department of Social Services (DSS); the partnership was intended to establish an integrated system of care for children and adults (Snyder Aff ¶ 21)

*Admit.* **Deny** *that DMHAS is a part of the KidCare program as of September, 2005. Conn. Gen. Stat. §17a-22a; Exh. 8, Andersson deposition at p. 104-105.*

85. In 2001, this reform effort culminated in Connecticut Community KidCare, designed to improve the way the state coordinates and finances children's mental health and substance abuse services. A true and accurate copy of the report entitled "Connecticut Community KidCare: A Plan to Reform the Delivery and Financing of Children's Behavioral Health Services" is attached. (Snyder Aff ¶ 22)

*Admit.*

86. A key purpose of Kidcare is to braid federal and state funds with local resources to provide localized services for children. KidCare was founded on the principle that children with behavioral health needs should receive services in their community whenever possible, with families and caregivers part of the planning and decision-making. (Snyder Aff ¶ 23).

*Admit.*

87. As a reflection of DCF's commitment to KidCare, DCF adopted a mission statement to strengthen families' capacity to care for children with behavioral health needs, with a strong preference to deliver and manage services within the local community (Snyder Aff ¶ 24)

*Admit.*

88 A fundamental principle of KidCare is that a local team, led by a care coordinator, would work closely with the family to consider options for services the family needs in order to help them care for their mentally ill child. (Snyder Aft. ¶ 25).

*Admit.*

89. In its first years of operation, KidCare funds provided by the state supported three new non-traditional services: mobile crisis teams, intensive home-based support services and care coordination! Additionally, more finds were made available for extended day treatment. (Snyder Aff. ¶ 26).

*Admit.*

90 The KidCare program is a federally endorsed model of systems of care, as recommended by the Center for Mental Health Services which is part of the Substance Abuse and Mental Health Administration of the US. Department of Health and Human Services, (Snyder Aff. ¶ 27).

*Admit.*

91. The federal model is premised on a local consortium of public and private health care providers, parents, service agencies, educational agencies who work together to coordinate the provision of community resources for children who are mentally ill! (Snyder Aft. ¶ 28).

*Admit.*

92. 59 care coordinators work closely with local community collaborative teams comprised of representatives from local providers, such as child guidance centers, schools, non-profit groups. The teams are encouraged to utilize both traditional and nontraditional services to assist families with mentally ill children. The coordinators serve every town in the state!! (Snyder Aff ¶ 29).

*Admit.*

93. The demand for community mental health services is growing. This is partly due to the publicity and public attention given to the KidCare program (Snyder Aff. ¶ 30).

*Admit.*

94. KidCare is designed to educate families about the availability of these services, to encourage communities to embrace serving these children and to expand the varieties of non-traditional services that will aid in keeping the child in their community (Snyder Aff. ¶ 31)

*Admit.*

95. Since 2002, the number of families served by care coordination services has increased from 150 annually to 750 annually. This is a result not only of the greater awareness of the program and of mental illness in children but also the fact that most private insurance companys limit the type and duration of services covered for these children, (Snyder Aff ¶ 32).

*Admit.*

96. The General Assembly also established the Children's Behavioral Health Advisory Committee (CBHAC) that includes families, advocates and providers. The committee meets monthly to address policy and practice issues and also strives to educate the public about the services available. (Snyder Aff. ¶ 33).

*Admit.*

97. Community education is required for all services funded through KidCare. Through public service announcements, distribution of information about KidCare in schools, public meetings arid other means, DCF has made every effort to inform families about the agency's commitment to make mental health services available to assist them care for their mentally ill children in their own communities. (Snyder Aft ¶ 34).

*Admit.*

98. KidCare services have been very successful in avoiding unnecessary hospitalization and out-of-home treatment of children with serious mental illness. Over 12,000 children have been served by 16 mobile crisis teams with few children (approximately 10%) requiring hospitalization or a higher level of care. This is triple the number of children that used the program in its first year of operation. (Snyder Aft ¶ 35).

