150. The average length of stay in these facilities has also been reduced from 422 days fox the period January 1, 2003 through March :31, 200.3 to :359 days from January 1, 2005 through March 31, 2005. (Snyder Aff. ¶ 68).

*Plaintiffs have no independent knowledge of the average length of stay in private out-of-state residential providers since defendants have failed to provide plaintiffs with Performance Based Contract Data (PBC Data), or any other similar data, for any out-of-state placements through discovery in accordance with Fed. Rule Civ. Proc. 26(e). Plaintiffs have no independent knowledge of the average length of stay in DCF residential facilities since defendants have failed to provide plaintiffs with PBC Data for any of the DCF facilities.* ***Deny*** *with respect to in-state private residential facilities. Exh. 25, Martin Affidavit, Exh. 17, Martin, Analysis of In-State Private Residential Facilities PBC data indicating Length of Stay (LOS). (All PBC Data upon which Marin relied was obtained from the DCF website and is too voluminous to include here.) Note that the DCF has failed to provide plaintiffs through discovery in accordance with Fed. Rule Civ. Proc. 26(e) PBC data for in-state providers for the periods 4/01/04 through the present. Reports available online at the DCF website were last updated 04/01/04. This reporting system has been operational since July 2001 and dictates that new reports will be posted 45 days following the end of the reporting period.*

151. An even greater reduction in placement was seen among children who were adjudicated delinquent. In fiscal year 199798, 452 children were placed in such facilities, whereas in 2003-04, only 277 children were-placed. (Snyder Aff ¶ 69).

*Plaintiffs have no independent knowledge of any placement data for SFY 1997-98, adjudicated delinquent or otherwise, since defendants failed to provide plaintiffs with such data through discovery in accordance with Fed. Rule Civ. Proc. 26(e).* ***Deny.*** *Exh. 18, Residential Treatment Center Annual Report 6/30/02, p. 5.*

152. The number of days children are spending in private hospitals has also decreased over time; in May, 2005, the average length of stay was 16 days compared to 37 days in May, 2004 (Snyder Aff, ¶ 70).

***Deny.*** *Exh. 25, Martin Affidavit, Exh. 12, Martin, Private Hospital Length of Stay (LOS) Data January 02 – July 05, Private Hospital Census Data, Jan. 02 – July 05. (All Hospital Census Reports upon with Martin relied were obtained from the DCF website but are not included here because they are too voluminous).*

153. DCF 's current administration is fully and deeply committed to avoiding residential placements for children who are mentally ill but can be treated in less restrictive settings, including foster care and group homes. (Snyder Aff. ¶71).

*Admit that DCF expresses its commitment.*

154. DCF has been successful in expanding the number of therapeutic foster care homes available for children. In April 2004, 423 children were placed in such foster care; by May, 2005, 492 children were placed in therapeutic foster care. (Snyder Aff ¶ 72.).

*Plaintiffs have no independent knowledge of the number of therapeutic foster care homes available since 2003 since defendants have failed to provide them with any updated foster care data through discovery in accordance with Fed. Rule Civ. Proc 26(e).*

155. DCF has also been expanding the number and types of group homes available to serve mentally ill children. (Snyder Aff. ¶ 7, 3).

*Plaintiffs have no independent knowledge of the number and types of group homes available to serve mentally ill children, except for those discussed at Paragraph 80, supra, and those disclosed by Dr. Synder at her deposition (See Exh. 22, Snyder Deposition Exhibit 1 attached), since defendants have failed to provide them with any further documentation of group homes available to serve mentally ill children through discovery in accordance with Fed. Rule of Civ. Proc. 26(e).*

THERAPEUTIC GROUP HOMES

156. In the fall of 2004, DCF issued a request for proposals (REPs) to develop therapeutic community services for children, including treatment foster homes, family support teams, and therapeutic group homes. The request asked for "creative and innovative proposals designed to help. meet [DCF']'s goal of returning children to Connecticut who are currently out-of-state; to assure that fewer children are placed in residential care and that no child who is removed from his or her home or community remains in an institutional setting for any longer than is absolutely necessary" (Snyder Aff. ¶74).

