220. To encourage foster families to adopt, the Department now provides college tuition reimbursement for children adopted from DCF's care after January, 2005 (Solera Aff ¶ 16).

*Plaintiffs have no independent knowledge of whether the DCF provides such tuition reimbursement since defendants have failed to provide plaintiffs with any information relating to treatment foster care through discovery in accordance with Fed. Rule Civ. Proc. 26(e).*

221. In addition, to encourage foster families to consider adoption, DCF provides adoption support to families, which will soon include an adoption assistance program, modeled after the employee assistance program. Even without an open case, the family may receive immediate assessment and referral for services, including therapeutic services, counseling, behavioral supports, and respite care. (Solera Aff: ¶ 17).

*Plaintiffs have no independent knowledge of the DCF adoption assistance program since defendants have failed to provide plaintiffs with any information relating to treatment foster care through discovery in accordance with Fed. Rule Civ. Proc. 26(e).*

222. One of the added benefits of placing children who have behavioral/mental health needs in foster care is that some of them who cannot be returned to their parents may be adopted by their foster family. The opportunity for adoption or at least a long-term commitment by the family is a major advantage of some foster care placements. Permanency is just as important for children with behavioral/mental health needs as it is for children who do not have such needs. (Solera Aff ¶ 18).

*Admit.*

223. DCF expended $500,000 in FY2004-05 for targeted recruitment and has the same level of finding for the current fiscal year. The money is spent to recruit homes for children of color, adolescents, sibling groups, medically complex and other hard to place children. Half of the money will be used for the Queen Esther Project to work closely with churches around the state to help in the recruitment effort. The remaining funds are being used for media campaigns, in English and Spanish. A national consultant is presently working with DCF to improve recruitment efforts (Solera Aff ¶ 19).

*Plaintiffs have no independent knowledge of the DCF foster care recruitment and funding, or any of these facts, since defendants have failed to provide plaintiffs with any information relating to such efforts through discovery in accordance with Fed. Rule Civ. Proc. 26(e).*

224. DCF is making every effort to recruit and train more foster families, including therapeutic and treatment foster families, and to obtain the funding necessary to support such services (Solera Aff. ¶ 20).

*Admit that DCF is obligated to do so under the Juan F. Consent Decree, XV(B)(1)(a)-(c).*

CASAMENTO

225. Charlene Casamento is the Assistant chief Fiscal Officer for the Department of Children and Families. She has held this position since December 2002. Prior to that she was employed by Department of Social Services from March 1999 to December 2002. (Casamento Aff., ¶1)

*Plaintiffs have no independent knowledge of Ms. Casamento or her statements as she was not disclosed by defendants through discovery as a potential witness in accordance with Fed Rule Civ. Pro. 26(e). Plaintiffs assume the veracity of the employment and educational statements in Ms. Casamento's affidavit.*

226. During this time she worked in the Office of Quality Assurance and in the Office of the Deputy Commissioner of Administration. (Casamento Aff ¶ 2).

*Plaintiffs have no independent knowledge of Ms. Casamento or her statements as she was not disclosed by defendants through discovery as a potential witness in accordance with Fed Rule Civ. Pro. 26(e). Plaintiffs assume the veracity of the employment and educational statements in Ms. Casamento's affidavit.*

227. Charlene Casamento has a master's degree in business administration and has had over 1.3 years of experience in the accounting, auditing and project management. (Casamento Aff. ¶ 2)

*Plaintiffs have no independent knowledge of Ms. Casamento her statements as she was not disclosed by defendants through discovery as a potential witness in accordance with Fed Rule Civ. Pro. 26(e). Plaintiffs assume the veracity of the employment and educational statements in Ms. Casamento's affidavit.*

228. Part of Charlene Casamento's responsibilities is to oversee the development of the department's budget and to assure that DCF's expenditures comply with all budget restrictions. (Casamento Aff. ¶ 3)

*Plaintiffs have no independent knowledge of Ms. Casamento her statements as she was not disclosed by defendants through discovery as a potential witness in accordance with Fed Rule Civ. Pro 26(e). Plaintiffs assume the veracity of the employment responsibilities in Ms. Casamento's affidavit.*

229. The majority of DCF's funding is appropriated through the state's general funds. (Casamento Aff. ¶ 4)

*Plaintiffs have no independent knowledge of Ms. Casamento or her statements as she was not disclosed by defendants through discovery as a potential witness in accordance with Fed Rule Civ. Pro. 26(e).*

230. The state operates under a biennial budget, and agencies are appropriated funds that establish spending limits for each agency. (Casamento Aff ¶ 5).

