## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| W.R., individually and on behalf of her minor son, JOSEPH R.; SUSAN K.; M.O., individually and on behalf of her minor son, OMAR S.; and on behalf of all others similarly situated, and<br><br>JEANNE MILSTEIN, CHILD ADVOCATE OF THE STATE OF CONNECTICUT<br><br>    PLAINTIFFS<br><br>V.<br><br>CONNECTICUT DEPARTMENT OF CHILDREN AND FAMILIES, and<br><br>DARLENE DUNBAR, in her official capacity as Commissioner of the Connecticut Department of Children and Families,<br><br>    DEFENDANTS | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIV. NO. 302CV429 (RNC)<br><br><br><br><br><br><br><br><br><br>September 26, 2005 |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

The plight of Connecticut's severely mentally ill children in the Department of Children and Families' care is serious and ongoing. In filing its Motion for Summary Judgment, DCF[1] attempts to show that it has enacted sweeping reforms for the placement of those in its care. Unfortunately, the state's memorandum simply underscores the fact that any reforms which have occurred have not reached the plaintiffs in this case -- the seriously mentally ill youth in DCF's care. Unlike other children in DCF care, the plaintiffs and the members of the proposed class continue to languish in institutions, inappropriate foster care, and shelters with DCF's full knowledge that such placements are detrimental to the children and cause them irreparable injury. This constitutes an ongoing discriminatory practice by DCF in violation of state and federal law.

The results of DCF's failure are significant: plaintiff Susan K. experienced more than 17 different placements during the time she was in DCF's care until she filed this suit and an action in state court to obtain a community based placement. *See In Re Shonna K.*[2], 77 Conn.App. 246 (2003); *[see also* Attachment A, Joseph R. 2/1/01 Central Placement Team Request]. Plaintiff Joseph R. has been placed by DCF in more than 11 placements within the last five years and continues to seek a community based placement. *Id.* DCF placed Omar S. in numerous placements, including one from which he ran away. Omar ultimately filed an Application for

---

[1] For purposes of this memorandum, both defendants are referred to as "DCF" or "the state".

[2] Plaintiff Susan K. and Shonna K. are the same individual, *see* Plaintiffs' Motion To File in Fictitious Names, filed March 2002.

1

Temporary Injunction in state court in order to return to DCF care. [Ex. 4 to Pl. Rule 56(a)2

Statement of Undisputed Facts]. Named plaintiffs' situations are not unique to them - the

affidavit of the mother of Samuel C., a 15 year old ward of DCF, notes that her son has

experienced 17 different placements since 1996 while in DCF care, and remains institutionalized

today while awaiting a community based placement. [Ex. 10 to Pl. Rule 56(a)2 Statement of

Undisputed Facts].

Although DCF has attached several inches of documents to its motion for summary

judgment attempting to show that it is providing appropriate overall services to the children and

youth in its care,[3] the documents do not show that severely mentally ill children are being placed

in community based placements any more than when the instant suit was filed and indeed

underscore the discriminatory nature of DCF's actions.

Ultimately, defendants' motion for summary judgment is essentially a reiteration of their

previous motion to dismiss, with renewed claims regarding mootness, *res judicata*, abstention,

failure to exhaust, lack of jurisdiction, and disputing plaintiffs' eligibility under the Americans

With Disabilities Act ("the ADA") 42 U.S.C. §12101 et. seq and §504 of the Rehabilitation Act

of 1973 ("§504"). 42 U.S.C. §§620 et. seq. and 670 et. seq. Regardless, the procedural posture of

this case is before the court on summary judgment and summary judgment for defendants should

be denied because numerous material facts remain in dispute in this case.

---

[3]Defendants are required to significantly improve services provided to those in its care in
accordance with two settlement agreements: *Emily J. v. Rell*, 3:93cv1994(RNC); *Juan F. v. Rell*;
H89(AHN); Defendants' Statement of Undisputed Facts (hereinafter DCF SUF)115, 116, 118.

## A. Procedural Background

In March of 2002, plaintiffs Susan K., Omar S. and Joseph R. filed suit to obtain

community based residential placements on their own behalf and on behalf of a proposed class of

approximately1,500 severely mentally-ill children and youth in DCF's care who are in desperate

need of community based placements from DCF. DCF subsequently filed a motion to dismiss

which the court denied in March of 2003[4]. *W. R. v. Connecticut Department of Children and*

*Families,* 2003 WL 1740672 *3 (D.Conn 2003). On July 14, 2003, the named plaintiffs

requested certification of their case as a class action. Following oral argument on the class

certification motion, the court denied plaintiffs' motion without prejudice on September 30th,

2004. *W.R. v. Connecticut Department of Children and Families,* 2004 WL 2377142 *1

(D.Conn. 2004). After a lengthy discovery process, however, plaintiffs filed a renewed motion

for class certification in May, 2005, which is pending. DCF's current motion for summary

judgment followed.

