## INDEX TO COMPLAINT ATTACHMENTS

1. Attachment A , Joseph R. 2/1/01 Central Placement Team Request

2. Attachment B , Affidavit of Omar Sosa

3. Attachment C , Omitted

4. Attachment D , Fed. Rule Civ. Pro. 26, Expert witness Report, LaVigna

5. Attachment E , Excerpts Pritchard Deposition

6. Attachment F , Excerpts Gilman Deposition

7. Attachment G , DCF/DMR Memorandum of Understanding, 2000

8. Attachment H , Institute of Living Letter

9. Attachment I , Defendants' Revised Responses to Plaintiffs' First Set of Admissions

# CONNECTICUT CHILDREN'S PLACE
## ADMISSION PACKET

## CENTAL PLACEMENT TEAM
## REQUEST

| Case Name: | Case ID#: |
|---|---|
| Child/Youth:<br>Joseph R██████ | Child ID#:<br>230069 |
| Child DOB:<br>6/5/89 | Child Gender:<br>Male |

## I. MUST BE COMPLETED FOR ALL REQUESTS

ALTHOUGH SOME OF THIS INFORMATION WAS PREVIOUSLY DOCUMENTED EARLIER IN THIS REQUEST, IT IS NECESSARY TO REPEAT IT HERE. THIS PAGE WILL SERVE AS A "TEAR OFF" TO BE SENT BY CPT STAFF TO THE PROVIDER UPON THEIR CONFIRMATION OF A WILLINGNESS TO INTERVIEW THIS CHILD.

Requested By: (check one and specify office) ☐ SW  ☐ SC  ☐ EA ☐ NC  ☐NW
Office (specify)_____ ☐ PAROLE ☐ PROBATION ☐PUBLIC DEFENDER

Person Making The Referral's Name and Phone: (Worker, Probation or Parole Officer or Public Defender)

_____     _____     (_____)_____
Print                                          Signature                                     print area code & phone#

TITLE: (e.g. Worker, Probation or Parole Officer, Public Defender)

_____
Print your title

Supervisor's Name and Phone:

_____     _____     (_____)_____
Print                                          Signature                                     print area code & phone #

DCF Program Supervisor's Name and Phone:

_____     _____     (_____)_____
Print                                          Signature                                     print area code & phone #

DCF Licensed Independent Practitioner:

_____Charles Rehmer, LCSW_____     _____     (860) 292-4019
Print                                          Signature                                     print area code & phone #

Required Authorization Signature (Designee)
(Regional Administrator/LL Superintendent/Probation Office Supervisor/Supervisory Asst. Public Defender)

_____     _____     (_____)_____
Print                                          Signature                                     print area code & phone #

## CONNECTICUT CHILDREN'S PLACE
## ADMISSION PACKET

### CENTAL PLACEMENT TEAM
### REQUEST

## II. CLINICAL INFORMATION

DSM Diagnosis (required for all residential treatment referrals and preferred for group homes)
Date of Diagnosis:

| PRIMARY Axis I: Code: | Description | PRIMARY Axis III: Code: | Description |
|---|---|---|---|
| 296.4 | Bipolar Disorder Severe with Psychotic Features | None | |
| 313.4 | Oppositional Defiant Disorder | | |
| 309.81 | Posttraumatic Stress Disorder | | |

| Axis II: Code: | Description | Axis IV: Code: | Description |
|---|---|---|---|
| | Deferred | | Problem with family support, psychosocial problems |

**Axis V:**      (current GAF) <u>40</u>          (Highest GAF in last 12 months) <u>40</u>

If Diagnosis Has Not Been Made, (Probation & Parole only), What Is The Risk Score? _____

<u>Probation Risk Assessment Score:</u>          N/a          Parole Risk Assessment Score:          N/a

<u>Licensed Mental Health Practitioner's pertinent findings or recommendations:</u>

