6. If the child/youth has a case in probate court, DCF will present the transition plan to the court as soon as it is developed but no later than the beginning of the eighth month.

**B.    Protective Services Cases**

1. Effective October 1, 2000, for any family referred to DCF for protective services intervention where the child is a DMR client or eligible for DMR service, an assessment of the reason for report to DCF will be undertaken to determine whether protective services are warranted. DCF will assume the costs for its casework and for in-home or out-of-home services to children/youth in protective services. If the child is in need of protective services, DMR will assist DCF in acquiring support, family training, adequate respite and other services deemed necessary to maintain the child safely in their home. If placement of the child is necessary to safeguard the child, DMR and DCF will jointly work in locating appropriate emergency and longer-term placements. DMR and DCF will jointly work to develop emergency placements, respite care and Community Training Homes for children who are mutual clients.

2. If protective services are not warranted and the child does not meet the criteria for the Voluntary Services Program, DCF will make DMR aware of the child's status. The DMR case manager will provide service coordination and refer for appropriate supports. If the child is not a client of DMR, DCF will refer to DMR, who will expedite the eligibility process.

3. DCF is solely responsible when protective services are warranted to determine necessary intervention to protect the child when the parent is a client of DMR. DMR will continue to serve the parent and determine the appropriate supports for him/her.

4. For children committed to the care and custody of DCF, DMR will assist DCF in locating and providing appropriate services, including support to placements and locating or developing placements when needed either on an emergency basis or for long term placement. DCF will refer these youths to DMR at age 16 so that a two-year

transition plan is developed. DCF will be responsible for youths up to age 18, unless the youth is in school full time, in which case the responsibility will extend to age 21.

**C.    Children/Youth Currently in the Voluntary Services Program or Protective Services or Committed to DCF**

DCF and DMR are committed to developing programs to meet the needs of children/youth who have mental retardation and are involved with DCF through the Voluntary Services Program, protective services or for committed children transitioning to DMR.

1. <u>Voluntary Services Program</u>
No later than October 1, 2000, DCF and DMR Regional Administrators shall meet and designate regional teams to review all Voluntary Services Program cases in which the child is a client of DMR and to develop joint service plans and/or transition plans, as appropriate. Regional teams shall include DCF social workers/DMR case managers, their supervisors, and resource development staff. Beginning with the completion date for these reviews, these plans shall be consistent with Section A above.

2. <u>Committed Children</u>:
The review used for Voluntary Services Program cases shall also occur for cases in which the diagnosed child/youth is in out-of-home care and committed to DCF. The review shall result in a joint plan or transition plan when it is clear that DMR services will be needed when youth attains age 18 or is no longer in full time school attendance up to age 21.

**D.    Data Collection**

The regional working teams will collect data that will inform prevention and placement activities for DCF and DMR. Data collection, method, and format will be decided jointly by DCF/DMR regional administrators. Recommendations to Commissioners from these teams as a result of reviewing this data will occur no later than April 1, 2001.

**E.   Dispute Resolution**

When DCF and DMR cannot agree with regard to a child/youth who is a client of DMR, then the child/youth shall receive the services and the agencies shall equally share the financial responsibility for the child/youth. When DCF and DMR cannot agree with regard to any other issue, the dispute shall be resolved by the designees of the Commissioners of each agency.

_____
**Kristine D. Ragaglia, Commissioner**
**Department of Children and Families**

_____
**Peter H. O'Meara, Commissioner**
**Department of Mental Retardation**

6/29/2000
_____
**Date**

6/29/a
_____
**Date**



**THE INSTITUTE OF LIVING**

*Hartford Hospital's Mental Health Network*

October 22, 2001

Judge Michael Mack
Willamantic Juvenile Court
81 Columbia Avenue
Willamantic, CT 06226

Re: Joseph R█████
d.o.b. 6/5/89

Dear Judge Mack:

