UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Barbara. P. on her own behalf

     PLAINTIFF

                                  CIV NO. 302CV429 RNC
VS.
CONNECTICUT DEPARTMENT OF CHILDREN
AND FAMILIES and
DARLENE DUNBAR, in her official capacity as
Commissioner of the Department of Children and
Families                                  April 18, 2006
     DEFENDANTS
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PROPOSED COMPLAINT OF BARBARA. P.

### I. Preliminary Statement

1.     Plaintiff Barbara P. is a nineteen year old young woman with a long history of serious emotional disabilities and behavioral issues who has been raised by the Department of Children and Families ("DCF") since the age of five years as a committed child. It is currently DCF's responsibility to provide her with an appropriate placement and she brings this action on her own behalf to challenge DCF's past and current failure to provide a clinically appropriate community based residential placement to her because of the nature and extent of her disabilities.  She seeks to join herself as a party in WR v. DCF, Civ. No. 302CV429 (RNC), and files a Motion for Joinder of Party Pursuant to Fed. Rule Civ. Proc. 20(a), and a memorandum in support thereof contemporaneously herewith.

2.      Plaintiffs W.R., Joseph R., Susan K, M.O., Omar S. and Jeanne Milstein moved this court for class certification on July 11, 2003. The court heard oral argument on the first motion on December 22, 2003, and issued a ruling on September 30, 2004 denying plaintiffs' motion without prejudice. After engaging in extensive discovery, plaintiffs filed a Second Motion for Class Certification on May 1, 2005. Because the court has not yet ruled on this motion, Barbara P. asks this court to join her so that her interests may be protected.

3.      In June, 1990, Barbara P. first entered DCF custody through an emergency 96 hour hold. The Juvenile Court adjudicated Barbara as neglected and ordered protective supervision by DCF on November 13, 1990. Following an order of temporary custody (OTC) in February 1991 lasting more than six weeks, the court issued another OTC on June 9, 1991 and on September 13, 1991, Barbara P. was committed to DCF.

4.      Barbara P. remained continuously in DCF for the following fourteen years, through September of 2005. During that time, DCF psychiatrically hospitalized Barbara at least five times at Newington Children's Hospital, Elmcrest Hospital, Natchaug Hospital and Mt. Sinai Hospital. Barbara P. also had a history of partial hospitalization as well as out patient therapy. In addition to those disruptions in her placement, DCF moved Barbara P. at least thirty-nine additional times - in and out of regular foster homes, residential facilities, relative foster care, therapeutic foster homes, specialized foster care, group homes, transitional living placements (TLAP programs), youth shelters, adult shelters, independent living placements (IL programs), community housing assisted placements (CHAPs), and out of state placements. DCF also

sporadically placed Barbara in her mother's home although she had been adjudicated neglected by her mother's care. As Barbara became older, DCF failed to find placements for her, forcing her to spend nights on the street while moving from shelter to shelter. DCF's past and ongoing failure to provide placements to Barbara to meet her treatment needs and to keep her safe caused and continues to cause her irreparable harm. Moreover, DCF placed Barbara P. in these inappropriate placements with full knowledge that they were detrimental to her and were unsafe.

5.     Barbara P. was in the care and custody of DCF for more than fourteen years but agreed to sign herself out of DCF in September 2005 after DCF failed to find any appropriate placement for her and alleged she could not remain in the care of DCF because of her behavioral issues.

6.     On February 22, 2006, Barbara P. mailed an application for re-entry to DCF care pursuant to DCF Policy Manual §42-20-50 but never received a final response to her application. Although DCF is required by policy to conduct and complete assessment of any youth applying for re-entry within thirty days of application, DCF's decision on whether to accept a youth for re-entry is not governed by any timeline.  On March 15, 2006, Barbara P. filed an Application for Temporary Injunction with the Connecticut Superior Court for Juvenile Matters due to DCF's failure to act on her application for re-entry and due to the fact that the homeless shelter Barbara had stayed in was scheduled to close for the season on March 31, 2006.

7.     At the hearing on her motion for temporary injunction, the Superior Court for Juvenile Matters at Waterford accepted DCF's agreement to accept Barbara P. for re-

entry to DCF and provide her with a placement and make best efforts to provide an

appropriate placement for Barbara P. by March 31, 2006, the date when the shelter in

which she had been living was scheduled to close for the season. The court (Driscoll, J.)

then directed DCF to prioritize its efforts by addressing Barbara P.'s physical and mental

security and not to overload her with requirements as conditions for services.

8.    Although DCF agreed to re-admit Barbara P. to its care on March 24,

2006, she remains homeless and without mental health treatment due to DCF's lack of

community based placements.

