UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| W.R., individually and on behalf of her minor son, JOSEPH R.; SUSAN K.; M.O., individually and on behalf of her minor son, OMAR S.; and on behalf of all others similarly situated, and<br><br>JEANNE MILSTEIN, CHILD ADVOCATE OF THE STATE OF CONNECTICUT<br><br>PLAINTIFFS<br><br>V.<br><br>The CONNECTICUT DEPARTMENT OF CHILDREN AND FAMILIES<br><br>And<br><br>DARLENE DUNBAR, in her official capacity as Commissioner of the Connecticut Department of Children and Families,<br><br>DEFENDANTS | CIV. NO. 302CV429 (RNC)<br><br>June 22, 2007 |

**JOINT BRIEF IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENT AND CLASS NOTICE, TO SET A DATE FOR A FINAL FAIRNESS HEARING AND FINAL SETTLEMENT APPROVAL**

I. Introduction

   A. Background

On March 8, 2002, the plaintiffs, who are youth[1] in the care of the Connecticut Department of Children and Families ("DCF") with severe mental health needs[2] and

---

[1] The term "youth" refers to children, youth, and young adults in the care of DCF
[2] This includes youth with serious behavioral issues

1

several of their parents, filed suit against DCF and its Commissioner on their own behalf and on behalf of a proposed class. In their complaint, plaintiffs raised their concerns regarding the lack of community based placements available to mentally ill youth in state care and the lack of resources available to maintain mentally ill youth outside of residential institutions. DCF, as the state child protection agency provides services to mentally ill youth in its care who can not live in their family homes. DCF provides these services both to youth committed to DCF through the Juvenile Court as abused, neglected, or 'uncared for', as well as to youth who voluntarily seek the assistance of the DCF through its voluntary services program. Due to the difficulty of serving these populations, mentally ill youth are likely to reside in residential institutions and hospitals; frequently, they are moved among unsuccessful foster home placements. The lack of stability and appropriate programming is detrimental to the mental health of class members.

### B. Plaintiffs' claims and relief sought

In their original and amended complaints, plaintiffs challenged DCF's failure to provide community based placements to mentally ill youth in state care on the grounds that DCF violated plaintiff' rights to nondiscrimination based upon disability, pursuant to Title II of the Americans With Disabilities Act (ADA), 42 U.S.C. § 12132, and its implementing regulations; Section 504 of the Rehabilitation Act (Section 504), 29 U.S.C. § 701, *et seq.*, and its implementing regulations; Connecticut General Statutes §§17a-3 and 17a-16; and Article First of Sec. 20 of the Connecticut Constitution. Plaintiffs alleged that DCF's actions harmed them and members of the proposed class by placing them in inappropriate and often harmful placements due to its failure to develop

2

appropriate community based placements for mentally ill youth in Connecticut. DCF denied these allegations.

Plaintiffs sought declaratory and injunctive relief requiring defendants to:

1. Enter a preliminary and permanent injunction ordering the defendants to provide plaintiffs and members of plaintiffs' class with clinically indicated and appropriate community based residential placements including, where necessary, professionally staffed residential placements.

2. Award plaintiff Susan K. $1,250,000 in damages.

### C. Plaintiff class certification

On May 30th, 2007, the court certified the following class:

> [m]entally ill youth and/or youth with serious behavioral issues in the care of DCF whose mental health needs cannot be met in traditional foster home placements or institutions, who are in need of community based placements and/or who have experienced or are at high risk of experiencing, multiple failed placements. W.R. v. DCF, 3 Conn. Ops 549 (6/4/07).

### D. Discovery and expert involvement

Throughout the course of this litigation, plaintiffs engaged in extensive discovery to ascertain details of the community based placements available for mentally ill youth in DCF's care. This involved extensive written discovery, lengthy sets of interrogatories, requests for production of voluminous DCF documents, as well as three detailed Requests for Admissions. Discovery further included depositions of numerous DCF administrators including: Karen Snyder, DCF's Assistant Commissioner and Chief of Operations, Karen Andersson, DCF's Director of Mental Health, Lou Ando, DCF Bureau Chief for Behavioral Health, Medical, and Education, Tom Gilman, retired DCF Deputy Commissioner, Dorian Long, a DCF Program Supervisor, Sandra Rudin, a DCF social

work supervisor, DCF staff Cathleen Connolly, Tony Tigeliero, Karin Rohs, and Maria Allegro.