99. Over 3200 children have been involved with care coordination to date (Snyder Aff ¶ 36).

*Admit that KidCare services have avoided some hospitalizations; **deny** that KidCare adequately addresses the needs of children and youth with severe mental illness for whom out of home placement has been deemed clinically appropriate. Exh. 8, Andersson deposition at p. 121; Conn. Gen. Stat. §17a-22a(c) describing KidCare as not including 24/7 placements.*

17

100. DCF has recently expanded the types of community-based services for families with mentally ill children. Some of these programs were not even in existence ten years ago in this state (Snyder Aff. ¶ 37).

*Admit that the DCF has expanded the types of community-based services for families with mentally ill children and that some of these programs were not even in existence ten years ago in this state.* **Deny** *that these community-based services are made available to severely mentally ill children who are living in residential facilities, both within and without the state. Exh. 5, DCF 2004 Needs Assessment, p. 26-28; Exh. 8, Andersson deposition, p. 114, 121 line 21;*

101. Among the types of in-home services is Intensive In-Home Child and Adolescent Psychiatric Services (IICAPS), which uses teams of clinicians and paraprofessionals to work in the home with the family to develop and implement treatment plans and provide psychiatric services for the child. (Snyder Aff. ¶38).

*Admit.*

102. Other in-home services are: Multidimensional Family Therapy, Functional Family Therapy and Multisystemic Therapy. Each type is directed at a particular array of problems. Each is considered either evidence-based, meaning that the service has been shown to be successful through a peer review and evaluation or "a promising practice" meaning currently subject to peer review and evaluation. (Snyder Aff. ¶ 39).

*Admit.*

103. Flexible funds as well as mentors and respite care are also available to assist families in keeping children in their homes. (Snyder Aff. ¶ 40).

*Admit.*

104. Another new service is the crisis stabilization program which provides short-term care for children who are going through a mental health crisis; crisis stabilization beds are available to help children who are at risk of disrupting from their homes avoid hospitalization or more restrictive placements by offering short-term services and treatment to integrate back into their community. These beds served 48 children in the last quarter of 2004, with 32 returning home or to foster care with services in place. (Snyder Aff. ¶ 41).

*Plaintiffs have no independent knowledge regarding crisis stabilization beds since defendants failed to provide such data to plaintiffs through discovery in accordance with Fed. Rul. Civ. Proc. 26(e).*

105. Another new service offered to families is family support teams — at a cost of over $7 million, the state is making these professional teams available to families who have children in residential treatment who will be returning home or to foster care. The teams

18

are designed to help these families integrate the children back into the community. (Snyder Aff. ¶ 42).

*Admit that DCF offers family support teams. Plaintiffs have no independent knowledge of whether these professional teams are in fact available to families who have children in residential treatment who will be returning home or to foster care since defendants failed to provide such data to plaintiffs through discovery in accordance with Fed. Rule Civ. Proc. 26(e).* ***Deny*** *that these services are available for children with severe mental illness for whom returning to their families or to foster care is not clinically indicated. Exh. 5, 2004 DCF Needs Assessment, pp. 27-28.*

106. DCF also expects residential treatment facilities to engage in discharge planning earlier and work more closely with local care coordinators to assist children return to their community more expeditiously and planfully. (Snyder Aff. ¶ 43).

*Admit that the DCF expects residential treatment facilities to engage in discharge planning earlier and to work more closely with local care coordinators to assist children in returning to their communities more expeditiously and planfully. Plaintiffs have no independent knowledge of whether residential treatment facilities are in fact engaging in discharge planning earlier and work more closely with local care coordinators to assist children return to their community more expeditiously since defendants failed to provide such data to plaintiffs through discovery in accordance with Fed. Rule Civ. Proc. 26(e).* ***Deny*** *that there are appropriate community-based services to effectuate discharge plans. Exh. 10, Paul Affidavit; Exh. 11, Rudin deposition pp. 99; Exh. 8, Andersson deposition, pp. 25-27; 65-67; Exh. 5, 2004 DCF Needs Assessment.*

107. Families do not need to be clients of DCF in order to qualify for KidCare services. A majority (over 60%) of families using Emergency Mobile Crisis services are not clients of DCF. (Snyder Aft ¶ 44).

*Admit.*

FUNDING

108 Additional mental health finding was provided in 2001, when the General Assembly established the Community Mental Health Strategic Investment Fund, to be used for community mental health facilities and services. A Community Mental Health Strategy Board determines how the funds are to be used (Snyder Aff. ¶ 45).