*Admit that the DCF issued an RFP.*

157. In March, 2005, the department issued another RFP for the development of group homes for youth "who may have required psychiatric hospitalization, are at increased risk of psychiatric hospitalizations or require clinical services of different intensities in a small structured setting." (Snyder Aff. ¶ 75)

*Plaintiffs have no independent knowledge of the RFP issued in March 2005 since defendants failed to disclose such information to plaintiffs through discovery in accordance with Fed. Rule Civ. Proc. 26(e).*

158. As a result of these requests for proposals, DCF has funding and developers for 35 new therapeutic group homes Currently, DCF operates 23 group homes, including three considered therapeutic in that they offer intensive services for severely disturbed or retarded individuals. An additional six group homes are slated for development in SFY 2006. (Snyder Aff. ¶ 76)

*Plaintiffs have no independent knowledge of such funding and developers for 35 new therapeutic group homes, or the additional six group homes, since defendants failed to disclose such information to plaintiffs through discovery in accordance with Fed. Rule Civ Proc. 26(e).*

159. The department is moving as expeditiously as possible, has the funding and is currently working with the developers to have these homes open quickly. It is anticipated that all thirty-five homes will be open within the next year. (Snyder Aff. ¶77).

*Plaintiffs have no independent knowledge of such funding since defendants failed to disclose such information to plaintiffs through discovery in accordance with Fed. Rule Civ. Proc. 26(e).*

160. DCF and providers have occasionally experienced problems with developing group homes. Although zoning approval is not required, DOE and group home developers work hard to build a welcoming community for the children who will be living in the home. School systems, neighbors and local officials often raise issues that need to be addressed before plans can be finalized. In one instance, a provider had to forego plans and move the site to another town due to local resistance. (Snyder Aff. ¶ 78).

*Plaintiffs have no independent knowledge of such problems since defendants failed to disclose such information to plaintiffs through discovery in accordance with Fed. Rule Civ. Proc. 26(e).*

161. Therapeutic group homes cost approximately $900,000 a year to operate and are more costly than residential treatment but may offer greater benefits to the children, (Snyder Aff.¶79)

*Admit that therapeutic group homes offer greater benefits to the children.* ***Deny*** *that they are more expensive than residential treatment. Exh. 15, Sudders deposition, pp. 82-83; Exh. 19, Gibber deposition, pp. 110, 111, 116-118; Exh. 8, Andersson deposition, p. 105-106.*

EFFICIENCY IN OPERATIONS

162. DCF staff work hard to maximize federal funds, particularly social security and Medicaid funds, that reimburse the state for the costs associated with foster care, residential care and adoption In the last year, DCF's federal reimbursement has doubled in the last two years from $45 million to over $100 million. (Snyder Aff. ¶ 80).

*Plaintiffs have no independent knowledge of DCF's federal reimbursement over the last two years since defendants have failed to provide such data to plaintiffs through discovery in accordance with Fed. Rule Civ. Proc. 26(e).*

163. Although these funds are recouped for the General Fund, rather than DCF's own budget, the additional revenue provides support at the legislature for DCF's efforts to

expand community-based mental health services as offsets to residential care. (Snyder Aff ¶ 81).

*Plaintiffs have no independent knowledge of the manner in which the DCF recoups federal funding since defendants have failed to provide such data to plaintiffs through discovery in accordance with Fed. Rule Civ. Proc. 26(e).*

164. DCF is expecting to better manage its utilization of community-based service resources through a contract currently under negotiation with a private administrative service organization (ASO). The ASO will assist DCF in expanding resources for mentally ill children (Snyder Aff. ¶ 82).

*Plaintiffs have no independent knowledge of the utilization of contracts with a private ASO, or the manner in which DCF plans to expand resources for mentally ill children, since defendants have failed to provide such data to plaintiffs through discovery in accordance with Fed. Rule Civ. Proc. 26(e).*

DEMAND FOR SERVICES

165. A problem facing DCF currently is the increasing number of families seeking voluntary services. The number of families seeking these services has grown substantially. Families seeking voluntary services from DCF have increased from 853 as of July 1, 2002 to 1263 on June 22, 2005 (Snyder Aff. ¶ 83).

*Plaintiffs have no independent knowledge of whether an increasing number of families are seeking voluntary services since such data was not disclosed by defendants through discovery in accordance with Fed. Rule Civ. Proc. 26(e)*

166. Although the Commissioner has the authority to limit the number of families receiving voluntary services, she has chosen not to do so. As a consequence, as the number of families seeking these services increase, some families have longer waits for services. However, it is very rare that a family is required to wait more than a few months for services. (Snyder Aff ¶ 84).