*Plaintiffs have no independent knowledge of Ms. Casamento or her statements as she was not disclosed by defendants through discovery as a potential witness in accordance with Fed Rule Civ. Pro. 26(e).*

231. Since SPY 2002, DCF's total appropriation has grown from $464,516,600 to $726,169,733 in SFY 2006 Attached is a true and accurate copy of DCF's Appropriation for each state fiscal year' (SPY). (Casamento Aff. ¶ 6).

*Plaintiffs have no independent knowledge of Ms. Casamento or her statements as she was not disclosed by defendants through discovery as a potential witness in accordance with Fed Rule Civ. Pro 26(e). Plaintiffs assume the veracity of the DCF Appropriation data.*

232. Appropriation increases for DCF have come at a time when most state agencies have been experiencing budget reductions. (Casamento Aff. ¶ 7).

*Plaintiffs have no independent knowledge of Ms. Casamento or her statements as she was not disclosed by defendants through discovery as a potential witness in accordance with Fed Rule Civ. Pro 26(e). Plaintiffs assume the veracity of the appropriation increases and budget reductions contained in Ms. Casamento's affidavit.*

233. Despite budget increases, DCF has had to seek deficiency funding over the past few years: $2.5 million in SFY 2003, $23.1 million in SFY 2004 and $11.8 million in SFY 2005. (Casamento Aff. ¶ 8).

*Plaintiffs have no independent knowledge of Ms. Casamento or her statements as she was not disclosed by defendants through discovery as a potential witness in accordance with Fed Rule Civ. Pro. 26(e). Plaintiffs assume the veracity of the deficiency funding statements contained in Ms. Casamento's affidavit.*

234. Mental health expenditures in DCF's budget cannot be readily identified because the agency operates under a consolidated budget, with many of the services provided serving more than one mandate, making it difficult to tie a service to one mandate. (Casamento Aff. ¶ 9).

**Deny.** *Exh. 24, SFY State Spending Plan, Fiscal Year 2005.*

235. Expenditures are not budgeted by type of child or case and there are no separate line items for the various type of lawsuit. Therefore, it would be very difficult to break down expenses by each category of child. (Casamento Aff ¶ 10).

*Deny. Exh. 24, SFY State Spending Plan, Fiscal Year 2005*

236. The majority of DCF's budget is earmarked for Juan F. or already being used for community-based services for children not covered by Juan F or Emily J. consent judgments. (Casamento Aff ¶ 11).

*Deny. Exh. 24, SFY State Spending Plan, Fiscal Year 2005.*

237. DCF has increased federal reimbursement from the Federal Foster Care (IV-E) and Adoption Assistance programs from $45 million in SPY 2003 to over $106.7 million in SFY 2005. (Casamento Aff. ¶ 12).

*Plaintiffs have no independent knowledge of Ms. Cssamento or her statements as she was not disclosed by defendants through discovery as a potential witness in accordance with Fed Rule Civ. Proc. 26(e) Plaintiffs assume the veracity of the federal reimbursement statements contained in Ms. Casamento's affidavit*

238. DCF has been allowed to submit budget expansion options during the last two years Attached is a true and accurate copy of the budget option requests for the last two fiscal years. (Casamento Aft. ¶ 13).