## II    SUMMARY OF PARTIES

### A. Child Advocate Milstein

Plaintiff Jeanne Milstein has been the State of Connecticut's Child Advocate since 2000.

As such, she is charged under Connecticut General Statutes to "secure and ensure the legal, civil,

and special rights of children who reside in this state," Conn. Gen. Stat. § 46a-131(a)(7). During

her tenure as Child Advocate, Ms. Milstein has investigated numerous cases of mentally ill

---

[4]Although this court did dismiss plaintiffs' claims for damages under the Rehabilitation Act of
1973 and under state law, plaintiffs' claims for damages under the ADA remain.

youth who DCF has denied community based placement and subjected unnecessarily to harmful

institutional placements or repeated unsuccessful foster care placements. [Attachment 1 to

Plaintiffs' Second Motion for Class Certification (Milstein deposition March 31, 2004, p 9)].

Since DCF does not provide sufficient community based placements, Ms. Milstein's office

receives numerous requests for assistance from the families, guardians and professionals who

work with these youth. *Id.* Ms. Milstein is well versed in the *Juan F.* Exit Plan, the KidCare

program and the other DCF services described in defendants' motion for summary judgment.

[DCF SJ Brf. at 32-45]. She continues participation in this suit since DCF has continued to

discriminate against seriously mentally ill children by not providing appropriate community

based placements to them as it does to children without such disabilities.

### *B. Susan K.*

Susan K. is a now 21 year old mentally ill young adult who only obtained her current

appropriate placement from DCF as a result of an application for temporary injunction in state

court. *See In Re Shonna K.*, 77 Conn.App. 246 (2003). Susan has serious mental health issues

and had numerous suicide attempts and inpatient hospitalizations while in DCF's care which

made it difficult to find placements for her. [DCF Rev'd Resp. to 3rd Rqst to Admit ¶ 1, 4, 9, 11].

Susan was in DCF's care from the time she was 9 years old until the fall of her 21st birthday.

[DCF SJ Brf. at 4-5]. She now receives services from the Department of Mental Health. [DCF

SUF 9].

### *C. Omar S.*

Omar S. is an 18 year old youth in DCF's care who has been diagnosed with mental

4

illness, severe language and learning disabilities and a history of oppositional behaviors. [Attachment B; Affidavit of Omar S.; Answer ¶10]. DCF became Omar's guardian in 2001 due to his specialized needs. [DCF SJ Brf. at 5]. After his commitment, DCF placed Omar in 3 foster homes, a long term shelter placement, a long term residential placement and a group home, from which Omar ran away in April, 2005 after he was threatened and injured by neighborhood youth. After he ran away, although still a minor ward of the commissioner, DCF petitioned for revocation of his commitment [DCF SUF ¶30] In August of 2005, Omar requested that DCF permit him to return to its care but the agency refused. [Att. B; Affidavit of Omar S.] Omar's counsel filed an application for temporary injunction on his behalf and the juvenile court ordered him back into DCF custody where he remains currently. *Id*

### D. Joseph R.

Joseph R. is a sixteen year old mentally ill child in DCF's care through its Voluntary Services Program who has suffered from mental health problems for most of his life and has experienced numerous hospitalizations and placements through DCF. [DCF SJ Brf. at 5]. Joseph has been diagnosed bi-polar disorder with severe psychotic features and Post Traumatic Stress Disorder. [DCF Statement of Undisputed Facts 49]. His assaultive behaviors have led to repeated delinquency charges and hospitalizations. [DCF SJ Brf. at 6]. His mother filed an application for temporary injunction in 2001 to obtain Joseph's return to a DCF placement and continues to seek a community based placement currently. [Answer 60]. His current treatment team is recommending placement in a small, individualized, community based group home near his mother. [Att A; Joseph R. CPT Request]

5

### E. DCF Defendants:

The DCF, by and through its Commissioner, is the state child care agency required by state law to provide clinically appropriate services and placement to children and youth in its care. *See* Conn. Gen. Stat. §17a-3. The DCF is also a recipient of federal funds and is therefore prohibited from discriminating against plaintiffs due to their severe mental illness disabilities. [Answer at ¶ 14].

## III    LEGAL ARGUMENT

### A.    <u>Standard of Review for Summary Judgment</u>

DCF moves for summary judgment in this case, claiming there are no material facts in dispute between the parties. In response, plaintiffs identify 41 genuine issues of material facts in dispute demonstrating that this case is not appropriate for summary judgement. *[See* Pl. Rule 56(a)2 Statements of Material Facts in Dispute].