By Whom (degree)?     <u>Charles Rehmer, Supervising LCSW</u>          When? (date)   <u>9/7/05</u>

findings or recommendations:

Joseph should be recommended for a small, structured, specialized group home where he can continue to work on anger management and expressing his frustration in a positive way. He is in need of twenty-four hour supervision, by a caring staff trained in crisis intervention and addressing behavior therapeutically. The staff should be trained and capable of safely restraining a youth if needed. Joe would benefit from constant and consistent reinforcement of positive behaviors in a highly structured program. This could be best done in a small therapeutic environment. One staff per two youth with the option of providing Joe with a one to one staff in the event that he requires this level of supervision and support would be optimal. A group home where he can receive the individual attention he craves will be important for his continued development. It is recommended that there be no more than four adolescents in the home. Joe would do best in an environment that promotes privacy. He should not be housed with adolescents who have psychosexual behavior problems, as this is a trigger for him. There should be the ability to provide on site individual therapy with a skilled therapist at least once a week. Continuing weekly family therapy session that our solution orientated such as Multi

**CONNECTICUT CHILDREN'S PLACE**
**ADMISSION PACKET**

Systemic Family Therapy will also be an important component. It would also benefit the relationship between Joseph and his mother if the group home were a reasonable distance from mom's residence. Joseph will require psychiatric services for the purpose of medication monitoring. He should also have routine access to medical care. Socially Joseph would benefit from continuing to have a visiting resource such as a mentor. He should also be engaged in recreational activities, which have proven to be a positive outlet for him. He will require transportation for services, activities and appointments. Joseph will require appropriate educational services stated in his IEP.

**CENTAL PLACEMENT TEAM**
**REQUEST**

## III. SERVICE INFORMATION

Identify specific behaviors or issues that required remediation to maintain child in the community

| PROBLEM BEHAVIOR | WHAT SERVICES WERE IMPLEMENTED TO ADDRESS THE BEHAVIOR AND BY WHOM? | DATES OF SERVICE | OUTCOME OR RESULTS |
|---|---|---|---|
| Violent and aggressive behaviors. | Home | Voluntary services through DCF began in November of 1996 | Joseph was hospitalized |
| Violent and aggressive behaviors Threatening to harm mother on 11/12/99 | Nachaug Hospital/Day Hill Hospital/Yale New Haven Hospital | Five times in-patient hospitalizations from February 1996 to February 1997. | Transferred to Harmony Hill |
| Assaultive and aggressive. | Harmony Hill | 1999- 2000 One year at Harmony Hill | Arrested repeatedly for assaultive behaviors |
| Aggressive, assaultive, non-compliant | Connecticut Children's Place | Two time at CCP 1st from 12/00 to 10/01 2nd from 11/01 to 7/02. | First visit he was hospitalized for being aggressive and assaultive toward staff. Re-admitted then Reunification home |
| Aggressive and assaultive behaviors | Home | 7/02 to 11/02 | Reunification efforts unsuccessful due to Joe's behaviors |
| sive and non-compliant behaviors displayed again. | Riverview | 11/02 to 7/03 | Recommended residential |

## CONNECTICUT CHILDREN'S PLACE
## ADMISSION PACKET

| | | | |
|---|---|---|---|
| Assaulted staff with a shower rod. Refused medications. | Brightside | 7/03 to 9/04 | decompensated after refusing meds. |
| Verbally and physically aggressive behavior, and Paranoia. | Providence Hospital | 9/04 to 5/05 | Stabilized on Medication. |
| Verbally and physically Aggressive and posturing. When upset, non-compliant | Connecticut Children's Place | 5/17/05 to Present | Currently working on Anger management, using positive coping Skills |

What behaviors need to be changed or eliminated:

**FOR RESIDENTIAL CARE:**  BEHAVIOR OBJECTIVES THAT MUST BE ACHIEVED
**FOR GROUP HOME FOSTER CARE:** WHAT MUST BE ACHIEVED IN THE PLACEMENT
**(Please write them in clear, measurable and achievable terms and
make sure they are appropriate for the type of placement sought)**

| |
|---|
| Joseph should continue to receive weekly individual therapy. |
| Joseph and his mother should continue weekly family therapy. |
| Joseph will require medical monitoring by a psychiatrist. |
| Joseph will need to be maintained in a school setting to meet his educational needs as well as support him behaviorally and emotionally. |
| Joseph will need support services from caring adults who set limits and are consistent. |
| Joseph would benefit from participation in activities that promote social and emotional growth. Basketball and playing cards are both positive outlet for him |
| Joseph should be offered a vocational component or access to a work experience program, to gain life/job skills |
| |
| |

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| W.R., individually and on behalf of her minor son, JOSEPH R.; SUSAN K.; M.O., individually and on behalf of her minor son, OMAR S.; and on behalf of all others similarly situated, and | ) ) ) ) ) | |
| JEANNE MILSTEIN, CHILD ADVOCATE OF THE STATE OF CONNECTICUT | ) ) ) | |
| PLAINTIFFS | ) ) | |
| V. | ) ) | CIV. NO. 302CV429 (RNC) |
| CONNECTICUT DEPARTMENT OF CHILDREN AND FAMILIES, and | ) ) ) | |
| DARLENE DUNBAR, in her official capacity as Commissioner of the Connecticut Department of Children and Families, | ) ) ) ) | |
| DEFENDANTS | ) | September 16, 2005 |

## AFFIDAVIT OF OMAR SOSA

1. I, Omar Sosa, am over the age of eighteen and understand the meaning of an oath.

2. I was in the care of the DCF between August 2001 and July 13, 2005.

3. I was placed at the Waterford Country School's Rita Shelter on February 8, 2002, and resided there until April 1, 2003, when I was moved to Hillcrest Educational Center's Brookside School campus in Great Barrington, Massachusetts. I remained at Brookside until October 18, 2004.

4. I was placed at Barnard House, a DCF transitional living program, on October 18, 2004.

5. In April, 2005, I ran away from my DCF placement at the Barnard House in Hartford, Connecticut and returned to my mother's home in the Bronx, New York.

5. The DCF Filed a Motion to Revoke my Commitment, which motion was granted on July 13, 2005.

6. While living in New York with my mother, I was not able to attend school and I could not find steady employment. I realized I had made a mistake in leaving Connecticut. I decided to try to return to Connecticut because I thought I would be able to get the services and education I need.

7. In August, 2005, I called the DCF Hotline. The Hotline worker called me back and told me I could not re-enter DCF's care.

8. I called Attorney Bet Gailor and asked her to help me re-enter the DCF's care.

9. Attorney Gailor filed an Application for Temporary Injunction in Superior Court for Juvenile Matters on August 25, 2005.

10. At the hearing on the Application held August 26, 2005, Judge Stuart Bear vacated his prior order revoking commitment. I returned to Connecticut that same evening to re-enter state care.

11. I was placed in the Bent Shelter in Waterford, Connecticut where I spent the Labor Day weekend.

12. I turned eighteen on that Sunday, August 28, 2005.

13. On Monday, August 29, 2005, I was placed with a foster family in Ashford, Connecticut. I did not know how long I would be staying there. DCF was looking for another placement for me, but no placement interviews had been scheduled, yet.

14. I was not enrolled in school while I lived in Ashford. On Thursday, September 8, 2005, I mentioned to my foster mother that I was going to be enrolled in Ashford Public Schools the following day. She got angry and upset. I overheard her tell the

DCF that she had made a deal with them that I wouldn't go to the same school her

daughter attended, which was EO Smith High School in Mansfield, Connecticut, the

high school I might have attended if I remained in Ashford.

15. I contacted my surrogate parent, Arthur Mattiello to ask him to assist me in

securing appropriate educational services. Mr. Mattiello contacted the DCF and

asked that I be enrolled in school immediately.