This letter is meant to outline current behavioral status, medication regime, and recommendations for treatment. Joseph was admitted as an inpatient at the Institute of Living on 9/22/01 due to aggressive, assaultive, and rageful behavior (i.e. hitting, kicking, throwing objects, and spitting) towards staff members at Connecticut Children's Place (CCP), despite the implementation of restraints (2 to 3 times) and administration of Benadryl (12.5 mg). Joseph had been non-compliant with his medication (Zyprexa: 5 mg in the morning, 10 mg at night) beginning four days prior to this incident (four days prior to his admission to IOL) and had been contemplating running away. On admission to IOL, Joseph reported decreased appetite and sleep onset difficulty. His insight, judgment, and impulse control were poor. Joseph exhibited fast and pressured speech, anxious and agitated affect, illogical and paranoid thinking, and fidgety behavior. Additionally, he expressed homicidal ideation but denied having suicidal thoughts. According to Joseph's record, this is his third inpatient hospitalization.

On the morning following his admission, Joseph refused to take his medication, adhere to the unit routine and follow directions. He became verbally and physically assaultive towards staff (i.e. cursing, kicking, spitting, and attempting to bite). At that time, Joseph needed to be carried into a seclusion room (which requires lock-door separation due to seriously unsafe behavior), where he remained for two hours until his behavior de-escalated.

While in the hospital, Joseph initially experienced considerable difficulty following staff directions and adhering to the rules and expectations within the milieu. He was easily agitated and belligerent, unwilling to participate in therapeutic groups and activities and resistant in individual and family therapy to discussing his difficulties. Because of aggressive and out of control behavior toward staff members, Joseph was brought to the seclusion room on three occasions, one after which he had refused to take his medication for 1 to 2 days. After calming down, regaining control of his behavior, and resuming his

400 Washington Street   Hartford, Connecticut 06106   (860) 545-7000

R██████ Joseph                                    D.O.B. ███89

medication (Zyprexa), Joseph was placed on a structured behavioral plan, to which he has responded quite well and made considerable behavioral gains. Joseph now attends all therapeutic groups and activities, has remained safe (free from assaultive behavior) for approximately 2 weeks, and has been interacting well with staff and his peers. Although at times he has become argumentative regarding rules and behavioral limits, Joseph's response to verbal redirection has improved.

In individual therapy, Joseph has expressed his mistrust of adults and has been quite guarded, despite much encouragement, in discussing his thoughts and feelings, particularly those that are central to his presenting difficulties with anger control. Because of this, he has received little benefit from psychotherapy. In family therapy, Joseph has begun to voice his thoughts and feelings around issues such as his unwillingness to agree with the rules and expectations that his mother has established at home (e.g. going to bed by a certain time, accepting "no" for an answer when his mother is unable to fulfill a request made by Joseph, remaining in control of his anger outbursts) and believing that he is scapegoated and treated "unfairly". Joseph's mother has conveyed to her son her right, as a parent, to establish rules that the writer believes are appropriate, given his age and the nature and history of his behavioral difficulties. Joseph has not been able to demonstrate an understanding of this and has instead resorted to arguing about past perceived mistreatment and aggrievances, while insisting that he is "right" and others are "wrong". Ms. R████ has discussed her concerns with the writer regarding her readiness to have her son return home. She expressed considerable, yet appropriate, worry about how to manage her son's behavior when it escalates, while at the same time assuring her son's safety and the safety of other family members. She recounted several events in which Joseph's anger became explosive at home and had essentially, in her own words, "held the family hostage."

It should be noted that Joseph has a tendency to misperceive events and form mistaken impressions of people, particularly adults, including what their actions signify. He has repeatedly voiced that "staff" has been "setting (him) up" for him to lose control of his behavior. Additionally, he seems more likely than others his age to draw unreasonable conclusions about relationships between events. These thought processes, along with his deep mistrust of adults, contribute to his oppositional and defiant behavior. However, we do not see Joseph as having any formal schizophrenia or related disorder.