9.    The Department of Children and Families was aware and continues to be

aware that children like Barbara P. who have mental illness can benefit from placements

in small, professionally staffed, community based placements, such as those provided in

the states of Massachusetts and New York. DCF's past and continued failure to provide

such a placement to Barbara P. reflects a discriminatory animus resulting from the nature

and extent of her disabilities.

## II. JURISDICTION AND VENUE

10.    Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1343(3) and

§504 of the Rehabilitation Act, 42 U.S.C. §1983, 42 U.S.C. §§620 et seq. and 670 et seq.

of the Americans with Disabilities Act. Plaintiff's request for declaratory relief is

authorized by 28 U.S.C. §§2201 and 2202. Venue is in the District of Connecticut, in

which named plaintiff's claims arose, pursuant to 28 U.S.C. §§1391(b) and 1393(a).

## III. PARTIES

11.     Plaintiff Barbara P. is a nineteen year old young woman with mental illness. She is currently homeless although DCF is under a court approved agreement to provide her with an appropriate placement which meets her physical safety and mental health needs.

12.     Defendant Darlene Dunbar is the Commissioner of the Connecticut Department of Children and Families and is sued in her official capacity.

13.     The defendant Connecticut Department of Children and Families is the state agency responsible for the care and education of children and youth like Barbara P. whose needs cannot be met by their families.

14.     The defendant Connecticut Department of Children and Families receives federal funding from numerous sources.

## IV. INDIVIDUAL FACTUAL ALLEGATIONS

15.     Barbara P., now nineteen years old, suffered sexual abuse as a young child, suffered physical abuse both prior to and while in the custody of DCF, and has a long history of mental illness and severe behavioral issues. She has been variously diagnosed as having Oppositional Defiant Disorder ("ODD"), Post Traumatic Stress Disorder ("PTSD"), Attention Deficit Hyperactivity Disorder ("ADHD"), Victim of Sexual and Physical Abuse, Nonverbal Learning Disability, Psychosocial Stressors including dysfunctional family, history of abuse, multiple behavior problems, Adjustment Disorder, Disturbance of Conduct, Major Depression Disorder, and Reactive Attachment Disorder. Barbara P. was most recently assessed at the Genesis Center in November 2005, at her initiation for purposes of renewing medical prescriptions. She was diagnosed

with ADHD, R/O (rule-out) Bipolar Disorder, R/O Pervasive Developmental Disorder and R/O Borderline Personality Disorder .

16.    On June 14, 1990, DCF  removed Barbara P. from her home under a 96 hour hold when police investigating a domestic violence incident noticed bruises on her and her siblings. During that time DCF placed Barbara P. in two different foster home placements. The third time she was moved, DCF returned her to her mother.

17.    The Superior Court for Juvenile Matters adjudicated Barbara neglected on November 30, 1990 and placed her under DCF's protective supervision. On February 4, 1991, the court issued an additional order of temporary custody resulting in DCF moving Barbara P. a fourth time and  placing her with a third foster family during her recuperation from surgery following an incident in her home when her spleen was ruptured.

18.    Barbara P. returned to her mother's home on March 23, 1991. Her fifth move.  However, her mother became homeless and was arrested for driving under the influence. On June 7, 1991, when Barbara was four and half years old, DCF removed her from her mother in a traumatic scene during which her mother was arrested and handcuffed. DCF then placed her in a fourth foster home located in Gales Ferry, Connecticut. It was also her sixth move in less than a year's time.

19.    During the summer of 1991, DCF referred Barbara P. to Newington Children's Hospital for assessment by the Program for Evaluation of Development and Learning ("PEDAL") to elucidate a diagnosis and to provide recommendations for

intervention strategies. At that time she was presenting with attentional and behavioral issues and had displayed an unusually high tolerance for pain.

20.    The PEDAL summary noted that Barbara P. was beginning to utilize avoidance and denial in order to cope with the abuse and neglect she had suffered and that she was acting out her feelings by oppositional, defiant, self-injurious, aggressive, unmodulated or impulsive behavior. She was at significant risk for developing more serious behavioral, emotional and or personality dysfunction and intensive individual psychotherapeutic intervention on a long term basis was recommended.

21.    On September 13, 1991, while Barbara P. was still in foster care, her mother agreed to a voluntary commitment of eighteen months after testimony and evidence were presented in a neglect hearing against the mother.

22.    On December 9, 1991, in her seventh move in a year and half's time, DCF placed Barbara in a fifth foster home, this one located in Norwich, CT.

23.    Barbara P.'s placement in the fifth foster home was one of her longest foster placements, lasting thirteen months. During that time, however, DCF placed Barbara P. at Newington Children's Hospital for an inpatient evaluation due to her increasingly oppositional and aggressive behaviors, sexualized behavior and high level of impulsivity.