Plaintiffs retained and disclosed, pursuant to Fed. R. Civ. P. 26(a)(2)(A), five expert witnesses to testify at trial regarding nationwide and regional standards in providing community based programs to mentally ill youth in state care, to address the status of community based services in Connecticut and to address the status of mentally ill youth in need of community based care, including Mary Lou Sudders, former Massachusetts Commissioner of Mental Health, Gary Lavigna, a nationally known clinical psychologist and board certified behavior analyst, Hal Gibber, Executive Director Tri-County Youth Programs, Dr. Robin Grant-Hall, an expert on youth in state care with mental health issues, and Dr. Lynn Zimmerman, associated with Yale Child Study. Plaintiff Jeanne Milstein, as the Connecticut Child Advocate, also offered her expertise regarding youth in state care. Defendants deposed all plaintiffs' experts except for Dr. Gary Lavigna.

### E. History of negotiations

After extensive briefing on motions to dismiss, summary judgment and after oral argument on two motions for class certification, arm's length negotiations took place for over ten months under the aegis of Dr. Robert Carl, a mediator with experience in mental health issues and DCF who had been recommended by the District Court. Experienced counsel for the parties participated in negotiations over the course of nine months, relying on both information gained through discovery, as well as the advice and assistance of expert witnesses. During negotiations, the parties explored a range of approaches that could be employed to improve provision of community based services to mentally ill

youth in DCF care. With the assistance of the experts retained by the parties and the mediator, the parties ultimately reached the Settlement Agreement now before the court for approval. The Settlement Agreement affords, in significant measure, the relief sought on behalf of the plaintiff class, and is wholly consistent with the merits of the legal claims and range of potential resolutions that could have followed full litigation.

### F. Improvements in DCF Community Based Placements

During the course of this litigation, defendants took steps to address the issues raised in this case. DCF has established, built, or is in the process of building, at least 45 new small group homes in various communities throughout the state for no more than 8 youth per home.[3]

DCF will implement additional measures incorporated in the Settlement Agreement, upon approval by the court. These include:

1. <u>Emergency Mobile Psychiatric Services</u> ("EMPS"):

 a. DCF will increase funding of EMPS by $1,000,000.00 per year for 3 years. The added money will be used to increase the number of EMPS staff during peak and expanded hours to allow for maximum mobility and faster response times to crisis calls. The DCF geographic areas of New Haven, Hartford, Bridgeport, Waterbury, and New Britain will receive additional resources with this increased money. DCF will make good faith efforts to ensure the expenditure of the funds allocated in accordance with the Settlement Agreement.

 b. For the Eastern Connecticut region currently served by the DCF offices in Willimantic and Norwich, DCF will commit an additional amount of $187,500

---

[3] The majority of these homes are now in operation, as of the date of the Settlement Agreement

5

in the first year, and, for Years Two and Three of the Settlement Agreement, DCF will commit an additional $250,000 per year, to enhance the EMPS currently offered in Eastern Connecticut.

  c. DCF and a Consultant hired to oversee the implementation of the settlement will periodically review the allocation of all EMPS services as compared to demand and need for the services. If the parties agree, DCF may reallocate the additional EMPS funding referred to in this suit to areas where the need is greatest.

### 2. Individual Community Based Options (called "ICBO")

  a. DCF, together with the Consultant to be hired under the settlement, will develop and implement an ICBO program to help *W.R.* class members obtain and remain in appropriate community based placements.

  b. In Year One of the term of this Settlement Agreement, DCF will commit $1,312,500.00 (one million three hundred thousand five hundred dollars) to develop and implement ICBO for *W.R.* class members who otherwise would remain in inappropriate residential placements, be at high risk of placement in such facilities due to their mental or behavioral health problems, or have experienced multiple unsuccessful foster care placements, group home placements, or other community based placements. Specifically, these funds will be used to provide therapeutically supported living, crisis supports, and related services to help maintain these individuals successfully in the community. It is contemplated that these services or supports will be directed to *W.R.* class members who are adolescents and have experienced multiple placements. DCF will identify ICBO funds as a separate budget line item for the purpose of augmenting, and not replacing, the current service array provided to class members.

    c. In Years Two and Three, DCF will commit $2,000,000.00 (two million dollars) per year to develop and implement ICBO for *W.R.* class members who would otherwise remain in residential treatment facilities, be at high risk of placement in such facilities due to their mental or behavioral health problems, or have experienced multiple unsuccessful foster care placements.