*Admit.*

109. DCF's efforts to provide new community-based services for mentally ill children were boosted in 2002 when the Community Mental Health Strategy Board allocated $5 million in 2002 for early childhood consultation for mentally ill children under six, expanded in-home mental health services, flexible funds to provide "wrap-around" services for the family, mental health supports for educational success and intensive

19

juvenile justice intermediate assessments to prevent children from being placed in hospitals for evaluations. (Snyder Aff. ¶ 46).

*Admit.*

110. The most recent budget allocation allows DCF to continue in-home mental health services, flexible funding, early childhood consultation, and intermediate evaluations. An additional $1 million has been provided for flexible finding by the Community Mental Health Strategy Board. (Snyder Aff. ¶ 47).

*Plaintiffs have no independent knowledge of appropriations by the Community Mental Health Strategy Board as this information was not disclosed by defendants through discovery in accordance with Fed. Rul. Civ. Proc. 26(e). However, plaintiffs assume the veracity of the data contained in Ms. Snyder's affidavit.*

111. In 2002, DCF applied for and received $9.5 million for a federal SAMHSA (Substance Abuse and Mental Health Services Administration) demonstration grant for a school-based system of care program in Bridgeport. (Snyder Aff'. ¶ 48).

*Admit.*

112. Recently, DCF applied for two more SAMSHA grants of $9.5 million each for systems of care projects in Hartford and New London (Snyder Aff. ¶ 49).

*Plaintiffs have no independent knowledge of appropriations by the Community Mental Health Strategy Board as this information was not disclosed by defendants through discovery in accordance with Fed. Rul. Civ. Proc. 26(e). However, plaintiffs assume the veracity of the data contained in Ms. Snyder's affidavit.*

EFFORTS AND LAWSUITS INVOLVING JUDGMENT DEPARTMENT

113. In the past three years, DCF has worked more closely with the Connecticut Judicial Department to jointly plan mental health programs for children who are delinquents or from families with service needs. (Snyder Aff. ¶ 50).

*Admit.*

114. The two agencies are currently engaged in a joint strategic planning process under the direction of the Child Welfare League of America. Among the goals of this effort is to coordinate services for these youth, to increase the opportunities these children have to remain in their own communities (Snyder Aft ¶ 51).

*Plaintiffs have no independent knowledge of the strategic planning process under the direction of the Child Welfare League or the goals of this effort as this information was not disclosed by defendants through discovery in accordance with Fed. Rul. Civ. Proc.*

20

*26(e). However, plaintiffs assume the veracity of the data contained in Ms. Snyder's affidavit.*

115. The two agencies are defendants in a federal class action lawsuit, Emily J v. Rell, 3:93cv1994 (RNC), pending before this court; the action centers on mental health services to children with serious mental illness who are detained by the courts as delinquents. (Snyder Aff. ¶ 52).

*Admit.*

116. As a result of a settlement agreement in that action, DCF and the Judicial Department will be substantially expanding the array of community-based services provided to these children. The department will also continue to offer intensive evaluations for children in detention to expedite their return to the community. These assessments have reduced the need to send these mentally ill children to Riverview Hospital for in-patient evaluations. (Snyder Aff. ¶ 53).

*Plaintiffs have no independent knowledge of whether the array of community-based services provided to the Emily J. class members has expanded substantially, nor do plaintiffs have any independent knowledge of whether the number of in-patient evaluations at Riverview Hospital has been reduced, or any data to substantiate that intensive evaluations of children in detention have been completed, since this information was not disclosed to plaintiffs by defendants through discovery in accordance with Fed. Rul. Civ. Proc. 26(e*

117. DCF is also engaged in planning for delinquent and FWSN females who require community-based services. Attached is a true and accurate copy of the "Plan for a Continuum of Community-Based Services for Female Status Offenders and Delinquents" which was prepared by DCF to comply with Special Act 04-05. (Snyder Aff. ¶ 54).

*Admit that the DCF is engaged in planning for delinquent and FWSN females who require community-based services. Plaintiffs were not provided with a copy of the "Plan for a Continuum of Community-Based Services" until they received such copy appended to the DCF Motion for Summary Judgment.*

JUAN F.