*Admit that the Commissioner has the authority to limit the number of families receiving voluntary services. Plaintiffs have no independent knowledge of whether the number of families seeking these services has increased or what the wait for services is since defendants have failed to provide such data to plaintiffs through discovery in accordance with Fed. Rule of Civ. Proc. 26(e).*

167. Of the 1263 children currently in voluntary services, only 173 are in residential treatment. Some of these children are mentally retarded and will be transferred shortly to the jurisdiction of the Department of Mental Retardation. (Snyder Aff. ¶ 85).

*Plaintiffs have no independent knowledge of the number of children in voluntary services, the number of residential placements that are for children who are in voluntary services,*

*or the number of children in the care of the DCF who are also eligible for services from the DMR since defendants failed to provide plaintiffs with such information through discovery in accordance with Fed. Rule Civ. Proc. 26(e)*

168. Attached is a true and accurate copy of the memorandum of agreement between DCF and DMR, outlining the transfer of funds and responsibility for mentally retarded children in the voluntary service program. (Snyder Aft. ¶ 86)

*Admit. However, defendants failed to provide a copy of the memorandum of agreement to plaintiffs through discovery in accordance with Fed. Rule of Civ. Proc. 26(e).*

169. Currently private insurance companies rarely cover the cost of home-based treatment, despite the fact that these services can cost less than residential treatment. (Snyder Aft. ¶ 87).

**Deny.** *42 U.S.C. §1396d(r), Exh. 8, Andersson deposition, pp. 95-98.*

170. A problem impeding DCF's ability to expand mental health services is the shortage of qualified professionals, particularly Spanish speaking professionals. In some communities, it is difficult to find or recruit mental health professionals needed to provide needed services. (Snyder Aff. ¶ 88).

*Admit.*

RISK OF REALLOCATION

171. DCF's efforts to reallocate funds from residential care to community care must be done in a planful way to avoid reducing critically needed services for those children requiring intensive 24-hour treatment. (Snyder Aft. ¶ 89)

*Admit.*

172. Children who are placed out-of state are typically children presenting the greatest risk to the community, namely children who are acting out sexually, or are physically aggressive; such children cannot be handled in a less-restrictive setting and very few Connecticut residential treatment facilities will accept such children. (Snyder Aff. ¶ 90)

*Admit.*

173. Adverse consequences could arise from reducing further the number of residential treatment facility beds available in Connecticut. Some delinquent children are placed, through orders of the juvenile court, in such facilities, and reducing the number of such placements could result in more children ordered to the Connecticut Juvenile Training School. (Snyder Aft. ¶ 91).

*Admit that some delinquent children are placed through orders of the juvenile court in residential treatment facility beds available in Connecticut.* ***Deny*** *that plaintiffs seek a reduction in residential beds. Amended Complaint.*

174. Another factor affecting the number of children in residential placement is the reduction in population at Connecticut Juvenile Training School and the closure of Long Lane School for delinquents which has resulted in fewer placement options for delinquent girls. While this issue is being addressed by the development of more community-based resources, there still is a compelling need to maintain some residential treatment programs for this population (Snyder Aff. ¶ 92).

*Admit that the reduction in population at CJTS and the closure of Long Lane School might result in fewer placement options for delinquent girls.* ***Deny*** *that plaintiffs are seeking a reduction in the number of residential beds. Amended Complaint.*

175. Because few private hospital beds are available for children with serious mental illness, reallocating funds from Riverview Hospital for community-based services would be at the expense of children most in the need of intensive in-patient treatment (Snyder Aff ¶ 93).

*Admit that the number of private hospital beds is limited.* ***Deny*** *that plaintiffs seek a reduction in the number of hospital beds at Riverview Hospital. Amended Complaint.*

176. The state must continue to maintain a public hospital for children who cannot be safely maintained in less restrictive settings. Further reduction in the number of public hospital beds is difficult because of the increased demand for beds from patients who would otherwise be treated in private hospitals but whose insurance will not cover such services. (Snyder Aff. ¶ 94).

*Plaintiffs admit that the state must continue to maintain a public hospital for children who cannot be safely maintained in less restrictive settings.* ***Deny*** *that plaintiffs seek a reduction in the number of public hospital beds. Amended Complaint.*

177. The General Assembly is concerned that there maybe insufficient number of psychiatric hospital beds to care for children who require intensive in-patient treatment. (Snyder Aff: ¶95).