*Plaintiffs have no independent knowledge of Ms. Casamento or her statements as she was not disclosed by defendants through discovery as a potential witness in accordance with Fed Rule Civ. Pro 26(e). Plaintiffs assume the veracity of the budget option requests.*

239. Since SFY 2000, DCF has received funds to carry out the KidCare initiative. This past fiscal year' (SFY 2005), the funds totaled $23 million and supported extended day treatment, emergency mobile crisis teams, 59 local care coordinator's, home-based therapy, family advocacy and related services. (Casamento Aft. ¶ 14).

*Admit that since SFY 2000 DCF has received funds to carry out the KidCare initiative. Plaintiffs have no independent knowledge of KidCare funding for SFY 2005, but assume the veracity of the statements relating to such funding in Ms. Casamento's affidavit.*

240. DCF also has received funding through the Community Mental Health Strategic Investment Funds. Since the fund was established in 2001, DCF received over $5 million to cover new juvenile justice intermediate evaluations to prevent children from being hospitalized for evaluations, mental health supports in five school systems, flexible funding, early childhood consultations for mentally ill children under six, and In-Home Therapeutic Psychiatric Services (IICAPS). (Casamento Aff. ¶ 15).

*Admit.*

241. DCF's appropriation for SFY 2006 includes funds to support the continuation of in-home services, flexible funds, intermediate evaluations, and early childhood consultations that were previously funded via the Community Mental Health Strategy Board. (Casamento Aff. ¶16).

*Plaintiffs have no independent knowledge of DCF's appropriations for SFY 2006 or of Ms. Casamento since such information was not disclosed through discovery to plaintiffs in accordance with Fed. Rule Civ. Proc. 26(e).*

242. The Community Mental Health Strategy Board has provided an additional $1 million in funding for SFY 2005 for flexible funding, in-home services and early childhood consultation. (Casamento Aff. ¶ 17).

*Plaintiffs have no independent knowledge of the Community Mental health Strategy Board's funding for SFY 2005 since such information was not disclosed through discovery to plaintiffs in accordance with Fed. Rule Civ. Proc. 26(e), but assume the veracity of this information in Ms. Casamento's affidavit*

243. DCF utilizes both state and federal funds to expand community-based services. Federal community mental health block grant funding has been used most recently for care coordination, respite services, flexible funding and family advocacy. These funds come from the Substance Abuse and Mental Health Administration (SAMSHA). (Casamento Aff. ¶ 18).

*Admit*

244. In 2002, DCF applied for and received a six-year $9.5 million in federal SAMHSA grants for "Partnership for Kids Project" in Bridgeport, to implement a school-based system of care collaborative. Additional SAMHSA grants are being sought for two more urban areas. (Casamento Aft ¶ 19).

*Admit.*

245. Apart from KidCare funds, DCF received in SFY 2005 a budget increase of $6 million in community-based mental health services, to cover wrap-around services, two therapeutic group homes, treatment foster care and family support teams. (Casamento Aff ¶ 20).

*Plaintiffs have no independent knowledge of such expenditures since such information was not disclosed through discovery to plaintiffs in accordance with Fed. Rule Civ. Proc. 26(e), but assume the veracity of this information.*

246. KidCare funding has increased since the program began: in SFY 2001, the legislature provided $3.5 million for the program, in SFY 2002, $11.4 million, in SFY

47

2003, $21million, in SFY 2004, $22 million, in SPY 2005, $23 million and in SFY 06 $32 million. (Casamento Aff. ¶ 21).

*Plaintiffs have no independent knowledge of such KidCare funding increases since such information was not disclosed through discovery to plaintiffs in accordance with Fed. Rule Civ. Proc. 26(e), but assume the veracity of this information.*

247. DCF has received funding to develop family support teams, at a cost of $7 million during SPY 2005, increasing to $7.5 million in SPY 2006. These teams are intended to help families with children either transitioning to community-based services or being diverted from residential treatment. (Casamento Aft ¶ 22).

*Plaintiffs have no independent knowledge of such funding since such information was not disclosed through discovery to plaintiffs in accordance with Fed. Rule Civ. Proc. 26(e), but assume the veracity of this information.*

248. In SFY 2005 DCF has been allocated $500,000 to recruit foster and adoptive families for difficult to place children (older children, multiple behavioral or developmental problems and targeted recruitment). In SFY 2006, the Department received the $500,000 in SFY 05, as well as an additional $500,000 to enhance adoption and fostercare recruitment. (Casamento Aff ¶ 23).