In deciding a motion for summary judgement, the trial court must view the record as a whole, including the inferences to be drawn from the underlying facts contained in the moving party's materials, and that record must be viewed in the light most favorable to the party opposing the motion. *Adikes v. S.H. Kress & Co.*, 398 U.S. 144, 158-159 (1970). The moving party bears the burden to inform the court of the basis for its motion and identify those parts of the pleadings, answers to interrogatories, depositions, admissions on file and affidavits which point out the absence of evidence of genuine issues of material fact to support the nonmovant's case. *Celotex Corporation v. Catrett*, 477 U.S. 317, 323-325 (1986). Once the moving party has met its burden, the nonmoving party is required to go beyond the pleadings to designate specific

facts which show there is a genuine issue for trial. *Id.* at 324. That does not mean, however, that

the nonmovant must produce evidence of the kind required at trial. *Id.* Rather, the nonmovant

may oppose a summary judgment motion using any of the materials listed in Rule 56(c), except

for the mere pleadings alone. *Id.* In fact, when ruling upon a motion for summary judgment, the

court does not need to resolve such issues conclusively in favor of the party asserting the

existence of the disputed issues. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) *citing*

*First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253 (1968).

Facts are only deemed to be material when they might affect the outcome of the case and

those factual disputes which are irrelevant or unnecessary are not considered. *Messier v.*

*Southbury Training School,* 1999 WL 20910 *3 (D. Conn. 1999), *citing Anderson v. Liberty*

*Lobby, Inc.,* 477 U.S. 242, 248 (1986). The movant, DCF, has set forth 251 statements in its Rule

56(a)1 Statement. Of those statements at least 30 are not material to the outcome of the dispute

under the governing law as they relate to descriptions of employees of the DCF and their

responsibilities.[5] Accordingly, plaintiffs have objected to these statements as irrelevant and not

material in their Rule 56(a)2 response.[6]

Additionally, many of defendants' statements of undisputed fact are supported by

documents which defendants failed to disclose to plaintiffs in accordance with their Rule 26

---

[5] Movant's Local Rule 56(a)1 Statement Nos. 1, 2, 11-12, 31-36, 38-40, 64-66, 73, 83, 188-190, 197, 205-207, 225-228.

[6] There are also a number of other statements which plaintiffs have admitted which are relevant to the plaintiffs' individual cases but which are not particularly material to the outcome of the case. Plaintiffs admissions of those facts should not be interpreted to mean that plaintiffs' agree those facts are material to the outcome of the case.

ongoing discovery requirements. Consequently DCF may not rely on that material in a

dispositive motion such as summary judgement. Fed. Rule Civ. Pro. 26(e); *see also Szilvassy v.*

*U.S.,* 71 F.R.D. 589, 592 (S.D.N.Y. 1976) (court sanctioning of plaintiff who failed to comply

with Fed. Rule Civ. Pro. 26(e)'s ongoing discovery obligations). For example, defendants have

cited numerous facts regarding the development of alternative types of foster care, current data

pertaining to the development of new therapeutic foster homes what these therapeutic foster

homes offer, where they are located, or what types of children are eligible for placement in these

homes, which children are going to be placed in the treatment foster care, and information

regarding development of "multi-dimensional foster care" beds for children in the juvenile

justice system as required by the *Emily J.* Settlement Agreement. [DCF Rule 56(a) Ex. Y].

     Documents that are not disclosed during the discovery period are automatically precluded

from admission at trial. According to Federal Rule of Civil Procedure 37(c)(1), "[a] party that

without substantial justification fails to disclose information required by Rule 26(a) . . . is not,

unless such failure is harmless, permitted to use as evidence at a trial . . . or on a motion any

witness or information not so disclosed" Fed.R.Civ.P. 37(c)(1). "Rule 37(c)(1)'s preclusionary

sanction is 'automatic' absent a determination of either 'substantial justification' or

'harmlessness.'" *Design Strategies, Inc.* v. *Davis*, 367 F.Supp.2d 630 (S.D.N.Y. 2005) (*citing*

*American Stock Exchange, LLC* v. *Mopex, Inc.*, 215 F.R.D. 87, 93 (S.D.N.Y 2002); *Salgado* v.

*General Motors Corp.*, 150 F.3d 735, 742 (7th Cir.1998); *In re Motel 6 Sec. Litig.*, 161

F.Supp.2d 227, 243 (S.D.N.Y.2001).

     The Court does have discretion to admit certain non-disclosed material, but only in the

specific instances in which the non-disclosing party had "substantial justification" or the nondisclosure was harmless. *Design Strategies, Inc. v. Davis*, 367 F.Supp.2d 630 (S.D.N.Y 2005). Certainly plaintiffs would be harmed if summary judgment is granted based in any part on such previously undisclosed documentation, consequently the material may not be used by defendants.