16. On Friday, September 9, 2005, my social worker took me to Parish Hill High

School in Chaplin, Connecticut. My DCF worker and Attorney Gailor informed me

that I would be moving to another foster family placement in Hampton, Connecticut.

High school students living in Hampton attend Parish Hill High School.

17. When I went to enroll at Parish Hill High School, I was unsure about whether to

attend school before a Planning and Placement Team meeting (PPT) had been

scheduled, or whether I should ask for tutoring, because I did not know how long I

would be staying at my foster placement.

18. At that time, the only other placement that DCF was exploring for me was The

Learning Clinic in Brooklyn, Connecticut. The Learning Clinic is an approved

special education program with a residential component.

19. After meeting some staff at Parish Hill High School, I felt comfortable in

deciding to begin attending classes. I have been attending classes since Monday,

September 12. A PPT is scheduled to be held on September 27, 2005.

20. I like Parish Hill High School and would like to continue to attend school there.

3

_Omar Sosa_
Omar Sosa

State of Connecticut:

                : ss. Chaplin

County of Windham

    Signed and sworn to before me, this _21_st day of September, 2005

_Ben Jack_
Commissioner of the Superior Court

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF CONNECTICUT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

W.R., individually and on behalf of her minor son,
JOSEPH R.; SUSAN K.; M.O., individually and on
behalf of her minor son, OMAR S.; and on behalf
of all others similarly situated      ; and

JEANNE MILSTEIN, CHILD ADVOCATE OF
THE STATE OF CONNECTICUT

     PLAINTIFFS

VS.                                                                CIV. NO.
                                                          3:02CV429 RNC

CONNECTICUT DEPARTMENT OF CHILDREN
AND FAMILIES, and
DARLENE DUNBAR, in her official capacity as
Commissioner of the Connecticut Department of
Children and Families

     DEFENDANTS                              May 15, 2004

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**Federal Rule of Civil Procedure 26(2)**
**Disclosure of Expert Testimony**

**Plaintiffs' Expert**: Gary W. LaVigna, Ph. D.

**Expert's Qualifications and Publications**: See attached vitae

**Opinions to be expressed and the underlying basis and reasoning:**

Premise:  Children should be with their natural and nurturing parents and families, if at
all possible and reasonable.  If not, they should live in a setting that is as family like and
as nurturing as possible.  Institutional settings should be avoided at almost any cost, as
they are not capable of even approximating the nurturing and learning environments

1

that children need to develop to their full potential; to live, to go to school, to enjoy life, and ultimately to productively work in their home communities; and to develop and maintain loving and mutually respectful relationships with others, while acting within the socially prescribed rules for community presence and participation.

Accordingly, society should assure that each child has a loving and nurturing home in which to live. Depending on a child's needs and characteristics, various options, in order of preference are the child's natural home; a foster home; a therapeutic foster (in which the foster parents have received training to meet the needs of the children who live in their home), a professional foster home (in which the foster parents are trained and who provide foster placements in their home, professionally, and who do not work outside the home; and community based group homes which have revolving shifts of paid staff. This last option should be viewed as temporary, and is intended as a last stop alternative to prevent institutionalization. The number of children living in each of the out-of-home options, if any other than the focus child, should reflect that child's needs. (This is not to preclude the possible need for short-term hospitalization for purposes of psychiatric evaluation and stabilization.) Wherever the child lives, he or she should attend the neighborhood school.