Diagnosis:    Axis I:    Oppositional Defiant Disorder
                         Rule out Conduct Disorder
              Axis II:   Deferred
              Axis III:  None
              Axis IV:   Problems related to the social environment: disruption of family
                         by separation.
                         Other psychosocial and environmental problems: Chronic
                         behavioral difficulties with adult authority figures.
              Axis V:    Admission GAF: 25       Current GAF: 40



R██████, Joseph                                    D.O.B.████/89

Current medications: Zyprexa 5mg p.o. q am; 10mg p.o. qhs

It is recommended that, given Joseph's positive behavioral response within the milieu and the intensive structure, a specialized, therapeutic, community-based, supervised living situation, where staff are available 24 hours a day to provide clinical services and to ensure that rules are enforced, be sought. Clearly the intensity of the structure and the immediacy of consequences have helped Joseph refrain from some of the socially inappropriate behaviors that have decreased gradually from admission. It is important that this program have expertise in Oppositional Defiant disorders and Disruptive Behavior Disorder spectrum behaviors to help Joseph focus on pro-social behaviors, following rules and directions, and accepting responsibility for his misbehavior. It is unlikely that Joseph will make significant gains without intensive treatment. Given the nature and history of his behavioral dyscontrol and difficulty following rules and direction, it is highly unlikely he could benefit from a therapeutic / professional foster home placement. Additionally, Joseph's loyalty to his mother will make it very difficult for him to tolerate such placement. Therefore, this is not being recommended at this time.

It is also recommended that work continue with Ms. ██████ in preparing her for when Joseph does ultimately return home. Such work should involve helping Ms. R██████ feel more confident and comfortable with setting appropriate (e.g. firm and consistent) limits on Joseph's behavior.

If you have any additional questions, please feel free to contact us.

Sincerely,

Richard J. DioGuardi, M.A.                     Eric D. Cohen, M.D.
Primary Therapist                              Attending Psychiatrist

Laura M. I. Saunders, Psy.D.
Supervising Psychologist

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF CONNECTICUT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

W.R., individually and on behalf of her minor son,
JOSEPH R.; SUSAN K.; M.O., individually and on
behalf of her minor son, OMAR S.; and on behalf
of all others similarly situated; Jeanne Milstein,
Office of the Child Advocate,

PLAINTIFFS

    VS.

                                        CIV. NO. 302CV429 (RNC)

CONNECTICUT DEPARTMENT OF CHILDREN
AND FAMILIES, and DARLENE DUNBAR,
in her official capacity as Commissioner of the
Connecticut Department of Children and Families

            DEFENDANTS             August 17, 2005

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### Defendants' Revised Responses to
### Plaintiffs' First Request for Admission

      Defendants hereby submit a revised response to Plaintiffs' First Request for
Admission.

1.    The time between DCF's referral of an adolescent/young adult to the Department
      of Mental Health and Addiction Services (DMHAS) and the time DMHAS takes
      responsibility of the adolescent/young adult is typically 30-60 days. Tigeliero, p.
    27.

      *The defendants admit that Anthony Tigeliero testified at his deposition in
October, 2003 that his experience is that "in the few cases" he had it has taken 30 to 60
days before a decision is made regarding whether DMHAS will accept responsibility for
the child. Otherwise, the defendants deny this statement.*

2.    A young adult transitioning to DMHAS remains the responsibility of DCF so
      long as they are still in school, and DCF purchases services from DMHAS.
      Andersson, p. 151.

*Admit.*

3.    If a young adult who has transitioned from DCF to DMHAS has graduated from high school and are deemed DMHAS eligible, then DMHAS takes over responsibility for that young adult.  Andersson, p. 151.

*Admit.*

4.    DMHAS never assumes responsibility for a young adult until the young adult's 18th birthday.  Rudin, p. 103.

*Admit.*

5.    DCF transitions youth/young adults between the ages of 15 and 21 to DMHAS.  Long, p. 39.

*The defendants admit that youth with serious mental health problems requiring adult services are transitioned to DMHAS between the ages of 15 and 21.*

6.    DCF has limitations in terms of servicing young adults at age 18 who have significant mental health issues.  Rudin, p. 99.

*The defendants admit that there are limited resources available to DCF for providing services to children who reach 18 and require treatment for significant mental health problems.*

7.    It is typical to transfer a person with the severity of treatment needs such as Susan K.'s to DMHAS.  Rudin, p. 99.

*Admit.*

8.    Sandra Rudin is not aware of any circumstances where children with significant mental health needs remain in DCFs care until age 21.  Rudin, p. 99.