24.    Newington Children's Hospital recommended that Barbara P.'s treatment focus on stabilizing her behavior so that she could remain in her fifth foster home with her sisters while a more long term placement plan was determined, rather than expose her to further separation or confusing moves to other temporary placement options. It was

noted that it was extremely important that a permanency plan be established as soon as possible as Barbara P.'s anger and anxiety was triggered by the insecurity of her situation. Barbara P. returned to the fifth foster home for four months.

25.    On January 22, 1993, when little more than six years old,  DCF moved Barbara  to her sixth foster home in Preston, Connecticut, her eighth move. This placement resulted in both a change to the Norwich school district for Barbara P. and a change in surrogate parent. Five months after her placement with her sixth foster family, Barbara P. was again hospitalized, this time at Elmcrest Hospital due to agitation, out of control behaviors and a need to change her medications to try stabilize her.

26.    As of January 1, 1993, DCF's Long Range Permanent Placement for Barbara P. was Non Foster Parent Adoption (not Permanent Relative Home), yet there is no indication in the record that her case worker was pursuing efforts to contact potential adoptive parents. In fact, the record is full of the case worker's involvement in supporting mother's efforts to keep family together and to rehabilitate herself.

27.    On May 1, 1993 a DCF-obtained psychological evaluation recommended that DCF continue pursuing placement of Barbara P. and her siblings with one of their parents. However, the evaluator recommended separating the siblings and splitting them up among the parents as mother could not manage all four of them. He also recommended initiating an alternate plan for placement if reunification with the parents was not well under way with a high level of expectation that it will succeed.

28.    In April of 1994 DCF's plan for Barbara P. was to pursue Termination of Parental Rights and possible relative foster placement with her grandparents. A

8

December 1994 DCF commissioned psychological evaluation noted that special attention

should be given to the length of time Barbara P. had been in placement and urged the

permanency planning be addressed without much further delay. At that time she had been

in the sixth foster home for nine months.

29.     By November 1995, Barbara P. had been living with her sixth foster

family for over a year and ten months. Despite the caseworker's observation that Barbara

P. had been in six foster homes, Barbara P. was extremely connected to her foster mother

and family, it was expected she would have a difficult transition, and her grandparents

were afraid her behavior problems might be too difficult for them to handle, it was still

DCF's intention to transfer Barbara P.'s guardianship to her grandparents.

30.     On December 1, 1995, DCF moved Barbara P. for the ninth time, to her

grandparents' home. Not long after she moved in with them, her grandparents decided

they could not keep Barbara P. due to her behaviors. They were not referred to a

reunification therapist until April 1996. When Barbara P. was placed with another foster

family a month later the grandparents expressed regret that they had not had the

reunification services earlier, for they thought they might have been able to keep Barbara

P. had they known more of the parenting skills they learned from the reunification

program.

31.     DCF moved Barbara P. for the tenth time on May 17, 1996, to another

foster home in Norwich, Connecticut, her seventh foster family.

32.     On January 29, 1997 Barbara P. was referred by her treating therapist for a

psychiatric evaluation because her behaviors were oppositional and defiant, stubborn,

distractible, at times very regressed, attention seeking, needy and at times physically

aggressive. Dr. Edelson diagnosed Barbara P. with Reactive Attachment Disorder and

recommended projective psychological testing to clarify the diagnosis and rule out the

possibility of Psychotic Thought Disorder. There is no indication that DCF obtained such

testing.

33.     On February 19, 1999 Barbara P. was removed from her seventh foster

home due to her behavior problems in that she was very oppositional and had severe

mood swings, and due to the deteriorating health of the foster mother. She had been with

her seventh foster family for two years and nine months.

34.     Moving her for the eleventh time, DCF placed Barbara P. in a therapeutic

foster home with foster family number eight. This placement lasted less than two months

and was disrupted on April 16, 1999 due to Barbara P.'s behaviors. Barbara P., then

twelve and half years old, moved for the twelfth time, returning to foster family number

six, a home she had left when she was nine years old.

35.     During her second stay with foster family number six, Barbara P. was

psychiatrically hospitalized three times and, after the third of those hospitalizations, she

did not return to that foster family. On April 21, 1999, just days after her placement with

this former foster family, the first of the three hospitalizations occurred. Barbara P. was

psychiatrically hospitalized at Natchaug Hospital for three weeks due to a fight with a

teacher and behaviors which had required the use of restraints twice that day, increasingly

escalating behavior with agitation, impulsivity, questionable auditory hallucination and

paranoid ideation. Barbara P., then eight years old was diagnosed as having ADHD and

Bipolar Disorder, Manic type, provisional. It was recommended that she be placed in the Joshua Center Partial Hospitalization Program and attend school at Project LEARN.