3. <u>Guidance</u>

    DCF, in collaboration with the Consultant, agrees to provide regular and structured guidance to its Area Resource Group staff, program supervisors, social workers, social work supervisors and individuals/organizations that contract with DCF to provide services to *W.R.* class members in the following areas:

    (a) transition planning for clients aging out of DCF's care, beginning at age 14; and

    (b) unconventional or individualized "out of the box" planning options related to the *W.R.* class, including strength-based planning and understanding that there is a "no eject/no reject" policy for services for all DCF clients, including services available for *W.R.* class members; and

    (c) the increased availability of EMPS services, as well as the availability of the group homes and ICBO services under this Agreement.

4. <u>Consultant</u>

    a. DCF will hire a Consultant for the purposes of implementing the Settlement Agreement. The plaintiffs and DCF will agree upon a third party consultant whom DCF will pay an annual salary of up to $175,000 (one hundred seventy-five thousand dollars).

    b. The Consultant's duties include:

      (1) helping DCF establish eligibility criteria for ICBO and an appropriate transition process for participation in the ICBO program;

      (2) identifying best and promising practices for clinical services and other supportive services provided in group home settings, EMPS and ICBO services and making recommendations for improvements to these programs;

      (3) providing a quarterly report to DCF and plaintiffs' counsel during each of the three years of the agreement on services provided in group home settings, as well as the EMPS and the ICBO services related to the *W.R.* and the nature and extent of the guidance provided by the Consultant to DCF;

      (4) helping DCF develop transition planning and policy to help older adolescent W.R. class members prepare for adulthood, and, if appropriate, transition to services provided by the Department of Mental Retardation (DMR) or the Department of Mental Health and Addiction Services (DMHAS).

**G. Other steps DCF will take:**

 1. Special Needs Trusts

    a. For four of the six individuals who are plaintiffs, intervenors, or joinders to the suit, DCF will fund small $5,000 special needs trusts, to be established by the plaintiffs for their benefit.

    b. For one of the other named plaintiffs and one of the joinder plaintiffs who have already aged-out of the DCF system, under a memorandum of agreement between DCF and DMHAS, DCF will fund the cost of a case manager, educational and vocational mentors, living expenses, educational services, health care

services, and other related expenses for three (3) years. Total costs may not exceed $199,953 per year.

    2. <u>Voluntary Services</u>   One of the plaintiffs, who is receiving voluntary services for serious mental illness, will remain eligible for DCF services and receive the same priority for services as committed youth, through his 23rd birthday.

    3. <u>Attorneys Fees and Costs.</u> In order to settle the case, DCF agreed to pay, and counsel for plaintiffs agreed to accept, $150,000.00 (one hundred and fifty thousand dollars) for attorneys' fees and costs.

## H. Approval of the Settlement Agreement by the Connecticut General Assembly

Conn. Gen. Stat. §3-125a requires the Attorney General to gain the approval of the Connecticut General Assembly prior to accepting the terms of any agreement resolving litigation which requires an expenditure from the General Fund of an amount in excess of two million five hundred thousand dollars[4]. Accordingly, the Connecticut Attorney General, Richard Blumenthal, submitted the Settlement Agreement to the Connecticut General Assembly on May 7th, 2007 pursuant to Conn. Gen. Stat. §3-125a and the Connecticut General Assembly Joint Rules §32. The Settlement Agreement was referred to the committees of cognizance: Judiciary, Human Services and Appropriations. These committees held a joint hearing on May 29th, 2007.[5] The legislature declined to

---

[4] This settlement is expected to cost the Department of Children and Families $3,044,953.00 in FY08 and $3,624,953.00 in FY09 and $3,624,953.00 in FY2010. See footnote 4, *infra,* for links to the legislative fiscal notes.

[5] The following is a link to the House and Senate Judiciary Committee resolutions
http://www.cga.ct.gov/asp/cgabillstatus/cgabillstatus.asp?selBillType=LCO%23&bill_num=7125&which_year=2007 (Senate);
http://www.cga.ct.gov/asp/cgabillstatus/cgabillstatus.asp?selBillType=LCO%23&bill_num=7132&which_year=2007 (House of Representatives)

9

hold a vote within 30 days of submission of the Settlement Agreement to the General Assembly; as a result, the Settlement Agreement is deemed to have been approved. Conn. Gen. Stat. § 3-125a.[6]