118. In another class action lawsuit, Juan F. v. DCF, 1-189-8.59 (AHN), brought on behalf of children who were abused or neglected or at risk of being abused and neglected, DCF has entered into a settlement agreement, denominated an Exit Plan, whereby the state is committed to reducing the number of these children placed in residential treatment facilities. A true and accurate copy of the Exit Plan and the most current description of the Outcome Measures are attached. (Snyder Aff. ¶55, Ex. O, P).

*Admit.*

21

119. The Juan F. class members are children who are abused, neglected, or at risk of being abused and neglected, and includes all children adjudicated neglected or uncared for by the juvenile court. (Snyder Aff. ¶ 56).

*Admit that the Juan F. class is comprised of children who are abused, neglected, or at risk of being abused and neglected, but **deny** that the class includes children who are adjudicated "uncared for." Exh. 13, Plaintiffs March 11, 2004 Letter to Honorable Robert N. Chatigny, describing lack of impact of Juan F. Exit Plan on W.R. v. DCF ; Defendants' Ex. M., DCF Summary Judgment, Juan F. Complaint, p. 10.*

120. The Exit Plan establishes a transition task force (TTF), comprised of a monitor appointed by the federal court, the Commissioner of Children and Families and the Secretary of the Office of Policy and Management, to oversee the implementation of the Exit Plan, including assuring resources needed to carry out the plan are available. (Snyder Aff. ¶ 57).

*Admit.*

121. Under the Exit Plan, all out-of-state placements are reviewed by the TTF; if the TTF doesn't approve the placement, the department must come up with another plan for the child. (Snyder Aff. ¶ 58).

*Admit that the Exit Plan requires the review of all out-of-state placements by the TTF. Plaintiffs have no independent knowledge of whether such reviews of out-of-state placements are taking place since the defendants have not provided plaintiffs with any data relating to the review of out-of-state placements through discovery in accordance with Fed. Rule Civ. Proc. 26(e). **Deny** that the Exit Plan protects children and youth with severe mental illness from being placed out-of-state. Exh. 5, DCF 2004 Needs Assessment Data, p. 27, ¶1.*

122. Under Outcome Measure 19, DCF is required to reduce the number of children, including abused and neglected children and children at risk of being abused or neglected, as well as children in the voluntary services program placed in privately operated residential treatment care to not more than 11% of the total number of these children in out-of home care. To date, DCF has reduced the number of children am 887 in the first quarter of 2004 to 814 in the first quarter of 2005. (Snyder Aff. ¶ 59)

*Admit the requirements of Outcome Measure 19. **Deny** that Outcome Measure 19 protects children and youth with severe mental illness from being placed out of state. Exh. 13, Plaintiffs March 11, 2004 Letter to Honorable Robert N. Chatigny, describing lack of impact of Juan F. Exit Plan on W.R. v. DCF.*

POSITIVE OUTCOME PLAN

123. DCF adopted and circulated the Positive Outcome for Children Plan (POC Plan) to explain how it would reach the outcome measures of the Exit Plan. The TIF approved the

POC Plan. A true and accurate copy of the POC Plan is attached (Snyder Aff. ¶ 60, Ex. Q).

*Admit.*

124. A major contribution in the development of the POC was made through the formation of an Advisory Board organized by the Court Monitor. The advisory board, which provided valuable insight on each of the measures, represented a diverse cross section of individuals both professionally and culturally. (Ex. R, p 62).

*Admit.*

125. All children and youth in out-of-home care will have their level of care and length of stay actively managed by local area offices in order to reduce the number of children requiring out-of-home care. (Ex. R, p. 79).

*Admit that goal 1 of outcome measure so provides.*

126. Area offices will be assigned target numbers relative to every type of out-of home care, and every area office will utilize a common data reporting / tracking protocol to monitor their progress toward achieving goals. (Ex. R, p. 79).