*Plaintiffs have no independent knowledge of whether the General Assembly is so concerned since defendants have failed to provide such information through discovery in accordance with Fed. Rule Civ. Proc. 26(e).*

178. This past session, the General Assembly enacted legislation requiring the Commissioner of the Office of Health Care Access to establish a committee comprised of representatives from DCF and DSS as well as hospital staff and advocacy representatives to examine the need to expand the number of inpatient beds. The committee's report is due January 1, 2006 (Snyder Aff. ¶ 96).

*Plaintiffs have no independent knowledge of the legislation requiring the Commissioner of the Office of Health Care Access to establish a committee comprised of representatives from DCF and DSS as well as hospital staff and advocacy representatives to examine the need to expand the number of inpatient beds, or that the committee's report is due January 1, 2006, but assume the validity of this information contained in Dr. Synder's affidavit.*

179. Diversion of DCF's mental health funds for more therapeutic group homes would be harmful to other mentally ill children because prevention, including home-based and crisis services would likely need to be reduced; and if funds were diverted from residential treatment, that would be detrimental to those children requiring that level of care and would not be cost-effective. (Snyder Aff. ¶ 97).

***Deny**. Exh. 9, Ando deposition at pp. 43, 46. Exh. 8, Andersson deposition, 19-21, 100-106; Exh. 15, Sudders deposition at pp. 81-82, Exh. 20, Sudders' Fed. Rule Civ. Proc 26(2) Expert Statement, p.2; Exh. 21, Gibber's Fed Rule Civ. Proc. 26(2) Expert Statement, p.2; Exh. 19, Gibber deposition at pp. 110, 111, 116-118.*

COMMITMENT TO DEINSTITUTIONALIZATION

180. DCF has made a full commitment to the systems of care model for community-based mental health services. This administration has dedicated itself to incorporating these principles at every level of the organization. Planning for and creating greater community resources is occurring both locally and through the ongoing budget process conducted by central office staff. (Snyder Aff. ¶ 98).

*Admit.*

181. The state's commitment to prevent institutionalization of mentally ill children is reflected as well in new legislation adopted this past session, formally establishing the Behavioral Health Partnership between DCF and DSS whose stated purposes include expansion of community-based services, and reduction of unnecessary use of residential services, (Snyder Aft ¶ 99).

*Admit.*

182. A greatly expanded effort has been made to prevent unnecessary institutionalization of children. This philosophy has been imparted to the professionals involved in assessing children, as well as all DCF staff. (Snyder Aff. ¶ 100).

*Plaintiffs have no independent knowledge of what policies or philosophies have been conveyed to the professionals involved in assessing children since defendants failed to provide any information relating to the assessment of children through discovery to plaintiffs in accordance with Fed. Rule Civ. Proc. 26(e).*

183. Before a child may be placed in a residential treatment facility, the child's records are reviewed by a central placement team and then by the director of the bureau of behavioral health and medicine to assess whether less restrictive placements would be able to address the child's mental health needs. (Snyder Aff. ¶ 101).

*Admit that there is a central placement team. Plaintiffs have no independent knowledge of whether the director of the bureau of behavioral health and medicine has developed specific protocols relating to placement determinations since defendants have failed to provide such information to plaintiffs through discovery in accordance with Fed. Rule Civ. Proc. 26(e).* ***Deny*** *that this review process prohibits discrimination against children and youth with severe mental illness. Exh. 5, 2004 DCF Needs Assessment, p. 27, ¶1.*

184. The fact that DCF has greatly expanded the resources and staffing devoted to mental health issues demonstrates that there has been a sea of change within the organization, placing much greater emphasis on the agency's mental health mandate, and particularly on-efforts to expand community mental health services (Snyder Aff. ¶ 102).

*Admit.*

185. DCF's efforts to reduce the number of children in residential placement are being directed equally at children who have been abused and neglected and children who are in the voluntary service program. (Snyder Aff. ¶ 103).

*Plaintiffs have no independent knowledge regarding whether the DCF's efforts to reduce the number of children in residential placement are directed equally at children who have been abused and neglected and children who are in the voluntary services program since defendants have failed to disclose such information to plaintiffs through discovery in accordance with Fed. Rule Civ. Proc 26(e).*

186. In the current budget, DCF has sought additional funding for these services, as they are a high priority for the agency. (Snyder Aff. ¶ 104).