*Plaintiffs have no independent knowledge of such funding since such information was not disclosed through discovery to plaintiffs in accordance with Fed. Rule Civ. Proc. 26(e), but assume the veracity of this information.*

249. Average annual costs for SPY 05 for therapeutic foster care per child is $30,426; average annual costs of treatment foster care for SPY 05 is $35,000 per child; projected average annual costs of multidimensional foster care is $34,667 per child; average annual costs of in-state residential treatment in private facilities for SPY 05 is $77,000 per child; and the projected average annual costs of therapeutic group homes per child is $180,000. (Casamento Aff. ¶ 24).

*Plaintiffs have no independent knowledge of such funding since such information was not disclosed through discovery to plaintiffs in accordance with Fed. Rule Civ. Proc. 26(e)*

250. Therapeutic group homes are more expensive than residential care because homes cannot offer the economies of scale of residential facilities and the services are more individualized. (Casamento Aff ¶ 25).

*Plaintiffs have no independent knowledge of such funding since such information was not disclosed through discovery to plaintiffs in accordance with Fed. Rule Civ. Proc. 26(e)* **Deny.** *Exh. 8, Andersson, p. 92, 105-106; Exh. 15, Sudders deposition, p. 82, 83, Exh. 19, Gibber deposition, p. 110, 111, 116-118.*

48

251. Over the course of SFY 2005 and SFY 2006, DCF has funding to develop 41 therapeutic group homes at a cost of $900,000 per home; once the group homes are fully operational the annualized cost of the group homes will be approximately $39 million. (Casamento Aff. ¶26).

*Plaintiffs have no independent knowledge of such funding since such information was not disclosed through discovery to plaintiffs in accordance with Fed. Rule Civ. Proc. 26(e).* ***Deny*** *that community-based placements are less cost-effective in the long run. Exh. 8, Andersson, p. 92, 105-10; Exh. 15, Sudders deposition, p. 82, 83; Exh. 19, Gibber deposition, p. 110, 111, 116- 118.*

**Plaintiffs' Issues of Material Fact**

1. Whether the DCF failed to provide clinically indicated and appropriate placements in Connecticut for plaintiff Susan K. while she was committed to the DCF?

2. Whether the DCF failed to provide clinically indicated and appropriate placements to plaintiff Joseph R. while he was in the care of the DCF?

3. Whether the DCF currently has treatment programs in Connecticut that are clinically indicated and appropriate to meet Joseph's needs?

4. Whether Joseph's needs are being appropriately addressed at CCP?

5. Whether Joseph's sleepiness and difficulty waking up is limited to days when there is school?

6. Whether the DCF failed to provide appropriate treatment programs to the plaintiff Omar Sosa, including his placement at the Barnard House?

7. Whether the protections afforded the Juan F class includes children and youth who are adjudicated uncared for?

8. Whether the DCF failed and continues to fail to provide clinically indicated and appropriate placements to children and youth over the age of 18 who remain in the care of the DCF?

9. Whether there are alternatives to out-of-state residential placement for children and youth with severe mental illness?

10. Whether there are sufficient residential beds for children and youth who need them in Connecticut?

11. Whether there were sufficient independent living programs for severely mentally ill youth over the age of 17? Whether there currently are sufficient independent living program placements for severely mentally ill youth over the age of 17?

12. Whether that there are adequate community-based residential placements for children and youth who are ready for discharge from residential placements?

13. Whether there are a wide variety of community-based services available for children and youth with severe mental illness?

50

14. Whether there are a wide variety of community-based services available for children and youth with severe mental illness who are ready for discharge from Riverview and other psychiatric private hospital placements?

15. Whether placements in residential facilities are more cost effective than placements in the community?

16. Whether children remain in shelters beyond the 45 days authorized by DCF policy because no other placements are available?