**B.** **Plaintiffs Remain Entitled To Relief Under The ADA and Rehabilitation Act**

DCF claims that plaintiffs fail to meet the standards set forth in the ADA and §504 to show discrimination against plaintiffs on the basis of their disabilities. Plaintiffs however, have in fact presented viable claims under both the ADA and the Rehabilitation Act by showing the DCF's pattern and practice of discriminating against them on the basis of their mental disability. Thus, despite DCF's attempts to show otherwise, the considerable quantity of statistical information attached to DCF's Motion for Summary Judgment simply underscores the fact that now, under court orders, the agency is providing community based placements to many of those in its care *unless* they are severely mentally ill. [Ex. 5, Pl. 56(a)2 Statement of Undisputed Facts, DCF Needs Assessment, pp. 26-27].

The ADA prohibits discrimination against individuals with disabilities in employment and hiring (Title I), in access to public services (Title II), and in public accommodations (Title III). The purpose of the ADA is to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1) (2000). Similarly, the Rehabilitation Act, which preceded the ADA, "was designed to eliminate discrimination on the basis of handicap in any program or activity receiving Federal financial

9

assistance." 34 C.F.R §104.1; 29 U.S.C §794 (2000). Courts have generally found that

"[a]lthough there are subtle differences between these disability acts, the standards adopted by

Title II of the ADA for State and local government services are generally the same as those

required under Section 504 federally assisted programs and activities." *Henrietta D  v  Guiuliani*,

119 F.Supp. 2d. 181, 206 (E.D.N.Y. 2000) *citing 28* C.F.R. Pt. 35, App.A, *W.R. v  Connecticut*

*Dept  of Children and Families,* 2003 WL 1740672, *1 n3 (D.Conn. 2003). To show that

defendants have violated the ADA, plaintiffs must show that they meet the ADA definition of

disabled, that the defendants are subject to the ADA and that plaintiffs were denied the

opportunity to participate in/benefit from DCF's community based placements by virtue of their

severe mental health disabilities. *Henrietta D.,* 119 F. Supp. 2d at 206, *citing  Doe v. Pfrommer*,

148 F.3d 73, 82 (2d Cir.1998). Additionally, plaintiffs must show that defendants receive federal

funding. *Id.*

Plaintiffs' complaint in this case encompasses the identical American with Disabilities

Act and Rehabilitation Act claims made by plaintiffs in *Olmstead v. Zimring*, the definitive

Supreme Court decision case addressing the rights of institutionalized persons under the ADA to

obtain community based placements. *Olmstead v. Zimring*, 119 527 U.S. 581 (1999). Plaintiffs

in the instant case, like the *Olmstead* plaintiffs, have experienced long term institutionalization

due to discrimination based on their disabilities. The Supreme Court in *Olmstead* concluded that

indeed the state's failure to provide institutional plaintiffs with community based placements

constituted discrimination in violation of the ADA. Since plaintiffs here make identical claims as

the plaintiffs in *Olmstead,* the Supreme Court decision validating those claims  provides ample

basis for ADA jurisdiction in this case. As the first circuit found, "[a] program may discriminate on the basis of mental illness if it treats a mentally ill individual in a particular set of circumstances differently than it treats non-mentally ill individuals in the same circumstances." *Hargrave v. Vermont*, 340 F.3d 27, 36 -37 (D. Vt. 2003).

Citing an affidavit from Karen Snyder, DCF claims that it does not keep mentally ill children indefinitely in institutional placements, but rather for less then a year, on average, before discharge, yet it provides no documents to back up her contention. [DCF SJ Brf. at 20, fn.6]. Plaintiffs experience has been quite different from DCF's claims. Name plaintiff Joseph R. has been in various institutional placements since 1999 except for approximately 6 months during that time when he attempted to return home or was in a Massachusetts group home. [Attachment A, Joseph R. CPT Request]. Plaintiff Omar S. was in a shelter or residential placement for more than two years [Attachment B, Omar Affidavit]. Other children in addition to the name plaintiffs are also routinely institutionalized for several years, as is demonstrated by Yvonne Paul's affidavit which describes her son's institutional placements of more than three years. [Ex. 10, Pl Rule 56(a)2 Statement, Paul Affidavit] Moreover, the plaintiffs in the following decisions to whom DCF provided small, individualized, community based placements under court order were all in residential placements for many years, not the "average less than one year" to which DCF cites. *See W.G. v. Senatore*, 18 F.3d 60, 62 (2nd Cir. 1994) (DCF residentially placed for six years); *K.P. v. Juzwic*, 891 F.Supp. 703, 710 (D. Conn. 1995) (DCF residentially placed for nine years) and *J.B. v. Killingly*, 990 F. Supp. 57, 62 fn 1 (D. Conn. 1997) (DCF residentially placed

11

for six years).[7] *See also Mrs. C. v. Wheaton*, 916 F.2d 69 (2d Cir. 1990) (DCF residentially placed

for 3 years-although decision did not order placement, plaintiff's settlement agreement with DCF

provided a therapeutic community based placement to plaintiff). Thus defendants' claim that

children in its care spend on average less than a year institutionalized is clearly not true of

plaintiffs or the proposed class and is a disputed material fact.