To assure that each child can be placed and/or remain in the least restrictive settings described above, specialized services should be available to and in each of these settings, including the natural family home. These specialized services and supports, to prevent movement to more restrictive, less normalized settings due to challenging behavior include:

    1.    Comprehensive Functional Assessment: This involves collecting data and information based on direct observation, interaction with the focus person, thorough records review and detailed interviews. The topics covered include:
        a)    Referral Information;
        b)    Description Of The Person – including the person's physical characteristics and their cognitive, language and communication, motor/perceptual, self-care, social, community, domestic and recreational/leisure skills and abilities;
        c)    Other Background Information – including the family history and background, an ecological description of the current living arrangement, a description of the current program (school) placement, health, medical and psychiatric issues, a description of previous and current treatment attempts, a mediator analysis, and a motivational analysis;
        d) A functional analysis of the problem behavior – including an operationalized description of the problem, the history of the problem, an antecedent analysis (including an identification of those setting events and triggers associated with both the higher and lower likelihoods of target behavior occurrence and a description of the directly observed events that support those conclusions), a consequence analysis (addressing both planned and unplanned consequences and their effects on both behavior over time and on the severity of the behavioral episode), an ecological analysis that identifies the mismatches between the person's needs and characteristics and their environments, and concluding hypotheses about the meaning, i.e., the function of the behavior, from

the child's perspective.

2.    A, Positive, Multielement Behavioral Support Plan – including three categories of proactive strategies, i.e, ecological strategies, to smooth the fit regarding the ecological mismatches that have been found in the assessment, including the provision of necessary wrap-around services; positive programming to teach functionally equivalent, functionally related, coping and tolerance skills and other behaviors/skills to replace the target behavior; and non-aversive focused support strategies to reduce and if possible eliminate the need for reactive strategies, and, in contrast with the proactive strategies, non-aversive reactive strategies to get rapid and safe control over target behavior when it occurs.  With children who have the needs being addressed here, reactive strategies should not used as consequences to reduce future problem behavior (that is addressed though the proactive strategies).  Rather, reactive strategies should have the narrow but important role of reducing the severity of an episode of target behavior, i.e., behavioral escalation should be avoided.

3.    If the mediators in the less restrictive setting cannot provide the services recommended in the support plan, intensive, specialized support, in the form of supplemental one-to-one services for up to 24-hours a day, should be provided to prevent placement in a more restrictive setting or to facilitate movement into a less restrictive setting.

Quality assurance systems to assure that contracted services are in-fact provided should be required by the funding agency.  These quality assurance systems should be based on objectively defined outcome and process standards, at least monthly self monitoring by the service provider against these standards, resulting in quantified performance measures, monthly reports by the service provider to the funding agencies, and unannounced drop-in monitoring by the funding agency to determine the accuracy of the self-reported performance measures.

Experience:  These opinions are based on 30+ years experience with providing just such services in family homes, foster homes, group homes, schools and in institutional settings.  The last 23 years of this experience has been as the Clinical Director of the Institute for Applied Behavior Analysis.

I recommend that if these options, services and/or quality assurance systems do not exist, Requests for Proposals should be issued.  If necessary, these should be distributed on a national level to attract agencies that are capable and willing.

Compensation will be paid but the amount has yet to be agreed-upon.

List of cases in which I have testified as an expert, at trial or by deposition, within the preceding four years: none.

_____
Gary W. LaVigna, Ph.D.

3

# ORIGINAL

1              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF CONNECTICUT
2      - - - - - - - - - - - - - - - - - - - - - x
       W.R., individually and on behalf of her son,
3      JOSEPH R.; SUSAN K.; M.O.; individually and on
       behalf of all others similarly situated,