*The defendants admit that Sandra Rudin was not aware of any circumstances where children with significant health needs remained in DCF's care until age 21; however, defendants deny that such children are never permitted to remain in DCF's care until age 21.*

9.   DCF has a range of mental health services for children with mild mental health
     issues (*i.e.*, for those going on to some vocational technical school or college).
     Rudin, p. 99.

     *Admit.*

10.  There are negative ramifications to long term placement in residential treatment
     facilities.  Ando, pp. 38, 40.

     *Admit.*

11.  A negative ramification for a youngster placed in a residential facility for an
     extended period of time, beyond the time at which they have made their
     maximum clinical benefit with their issue areas, is that they tend to lose ground.
     Ando, pp. 37, 40.

     *Admit.*

12.  A negative ramification to long term placement in residential treatment facilities
     is that larger facilities provide a very structured kind of experience which impacts
     a child's socialization process.  Ando, pp. 38, 40-42.

     *The defendants admit that Louis Ando testified at his September, 2003 deposition
     that larger facilities provide a very structured kind of experience which may impact the
     development of skills needed to function in less structured situations.*

13.  Another negative ramification to long term placement in residential treatment
     facilities is a lack of life skills development in dealing with the community and
     the world at large through actual personal interaction.      Ando, pp. 40, 42, 43.

     *The defendants admit that, by the nature of the artificial environment, residential
     treatment facilities can have a negative effect on the development of life skills; however,
     many facilities offer real-world independent living skills programs.*

14.  DCF knows that once children leave DCF's care, if they have been in a
     residential placement, the first place they go is back home where they are ill-
     prepared to deal with the community-based life because they do not know how to
     function in the world anymore.  Andersson, pp. 25-27.

     *The defendants admit that Karen Andersson made that statement at her October*

3

*2003 deposition. Otherwise, the defendants deny the statement.*

15.   "Residential care" is out of home placement in a large congregate-care setting for
      a variety of kids with a variety of behavioral challenges. Andersson, p. 53.

   *The defedants admit that Karen Andersson made that statement at her October 2003
deposition; however, defendants deny the statement is true for all residential treatment
facilities.*

16.   DCF has experienced problems with residential service providers "kicking"
      mentally ill kids out of their programs. Andersson, p. 65.

   *The defendants admit that in the past, some residential service providers have asked
DCF to remove mentally ill children whose behaviors have become dangerous to
themselves or others. However, current contracts prohibit residential treatment facilities
from having a unilateral reject/eject policy.*

17.   DCF has had a very difficult time finding placements for mentally ill children.
      Andersson, p. 65.

      *The defendants admit at her October, 2003 deposition Karen Andersson testified
that a request for application to develop alternative residential options was developed
for six target populations that would be transitioning out of DCF care to either DMR or
DMHAS; these populations include children for whom DCF was having problems find
placements.*

18.   Children coming out of long-term residential care are ill-equipped to deal with
      the demands of adult life. Andersson, p. 67.

      *The defendants admit at her October, 2003 deposition Karen Andersson testified
that children in residential treatment facilities have not been well-equipped to return to
life, either at home or in the community or in their own apartments. Otherwise, the
statement is denied.*

19.   The adult service system is not as supportive as the DCF system, doesn't have the
      kinds of services offered by DCF, and there are no entitlements to adult services.
      Andersson, p. 67.

   *The defendants admit that there are no entitlements to adult mental health
services and that some of the services available for families of mentally ill children are
not available in the adult mental health system.*

20.   DCF may have done a disservice to children in its care by keeping those children
in residential placements as long as it has. Andersson, p. 67.

*The defendants admit that in the past, some children in the state's care were
placed or maintained in residential treatment facilities when they may have been better
served in less restrictive settings.*

21.   Children in DCF's care who have been placed residentially just have not been
well-equipped to return to life, either at home or in the community or in their own
apartments. Andersson, p. 67.