36.     On June 3, 1999, a month after her release from Natchaug Hospital, Barbara P. was referred to Dr. London for a psychiatric evaluation by her school psychologist who felt Barbara P. might have dissociative disorder as well as bipolar disorder. Dr. London diagnosed Barbara P. as having ODD, PTSD, ADHD, a Nonverbal Learning Disability and being a Sexual and Physical Abuse victim.

37.     On September 22, 1999, Barbara P. was admitted to Mt. Sinai Hospital due to physical aggression which had culminated in aggression towards staff at her school. In a request for residential placement to DCF's Central Placement Team it was noted that, in addition to her aggressive behaviors, Barbara P. was depressed to the point of uncontrollable crying, she craved adult attention and she had difficulty attaching to others due to her multiple placements.

38.     Within less than three months, Barbara P. was hospitalized again. She was admitted to Elmcrest Hospital, now known as St. Francis Hospital, on a fifteen day Physician's Emergency Certificate after she assaulted her social worker and her foster mother and attempted to hurt herself. At that time she was diagnosed with Mood Disorder, Disruptive Behavior Disorder and ADHD. She ended up staying six weeks and the discharge recommendation was for placement at a long term residential facility.

39.     On February 7, 2000, Barbara P. moved for the thirteenth time when DCF placed her at Connecticut Children's Place, the state receiving home. As early as June of

2000, her discharge plan was for placement at Valleyhead, Inc. a residential facility for girls in Massachussetts. However, Valleyhead did not have a bed available at that time.

40.    In September 2000, in a request for reconsideration to DCF's Central Placement Team, residential placement was again requested. It was noted that Barbara P. had admitted while at CCP to an ongoing fear of rejection from any home she was placed in, and admitted trying to disrupt former placements so she could leave on her own terms rather than those of the foster parents. It was further noted that her success at Connecticut Children's Place ("CCP")was due not only to the structure and nurturing she was getting at CCP but also to Barbara P.'s realization that she would not be rejected from that residential setting. It was therefore recommended that she be placed in a residential setting where she could continue to address her abandonment, oppositionality and control issues while remaining in a safe structured nurturing environment.

41.    After months of waiting, a bed finally became available and, on November 1, 2000, DCF placed Barbara P. at Valleyhead. Her mental health diagnosis upon discharge from CCP was ADHD, PTSD, ODD, Abuse Victim and Depressive Disorder-NOS (not otherwise specified). Her Global Assessment of Functioning was listed as 65-70, indicating she was displaying only mild symptoms at the time.

42.    Within 6 weeks of Barbara P.'s change in placement to Valleyhead, her Global Assessment of Functioning was listed as 45, indicating she was exhibiting serious symptoms. It was also noted that Psychosocial and Environmental stressors impacting her mental health diagnosis included not only her history of severe abuse and neglect but also her multiple placements.

43. Barbara P.'s Global Assessment of Functioning had improved to a 55, indicating moderate symptoms, by May 2001 and in July 2001, Valleyhead's Counseling Summary recommended that Barbara P. be placed in a group home once her oppositional and aggressive behaviors stabilized. Despite this recommendation by the therapists at Valleyhead, DCF did not place Barbara P. in a group home until a year and a half after her discharge from Valleyhead. In that interim, DCF moved Barbara P. another seven times, placing her in several foster homes and, when no one would take her, back with the mother from whom DCF had taken custody after committing Barbara P. as neglected.

44. When discharged from Valleyhead on November 9, 2001, DCF placed Barbara back with former foster family number seven with whom Barbara P. last lived in 1999.

45. By August of 2002, DCF's plan was to transfer guardianship foster family number seven. However, in September 2002, when Barbara P.'s application for Supplemental Security Income ("SSI") was denied, the foster family notified DCF it could not take Barbara P. without a subsidy. Barbara P.'s social worker was going to apply for reconsideration of the SSI denial.

46. Barbara P. knew of the SSI denial and asked her DCF worker if DCF could arrange a subsidy so that her seventh foster mother could take guardianship of her. Within a month of the SSI denial, Barbara P.'s behavior had begun to deteriorate. In January 2003, that foster mother had had surgery and that, combined with Barbara P.'s increasing behavior issues, led the foster mother to notify DCF she needed two weeks

respite support. DCF provided a long weekend of respite by placing Barbara P. with her mother.

47.    Barbara P.'s behavior continued to deteriorate and foster mother number seven notified DCF it would have to find a new placement for Barbara P. After initially attempting to reunify Barbara P. with her mother, the foster mother told DCF it was likely Barbara P. needed placement in a group home.

48.    Barbara P. was moved for the sixteenth time, to her mother's on April 17, 2003, when DCF had not located another placement by the time foster mother number seven refused to keep Barbara P. any longer due to her behaviors.