## II. Legal Standards

### A. General principles

Class litigation lends itself to settlement because of difficulties of proof, uncertainty of outcome and length of litigation. Bourlas v. Davis Law Associates, 237 F.R.D. 345, 355 (E.D.N.Y. 2006). There is a strong judicial policy favoring settlements, particularly in a complex class litigation context. Wal-Mart Stores, Inc. v. VISA U.S.A., 396 F.3d 96, 116 (2d Cir. 2005); In re Luxottica Group S.P.A. Securities Litigation, 233 F.R.D. 306, 310 (E.D.N.Y. 2006); Bourlas, 237 F.R.D. at 354. There is a range of reasonableness in settlements which recognizes the uncertainties of law and fact and the risks and costs inherent in litigation. Wal-Mart Stores, Inc., 396 F.3d at 119. The possibility that the class may achieve more at trial is not dispositive, so long as the result of settlement is within the range of reasonableness. In re Luxottica Group S.P.A. Securities Litigation, 233 F.R.D. at 316. Where settlement of a class action results from arm's length negotiations between experienced counsel, after significant discovery, the court may presume the settlement is fair, adequate and reasonable. Wal-Mart Stores, Inc., 396 F.3d at 116; In re IPO Securities Litigation, 226 F.R.D. 186, 190 (S.D.N.Y. 2005).

---

[6] If modification of the Settlement Agreement were necessary for final approval of this Court, the earliest it could be re-submitted to the General Assembly for consideration and approval is the beginning date of the next regular session of the General Assembly: February 6, 2008. Conn. Gen. Assembly Joint Rules § 32.

10

### B. Steps for approval of a settlement in class action litigation

Courts must ultimately approve all settlements reached in class action litigation. Fed. R. Civ. P. 23(e). There are several steps in this approval process.

The court preliminarily approves the fairness of the settlement, prior to notice. In re NASDAQ Antitrust Litigation, 176 F.R.D. 99, 102 (S.D.N.Y. 1997). A grant of preliminary approval involves a determination that "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representative or segments of the class and falls within the reasonable range of approval." Bourlas, 237 F.R.D. at 355 (citing In re IPO Litigation, 226 F.R.D. at 191; In re NASDAQ Antitrust Litigation, 176 F.R.D. at 102). At this stage, the court need only find that the proposed settlement fits within the range of possible approvable outcomes. In re Prudential Securities Inc. Limited Partnerships Litigation, 163 F.R.D. 200, 210 (S.D.N.Y. 1995). *See also* Manual for Complex Litigation, Fourth § 21.632 (2007).

Once the preliminary approval is granted, the court orders appropriate notice in a reasonable manner of the proposed settlement and the date of the final fairness hearing to all class members who will be bound by the settlement. Bourlas, 237 F.R.D. at 355 (citing In re IPO Litigation, 226 F.R.D. at 191); In re Luxottica Group S.P.A. Securities Litigation, 233 F.R.D. at 309. The notice must fairly apprise class members of the terms of the proposed settlement and their options in connection with the proceedings. Wal-Mart Stores, Inc., 396 F.3d at 113. *See also* Manual for Complex Litigation, Fourth § 21.633 (2007).

Finally, the Court conducts the fairness hearing required by Fed. R. Civ. P. 23(e) to provide class members an opportunity to present their views of the proposed settlement and argument and evidence regarding the terms, before making a final determination as to whether the proposed settlement is "fair, reasonable and adequate." Fed. R. Civ. P. 23(e)(1)(C). *See also* Manual for Complex Litigation, Fourth § 21.632-21.635 (2007).

In the ultimate review of the substance of a settlement agreement for fairness, reasonableness and adequacy, courts in the Second Circuit look to what has been termed the Grinnell factors. Bourlas, 237 F.R.D. at 355, n. 7 citing, City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds*, Goldberger v. Integrated Resources, Inc., 209 F.3d 43 (2d Cir. 2000). The six factors relevant to the present case, which seeks systemic declaratory and injunctive relief, include the following (utilizing the Grinnell numbering):

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(6) the risks of maintaining the class action through the trial; and

(7) the ability of the defendants to withstand a greater judgment.

Grinnell, 495 F.2d at 463; Heyer v. New York City Housing Authority, No. 80 Civ. 1196(RWS), 05 Civ. 5286(RWS), 2006 WL 1148689, at *3 (S.D.N.Y. Apr. 28, 2006).