*Admit that the plan requires these protocols. Plaintiffs have no independent knowledge of the target numbers and common data/reporting/tracking protocols since such information was not disclosed by defendants through discovery in accordance with Fed. Rul. Civ. Proc. 26(e).* **Deny** *that such protocols protect the rights of children and youth with severe mental illness from discrimination. Exh. 13, Plaintiffs March 11, 2004 Letter to Honorable Robert N. Chatigny, describing lack of impact of Juan F Exit Plan on W.R. v. DCF.*

127. Every area office will, in collaboration with a contracted local private non-profit agency, clinically evaluate all children in out-of-home placement and their readiness for discharge; they will further identify the community services necessary to effectuate a discharge and they will implement the discharge plan within the local system of care. (Ex R, p. 79)

*Admit that the plan, Defendants' Ex. 9, calls for the clinical evaluations of all children in out-of-home placement and their readiness for discharge, and identification of community services necessary to effectuate a discharge and that discharge plan will be implemented. Plaintiffs have no independent knowledge of whether such clinical evaluations are occurring, or whether discharge plans are implemented, since such information was not disclosed by defendants through discovery in accordance with Fed. Rul. Civ. Proc. 26(e).* **Deny** *that Defendants' Ex. 9 protects children and youth with severe mental illness from continued segregation in out of state placements. Exh. 13, Plaintiffs March 11, 2004 Letter to Honorable Robert N. Chatigny, describing lack of impact of Juan F. Exit Plan on W.R. v. DCF.*

128. The Bureau of Behavioral Health will develop a residential utilization management authorization process in anticipation of the operationalization of an ASO through the Kid Care initiative. (Ex. R, p. 79).

*Plaintiffs have no independent knowledge of such residential utilization management authorization process since such information was not disclosed by defendants through discovery in accordance with Fed. Rul. Civ. Proc. 26(e).*

129. The Bureau of Behavioral Health will work with provider agencies to better match children requiring residential treatment to the types and levels of care for which DCF contracts with residential providers. (Ex. R, p. 79)

*Plaintiffs have no independent knowledge of the relationship between the Bureau of Behavioral Health and provider agencies since such information was not disclosed by defendants through discovery in accordance with Fed. Rul. Civ. Proc. 26(e).*

130. Another Outcome Measure 3, covering treatment plans, requires that at least 90% of the cases shall have clinically appropriate, individualized family and child specific treatment plans developed in conjunction with patents, children, providers and others involved with the case and approved by the DCF supervisor within sixty days of case opening or child's placement out-of-home whichever comes sooner, and for each six months period thereafter (Ex. R, p., 66).

*Plaintiffs admit that Outcome Measure 3 covers treatment plans and requires that at least 90% of the cases shall have clinically appropriate, individualized family and child specific treatment plans which are approved by the DCF supervisor within sixty days of case opening or child's placement out-of-home, whichever comes sooner, and for each six months period thereafter. Plaintiffs have no independent knowledge of whether the requirements of Outcome Measure 3 are being met since such information was not disclosed by defendants through discovery in accordance with Fed. Rul. Civ. Proc. 26(e). Plaintiffs **deny** that Outcome Measure 3 prevents discrimination against children and youth with severe disabilities because 10% of cases might constitute those children with the most severe disabilities. Exh. 5, DCF 2004 Needs Assessment, p. 37, ¶1.*

131. With respect to Outcome Measure 3, the POC states that the Bureau Chief of Continuous Quality Improvement will assure that timeframes are met on out-of-home cases. (Ex R, p.67).

*Admit that Outcome Measure 3 provides that the Bureau Chief of Continuous Quality Improvement will assure that timeframes are met on out-of-home cases. Plaintiffs have no independent knowledge of whether Outcome Measure 3 timeframes are in fact being met since such information was not disclosed by defendants through discovery in accordance with Fed. Rul. Civ. Proc. 26(e).*

132. Another Outcome Measure #7 covering reunification, requires that 60% of children who are reunified with parents/guardians shall be reunified within 12 months of their most recent removal from home. (Ex. R, p. 69).

*Admit that Outcome Measure 7 so provides.*

133. With respect to Outcome Measure #7, the POC states that the Bureau Chief for Child Welfare will establish a process of case supervision to determine viability of planning for reunification on a quarterly basis following the child's entry into care. Case conferences will be conducted on a semi-annual basis on all reunification cases to identify any case missing a definitive date for return. (Ex.R, p.70).