*Admit.*

187. As more community-based services and placements become available and children who are successfully treated are able to return home or to another permanent arrangement, it is expected that length of stays in residential treatment facilities will shorten and many placements will be diverted. (Snyder Aff. ¶ 105).

*Admit*

PETER MENDELSON

188. Peter Mendelson is the Director of the Bureau of Behavioral Health and Medicine for the Department of Children and Families (DCF). (Mendelson Aff. ¶ 1)

*Admit*

189. Peter Mendelson has worked in the mental health field for over 25 years. Peter Mendelson has held a variety of positions at the Department of Mental Health and Addiction Services (DMHAS) including chief administrative director, associate medical director, director of young adult services and director of the mental health division. Peter Mendelson has a Ph.D degree in sociology with a focus on social psychology (Mendelson Aff ¶2)

*Admit.*

190. In his current position, Peter Mendelson is responsible for behavioral health services delivered to children associated with DCF. (Mendelson Aff. ¶ 3).

*Admit.*

191. Twice a month Peter Mendelson conducts a meeting with mental health staff from the bureau, facility staff and mental health directors from all local offices to review children in DCF facilities, shelters and safe homes who require discharge planning. (Mendelson Aff. ¶4).

*Plaintiffs have no independent knowledge of Peter Mendelson's involvement in discharge planning as such information was not provided to plaintiffs through discovery in accordance with Fed. Rule Civ. Proc. 26(e).*

192. The goal of this meeting is to review the child's treatment needs, and formulate a discharge plan designed to meet those needs as quickly as possible (Mendelson Aff ¶ 5).

*Plaintiffs have no independent knowledge of these meetings as such information was not provided to plaintiffs through discovery in accordance with Fed. Rule Civ. Proc. 26(e).*

193. Peter Mendelson also is personally involved in most decisions involving children placed in residential treatment facilities. The rationale for his involvement is to reduce the number of children placed in such facilities by considering less restrictive options when clinically appropriate. (Mendelson Aff. ¶ 6).

*Plaintiffs have no independent knowledge of Peter Mendelson's role in such meetings as such information was not provided to plaintiffs through discovery in accordance with Fed. Rule Civ. Proc. 26(e).*

194. Prior to Peter Mendelson's review of these requests, the local office must also examine the request. No child is placed in a residential treatment facility without a written recommendation from a mental health professional involved in the child's assessment and/or treatment. (Mendelson Aff. ¶ 7).

*Admit that children and youth are not placed in residential treatment facilities without a written recommendation from a mental health professional involved in the child's assessment and/or treatment.* ***Deny*** *that the intensity of services required by a child or youth can only be provided in a residential treatment facility. Exh. 8, Andersson deposition, pp. 19, 26-27, 67-70.*

195. Both central office and local office professionals review such requests before they are sent to Peter Mendelson for review. All staff has been instructed to consider any type of program or service that might be available to eliminate the need for residential placement when clinically appropriate. (Mendelson Aff. ¶ 8).

*Plaintiffs have no independent knowledge of the central and local office protocols for referral to Peter Mendelson's review, or whether staff has been so instructed, since such information was not provided to plaintiffs through discovery in accordance with Fed. Rule Civ. Proc. 26(e).*

196. A fundamental principle that guides all of the work is that each child should be placed in the least restrictive clinically appropriate treatment setting as meets the child's needs. As much as possible, DCF tries to find a home-like placement for each child, or a community- type setting. (Mendelson Aff. ¶ 9).

*Admit that DCF is committed to this principle.* ***Deny*** *that there are adequate community-type settings available. Exh. 5, 2004 DCF Needs Assessment, pp. 25-27; Exh. 6, PBC data, Emergency Shelters, Second Admission ¶¶16, 17.*

197. Peter Mendelson also oversees the transition of children who are aging out of DCF's care and require adult services from DMHAS or the Department of Mental Retardation DMR). (Mendelson Aff. ¶ 10).

*Admit.*

198. As a result of many discussions between Peter Mendelson's office and officials from the Department of Mental Retardation (DMR), and budget decisions made by the General Assembly, the two agencies have entered into a memorandum of agreement whereby mentally retarded children who are seeking voluntary services from DCF will become the responsibility of DMR. (Mendelson Aff. ¶ 11).