17. Whether children ready for discharge from residential facilities have to wait for a step-down placement to become available and are harmed thereby?

18. Whether the DMHAS is a part of the KidCare program as of September, 2005?

19. Whether KidCare services include funding for out-of-home placements?

20. Whether community-based services for families of mentally ill children are made available to severely mentally ill children who are living in residential facilities, both within and without the state?

21. Whether family support team services are appropriate for children with severe mental illness for whom returning to their families or to foster care is not clinically indicated?

22. Whether the Emily J. litigation protects children and youth with severe mental illness from discrimination?

23. Whether the Juan F. Exit Plan protects children and youth with severe mental illness from being placed out-of-state (or, alternatively, does it protect them from discrimination)?

24. Whether Outcome Measure 19 of the Juan F. Exit Plan protects children and youth with severe mental illness from being placed out-of-state?

25. Whether the protocols established under the Juan F. Exit Plan, Defense Exhibit 9, p. 79, protect the rights of children and youth with severe mental illness from discrimination?

26. Whether Outcome Measure 3 of the Juan F. Exit Plan prevents discrimination against children and youth with severe disabilities?

27. Whether Outcome Measure 15 of the Juan F. Exit Plan protects severely mentally ill children and youth from discrimination?

28. Whether the localized mental health service system included in the POC plan protects children and youth with severe mental illness from discrimination?

29. Whether the number of children placed out-of-state has declined?

30. Whether the total number of all children, including delinquent and FWSN cases, placed in private residential facilities has declined?

31. Whether the average length of stay in private residential facilities, both within and without the state, have declined?

32. Whether there is a reduction in the numbers of adjudicated delinquents who are placed residentially?

33. Whether the number of days children are spending in private hospitals has decreased over time?

34. Whether the costs of therapeutic group homes are more expensive in the long run than residential treatment?

35. Whether private insurance companies rarely cover the cost of home-based treatment?

36. Whether plaintiffs are seeking reductions in the number of residential beds, the number of hospital beds at Riverview, and of public hospital beds?

37. Whether the cost of providing community-based placements for children and youth with severe mental illness would be an undue burden on state resources?

38. Whether the review of out-of-state placements by a DCF central placement team prohibits discrimination against children and youth with severe mental illness?

39. Whether foster family placements, including specialized/therapeutic foster home placements, are appropriate for children and youth with severe mental illness?

40. Whether mental health expenditures in DCF's budget can be readily identified for purposes of determining whether the relief sought by plaintiffs poses an undue hardship on the state and the court?

41. Whether the majority of the DCF budget is earmarked for Juan F or already is being used for community-based services for children not covered by Juan F. or Emily J.?

42. Whether the cost of implementing therapeutic group homes is necessarily $900,000 per home?

Plaintiffs,

By their Attorneys:


_____
Anne Louise Blanchard, Fed. Bar No. 08718
Bet Gailor, Fed. Bar No. 01981
Connecticut Legal Services, Inc.
872 Main Street
P. O. Box 258
Willimantic, CT 06226
Tel: 860 456-1761, x. 109, 111
Fax: 860 456-7420
Ablanchard@connlegalservices.org
bgailor@connlegalservices.org



_____
Catherine Williams, Fed. Bar No.
Connecticut Legal Services, Inc.
211 State Street
Bridgeport, CT 06604
Tel: 203 336-3851, 110
Fax: 203 333-4976
cwilliams@connlegalservices.org

## CERTIFICATION

I hereby certify that a copy of the foregoing Plaintiffs' Rule 56(a)2 Statement was mailed by first class mail, prepaid postage to the following counsel of record on September 26, 2005:

Attorney Susan T. Pearlman
Assistant Attorney General
MacKenzie Hall
110 Sherman Street
Hartford, CT 06105

Attorney Carolyn Signorelli
Assistant Attorney General
55 Elm Street
Hartford, CT 06105

Attorney Lori Welch-Rubin
129 Whitney Avenue
New Haven, CT 06515


_____
Bet Gailor