C.    **Plaintiffs Are Not Seeking a Fundamental Alteration of DCF Services**

The main argument of defendants' Motion for Summary Judgment is their claim that

plaintiffs have failed to meet the legal standards required by the ADA and §504. Defendants fail

to prove their case, however, as plaintiffs meet the requirements of the ADA and §504 as set

forth in the seminal Supreme Court case in this area, *Olmstead v. LC. Ex rel. Zimring*, 527 U.S.

581, 597 (1999).

1. **Legal Standard for Reasonable Accommodation**

To assure compliance with the integration mandates of the ADA and §504, the ADA

regulations mandate:

> [a] public entity shall make reasonable modifications in policies, practices, or
> procedures when the modifications are necessary to avoid discrimination on the
> basis of disability, unless the public entity can demonstrate that making the
> modifications would fundamentally alter the nature of the services, program, or
> activity. 28 C.F.R. §35.130(b)(7).

The Second Circuit has an established body of case law addressing discrimination claims

alleging failure to reasonably accommodate. In *Henrietta D. v. Bloomberg*, the Second Circuit

---

[7]    Attorney Pearlman was counsel of record in *W.G. v. Senatore*, 18 F.3d 60 (2nd Cir.
1994); and *J.B. v. Killingly*, 990 F. Supp. 57 (D. Conn. 1997).

held:

> .... we hold that a claim of discrimination based on a failure reasonably to accommodate is distinct from a claim of discrimination based on disparate impact. Quite simply, *the demonstration that a disability makes it difficult for a plaintiff to access benefits that are available to both those with and without disabilities is sufficient to sustain a claim for a reasonable accommodation* (emphasis added). *Henrietta D. v. Bloomberg*, 331 F.3d 261 276-277 (2d Cr. 2003).

In the instant case, plaintiffs are children and youth who have difficult and challenging behaviors resulting from severe mental illness. It is precisely because of the severe nature of their disabilities that they have difficulty accessing the out-of-home placements DCF provides, including foster care and other community based mental health services, such as wrap-around services, vocational services, out-patient counseling, etc. [Exs. 5 & 8, Pl. Rule 56(a)2 Statement of Material Facts In Dispute; 2004 DCF Needs Assessment ; Andersson Deposition p. 65]. Since the evidence supports a finding that their disabilities make it difficult for them to access the services the DCF provides, plaintiffs have sustained their claim for a reasonable accommodation.

Once plaintiffs have established their right to a reasonable accommodation, the public agency:

> .... may put forth a "fundamental alteration" defense, which requires a court to weigh and to balance the following factors *after a complex fact-intensive inquiry*: (1) the resources available to a state; (2) the range of services a state provides those with mental disabilities; and (3) a state's obligation to mete out those services equitably. *Bruggeman v. Blagojevich* 219 F.R.D. 430, 434 (N.D. Ill. 2004) *citing Olmstead*, 527 U.S. at 597 (emphasis added); *see also Henrietta D.*, 331 F.3d. at 281.

Under *Olmstead*, a "fundamental alteration" defense would "allow the State to show that, in the allocation of available resources, immediate relief for the plaintiffs would be

13

inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities". *Olmstead v. LC. Ex rel. Zimring*, 527 U.S. at 604. Furthermore, the plaintiff bears only a burden of production,

> [t]his burden, we have said, is not a heavy one....It is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits...Once the plaintiff has done this, she has made out a *prima facie* showing that a reasonable accommodation is available, and the risk of nonpersuasion falls on the defendant. *Henrietta D.* 331 F.3d at 280, *citing Borkowski v. Valley Central School District*, 63 F.3d 131, 138 (2d Cir. 1995).

The Second Circuit defines "reasonable" as

> ... a relational term: it evaluates the desirability of a particular accommodation according to the consequences that the accommodation will produce. This requires an inquiry not only into the benefits of the accommodation but into its costs as well....In short, an accommodation is reasonable only if its costs are not clearly disproportionate to the benefits that it will produce. *Borkowski v. Valley Central School District*, 63 F.3d 121, 137-138 (2d Cir. 1995), *citations omitted.*

Thus, this court must examine evidence addressing the above-cited three factors: the resources available to a state, the range of services a state provides those with mental disabilities, and whether the state is meting out those services equitably. Because material issues of fact remain regarding all three of these factors, summary judgment is not appropriate[8].