4
                        Plaintiffs,
5
              -against-      CIV.NO.: 302CV 429RNC
6
       CONNECTICUT DEPARTMENT OF CHILDREN AND
7      FAMILIES and CHRISTINE REGALIA, in her
       official capacity as COMMISSIONER OF THE
8      DEPARTMENT OF CHILDREN AND FAMILIES,
9                       Defendants.
       - - - - - - - - - - - - - - - - - - - - - x
10                      2505 Carmel Avenue
                        Brewster, New York
11                      September 24th, 2004
                        11:00 a.m.
12
13              EXAMINATION of SHAWN PRICHARD,
14     held at the above time and place and before a
15     Notary Public of the State of New York.
16
17
18
19
                    U.S. LEGAL SUPPORT, INC.
20                      175 Main Street
21               White Plains, New York 10601
22                      (914) 761-6620
23
24
25

```
 1              - Shawn Prichard, MD -              17

 2     program.  That's where we do a lot of our

 3     evaluations and where we do a lot of the meds

 4     changes.  We have a better staff-to-member

 5     ratio there and we get people stabilized at

 6     Multi-Care so we can move them downstream.

 7              Q.    What's the age that is

 8     currently there?  What's the age group that

 9     SDL covers?

10              A.    Our people are young adults,

11     eighteen to twenty-five.  We have people

12     outside of that range but it's typically

13     eighteen to twenty-five.

14              Q.    Where do most of the people

15     come from?

16              A.    All over the country, actually.

17              Q.    Have any of them been in foster

18     care?  Is that a common situation that they

19     have been in foster care?

20              A.    Not generally, no.  A lot of

21     lot of our DCF kids, yes, but not commonly;

22     no.  Usually they come from intact families.

23              Q.    Have most of the adolescents or

24     young adults who come to SLS been in more

25     restrictive placements such as such as
```

```
1                - Shawn Prichard, MD -              18
2    residential situations before they come here?
3         A.    Most of them have been in --
4    you name it -- in-patient psychiatric
5    hospitals; it's not unusual for us to get
6    somebody here who has been in ten or fifteen
7    different places.  We have had people who have
8    been in thirty different placements before
9    they come here.  This is what we do; this is
10   what we deal with here.  We deal with very
11   difficult treatment-resistant people who are,
12   if not treatment-resistant, very sick.  It's
13   our niche; we have developed it over the last
14   seventeen years, I guess.  So it's what we do.
15        Q.    What's the average length of
16   stay in SLS?
17        A.    I would have to look it up but
18   it varies.  We have had people here for ten
19   years, that are in our SDL program, for
20   example, and are partially responsive
21   schizophrenics and really can't live on their
22   own but don't need twenty-four hour care and
23   are happy here.
24             I don't know, I would have to
25   look it up.  But awhile.  We have a long list
```

1                                                          73

2

3    STATE OF NEW YORK          )

                                )    ss.

4    COUNTY OF WESTCHESTER       )

5

6

7                I, KATHRYN MACDONALD, a

8    Stenographic Reporter and Notary Public of the

9    State of New York, do hereby certify:

10

11               That the witness whose

12   deposition is herein set forth was duly sworn

13   by me; that the within transcript is an

14   accurate record of the testimony given by such

15   witness, to the best of my knowledge and

16   ability.

17

18               That I am not related to any of

19   the parties involved in this matter, and that

20   I have no personal interest whatsoever in the

21   outcome thereof.

22

23                    *Kathryn MacDonald*

24                    Kathryn MacDonald

25



UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

COPY

W.R., INDIVIDUALLY AND ON          :
BEHALF OF HER MINOR SON,
ET AL.,                            :

JEANNE MILSTEIN, CHILD             :
ADVOCATE OF THE STATE OF
CONNECTICUT,                       :

          PLAINTIFFS,       :

                            CIV. NO. 302CV429 (RNC)

VS.                                :

CONNECTICUT DEPT. OF CHILDREN:
AND FAMILIES, AND
                      :

DARLENE DUNBAR, IN HER OFFICIAL
CAPACITY AS COMMISSIONER OF THE
CONNECTICUT DEPARTMENT OF
CHILDREN AND FAMILIES,             ;

          DEFENDANTS.       :

                      MONDAY, OCTOBER 20, 2003
                      10:15 O'CLOCK A. M.



              DEPOSITION OF THOMAS GILMAN



WALTER ROCHOW, L.S.R.
Licensed Shorthand Reporter
P.O. BOX 5416
HAMDEN, CONNECTICUT 06518-5416
203-281-1778
CT Lic. #004

1  hard -- that it is hard to say whether something

2  is a residential or perhaps a group home, and it

3  all depends on licensure?