*The defendants admit at her October, 2003 deposition Karen Andersson testified
that children in residential treatment facilities have not been well-equipped to return to
life, either at home or in the community or in their own apartments. Otherwise, the
defendants deny this statement.*

22.   Placement in a community placement is optimal for the most significantly
impaired young adults. Andersson, p. 67.

*The defendants admit that if a significantly impaired young adult does not
require hospitalization, a community-based placement is often the preferred placement
for the individual.*

23.   Some children could benefit from residential care provided it is viewed as
treatment and not as a placement. Andersson, p. 68

*Admit.*

24.   There is a mismatch between what residential care should be and what it
currently is. Andersson, p. 69

*The defendants admit that at her October, 2003 deposition, Karen Andersson made
this statement. Otherwise, the defedants deny the statement.*

25.   Children/youth in long term residential care are ill-equipped for life because they
have never learned to manage money; don't know how to balance a checkbook;
don't know how to take their own medications because someone has always
given it to them, don't know how to engage a next-door neighbor in
conversation; don't know how to sit down and behave in a restaurant, or how to
ride a bus, or do the laundry, the kinds of skills we just assume kids who are 17,

5

18, 19 have. Andersson, p. 71.

*The defendants admit that at her October, 2003 deposition, Karen Andersson made this statement. Otherwise, the defendants deny the statement.*

26.    Some residential placements are institutions—a large congregate-care facility which warehouses people—long term chronic for folks that can't get better. Andersson, p. 72.

*The defendants admit that, some residential treatment facilities are used as institutions for the long-term care for chronically-ill individuals, who are typically severely disabled and would not be able to survive in a less structured setting.*

27.    The majority of children/youth in residential care don't fit into the need for institutional care. Andersson, pp. 72-73.

*The defendants admit that many children in residential treatment facilities don't need long-term institutional care; however, many will still need to be placed in some clinically appropriate residential program, such as a therapeutic foster home or treatment foster care. The defendants otherwise deny this statement.*

28.    DCF's independent living programs provide case management to the young adults placed there which assures that the young adults attend school, clinical services, maintain their apartments, pay bills, how to manage transportation. Tigerliero, p. 85.

*Admit.*

29.    DCF does not have community-based placements for persons with severe mental health issues, only for those with mild mental health issues who can remain in a foster care setting and attend school in the community with the services they need. Rudin, pp. 130-131.

*The defendants admit that at her September, 2003 deposition, Sandra Rudin testified that there are not community-based placements for children with severe mental health issues; otherwise the statement is denied.*

30    Social Worker Tigeliero does not believe a 24 hour community based home or apartment with 24 hour staffing exists in Connecticut. Tigeliero, pp. 55, 56.

*The defendants admit that when social worker Tigeliero testified in 2003, he believed there were not 24 hour community-based homes for mentally ill individuals in Connecticut.*

31.  As of July, 2003, over 175 children were waiting for therapeutic foster care. Andersson, pp. 94-95.

*Admit.*

32.  It was difficult for DCF to obtain appropriate services under DMHAS for young adults transitioning from DCF's care, so the young adult services transitional youth project was begun in 1998. Andersson, p. 111.

*Admit.*

33.  There are consistent wait lists for adequate respite and community mental health clinic services for mentally ill children and youth. Andersson, p. 121.

*Admit.*

34.  Connecticut is a state rich in resources. The 270 million dollars it spends on behavioral health services is tremendous compared to what other states are spending. Andersson, p. 122.

*Admit.*

35.  Connecticut needs to move behavioral health care money for children from residential care to community based care. Andersson, p. 122.

*The defendants admit thatat her October, 2003 deposition, Karen Andersson testified that mental health funding should be redirected and reallocated.*

36.  There are waiting lists for evaluations or services from Child Guidance clinics. Andersson, pp. 130, 131.

*The defendants admit that in some communities there are waiting lists for evaluations or services from child guidance clinics.*

37.  Very often there is no alternative to residential services for a child in Connecticut with serious mental health issues. Andersson, p. 34.

*The defendants admit that at her Ocotber, 2003 deposition, Karen Andersson testified that very often, but not always, there is no alterantive to residential services for a child required intensive mental health services. Otherwise the statement is denied.*

7

38.   Children end up in DCF shelters when DCF can't locate a placement for them. Rudin, p. 49.

   *The defendants admit that some children are placed in shelters while DCF locates a more appropriate placement for them,*

39.   There is only one group home in Sandra Rudin's geographical area. Rudin, p. 68.

   *The defendants admit this statement; however, additional group homes are under development in that area.*

40.   Waiting lists for residential placements are typically up to three months. Rudin, p. 73.

   *The defendants admit that at her September, 2003 deposition, Sandra Rudin testifed that the waiting list for residential placements " could be up to three months.... depending on the time of year." Otherwise, the statement is denied.*

41.   It can be harmful to some children who are ready for discharge to have to wait several months for an appropriate placement. Frankinberger, p. 28.