49.    On May 20, 2003, Barbara P.'s mother notified her DCF worker that she was having trouble with Barbara P. and asked the worker to make a referral to DMHAS, refer Barbara P. for individual counseling and a medical review, and look for activities for Barbara P.  Three days later, after a hotline call from her mother, DCF moved Barbara P. for the seventeenth time, and placed her with yet another foster family, foster family number nine, on May 23, 2003.

50.    On May 27, 2003, DCF moved Barbara P. for the eighteenth time and placed her with foster family number ten.

51.    On May 30, 2003, the DCF on-call worker had to remove Barbara P. for the nineteenth time as the foster family had only agreed to take Barbara P. temporarily and they had plans for the weekend. DCF then placed Barbara, again temporarily, with her eleventh foster family.

14

52.     On June 3, 2003, Barbara P. was moved by DCF for the twentieth time and placed with another new family, foster family number twelve, in Groton, Connecticut. The same day DCF placed her with them, the foster mother called DCF and said she wanted Barbara P. removed due to her behaviors.

53.     Barbara P. was moved for the twenty-first time, to her thirteenth foster family on June 4, 2003 to a family in Norwich.

54.     Finally, on June 5, 2003, DCF moved Barbara P. for the twenty-second time after DCF's Central Placement Team authorized an emergency placement for Barbara P. at the Thames House group home in Norwich, CT due to her out of control behaviors.

55.     On June 19, 2003, despite the need for the emergency placement at Thames House, the Administrative Case Review notes for Barbara P. state that DCF's plan for her was Independent Living ("IL"). However, the review contains no independent living plan and no services in place to address her needs consistent with the plan.

56.     Notes of a Supervisory Conference on July 30, 2003, indicate that Barbara P. was not doing well at Thames House and may need residential placement. Diagnoses listed for Barbara P. were ODD, ADHD and PTSD. Although she had carried the diagnosis of Depression-NOS through out her time at Connecticut Children's Place and at Valleyhead, the notes do not include that reference even though Barbara P. had not had an intervening psychiatric assessment.

15

57.    By August 2003, Barbara P.'s social worker was saying that Barbara P. needed a new group home which could better handle Barbara P.'s behaviors and on September 2, 2003, the social worker told Barbara P.'s mother that she was looking for new group home for Barbara P. However, DCF has never placed Barbara P. in another group home. Nor has it placed her again in a residential placement.

58.    On September 2, 2003, Thames House notified DCF that Barbara P. had been arrested twice, stated that her behavior and attitude was deteriorating, expressed concerns about her becoming a victim and recommended another group home or a foster home. Barbara P.'s worker noted that Barbara P. would be moved as soon as a placement became available. A few weeks later she noted that, although DCF considered a new placement in a group home with a smaller number of youths, there were no openings.

59.    The action Plan on Barbara P.'s December 2003 Treatment Plan called for a mental health assessment but did not identify the responsible party for ensuring the assessment took place.

60.    On January 9, 2004, the Thames House group home demanded an immediate meeting with DCF to request a one to one aide to support Barbara P. as her behaviors were resulting in unwanted physical contact with other more aggressive residents, putting Barbara P. in physical danger. The group home also requested a weekend respite due to Barbara P.'s behaviors. Barbara P.'s mother agreed to take her home for the weekend on January 16, 2004. Once Barbara P. had left, Thames House notified DCF that it had discharged Barbara P. that day.

61.     Although Thames House specifically recommended a residential placement for Barbara P. at the time it discharged her, DCF did not and has not placed her in a residential placement since then. Instead, it attempted to place Barbara P. in a group home, which Thames House did not recommend until her unmet needs involving boundaries, social skills and out of control behavior had been addressed. In light of her age, seventeen years old, Thames House also recommended a referral to DMHAS to enable Barbara P. to enter into an assisted living program.

62.     On February 10, 2004, Barbara P.'s caseworker, Kathleen Fulton, notified Victoria Niman, Medical Director of DCF, that Terry Bohara at Central Office of DCF had informed Ms. Fulton on February 4, 2004, that all group homes had rejected Barbara P. and that Ms. Bohara was going to withdraw the packet and re-submit it for residential placement.

63.     Ms. Niman pointed out that Barbara P. would be 18 years old in nine months, Barbara P.'s mother had expressed concerns about what DCF would do with Barbara P. when she turned 18 and asked the caseworker if the regional team had considered Barbara P. for referral to the Department of Mental Health Services. The case worker, Ms. Fulton, responded on February 10, 2004, saying she hoped to get Barbara P. into that department but that Barbara P. needed a re-evaluation because her juvenile diagnosis did not meet the criterion of a major mental health diagnosis. To date DCF has never obtained such re-evaluation.