**C. Approval of the Settlement Agreement**

1. Preliminary Approval

12

As described above, the Settlement Agreement before this court is the product of serious, well-researched, non-collusive negotiations which took place over the course of many months and was informed by consultation with national level experts. The Settlement Agreement comprehensively addresses the problems faced by youth with mental illness in the care of DCF and the provision of community based services by DCF to them. It falls within the reasonable range of potential approvable resolutions that could follow full litigation of such claims. For these reasons, it should be preliminarily approved.

### 2. Notice of the proposed settlement

The parties have jointly proposed a form of class notice, in English and Spanish, which includes a large print single page summary of the Settlement Agreement, followed by a more detailed, several page explanation of the settlement terms, both identifying the date, time and location of the fairness hearing, to be posted on DCF's website, the website for the Office of the Chief Child Protection Attorney, the Office of the Child Advocate, and the Office of Protection and Advocacy. DCF will request that the Department of Mental Health and Addiction Services, the Department of Mental Retardation, and the State Department of Education, also post this notice on their websites.

The parties also propose bilingual posters explaining services available to class members under the Settlement to be prominently displayed in the waiting rooms of all DCF offices, and prominent posting on the DCF website of the notice in English and Spanish and the Settlement Agreement. An English version of the proposed notice is

attached to the "Joint Motion for Preliminary Approval of Settlement Agreement and Class Notice, to Set a Date for a Final Fairness Hearing and Final Settlement Approval."

The parties believe the proposed notice will reach the members of the certified plaintiff class, fairly apprise them of the Settlement Agreement terms, and allow them to participate in the final fairness hearing should they choose to do so. Therefore, the proposed form and manner of notice and delivery should be approved.

### 3. Final approval of the Settlement Agreement before the Court

A review of the <u>Grinnell</u> factors in this litigation, with the exception of the reaction of the class to the settlement, can be evaluated in advance of the full fairness hearing. Such a review demonstrates that the Settlement Agreement, drawing on the expertise gained by counsel in the course of litigating this case, embodies practical solutions informed by discovery and expert assistance, for a range of issues preventing Plaintiff class members from obtaining and being maintained in community based programs by the Connecticut Department of Children and Families. It is a fully informed document, crafted at arm's length. From the defendants' viewpoint, the settlement is reasonable in that it requires the expansion of services that have already proven successful in maintaining youth in the community, creates new services for those class members who are the most difficult to serve; the agreement is time-limited, does not mandate continuing federal court oversight and specifies the full extent of defendants' financial obligations. For these reasons, it should be approved by the court.

**A. The complexity, expense and likely duration of the litigation**

This case is fairly complex both factually and legally. An examination of the Motion for Summary Judgment indicates that if a trial were necessary, a multitude of factual and legal issues would require resolution, and a lengthy trial would be likely. Trial would require presentation of evidence regarding DCF policy and practice both statewide and within each regional area in the state. Evidence would also address nationwide and regional standards for the provision of community based placements to mentally ill youth in state care, analysis of various services which could be provided to class members, and a detailed fiscal analysis of current programming by DCF in comparison to other state child welfare agencies. Detailed evidence would also be presented regarding the nature and complexity of the needs of the various class members and of the programs currently offered to them.

DCF administers a child protection function and as well as the Voluntary Services program, each of which has different statutory and regulatory requirements for mentally ill youth in state care. Additionally, the DCF Policy Manual has numerous sections addressing the requirements for serving members of the class, budgetary provisions and interactions with the federal Medicaid program which affect the provision of community based services. The rules governing various state and federal programs which provide services to class members, and the issues in dispute in the instant case, are complex and addressed through various regional DCF offices with thousands of employees. Additionally, many class members are also served by the DMHAS and DMR (for dually diagnosed class members), adding to the complexity of trial.

The parties have completed extensive discovery and have no pending motions. However, the expense and delay of continued litigation could be substantial. Prior to trial,

15

the parties would need to up-date discovery and testimony to address the re-filing of an extensive dispositive motion for summary judgment. Should the case proceed to trial on relevant issues of disputed fact and contested matters of law, motions *in limine*, with accompanying briefing and hearings to exclude the testimony of various experts, would be anticipated.