*Admit that Outcome Measure 7 so provides.*

134 DCF will build upon existing forms of collaboration, which enhance the reunification process (Ex. R, p., 70).

*Admit that DCF plans to improve the enhancement of the reunification process by building on existing forms of collaboration.*

135. Another Outcome Measure #15, covering children's needs, requires that at least 80% of all families and children shall have all their' medical, dental, mental health and other service needs provided as specified in their most recently approved treatment plan. (Ex R, p. 76).

*Admit that Outcome Measure 15 so provides. Plaintiffs have no independent knowledge of whether 80% of the mental health needs of children and youth are provided as specified in their most recently approved treatment plan are met since such information was not disclosed by defendants through discovery in accordance with Fed. Rul. Civ. Proc. 26(e).* **Deny** *that Outcome Measure 15 protects severely mentally ill children and youth from discrimination. Exh. 13, Plaintiffs March 11, 2004 Letter to Honorable Robert N. Chatigny, describing lack of impact of Juan F. Exit Plan on W.R. v. DCF.*

136. With respect to Outcome Measure #7, the POC states that area directors will develop their own strategies and protocols for supervisors to ensure that all identified needs are met as outlined in the treatment plan. Area directors will establish their own quality improvement strategies and protocols for quarterly case reviews (Ex. R. p. 76).

*Admit that Outcome Measure 7 so provides. Plaintiffs have no independent knowledge of whether such strategies and protocols have been developed or whether all identified mental health needs as outlined in the treatment plans are being met, or whether such quarterly case reviews are occurring, since such information was not disclosed by defendants through discovery in accordance with Fed. Rul. Civ. Proc. 26(e).*

25

137. With respect to Outcome Measure #7, the POC states that the mental health program director will track barriers and identify gaps in services in each area office and report these findings to Resource Management on a quarterly basis. (Ex R, p.76)

*Admit that Outcome Measure 7 so provides. Plaintiffs have not received through discovery all Residential Treatment Center Performance Based Contract Data Quarterly reports so their independent knowledge of whether the mental health program director has in fact tracked barriers and identified gaps in services and of the content of such quarterly reports is limited since not all such information was disclosed by defendants through discovery in accordance with Fed. Rul. Civ. Proc. 26(e).*

138. With respect to Outcome Measure #7, the POC states that the Bureau Chief of Child Welfare and Behavioral Health will facilitate the utilization of the newly created therapeutic community service teams (Ex. R, p 76).

*Admit that Outcome Measure 7 so provides. Plaintiffs have no independent knowledge of whether such therapeutic community service teams have been utilized since such information was not disclosed by defendants through discovery in accordance with Fed. Rul. Civ. Proc. 26(e).*

139. With respect to Outcome Measure #7, the POC states that the director of KidCare, Planning and Development with Area Directors will integrate the activities of the Administrative Service Organizations into each area. (Ex. R, p. 76).

*Admit that Outcome Measure 7 so provides. Plaintiffs have no independent knowledge of whether such integration is occurring since such information was not disclosed by defendants through discovery in accordance with Fed. Rul. Civ. Proc. 26(e).*

140. The POC Plan stated that requests for proposals would be issued for group homes, family support teams, treatment foster care, treatment group homes, alternatives to hospitalization, and flexible funding to "enhance the ability of local communities to service children in less restrictive, more local settings" (Ex Q, p :3).

*Admit that the POC Plan so stated, and that some RFPs have been issued. Otherwise, plaintiffs have no independent knowledge of to what extent such group homes, family support teams, treatment foster care, treatment group homes, alternatives to hospitalization, and flexible funding have been provided since such information was not disclosed by defendants through discovery in accordance with Fed. Rule. Civ. Proc 26(e).*

141. The Child and Family Service Plan cites the POC plan and explains that the POC plan was accepted by the TTF and is now being implemented. (Ex, R, p. 62).

*Admit that the Child and Family Service Plan cites the POC plan. Plaintiffs have no independent knowledge of whether the POC plan was accepted by the TTF and whether it*

26

*is now being implemented because such information was not disclosed by defendants through discovery in accordance with Fed. Rule Civ. Proc. 26(e).*

142. A localized mental health service system and expanded local services are included in the POC plan, along with plans for expanded foster care, group homes, family support teams, and flexible funding. (Snyder Aff ¶ 61).