*Admit.*

199. As of October 1, 2005, DMR will assume sole responsibility for all mentally retarded children receiving voluntary services from DCF. (Mendelson Aff. ¶ 12).

*Admit.*

200. Currently, many of these children have been placed in residential treatment facilities, in some cases, out of Connecticut, due to the lack of resources available to DCF Through this joint initiative, many of these children will be moved to smaller community settings operated by DMR. (Mendelson Aff. ¶ 13).

*Admit that many of these children have been placed in residential treatment facilities, in some cases, out of Connecticut, due to the lack of resources available to DCF Plaintiffs have no independent knowledge of whether any of these children will be moved to smaller community settings operated by DMR since defendants have failed to provide plaintiffs with such information through discovery in accordance with Fed. Rule Civ 26(e).*

201. DMR and DCF officials anticipate that this transfer of responsibility and funding will allow the families of these children to have more contact and involvement with their children and will also increase the opportunities of these children to be involved in their communities. (Mendelson Aff ¶ 14).

*Admit that DMR and DCF officials so anticipate, but plaintiffs have no independent knowledge of whether greater contact and involvement with their families and communities will in fact result.*

202. Another benefit of this agreement is that it should provide a more efficient transition for these children as they become adults and require adult services (Mendelson Aff ¶ 15).

*Admit.*

203. Currently, DCF has approximately 150 mentally retarded children placed out-of-home through the voluntary service program. (Mendelson Aff. ¶ 16).

*Plaintiffs have no independent knowledge of how many children with mental retardation are currently placed out-of-home through the voluntary services program since defendants have failed to provide plaintiffs with such information through discovery in accordance with Fed. Rule Civ. Proc. 26(e).*

204. As a consequence of this agreement, DCF also expects the number of children in residential treatment facilities to drop significantly over the next year (Mendelson Aff. ¶ 17).

*Admit.*

MARY SOLERA.

205. Mary Solera is assistant bureau chief of the Bureau of Child Welfare of the Department of Children and Families (DCF). (Solera Aff. ¶ I)

*Plaintiffs have no independent knowledge of Ms. Solera or her statements as she was not disclosed by defendants through discovery as a potential witness in accordance with Fed*

*Rule Civ. Pro.26(e). Plaintiffs assume the veracity of the employment and educational statements in Ms. Solera's affidavit.*

206. Mary has a masters degree in social work and has worked in the field of child welfare for thirty years. Prior to her current position, she held the following positions at DCF: social worker, supervisor, program supervisor, program director and area director. (Solera Aff. ¶2)

*Plaintiffs have no independent knowledge of Ms. Solera or her statements as she was not disclosed by defendants through discovery as a potential witness in accordance with Fed Rule Civ. Pro.26(e). Plaintiffs assume the veracity of the employment and educational statements in Ms. Solera's affidavit.*

207. Among Mary Solera's responsibilities is to oversee foster care services of the agency. One of her main goals is to expand the number of foster families and the types of foster care services available for children in the state's custody. (Solera Aff. ¶3).

*Plaintiffs have no independent knowledge of Ms. Solera or her statements as she was not disclosed by defendants through discovery as a potential witness in accordance with Fed Rule Civ. Pro.26(e). Plaintiffs assume the veracity of the stated goals regarding foster care in Ms. Solera's affidavit.*

208. Many children served by DCF have behavioral mental health issues and require special services. However, even children with serious behavioral health needs often can benefit from being placed in a foster family, rather than being placed in a residential treatment facility. (Solera Aff. ¶ 4).

*Admit that some children with behavioral mental health issues can benefit from being placed in a foster family, rather than being placed in a residential treatment facility.* ***Deny*** *that children and youth with severe mental illness can so benefit. Exh. 8, Andersson deposition at 34; Exh. 1, Grant-Hall deposition at 41.*

209. Foster care is often the preferred placement option because children, even children with behavioral/mental health issues, develop optimally in family-type settings, not in institutions. Family care settings for children of any age is usually the best setting to raise a child who cannot live with their parents. (Solera Aff. ¶ 5).

*Admit.*

210. For children with behavioral/mental health issues, who may benefit from a foster home, DCF contracts with private agencies who recruits and train foster families known as specialized/therapeutic foster families, to address the children's behavioral problems and assist with their treatment needs These families are paid a higher stipend than regular foster families and receive additional supports to maintain the placement. (Solera Aff. ¶ 6).