The Second Circuit has clear precedent analyzing under what circumstances a proposed

---

[8]"At this point the defendant's burden of persuading the factfinder that the plaintiff's proposed accommodation is unreasonable merges, in effect, with its burden of showing, as an affirmative defense, that the proposed accommodation would cause it to suffer an undue hardship. For in practice, meeting the burden of nonpersuasion on the reasonableness of the accommodation and demonstrating that the accommodation imposes an undue hardship amount to the same thing....Accommodation is not reasonable if it either imposes 'undue financial and administrative burdens' on a grantee, or requires a fundamental alteration in the nature of the program. *Borkowski*, 63 F.3d at 138; (internal citation omitted).

accommodation is reasonable and when such accommodation is not mandated because it would require a fundamental alteration of a public entity's program or services or cause undue hardship. In other words, the Second Circuit distinguishes between plaintiffs who seek special treatment, or additional benefits, as in *Rodriguez v. City of New York, 197 F.3d 611, 618-619 (2d Cir. 1999)* and those plaintiffs who merely seek "access to the *very same benefits and services provided to the non-disabled.*" *Henrietta D.*, 331 F.3d at 283. This court, in ruling on the state's Motion to Dismiss, noted this difference also: "[t]he critical distinction between *Rodriguez* and *Olmstead* is whether the requested benefit involves creating a new service, as in *Rodriguez*, or extending an existing program to additional individuals, as in *Olmstead.*" *WR v. Connecticut Department of Children & Families*, 2003 WL 1740672 *1 (D. Conn. 2003). In order to prevail on a Title II ADA claim, "...there must be something different about the way the plaintiff is treated 'by reason of ... disability.'"*Leocata v. Wilson-Coker*, 343 F. Supp. 144, 154 (D. Conn. 2004), *citing Henrietta D.*, 331 F.3d at 276 *quoting* 42 U.S.C. §12132. This is precisely what plaintiffs claim.

## 2. Community Based Placements Are Not A "New" Or "Fundamentally Different" Benefit Under *Olmstead.*

Defendants state that plaintiffs are seeking "new varieties of public benefits currently unavailable to anyone" *citing Doe v. Pfrommer*, 148 F.3d 73, 83 (2nd Cir. 1998). [DCF Sum J. Brf. at 18]. There is nothing fundamentally new or different about providing community based placements for children who require out of home care, because doing so is simply part of DCF's mandate to children in its care. According to its Statements of Undisputed Facts, DCF currently operates 23 community based group homes and plans to create additional ones. [DCF SUF 158].

In fact, DCF's statutory mandate pursuant to §17a-3 is, *inter alia,* to develop a state-wide program of services for children who are mentally ill, emotionally disturbed, abused, neglected or uncared for. DCF is further required to provide services and placements that are *clinically indicated and appropriate to the needs of the child or youth* (emphasis added). *Id.* As part of its delivery of mental health services and placements, DCF claims to offer an array of mental health services, including out-of-home placements to children and youth in its care. Plaintiffs assert that these services and placements are not even-handedly administered, and that they discriminate against children and youth who have severe mental illness. [Amended Complaint].

DCF routinely places children in community based placements whenever it is necessary to remove a child from his or her home. For example, a child may be placed in a shelter or a safe home in close proximity to their schools, or in foster homes. In addition, these children, who are without disabilities or who suffer from milder forms of mental illness, are offered an array of community based mental health services to children and youth in its care. [DCF Rev'd Resp to 1st Rqst. to Admit ¶9]. They, too, are entitled to receive clinically indicated and appropriate treatment, which may include individual and family mental health counseling, crisis intervention services, and other "wraparound" services designed to support the families and foster families of these children so that removal from their homes, schools, and/or communities does not result.

For many children with severe mental illness, foster care is not a clinically indicated and appropriate placement. [Exs. 1 & 8, Pl. Rule 56(a)2 Statement of Material Facts in Dispute; Andersson Deposition at 34; Grant-Hall deposition at 41]. These children are placed in residential facilities. Some of these facilities are operated by DCF, the remainder are run by DCF

contract providers, both within and outside the state. [Ex. 5, Pl. Rule 56(a)2 Statement of

Material Facts in Dispute, 2004 DCF Needs Assessment]. Many of such children remain in out-

of-state residential, or in-state residential placements for extended periods of time. Still more

remain in shelters, which normally have maximum stays of 45 days, for well over a year. [Exs.