4       A.  Yes.

5       Q.  What category do you think these

6  placements fit into?

7       A.  I would have to look at these.

8            (Documents shown to witness.)

9       A.  The one that begins on the first page

10  of the document says, under "Rates and

11  Supports," "The interim placement of," whoever

12  the youngster is, "CTH."

13       Q.  Do you know what that is?

14       A.  That is the DMR designation of

15  community training home.

16            That is somewhat related to a

17  foster care type of home.

18            I don't know this situation.  I

19  am just looking through it quickly.  CTH, that

20  is a community training home, which has some

21  similarities to a foster home.

22       Q.  But that is a DMR category?

23       A.  Yes.

24       Q.  There is your name right there.

25       A.  Yes, it is.

1    Q.  For community living arrangement for

2    two other children.

3                Can you tell -- this is, again, a

4    DMR CTH -- this is, again, a community training

5    home?

6    A.  Yes.  According to this document, this

7    is for blank, "and two additional children," so

8    for three children.

9                (Ms. Williams left the room at

10               this time.)

11   Q.  Because it says here -- it says he will

12   be in a "CTH, licensed by DMR" -- or "until his

13   new CLA" is ready -- "is licensed and ready to

14   accept him."

15               Is there any way to tell how this

16   community living arrangement placement would be

17   categorized or licensed, I should say?

18   A.  I don't know.  I would suspect from

19   reading this that it is a small congregate care,

20   but may fall under the licensure of a group

21   home.

22   Q.  I am trying to figure out where they

23   would show up on the line items in the budget

24   for the department.

25               I don't know where I would -- the

1    categories which we went through earlier, I

2    didn't know where this would figure into that.

3        A.   My guess is that it will not show up in

4    the line items up here, but will show up as part

5    of a memorandum of understanding with DMR,

6    because my guess is that the facilities are

7    licensed by DMR, and would be used by DCF.

8                  It is not clear from this, but

9    that would not be unusual, you know, for it to

10   happen that way.

11       Q.   All right.

12       A.   "Funding is to be transferred from DCF

13   to DMR South Central Region once a master

14   contract is established." This is, obviously, a

15   youngster who has connections both with DCF and

16   with DMR, and some joint planning, and

17   apparently the program would be licensed by DMR

18   and DCF would transfer funds to DMR for payment.

19       Q.   What is the criteria for obtaining a

20   community living arrangement like this?

21       A.   I think the criteria is really

22   primarily program criteria, which would mean

23   that this is the most appropriate, looking at

24   the variety of criteria, that this is the most

25   appropriate and efficient type of living

102

## CERTIFICATE

I, WALTER ROCHOW, L.S.R., A LICENSED SHORTHAND REPORTER AND NOTARY PUBLIC, DO HEREBY CERTIFY THAT I AM DULY COMMISSIONED AND QUALIFIED TO ADMINISTER OATHS IN AND FOR THE STATE OF CONNECTICUT.

I FURTHER CERTIFY THAT THE DEPONENT NAMED IN THE FOREGOING DEPOSITION WAS BY ME DULY SWORN AND THEREUPON TESTIFIED AS APPEARS IN THE FOREGOING TRANSCRIPT; THAT SAID DEPOSITION WAS TAKEN BY ME STENOGRAPHICALLY, AND REDUCED TO A TRANSCRIPT BY ME OR UNDER MY DIRECTION; THAT THE FOREGOING TRANSCRIPT IS A TRUE, ACCURATE AND COMPLETE RENDITION OF THE TESTIMONY GIVEN BY THE DEPONENT.

I FURTHER CERTIFY THAT I AM NEITHER OF COUNSEL, NOR ATTORNEY TO ANY OF THE PARTIES TO SAID CAUSE, NOR AM I INTERESTED IN THE OUTCOME OF SAID MATTER.