   *Admit. The defendants admit that for some children, once they are ready for discharge from residential care, if they have to wait for several months for their next placement, they may lose some of the gains they have made in placement.*

42.   Children who are in the process of discharging from long term placement in a residential treatment facilities need an aftercare model that provides them with the skills they need to function in other less structured situations. Ando, p. 38, 41.

   *Admit.*

43.   DCF residential facilities are only licensed to care for children under the age of 18. Anderson, p. 152.

   *The defendants admit; however other state agencies may license such facilities.*

44.   There are not enough residential beds for the children in DCF's care who need them. Gilman, pp. 70-72.

   *Deny.*

45.    There are no DCF Independent Transitional Living Programs for severely
       mentally ill children over age 17. Tigeliero, p. 69.

       *The defendants admit at his October, 2003 deposition, Anthony Tigeliero testified
       that there was no independent living program offered to someone with severe mental
       health issues like Susan's.*

46.    DCF Transitional Living programs are for children age 17 or older without
       significant mental health needs. Tigeliero, p. 17.

       *Deny.*

47.    DCF does not offer an independent living program for children with severe
       mental health issues, although it does offer such programs for children with no or
       less severe disabilities. Tigeliero, p. 69.

       *Admit.*

48.    Children in the Transitional Program move to DMHAS, and DCF pays DMHAS
       like a vendor to provide services, as early as age 18 but DCF funding
       responsibility ends at age 21. Long, pp. 40-41.

       *They admit that children in the Transitional Program move to DMHAS and
       DCF pays DMHAS like a vendor to provide services as early as age 18 and that
       in most but not all cases, DCF's funding ends at age 21 for children who require
       adult mental health services.*

49.    DCF's policy regarding closing of DCF cases upon transition to DMHAS is not
       clear to DCF's employees. Frankinberger, p. 42.

       *The defendants admit that Mark Frankinberger made this statement at his
       November, 2003 deposition. Otherwise the statement is denied.*

50.    DCF's agreements or policies with the DMHAS are not clear to its employees,
       even those in DCF's RRGs. Frankinberger, p. 42.

       *The defendants admit that Mark Frankinberger made this statement at his
       November, 2003 deposition. Otherwise the statement is denied.*

51.    Mr. Frankinberger, the clinical social worker member of the RRG for Eastern
       Connecticut, is not familiar with the specifics of the memo of agreement between

9

the DCF and DMR regarding which agency is responsible for placing children. Frankinberger, pp. 91-92.

*The defendants admit that Mr. Frankinberger is a clinical social worker for DCF and testified in 2003 that he was not familiar with the memorandum of agreement between DCF and DMR regarding which agency is responsible for placing children.*

52.    For most children, it would be harmful to be in multiple placements, such as 12 placements, in two years. Frankinberger, p. 35.

*Admit*

53.    During the time DCF social worker Tigeliero was a treatment social worker, he saw children in need of residential placement remain in the Thomas Bent shelter beyond the best case scenario of a 90 day stay, due to the lack of available space in residential placements. Tigleiro, p. 7.

*The defendants admit that Mr. Tigeliero is a DCF social worker and testified in 2003 that he was aware of children who had remained in the Thomas Bent shelter more than 90 days, due to the lack of available space in residential placements.*

54.    Social worker Tigeliero is aware of community based placements in other states but not familiar with any in Connecticut for children under 18. Tigeliero, pp. 18, 19.

*The defendants admit that Mr. Tigeliero is a DCF social worker and testified in 2003 that he was unaware of community-based placements for children in Connecticut.*

55.    Very often there is no alternative to residential services for a child in Connecticut with serious mental health issues. Andersson, p. 34.