64.     On March 2, 2004, DCF caseworker wrote to Dr. Maloney asking if he could provide an updated psychiatric evaluation of Barbara P. There is no record that

DCF obtained an updated psychiatric evaluation from Dr. Maloney or anyone else since the time Barbara P.'s caseworker acknowledged it was needed in order to facilitate a transition to DMHAS.

65.    Barbara P.'s twenty-third change in placement, when DCF placed her with her mother, for the weekend respite from Thames House, lasted nearly two months duration until March 8, 2004.

66.    On or about March 8, 2004, in her twenty-fourth move, Barbara P. was placed in her fourteenth foster home, in North Stonington, on emergency basis.

67.    By March 26, 2004 the Central Placement Team ("CPT") had withdrawn the CPT packet citing fact that all group homes had rejected Barbara P.

68.    On or about April 19, 2004 Barbara P., DCF moved Barbara for the twenty-fifth time, placing her back with her mother because Barbara's foster mother called the police and requested her removal after Barbara P. pulled a knife on another foster child.

69.    On or about April 21, 2004, a former foster parent agreed to take in Barbara P. but only for 30 days. Barbara P. moved, for the twenty-sixth time, back to foster family number seven's home in Norwich.

70.    On or about the 29th of April 2004, DCF was considering placing Barbara P. in a TLAP program even though she had not shown herself as mature enough to be independent because they had no more resources for her and despite the Thames House recommendation for residential placement. Two months later, on June 28, 2004, it was

noted that it was unlikely Barbara P. would be accepted into the TLAP program because of her immaturity and impulsiveness.

71.    On or about June 29, 2004, Barbara P. was moved for the 27th time, this time to the Thomas Bent Shelter, in Quaker Hill, CT, a short term shelter for children needing an immediate place to stay. Although the shelter was established by the Waterford Country School which has a residential program, there is no indication that DCF applied for placement in that program.

72.    By July 16, 2004, without having obtained an updated psychiatric or psychological evaluation to support its plan, DCF planned to discharge her from the Thomas Bent Shelter into Independent Living through the Community Housing Assistance Program ("CHAP").

73.    On or about October 1, 2004, Barbara P.'s eighteenth birthday, DCF moved Barbara P. for the twenty-eighth time; this time to the Supervised Apartment Independent Living program ("SAIL") in Bristol, CT. This placement in a transitional living program was made even though her final treatment plan review at Thames House noted that Barbara P. never demonstrated good behaviors that were in line with her discharge plan of independent living. It noted that under her behaviors is a sad and anxious young woman who has few coping skills and needs far more than can be provided in a shelter facility. In fact, it noted that Barbara needed as much structure and support as possible in order to explore the feelings she denies because she does not know how to manage them. The move to the S.A.I.L. placement also necessitated a change in schools to the Wheeler Clinic's Northwest Village School.

74.     On November 10, 2004, just after she had finally started school at the Northwest Village School, Barbara P. was expelled from the S.A.I.L. program due to her aggressive behaviors. DCF found a room for her to sublet and, on November 30, 2004, she was moved for the twenty-ninth time, to the home of still another foster parent, her fifteenth different foster parent, in Gales Ferry, as part of its CHAP program.

75.     This move necessitated another change in schools for Barbara P. Despite the Joshua Center's June 18, 2004, recommendation that Barbara P. continued to require a clinically based educational setting, DCF placed her at LEARN Regional Educational Service Center in Old Lyme, CT.

76.     By April 30, 2005 Barbara P. had been disrupted from her foster home and was living in Columbus House, an adult shelter in New Haven, Connecticut, her thirtieth placement by DCF. Staff there could not emphasize enough that the shelter was not a good place for Barbara P. as Columbus House is a "wet shelter" meaning it is a place where some people are alcoholics or use drugs. It was noted by staff at Columbus House that Barbara P. appeared stressed out and may have had an anxiety attack while there.

77.     On or about May 3, 2005, DCF moved Barbara P. for the thirty-first time to the Sea Breeze Inn, a motel in Stonington.

78.     DCF moved Barbara P. again on or about June 1, 2005 into an apartment in Gales Ferry, CT. Just over a month later had been moved to an apartment on Thames Street in Groton, Connecticut. Less than two weeks later, on or about July 27, 2005, DCF moved her to an apartment with a roommate on Bishop Court in Groton, CT.

79.    Barbara P.'s thirty-second, thirty-third and thirty-fourth moves were all made within less than two months. The placement in the Bishop Court apartment ended mere days after it began when Barbara P. was asked to leave on July 31, 2005. As she had nowhere to go, she spent the night at the home of her mentor.

80.    The next day, DCF issued a notice of proposed discontinuance of services for failure to comply with the regulations of the independent living program.