The parties estimate a trial on the merits would take approximately two weeks and would likely involve testimony of at least six experts. In addition, expert testimony would entail significant expense. The trial would also involve testimony of many agency staff, and time spent by DCF employees and administrators preparing for and attending court hearings would be time not spent assisting needy individuals. Class members would provide testimony; many class members are fragile due to disability and/or transient because of their limited income, and the process of preparing for and attending court hearings would be daunting. There is extensive documentation that would be submitted as evidence. Pretrial matters and preparation and conduct of the trial and preparation of briefings would involve many hundreds of hours of attorney time and great expense to plaintiffs' counsel and the state, as well as difficulty for members of the plaintiff class participating in the trial. In assessing liability and potentially devising relief for the class, the court likely would have to immerse itself in the details of DCF operations and become familiar with current standards of practice regarding effective delivery of community based services to mentally ill youth in state care.

### B. The stage of the proceedings and the amount of discovery completed

This factor is relevant to the ability of the court and parties to assess the strength of the case and the relative efficacy of the settlement agreement. Wal-Mart Stores, Inc., 396 F.3d at 118, In re Luxottica Group S.P.A. Securities Litigation, 233 F.R.D. at 312.

The present case was filed in March, 2002. Plaintiffs have conducted extensive discovery, now complete, and retained and disclosed five national and regional level experts to address national and regional standards for mentally ill youth in state care.

In addition to the efforts of counsel for the parties in crafting the Settlement Agreement before the court, the Agreement also passed through the Connecticut General Assembly, in accordance with Conn. Gen. Stat. 3-125a, on June 7, 2007.

### C. The risks of establishing liability and maintaining the class action through trial

As a result of the extensive discovery in this case, as well as research and the assistance of the experts, the parties became well-versed in the range of approaches comparable agencies around the country have taken to provide community based services to mentally ill youth in state care. To some extent, this was and remains unsettled; states are only beginning to implement improvements in the delivery of services that address the cognitive, psychological, familial and other limitations of mentally ill youth in state care. How the courts will ultimately interpret the responsibilities of state child welfare

17

agencies to mentally ill youth in state care is not clearly established. The range of potential remedial steps that could be ordered by the court could create an unknown but extraordinarily expensive level of required investment by a state agency to achieve compliance with the law. Moreover, a trial, as well as the likely appeals, could take years, ultimately delaying the provisions of services designed to benefit the plaintiff class.

Partly as a result of the discovery process, and certainly as a result of the settlement negotiations, it became clear the parties had a mutual interest in improving DCF's provision of community based services to mentally ill youth. The negotiations were informed by the discovery and legal and scientific research over the course of the five years this case has been pending. The assistance of experts proved invaluable in developing alternatives and evaluating appropriate remedial steps, leading to the Settlement Agreement before the court. All parties participated in the crafting of the resolution reflected in the agreement, and Defendants were able to provide a fiscal analysis of the cost of increasing services to members of the plaintiff class.

### D. The ability of the defendants to withstand a greater judgment

Connecticut adopts a biennial budget in each odd numbered year, with adjustments made in even numbered years. Conn. Gen. Stat. § 4-71. While the state may well be able to afford increased costs resulting from a trial and judgment, a potential court order requiring defendants to immediately provide community based programming to several thousand class members would greatly affect DCF's operations and possibly disrupt the agency's other functions. This

settlement, addressing the claims of the plaintiff class, has predictable expenses, facilitating state budget planning; the parties can ensure quick and improved provision of community based services to class members.

## IV. Conclusion

The parties believe resolution of this matter through negotiation, rather than further lengthy and expensive adversarial litigation, is in the best interests of both defendants and the plaintiff class. The Settlement Agreement includes terms and conditions that are fair, reasonable and adequate, and addresses the issues raised on behalf of the plaintiff class. It will result in systemic improvements more quickly than if the lawsuit were fully litigated, and without the expense and uncertainty associated with such litigation and any potential appeals.

For the reasons articulated above, the parties request that the court enter an order preliminarily approving the Settlement Agreement and the proposed form of notice and manner of its delivery, and ultimately approve the Settlement Agreement following full review at a fairness hearing.

Plaintiffs, by

_/s/ Anne Louise Blanchard_
Anne Louise Blanchard
Connecticut Legal Services, Inc.
Federal Bar No. ct 08718
872 Main Street
Willimantic, Connecticut 06226
Telephone: (860) 456-1761; Fax: (860) 456-7420
e-mail: ablanchard@connlegalservices.org

Defendants, by:
Attorney Susan Pearlman
Federal Bar No. ct06338
Office of the Attorney General

MacKenzie Hall, 110 Sherman Street
Hartford, CT 06105
Tel: 860-808-5480;  fax 860-808-5595
e-mail: susan.pearlman@po.state.ct.us