*Admit that a localized mental health service system and expanded local services are included in the POC plan, along with plans for expanded foster care, group homes, family support teams, and flexible funding. Plaintiffs have no independent knowledge of the same since such information was not disclosed by defendants through discovery in accordance with Fed. Rule Civ. Proc. 26(e).* **Deny** *that the POC plan protects children and youth with severe mental illness from discrimination. Exh. 13, Plaintiffs March 11, 2004 Letter to Honorable Robert N. Chatigny, describing lack of impact of Juan F. Exit Plan on W.R. v. DCF.*

143. A new operational structure for the local offices is included in the POC Plan to manage treatment planning and utilization of out-of-home treatment care. (Snyder Aft ¶ 62).

*Admit that a new operation structure for the local offices is included in the POC Plan. Plaintiffs have no independent knowledge of whether such new operational structure is effectively managing treatment planning and utilization of out-of-home treatment care since such information was not disclosed by defendants through discovery in accordance with Fed. Rule Civ Proc. 26(e).*

C HILD AND FAMILY SERVICES PLAN

144. In September, 2004, DCF filed a Child and Family Services Plan (CFS Plan) with the Administration for Children and Families, U.S. Department of Health and Human Services. The plan is required for states utilizing federal funds to help defray the costs of foster care, under the federal Child Abuse Prevention and Treatment Act. A true and accurate copy of the plan is attached. (Snyder Aff ¶ 63).

*Plaintiffs have no independent knowledge of the CFS Plan since such information was not disclosed by defendants through discovery in accordance with Fed. Rule Civ Proc. 26(e).*

145. The Child and Family Services Plan outlines DCF's plans to use a private non-profit agency to work with each area office to identify children ready for discharge from residential facilities who require community-based services and to assess needs for expanded community based programs to prevent children with mental illness from leaving their communities. (Service Plan, p. 79).

*Plaintiffs have no independent knowledge of the CFS Plan or whether or to what extent it has been implemented since such information was not disclosed by defendants through discovery in accordance with Fed. Rule Civ. Proc. 26(e).*

146. The CFS Plan, which was made public, incorporated the POC; it explains in greater detail how the department will carry out its obligations under the Exit Plan, and cites that target numbers have been established for each office to reduce the number of children placed in residential treatment facilities. (Snyder Aff. ¶ 64).

*Plaintiffs have no independent knowledge of the CFS plan or whether target numbers have been established since such information was not disclosed by defendants through discovery in accordance with Fed. Rule Civ. Proc. 26(e). Exh. 13, Plaintiffs March 11, 2004 Letter to Honorable Robert N. Chatigny, describing lack of impact of Juan F Exit Plan on W.R. v. DCF.*

147. DCF is implementing the POC Plan. Each area office has a written plan, called a quality improvement plan, to meet the requirements of the Exit Plan, including the goals of reducing the number of children in residential treatment. Each plan includes specific strategies customized for each office to meet the Exit Plan goals. Weekly discharge planning meetings are required in all legions to expedite the return of children from residential placements. (Snyder Aff. ¶ 65).

*Plaintiffs have no independent knowledge of any such written quality improvement plan and weekly discharge planning meetings or whether the return of children from residential placements is in fact expedited since such information was not disclosed by defendants through discovery in accordance with Fed. Rule Civ. Proc. 26(e)*

DEINSTITUTIONALIZATION

148. The number of children placed out-of-state has declined from 524 in June, 2004 to 393 in May, 2005. (Snyder Aff. ¶ 66).

**Deny** *that the number of children placed out-of-state has declined. Exh. 25, Martin Affidavit, Exh. 14, Martin Graph of Number of Children Placed in out-of-state residential facilities May 2002 through June 2005; Ex. 15, Sudders Deposition, p. 55.*

149. The total number of all children (includes delinquent and FWSN cases) placed in private residential facilities has also declined. As of January, 2004, 1215 children were placed in residential placement, by June, 2005, that number had been reduced to 993. (Snyder Aff. ¶ 67).

**Deny.** *Exh. 16, LINK Reports, Total Numbers of Children in Placement 2002, 2003, 2005, LINK Report 3/31/05; Exh. 15, Sudders deposition, p 55*

28