*Admit.*

211. Specialized/therapeutic foster homes have been successful placements for many children with behavioral/mental health needs. These placements tend to provide greater stability for these children than regular foster care. (Solera Aff. ¶ 7).

*Admit that for some children specialized/therapeutic foster homes have been successful and that these placements tend to provide greater stability than does regular foster care.* ***Deny*** *that such foster homes are successful for children and youth with severe mental illness. Exh. 6, Youth Emergency Shelter PBC Data, Second Admission, ¶¶16, 17;* Exh. 8, *Andersson deposition at 34; Exh. 1, Grant-Hall deposition at 41.*

212. Because of the nurturing atmosphere, individualized attention, and close supervision offered by the families, many children with behavioral/mental health challenges have thrived in these homes. (Solera Aff. ¶ 8).

*Plaintiffs have no independent knowledge of whether children with behavioral/mental health challenges have thrived in these homes as defendants have failed to provide plaintiffs with any data regarding the outcomes of placement for specialized/therapeutic foster homes through discovery in accordance with Fed. Rule Civ. Proc. 26(e).*

213. Specialized/therapeutic foster families are trained and supervised by qualified licensed child placement agencies, and supported with an integrated constellation of services, including individual, group, and/or family therapy, and other assistance as needed (Solera Mf19).

*Plaintiffs have no independent knowledge of whether such families are trained and supervised and supported with an integrated constellation of services, as defendants have failed to provide plaintiffs with any data regarding the outcomes of placement for specialized/therapeutic foster homes through discovery in accordance with Fed. Rule Civ. Proc. 26(e).*

214. As of March, 2005, 961 children were placed in private agency specialized/ therapeutic foster care. In March 2004, there were only 883 children in such placements; in the prior year, there were only 800 children in such placements. (Solera Aff ¶ 10).

*Plaintiffs have no independent knowledge of how many children were placed in private agency specialized/therapeutic foster care during 2004 and 2005 since defendants have failed to provide plaintiffs with any data regarding the census of children in specialized/therapeutic foster homes through discovery in accordance with Fed. Rule Civ. Proc. 26(e).*

215. Specialized/therapeutic foster care is intended for children leaving a hospital or residential placement, for children who have not been able to manage in regular foster homes and for children who have experienced multiple placements. (Solera Aff. ¶11).

*Admit that it is DCF's intent that specialized/therapeutic foster care is for children who are leaving a hospital or residential placement or for children who have not been able to manage in regular foster homes or who have experienced multiple placements.* ***Deny*** *that specialized/therapeutic foster care is appropriate for children and youth with severe mental illness. Exh. 8, Andersson deposition at 34; Exh. 1, Grant-Hall deposition at 41.*

216. DCF has allocated additional funds to create a new, even more intensive level of placement services for children who have mental health needs, referred to as treatment foster care. The target population for treatment foster care is children with a serious mental illness diagnosis who are at imminent risk of entering or returning to hospitals or residential placements. (Solera Aff. ¶12).

*Admit.*

217. Treatment foster families collaborate closely with Family Support Teams and community- based providers, and crisis intervention services are available around the clock. (Solera Aff. ¶13).

*Plaintiffs have no independent knowledge of what services are available to treatment foster families since defendants have failed to provide plaintiffs with any information relating to treatment foster care through discovery in accordance with Fed. Rule Civ Proc. 26(e).*

218. In fiscal year 2005, there were nine children in treatment foster care, with five more placements imminent. Funding has been allocated for fiscal year 2006 to enable 62 more children to enter treatment foster care (Solera Aff ¶ 14).

*Plaintiffs have no independent knowledge of how many children are in treatment foster care or of funding for 2006 since defendants have failed to provide plaintiffs with any information relating to treatment foster care through discovery in accordance with Fed. Rule Civ. Proc. 26(e).*

219. In addition, pursuant to the Emily J settlement agreement, in the next year, DCF will be contracting for the development of up to thirty-five new multidimensional foster care beds for children who are in the juvenile justice system and would otherwise require placement in a residential treatment facility; additional slots will be developed in the next fiscal year. (Solera Aff. ¶115).

*Plaintiffs have no independent knowledge of the development of 35 new multidimensional foster care beds since defendants have failed to provide plaintiffs with any information relating to treatment foster care through discovery in accordance with Fed. Rule Civ. Proc. 26(e).*