10 & 17, Pl. Rule 56(a)2 Statement of Material Facts in Dispute]. DCF acknowledges that

removal from their communities is harmful to children. [DCF Rev'd Resp. to 1st Rqst. to Admit

¶61]. In addition, removal results in a child's inability to attend neighborhood schools, to

participate with family counseling, and to learn the life skills needed for survival as adults who

will live in those communities. Family therapy is often impossible to provide, simply because of

the difficulty families encounter traveling long distances to where they have been placed by DCF.

[Att. B; Omar affidavit; Ex. 10; Pl. Rule 56(a)2 Statement of Material Facts in Dispute]. Even if

DCF does not intentionally discriminate, or lacks the resources or expertise within the state to

provide these services to children and youth in its care who have severe mental health issues, it is

of no import if defendants' lack of intent results in unwarranted segregation and denial of access

to the same services and community based placements to which their non-disabled counterparts

are entitled.

     Evidence supporting plaintiff's argument that community based therapeutic group homes

do not constitute a new or different service is the fact  that for many years the DCF has

collaborated with the Department of Mental Retardation (DMR) to provide community based

residential services for children who are both mentally ill and mentally retarded. [Att. G:

DCF/DMR Memorandum of Understanding dated 2000; DCF SUF Ex.EE, DCF/DMR

Memorandum of Understanding 2005]. In fact, DCF has relied upon the expertise of the DMR in establishing group homes with intensive supports for children and youth who need extensive services in order to remain in their communities. [Att. F, Gilman Deposition]

Plaintiffs have submitted other evidence in support of their position that the state's system of delivering mental health services to children discriminates against the severely disabled since the services are not being meted out equitably. For example, DCF admits that "there are limited resources available to DCF for providing services to children who reach 18 and require treatment for significant mental health problems." [DCF Rev'd Resp to 1st Rqst. to Admit ¶ 6]. DCF also admits that its residential facilities are only licensed to care for children under the age of 18. [DCF Rev'd Rsp to 1st Rqst. to Admit ¶ 43; and ¶45 re ITLP over 17]. In contrast, plaintiffs have submitted the affidavit of named plaintiff Omar S. to establish that no residential facilities have been offered to him since he returned to Connecticut because none are licensed for youth over the age of 18 years. [Att. B, Omar Affidavit; Exs. 2, 14 & 17, Pl. Rule 56(a)2 Statement of Material Facts in Dispute]. Omar now finds himself in very similar circumstances as did plaintiff Susan K. when she was over the age of 18 but remained in the care of the DCF. *See In Re Shonna K.*, 77 Conn. App. 246 (Conn. App. 2003).

Additional examples of the lack of services for young adults in DCF's care include *Joseph L. v. DCF.*, 2005 WL 469605 (D. Conn. 2005), *Mrs. C. v. Wheaton*, 916 F.2d 69, 71 (D. Conn. 1990). Such continued evidence of failure to make services available to youth over the age of 18 shows that the facts upon which defendants rely in their Statement of Material Facts not in Dispute are in fact disputed.

Defendants attempt to bolster their argument that plaintiffs are seeking new services by basing their interpretation of *Olmstead* on *Rodriguez v. City of New York*, which had different facts than the instant case. [DCF SJ Brf. at 19-45]. *See Rodriguez*, 197 F.3d. 611, 619 (2nd Cir. 1999) (whether state had to provide safety monitoring devices to people with mental illness so that they could remain at home instead of being placed in institutionalized care). Unlike the *Rodriguez* plaintiffs, however, plaintiffs here are not asking that the DCF create new services for them; rather, they claim that the DCF, in its provision of mental health services, and, in particular, with its provision of community based residential placements for children and youth whose treatment needs necessitate out-of-home placement, discriminates against children and youth with severe mental illness by failing to administer mental health services so as to allow them to receive services in their communities. Because DCF is in the business of providing out-of-home residential care in the community to many of the children and youth in its care, plaintiffs' proposed accommodation of the development of therapeutic groups homes is not tantamount to creating a new service. In fact, DCF is already providing such services for members of the *Emily J.* class. [DCF SUF 116, 117] In addition, DCF has already placed children who lived at Riverview Hospital into small, community based group homes. [DCF SUF 80]. Thus, since *Rodriguez* is factually distinguishable from the instant case, it is not controlling precedent