WITNESS MY HAND AND SEAL AS A NOTARY PUBLIC THIS 27TH DAY OF OCT., 2003.

WALTER ROCHOW, L.S.R.
NOTARY PUBLIC.

MY COMMISSION EXPIRES: JUNE 30, 2006.

WALTER ROCHOW, L.S.R.
Licensed Shorthand Reporter
P.O. BOX 5416
HAMDEN, CONNECTICUT 06518-5416
203-281-1778
CT Lic #004

# INTERAGENCY AGREEMENT

## The Department of Children and Families
## and
## The Department of Mental Retardation

### Effective July 1, 2000

The purpose of this agreement is to facilitate the coordination of services between the Department of Children and Families (DCF) and the Department of Mental Retardation (DMR) for clients who are within the care of DCF and who may be eligible for services through DMR. This agreement establishes protocols for the transition of children and youth from the DCF to the DMR system. Both DCF and DMR are committed to providing quality services for children and youth who are eligible for their programs.

DCF and DMR will jointly endeavor to develop resources for children who are mutual clients. Resource development will include in home supports, community based services, emergency and placement options, and out-of-home care. DCF and DMR will work collaboratively with the Office of Policy and Management (OPM) to address budget implications necessary for the implementation of this agreement. This agreement formalizes our pledge to work together to ensure the provision of these high quality services for each youngster entitled to receive them. The effectiveness of the implementation of this agreement will be reviewed on an annual basis.

A.    **Applicants from DCF's Voluntary Services Program**

1.    Commencing October 1, 2000, for any new applicant to DCF's Voluntary Services Program (VSP) who is also a client of DMR, DCF and DMR (Voluntary Services social work/DMR case manager and their supervisors) will jointly review the application to determine supports appropriate to meet the needs of the child. Determination regarding eligibility for Voluntary Services will be the decision of DCF. The child must have an emotional or behavioral disorder diagnosable under the most recent issue of the DSM IV, provided that a child or youth with a "V" code or a developmental disability shall not be eligible unless the child or youth has another clinically diagnosable

emotional or behavioral disorder. Children who have mental retardation and are not clients of DMR shall be referred to DMR for determination of eligibility. The eligibility determination will be expedited by DMR and a decision made within thirty days of receipt of required documentation in order to make determinations about Voluntary Services within sixty days.

2. For every child/youth accepted through this joint process, DCF and DMR shall develop a joint service plan. DCF is responsible for the implementation of the joint service plan; however, DMR will assign a case manager to each child or youth to assist DCF in locating in-home supports and services such as but not limited to case management, behavioral specialists, increased respite, emergency placement options, home health services, and recreation. If the child/youth is in need of out-of-home placement, DMR will assist DCF to locate the appropriate placement. If such a placement does not exist, DCF and DMR regional administrators or their designees will jointly develop a placement, either through an existing licensed facility or an RFP issued by DCF for individualized placement. DMR will refer the child to the Age Out list upon the child's acceptance into Voluntary Services to ensure funding for the next year.

3. DCF will assume the costs for its casework and for services provided to the child/youth and placement of the child/youth (if necessary) once the child/youth is admitted into the Voluntary Services Program pursuant to DCF's regulations. DCF funding will continue until DMR age out funding is appropriated and DMR services are in place. The town of nexus will be notified of the referral for Voluntary Services and educational recommendations will be considered in the assessment.

4. No later than six months after the child/youth is admitted into the Voluntary Services Program and payment for service or placement has commenced, DCF and DMR will determine whether ongoing services will be likely beyond twelve months. If so, DCF and DMR will develop a transition plan for the child/youth, which will include the town of nexus, and joint casework commencing in the eighth month to ensure a smooth transition for the child/youth.

5. DCF will terminate the Voluntary Services Program for the child/youth and close its case once DMR services are in place.