*The defendants admit that at her October 2003 deposition, Karen Andersson testified that very often, but not always there is no alternative to residential treatment for a child requiring an intense level of mental health services. Otherwise, the statement is denied.*

56.    The reason why children who are placed out-of-state typically have more severe and difficult behaviors than those placed in-state is because in-state providers are not maintaining the appropriate programs. Ando, pp. 21-23.

*The defendants admit Louis Ando made that statement at his September, 2003 deposition. Otherwise, the statement is denied.*

57. Placements involving community-based treatment are DMHAS programs. Frankinberger, p. 44.

*The defendants admit that DMHAS has community-based treatment, as does DCF.*

58. Children waiting for placement in a professional or therapeutic foster care home may be placed in a hospital or a shelter while they are waiting for their placement.    Frankinberger, pp. 27-28; Tigeliero, p. 5.

*The defendants admit that at his October, 2003 deposition, Anthony Tigeliero testified that children could be placed in foster care, residential placements or shelter placements whil awaiting an appropriate placements, and that at his November 2003 deposition, Mark Frankinberger testified that children could be waiting in a hospital, shelter or a foster home.*

59. DCF knows that once children leave DCF care, if they have been in residential placement, the first place they go is back home where they are ill-prepared to deal with the community-based life because they do not know how to function in the world anymore. Andersson, pp. 26-27.

*See response to No. 14*

60. DCF has been unable to provide children in its care appropriate placements or has waited up to one year for placement because the type of needed placement was not available. Auwood, pp. 19, 27; Allegro, p. 47.

*The defendants deny this allegation.*

61. It is traumatic to remove children from their homes and their communities. Andersson, p. 26.

*Admit.*

62. Children who are in the process of discharging from long term placement in residential treatment facilities need an aftercare model that provides them with the skills they need to function in other less structured situations.    Ando, p. 4-7.

*See response to No. 42*

63. The range of average cost for placement in a residential treatment facility is between $200 and $400 per day. Ando, pp. 35, 38.

11

*Admit.*

64.   The range of average cost for placement in a therapeutic group home is approximately $300 to $500 a day. Ando, pp. 36, 38.

*Admit that cost range from $300 to $600.*

65.   In the long term, over 10 years, in terms of a youngster's ability to successfully navigate a transition from larger placements to smaller placements and then to a foster family, it is a cost savings to move them to a more expensive smaller placement, because it avoids many alternate placements and a lot of aggression on the part of the child. Ando, pp. 43, 46.

*The defendants admit that at his September, 2003 deposition, Louis Ando made that statement. Otherwise, the statement is denied.*

66.   The State of Connecticut spends over $30 million annually to have children in residential placements out of state because there are no programs within Connecticut that meet their needs. Gilman, p. 43.

*The defendants admit that at his October 2003 deposition, Thomas Gilman made that statement. Otherwise, the statement is denied.*

67.   It is difficult to work on family treatment goals or family counseling goals when a child is located in an out of state facility. Gilman, p. 54.

*The defendants admit that if a child is placed at a great distance from their family, it may be more difficult to work on family treatment goals or counseling; otherwise the defendants deny the statement.*

68.   "Residential care" is out of home placement in a congregate setting. Andersonn, p. 39.

*See response to No. 15.*

69.   Group homes are not "residential care". Andersonn, p. 39.

*Admit.*

70.   Group homes have traditionally not offered the same level of clinical support and intervention as residential providers. Andersonn, p. 41.

*Admit.*

12

71. A therapeutic group home is intensively staffed with a tremendous amount of clinical oversight. Andersson, pp. 41, 43.

   *Admit.*

72. An "intensively staffed" group home means on any given shift there is 3-3-2 staffing, three direct care, childcare staff each on the first and second shift and two on the overnight shift. Andersson, pp. 41, 43.

   *DCF admits at her October, 2003 deposition, Karen Andersson made that statement; otherwise the statement is denied.*

73. There is also a program director, a clinical therapist, and a nurse in an intensively staffed group home that are there daily, though not all day, and a multitude of community-based services, including access to mobile crisis teams. Andersson, pp. 41, 43.