81.    When Barbara P. requested a hearing on the discontinuance the following day, August 2, 2005, DCF placed her in a New London, Connecticut foster family, her thirty-fifth move. This was also Barbara P.'s fifteenth different foster family in her fifteen years of involvement with DCF. She was eighteen years old.

82.    The placement in the New London foster home lasted only 2 days and on August 4, 2005, Barbara P. was moved, for the thirty-sixth time, to the WACAP shelter in Danielson, CT.

83.    On August 5, 2005, Barbara P. requested a treatment plan hearing through her court appointed attorney, Barry Ward, as she wanted to continue receiving DCF services and at a minimum transition services to other appropriate agencies.

84.    On or about August 7, 2005, DCF moved Barbara P. for the thirty-eighth time, to the Eddy Shelter in Middletown, CT.

85.    By DCF's own account, which among other things does not include the numerous emergency placements with Barbara P.'s mother, as of August 12, 2005, Barbara P. has been in 27 different placements including: regular, relative, specialized

and therapeutic foster homes, group homes residential facilities, youth and adult shelters, IL, TLAP and CHAP apartments and psychiatric hospitals.

86.    On August 23, 2005, DCF entered into a stipulated agreement with Barbara P. resolving the Administrative Hearing she had requested. That agreement provided that DCF would: (1) "continue to work towards" obtaining services for Barbara P. from the Department of Mental Health and Addiction Services; and (2) call the New London shelter with Barbara P. and, if she could go there, DCF would assist her with transportation to the New London shelter.

87.    On August 23, 2005, DCF moved Barbara P. for the thirty-ninth time, to the Columbus House, the "wet shelter" for homeless adults in New Haven. Barbara P., believing she had no other option after DCF alleged she could not remain in DCF care due to her behavioral issues, signed herself out of DCF care.

88.    On August 30, 2005, Robert Donovan of DMHAS notified Barbara P.'s DCF caseworker, Kathleen Fulton, that DMHAS could not make a final decision on acceptance of Barbara P. for services as it needed additional records regarding Barbara P.'s diagnosis, treatment and whether she was being prescribed psychotropic medications. He indicated it would be helpful if DCF obtained a clinical evaluation from her current outpatient treatment provider in order to determine if Barbara P. qualified for DMHAS services.

89.    On February 22, 2006, Barbara P. sent DCF a written request for permission to re-enter DCF services in accordance with DCF policy 42-20-50. When DCF had not acted on Barbara P.'s request by March 15, 2006, her legal counsel filed an

Application for Temporary Injunction seeking an order requiring DCF to accept her

application for re-entry and provide her with a clinically appropriate placement until it

appropriately transitions her to the Department of Mental Health and Addiction Services.

90.    As of March 24, 2006, DCF still had not obtained an updated psychiatric

evaluation of Barbara P. despite the fact that her case worker acknowledged in February

2004 that such an evaluation was need in order to try to transition her to DMHAS.

91.    DCF only agreed to accept Barbara P. back into its care after she filed a

motion for temporary injunction.

92.    Pursuant to its agreement to take Barbara P. back into its care, DCF was to

provide Barbara P. with an appropriate placement and to transition her to DMHAS.

93.    Pursuant to its agreement to accept Barbara P. back into its care, DCF was

to provide her counsel with copies of its efforts to refer Barbara P. for placement but

failed to do so.

94.    Although DCF was aware the emergency shelter in which Barbara P. had

been living was closing for the season on March 31, 2006 and had agreed to make

placement for her by that date, DCF failed to do so.

95.    DCF did not notify Barbara P.'s counsel that it had a placement for

Barbara P. until after her counsel had notified DCF's counsel that it would be necessary

to pursue further legal action if DCF did not make an appropriate placement by April 7,

2006.

96.     The placement DCF offered for Barbara P. was a foster home where, Barbara P. would be expected to adhere to the same bedtime schedule, nine o'clock p.m. as the much younger children in the home.

97.     Despite the fact that DCF had previously considered it appropriate to place Barbara P. in a motel, the Sea Breeze Inn, for a month as an eighteen year old, it refused to offer such a temporary placement to her again.

98.     Upon arriving at the foster home, the foster parent informed Barbara P. that she had only agreed to take her for the night. Barbara P.'s mother who had transported her to the foster home, was able to persuade the foster parent to keep her over the weekend until April 10, 2006 when, hopefully, DCF would be able to find an appropriate placement.

99.     Barbara P., in her frustration over the inappropriate placement and knowing she would be required to leave on April 10, 2006, left the foster home on the evening of April 9, 2006, before she would be required to leave it the next day.