### 3.    *Juan F.* does not encompass plaintiffs' claims.

DCF also claims that the *Juan F.* Exit Plan addresses all of plaintiffs' claims. [DCF SJ Brf. *passim.*] However, among other short comings as applied to plaintiffs and the proposed

class, the *Juan F.* Exit Plan's requirement that the number of children in out-of-state placement be reduced does not address plaintiffs' discrimination claims. Facts in dispute include which children are being returned to state care and whether those with more severe disabilities are being left behind. Indeed, plaintiffs have submitted substantial evidence reflecting the fact that the more severe the child's disabilities, the more likely it will be that he or she is placed out of state in an institutional setting. [Ex. 5, Pl. Rule 56(a)2 Statement, 2004 DCF Needs Assessment]. Additionally, there are facts in dispute regarding whether those children who are returning to Connecticut are receiving clinically appropriate treatment, or whether they are remaining in shelters or other inappropriate placements. Also, there is evidence to support the conclusion that DCF continues to send children and youth with more severe disabilities out of state for treatment because of the lack of treatment facilities within the state to accommodate their treatment needs. [Ex. 10, Pl. Rule 56(a)2 Statement, Paul Aff.]. Finally, it is important to note both that the *Juan F.* Consent Decree does not extend to those above the age of 18, nor does it extend to children who are Receiving Voluntary Services from DCF, and that plaintiffs dispute whether whether the *Juan F.* Consent Decree includes "uncared for children". [*Compare* DCF SUF Ex. 0, Juan F. Exit Plan *with* DCF SUF Ex. D, Karen Synder affidavit]. Consequently, the existence of the *Juan F.* Exit Plan does not offer sufficient protections to plaintiffs and the class they seek to represent.

### D. Plaintiffs' Claims Do Not Create Either Undue Hardship or an Impermissible Accommodation Burden On DCF

In addition to their "fundamental alteration" defense, defendants raise both "undue hardship" and "administrative burdens" as their affirmative defense to the reasonable

accommodation claims raised by plaintiffs. [DCF SJ Brf. *passim* at 22-45]. The Second Circuit
has noted,

> the undue hardship inquiry requires not simply an assessment of the cost of the
> accommodation in relation to the recipient's overall budget, but a case-by-case
> analysis weighing facts that include: (1) [t]he overall size of the recipient's
> program with respect to number of employees, number and type of facilities, and
> size of budget; (2) [t]he type of the recipient's operation, including the
> composition and structure of the recipient's workforce; and (3) [t]he nature and
> cost of the accommodation needed. *Henrietta D.*, 331 F.3d at 281.

As discussed below, since each of the prongs involves facts which remain in dispute,
summary judgment is inappropriate.

First, defendants assert that plaintiffs are unreasonable to request as an accommodation
the development of residential community based group homes, or therapeutic group homes,
because foster care is a "very real and preferred option for mentally ill children". [DCF SJ Brf. at
24]. Defendants then incorrectly state that plaintiffs' request for community based professionally
staffed placements means that plaintiffs have "rejected the more reasonable, less costly
accommodation" of foster care and that therefore the community based placements are not a
reasonable accommodation under *Olmstead*. [DCF SJ Brf. at 24]. Plaintiffs do not dispute that
foster care is a viable service for many children in the DCF's care. Indeed, plaintiffs' expert,
Gary LaVigna, agrees that children should live in as close to a family setting as possible. [Att. D,
Expert witness report, LaVigna]. However, just as for the name plaintiffs, foster care is not an
option for many children with mental illness. [Exs. 1& 8, Pl. Rule 56(a)2 Statement, Grant-Hall
Deposition p. 41; Andersson deposition, p.34]. Thus defendants' claim that plaintiffs dismiss
foster care options is irrelevant, as plaintiffs' proposed class consists of children for whom foster

21

care, as presently and previously conceived, is inappropriate for a variety of clinical reasons.

Next, defendants argue that the community based "relief sought would require "a fundamental alteration" because of budget constraints. [DCF SJ Brf. at 27]. Since one of the changes to which DCF refers is aimed at developing more community based placements, in effect, defendant's are not so much arguing that the provision of community based mental health services is a fundamental alteration of how DCF provides mental health services to children and youth in its care, but rather that the provision of such services for children and youth with severe mental illness is another "undue hardship" argument based on budget constraints. In this regard, defendants assert that over $8 million is directed over the next two fiscal years for community based mental health services. [DCF SJ Brf. at 33]. However, the state does not define what services this includes, and since the variety of mental health services the DCF provides is extensive, there is no evidence that such services will be for children and youth with severe mental health issues.

In determining whether the cost of accommodation is an undue hardship, the DCF opines that "only the agency's mental health resources should be considered by the court, not its entire budget", citing Bruggeman v. Blagojecick, 219 F.R.D. 430 (N.D. Ill. 2004); and Frederick L. v. Department of Public Welfare, 364 F.3d 48 (3rd Cir. 2004); [DCF SJ Brf. at 29]. The state argues first that this court should only consider the state's mental health resources in lieu of the agency's entire budget, but then goes on to state that the state's "existing mental health budget is not readily identifiable" because DCF operates under a consolidated budget". Furthermore, the DCF complains that it is impossible to determine expenditures based on type of child or types of

22