   *Admit.*

74. Typically children who DCF places out of state have more severe and difficult behaviors. Ando, pp. 21, 23.

   *Admit.*

75. DCF's continuum of placements runs from least restrictive in the sense of wrap-around services in the home, to foster homes, to professional foster home, to therapeutic group homes, to institutional placements, and to hospitals. Ando, pp. 23-24.

   *The defendants admit that at his September 3. 2004 Louis Ando made that statement; otherwise, the defendants deny the statement.*

76. Therapeutic group homes are part of DCF's effort to move children from more restrictive to less restrictive placements. Ando, pp. 42, 45.

   *Admit.*

77. For children who are unable to have their needs met in residential treatment facilities because they display very extreme behaviors, do not function well in a large group, do not have the ability to make the connections or the attachment to

numbers of rotating staff members, it is important for DCF to design placements for them. Ando, pp. 43-44, 46-47

*Admit.*

78.    To design a placement for children who are unable to have their needs met in residential treatment facilities because they display very extreme behaviors, do not function well in a large group, do not have the ability to make the connections or the attachment to numbers of rotating staff members, DCF uses the request for application process that says to providers that DCF has specific types of needs for children, and asks if the providers can establish a specific type of group home to address those needs. Ando, pp. 44, 47.

*Admit.*

79.    A 'request for application process' to design a placement for a children who are unable to have their needs met in residential treatment facilities because they display very extreme behaviors, do not function well in a large group, do not have the ability to make the connections or the attachment to numbers of rotating staff members would be used to establish a therapeutic group home. Ando, pp. 44, 47.

*Admit.*

80.    Types of placements available to children with serious mental health issues are institutions such as residential and group homes, and living arrangements, which are not treatment placements, such as foster care, professional foster care, specialized or therapeutic foster care and regular DCF foster care. Frankinberger, pp. 20, 21.

*The defendants admit that Mark Frankinberger made that statement at his November, 2003 deposition. Otherwise the defendants deny the statement.*

81.    Mr. Frankinberger is not familiar with any group homes, still in existence, which have less than eight children in them in Connecticut. Frankinberger, p. 59.

*The defendants admit that Mr. Frankinberger testified at his November 2003 deposition that he was not familiar with any group homes with less than eight children in Connecticut.*

82.    Mr. Frankinberger does not know of the existence of any supported apartments, with 24 hour staffing, where children are placed in an apartment setting or house

14

setting by themselves or perhaps with one other child in Connecticut.
Frankinberger, p. 59.


*The defendants admit that Mr. Frankinberger testified at his November, 2003*
*deposition that he was not familiar with any supported apartments with 24 hour staffing*
*where youth are placed in an apartment setting or house setting by themselves or*
*perhaps with one other child in Connecticut.*


83.      There are shortages in placements for behaviorally impaired children in the
         care or custody of DCF who are transitioning out of DCF.   Long, p. 45.

     *Admit.*


84.      It is a challenge to find placements for cognitively and /or behaviorally
         impaired children in the care or custody of DCF who are transitioning out of

15

DCF, although less so than for behaviorally impaired.  Long, p. 45.

*Admit.*

Respectfully submitted,

Susan T. Pearlman
Assistant Attorney General
Fed. Bar No. ct 06338
MacKenzie Hall
110 Sherman Street
Hartford, CT 06106
Phone: 860 808-5480
Fax:  860 808-5590
E-mail: susan.pearlman@po.state.ct.us

16

## CERTIFICATION

I certify that a copy of the foregoing Defendants' Revised Responses to Plaintiffs' First

Request for Admissions was mailed postage pre-paid to the following counsel of record on

August 17, 2005.

Anne Louise Blanchard
Federal Bar No. ct 08718
Connecticut Legal Services
872 Main Street
Willimantic, Connecticut 06226
Telephone: (860) 456-1761 x109
Fax: 860 456-7420
ablanchard@connlegalservices.org

Attorney Carolyn Signorelli
Assistant Attorney General
55 Elm Street
Hartford, CT 06105

Attorney Lori Welch-Rubin
Engelman & Welch-Rubin, LLP
129 Whitney Avenue, New Haven CT 06510
New Haven, CT 06510

Attorney Susan T. Pearlman
Assistant Attorney General

17