100.    DCF has not found an appropriate placement for Barbara P. and she remains homeless.

101.    In its continual failure to provide Barbara P. with clinically indicated and appropriate community based treatment over the course of almost fifteen years, DCF acted with deliberate indifference to both Barbara P.'s needs and its statutory obligations.

102.    DCF's continual failure to provide Barbara P. with clinically indicated and appropriate community based treatment over the course of almost fifteen years reflects a discriminatory animus toward Barbara P. on the basis of her severe mental illness and

24

behavioral issues. There is no indication in the extensive DCF record of Barbara P. that

the agency ever provided her with consistent mental health treatment to address her

sexual and physical abuse, post traumatic stress disorder, reactive attachment disorder,

depression, the structure and support she needed as a child with attention deficit

hyperactivity disorder and the impact of the multiple placements she endured, which

would have enabled her to have a chance at being able to successfully live on her own.

### V. CAUSES OF ACTION

#### A.    FIRST CAUSE OF ACTION

103.    Paragraphs 1 through 102 are incorporated herein.

104.    DCF and its Commissioner have violated Barbara P.'s rights under the

American with Disabilities Act by failing to provide her with a clinically indicated and

appropriate community based placement.

#### B.    SECOND CAUSE OF ACTION

105.    Paragraphs 1 through 102 are incorporated herein.

106.    DCF and its Commissioner have violated Barbara P.'s rights under

Section 504 of the Rehabilitation Act by failing to provide her with a clinically indicated

and appropriate community based placement.

#### C.    THIRD CAUSE OF ACTION

107.    Paragraphs 1 through 102 are incorporated herein.

108.    DCF and its Commissioner have violated Barbara P.'s rights under Conn.

Gen. Stat. §17a-3 by failing to provide her with a clinically indicated and appropriate

community based placement and violated Conn. Gen. Stat. §17a-16 by exposing her to inhumane and undignified treatment.

### D.    FOURTH CAUSE OF ACTION

109.    Paragraphs 1 though 102 are incorporated herein.

110.    DCF and its Commissioner have violated Article First, §20 of the Constitution of Connecticut by discriminating against Barbara P. by failing to provide her with a clinically indicated and appropriate community based placement by exposing her to inhumane and undignified treatment, and unnecessarily segregating her in an institutional setting in another state, far from her family, due to DCF's failure to provide the needed supports in Connecticut.

111.    **VI. <u>CLAIMS FOR RELIEF</u>**

WHEREFORE, the plaintiff Barbara P. respectfully request that the court:

112.    Grant her motion to be joined Barbara P. as a party plaintiff in the W.R. v. DCF suit pending before it, docket no. 302CV429 (RNC);

113.    Enter a preliminary and permanent injunction ordering the defendants to comply with the Rehabilitation Act, the Americans with Disabilities Act, Conn. Gen. Stat. §17a-3 and the Twenty-First Amendment to the Connecticut Constitution by providing Barbara P. with a clinically indicated and appropriate community based placement.

114.    Enter an order:

Ordering the defendants to comply with the Rehabilitation Act, the Americans with Disabilities Act, Conn. Gen. Stat. §17a-3 and the

Twenty-First Amendment to the Connecticut Constitution by

providing Barbara P. with a clinically indicated and appropriate

community based residential placements.

115.    Enter a declaratory judgment that:

The defendants violated the Rehabilitation Act, the Americans

with Disabilities Act, Conn. Gen. Stat. §17a-3 and the Twenty-

First Amendment to the Connecticut Constitution by failing to

provide Barbara P. with a clinically indicated and appropriate

community based residential placement.

116.    Award plaintiff Barbara P. $1,250,000 in damages.

117.    Award costs, attorneys' fees and other such relief as the Court may deem

appropriate.


PLAINTIFF,  Barbara P.


By: _____
Catherine L. Williams, Her attorney
Connecticut Legal Services, Inc
211 State Street
Bridgeport, CT 06604
Fed. Bar No. ct02059
cwilliams@connlegalservices.org
Tel:  203-336-3851
Fax:  203-333-4976

## CERTIFICATION

I certify that a copy of the foregoing Proposed Complaint was mailed, postage prepaid, to the following counsel of record on the 19th day of April, 2006 to:

Attorney Susan T. Pearlman
Assistant Attorney General
MacKenzie Hall
110 Sherman Street
Hartford, CT 06106

Attorney Carolyn Signorelli
Assistant Attorney General
55 Elm Street
Hartford, CT 06105

Attorney Anne Louise Blanchard
Connecticut Legal Services, Inc.
872 Main Street
P. O. Box 872
Willimantic, CT 06226

Attorney Bet Gailor
Connecticut Legal Services, Inc.
872 Main Street
P. O. Box 872
Willimantic, CT 06226

Attorney Winona Zimberlin
2 Congress Street
Hartford, CT 06114

Catherine L. Williams